UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

PHOENIX LIGHT SF LIMITED, in its own right and
the right of BLUE HERON FUNDING V LTD., BLUE
HERON FUNDING VI LTD., BLUE HERON
FUNDING VII LTD., BLUE HERON FUNDING IX
LTD., KLEROS PREFERRED FUNDING V PLC,
SILVER ELMS CDO PLC, SILVER ELMS CDO II
LIMITED, C-BASS CBO XVII LTD. and C-BASS
CBO XIV LTD., and each of BLUE HERON
FUNDING V LTD., BLUE HERON FUNDING VI
LTD., BLUE HERON FUNDING VII LTD., BLUE
HERON FUNDING IX LTD., KLEROS PREFERRED
FUNDING V PLC, SILVER ELMS CDO PLC and
SILVER ELMS CDO II LIMITED, in their own right,

                                    Plaintiffs,

                    -against-

THE BANK OF NEW YORK MELLON
CORPORATION,

                                    Defendant.

---------------------------------------------------------------x

**14 CV 10104**

Index No. _____

**COMPLAINT**

**DEMAND FOR JURY TRIAL**



RECEIVED
DEC 23 2014
U.S.D.C. S.D.N.Y.
CASHIERS

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

NATURE OF ACTION ..........................................................................................................1

PARTIES ............................................................................................................................6

JURISDICTION AND VENUE .........................................................................................9

FACTUAL ALLEGATIONS ..............................................................................................9

I.      THE SECURITIZATION PROCESS ........................................................................9

II.     BNY MELLON'S DUTIES AND OBLIGATIONS ...............................................11

        A.      BNY Mellon Had a Duty to Take Physical Possession
              of Complete Mortgage Files and Enforce Related Repurchase Obligations ...…...12

        B.      BNY Mellon Had a Duty to Provide Notice of Defaults
              and Enforce Repurchase Obligations Triggered by Such Notice .........................21

        C.      BNY Mellon Had a Duty to Exercise Due Care to
              Enforce Repurchase Obligations and Avoid Conflicts of Interest........................22

        D.      BNY Mellon Had a Duty to Provide Accurate
              Remittance Reports and Certifications Under Regulation AB .............................23

        E.      BNY Mellon Had a Duty to Address the Master
              Servicers' and Servicers' Failure to Meet Prudent Servicing Standards ..............24

        F.      BNY Mellon Is Liable For Negligence in Performing Its Duties.........................26

III.    BNY MELLON BREACHED ITS CONTRACTUAL, FIDUCIARY AND
       STATUTORY DUTIES...........................................................................................27

        A.      BNY Mellon Failed to Take Possession of Complete Mortgage Files.................27

              1.     The Servicers' and Master Servicers'
                    Cover-up of the Sponsors' Document Delivery Failures..........................30

                    a.      Credit-Based Asset Servicing and
                          Securitization LLC and Litton Loan Servicing LP.......................32

                    b.      Countrywide Home Loans, Inc.
                          and Countrywide Home Loans Servicing LP ...............................34

c.      First Horizon Home Loan Corporation ........................................... 39

d.      First NLC Financial Services, LLC ............................................... 40

e.      GE Mortgage Holding LLC ........................................................... 40

f.      JPMorgan Chase Bank, N.A.
and ECC Capital Corporation ....................................................... 41

B.      BNY Mellon Was Aware of but Failed to Provide Notice of Defaults ........... 44

1.      The Originators' and Sponsors' Pervasive
Breaches of Representations and Warranties ................................... 53

a.      Ameriquest Mortgage Company ................................................... 57

b.      Countrywide Home Loans, Inc. and Countrywide Bank, N.A. ..... 59

c.      Credit-Based Asset Servicing and Securitization LLC ................. 71

d.      Decision One Mortgage Company LLC ....................................... 73

e.      ECC Capital Corporation
and Encore Credit Corporation ..................................................... 74

f.      First Horizon Home Loan Corporation ........................................... 79

g.      First NLC Financial Services, LLC ............................................... 85

h.      Impac Funding Corporation .......................................................... 89

i.      Lime Financial Services, Ltd. ...................................................... 91

j.      MILA, Inc. .................................................................................... 92

k.      Millennium Funding .................................................................... 94

l.      MortgageIT, Inc. .......................................................................... 95

m.      NC Capital Corporation and
New Century Mortgage Corporation ........................................... 99

n.      Ownit Mortgage Solutions, Inc. ................................................. 104

o.      Wilmington Finance, Inc. ........................................................... 106

p.      WMC Mortgage Corporation and GE Mortgage Holding LLC .. 108

    C.        BNY Mellon Failed to Exercise
             Due Care and Enforce Repurchase Obligations....................................................115

           1.       Events of Default Relating to Delay Delivery
                  Mortgage Loans Under the Countrywide and First Horizon PSAs .........116

           2.       BNY Mellon Received Formal Notice of Representation
                  and Warranty Violations Which Ripened into Events of Default...........119

           3.       Servicer Events of Default Relating to
                  Document Delivery Failures in the Covered Trusts.......................122

           4.       Events of Default Under the First NLC 2005-1 Indenture.............124

    D.        BNY Mellon Provided False Regulation
             AB Certifications and Remittance Reports.........................................................125

    E.        BNY Mellon Failed to Address the Master
             Servicers' and Servicers' Looting of Trust Assets ...............................................126

           1.       Countrywide Home Loans, Inc. and
                  Countrywide Home Loans Servicing LP's Servicing Scams .................130

           2.       First Horizon Home Loan Corporation's Servicing Scams ....................132

           3.       JPMorgan Chase Bank, N.A.
                  and ECC Capital Corporation's Servicing Scams  ................................133

            4.       Litton Loan Servicing LP's Servicing Scams...........................................136

IV.      BNY MELLON'S CONDUCT INJURED PLAINTIFFS ............................................139

CAUSES OF ACTION.....................................................................................................141

FIRST CAUSE OF ACTION
(Violation of Section 315(b) of the TIA (15 U.S.C. § 77ooo(b))) ................................141

SECOND CAUSE OF ACTION
(Violation of Section 315(c) of the TIA (15 U.S.C. § 77ooo(c))) ................................143

THIRD CAUSE OF ACTION (Breach of Contract)..................................................144

FOURTH CAUSE OF ACTION (Breach of Fiduciary Duty)....................................146

FIFTH CAUSE OF ACTION (Negligence and Gross Negligence)..........................147

SIXTH CAUSE OF ACTION (Negligent Misrepresentation) ..................................148

SEVENTH CAUSE OF ACTION (Violation of the Streit Act)...................................................150

PRAYER FOR RELIEF ............................................................................................................152

Phoenix Light SF Limited, as a holder of residential mortgage-backed securities ("RMBS") issued by certain Covered Trusts (defined below) and in the right of Blue Heron Funding V Ltd., Blue Heron Funding VI Ltd., Blue Heron Funding VII Ltd., Blue Heron Funding IX Ltd., Kleros Preferred Funding V PLC, Silver Elms CDO PLC, Silver Elms CDO II Limited, C-BASS CBO XVII Ltd. and C-BASS CBO XIV Ltd., and each of Blue Heron Funding V Ltd., Blue Heron Funding VI Ltd., Blue Heron Funding VII Ltd., Blue Heron Funding IX Ltd., Kleros Preferred Funding V PLC, Silver Elms CDO PLC and Silver Elms CDO II Limited, in their own right as holders of RMBS issued by other Covered Trusts (collectively, "Plaintiffs"), by and through their attorneys, bring this action against The Defendant Bank of New York Mellon Corporation ("BNY Mellon" or "Defendant"), and allege as follows:

## NATURE OF ACTION

1.  This action arises out of BNY Mellon's role as trustee for 27 securitization trusts (the "Covered Trusts"), identified in Exhibit A, and asserts claims against BNY Mellon for breach of its contractual and fiduciary duties, and its duties under the federal Trust Indenture Act of 1939 (the "TIA"), 15 U.S.C. § 77aaa, *et seq.*, and New York's Streit Act, N.Y. Real Property Law § 124, *et seq.* (the "Streit Act").

2.  The Covered Trusts were created to facilitate RMBS transactions introduced to investors from 2005 to 2007. Sixteen of the RMBS transactions were sponsored by Countrywide Home Loans, Inc. (the "Countrywide Trusts"), four were sponsored by Credit-Based Servicing and Securitization LLC (the "C-BASS Trusts"), two were sponsored by GE Mortgage Holding LLC (the "GE Trusts"), two were sponsored by First Horizon Home Loan Corporation (the "First Horizon Trusts"), two were sponsored by First NLC Financial Services, LLC (the "FNLC Trusts") and one was sponsored by ECC Capital Corporation

(the "ECR Trust") (Countrywide Home Loans, Inc., Credit-Based Servicing and Securitization LLC, GE Mortgage Holding LLC, First Horizon Home Loan Corporation, First NLC Financial Services, LLC and ECC Capital Corporation are referred to collectively as the "Sponsors").

3.      Plaintiffs purchased, and currently hold, RMBS certificates with an original face value of $732 million issued by the Covered Trusts identified in Exhibit B (the "Certificates").

4.      The Certificates represent interests in the cash flows associated with the mortgage loans deposited into the Covered Trusts by the Sponsors and their affiliates or business partners.  The Certificateholders are the beneficiaries of the Covered Trusts.  The performance of the RMBS depended on the Sponsors depositing properly underwritten mortgage loans having complete documentation into the Covered Trusts.  The quality of the mortgage loans is critical, and numerous provisions of the governing agreements assure that only qualifying loans would be deposited into the Covered Trusts.  Similarly, because the securities were to be "mortgage-backed," numerous other provisions seek to assure that complete documentation for each loan, including an original mortgage note and a properly assigned mortgage, would be delivered to BNY Mellon.

5.      The Certificateholders, however, did not receive any loan or mortgage files that they could check to make certain that their contractual rights were being protected. Rather, such investors were dependent upon their trustee representative, BNY Mellon, to police the deal and protect their contractual and other legal rights.

6.      The Sponsors and BNY Mellon typically had very close business relationships. For example, BNY Mellon is Countrywide's trustee of choice for over 530 RMBS trusts.

Nevertheless, as trustee, BNY Mellon was obligated to act against the financial interest of the Sponsors when demanded by the circumstances.  The principal protections received by investors in the Covered Trusts were their contractual rights to have the Sponsors or the party who originated the mortgage loans (the "Originator") replace or repurchase defective mortgage loans and the duties of BNY Mellon to enforce such obligations and the other rights of investors in the Covered Trusts.  BNY Mellon, however, abandoned its obligations and breached its statutory, fiduciary and contractual obligations to protect the rights of investors such as Plaintiffs.  As a result, Plaintiffs have suffered very material damages, which they seek to recover in this action.

7.     As the trustee for the Covered Trusts, BNY Mellon owes Plaintiffs and the other Certificateholders certain contractual and fiduciary duties, as well as duties under the TIA and the Streit Act with respect to the mortgage loans owned by the Covered Trusts. Among these duties are those set forth in governing agreements, generally identified as pooling and servicing agreements ("PSAs"),[1] which were incorporated by reference into the Certificates BNY Mellon signed, and under applicable state and federal laws.

8.     BNY Mellon breached its contractual, fiduciary and statutory duties in at least five different ways.

9.     First, the PSAs purported to transfer title to the mortgage loans to the Covered Trusts for the benefit of Certificateholders.  To ensure that the rights, title and interest in the mortgage loans were perfected and properly conveyed to BNY Mellon, the PSAs imposed on BNY Mellon a duty to ensure that key documents for the loans were included in the

---

[1] Three of the Covered Trusts (CWHEL 2005-H (the "CWHEL Trust"), FNLC 2005-1 and ECR 2005-1) were structured using indentures, servicing agreements, trust agreements and mortgage loan purchase agreements, which together are the functional equivalent of a PSA.  Unless expressly noted herein, when the term PSA is used it is also referring to aforementioned governing agreements executed in connection with those securitizations.

mortgage files and to create an exception report identifying those mortgage loans for which the mortgage files were incomplete. The relevant Sponsor or Depositor was required to substitute compliant loans for the loans with incomplete files or repurchase the loans. BNY Mellon, however, systematically disregarded its contractual and fiduciary duties to enforce its rights on behalf of Certificateholders to ensure that mortgage loans lacking complete mortgage files were removed from the mortgage pools underlying the Certificates. If BNY Mellon had met its contractual, fiduciary and statutory duties with respect to the non-compliant loans, which constitute the overwhelming majority of the defaulted loans, Plaintiffs would not have incurred their very significant losses. And if Plaintiffs had been aware of these Events of Default or defaults they would not have continued to invest in RMBS throughout 2005–2007.

10.     Second, BNY Mellon is obligated to provide Certificateholders with notice of defaults under the PSAs. BNY Mellon violated this requirement by failing to give Certificateholders any notice of repeated breaches by the Master Servicers or Servicers designated under the PSAs or of systemic breaches by the Sponsors, Originators or affiliates that served as the depositors (the "Depositors"). For example, the Master Servicers or Servicers routinely failed to provide Certificateholders with notice of the Sponsors' or Originators' numerous breaches of representation and warranty provisions in the PSAs and loan purchase agreements that the mortgage loans had been underwritten in accordance with applicable underwriting guidelines. If adequate notice of such breaches had been provided, the Sponsors or Originators would have been required to repurchase the mortgage loans that did not comply with the applicable underwriting guidelines and which ultimately caused a significant portion of Plaintiffs' losses.

11.     <u>Third</u>, BNY Mellon failed to exercise due care and avoid conflicts of interest as required under common law, the TIA and the Streit Act.  Having notice of the Master Servicers' and Servicers' numerous defaults and Events of Default under the PSAs and breaches of representations and warranties provided by the Sponsors and Originators, BNY Mellon should have exercised due care to ensure that Certificateholders were adequately compensated.  If BNY Mellon had exercised due care, it would have issued repurchase demands years ago and, if necessary, commenced repurchase litigation forcing the Sponsors or Originators to repurchase defective loans.

12.     <u>Fourth</u>, BNY Mellon had a duty to provide accurate certifications and remittance reports as required under the PSAs and applicable federal law.  BNY Mellon negligently failed to do so.  If it had accurately reported the facts regarding its knowledge of defective mortgage loans, the Sponsors or Originators would have been forced to repurchase the non-compliant loans that have caused Plaintiffs' losses.  Accurate certifications also could have prevented subsequent mortgage loan securitizations from including large numbers of defective and non-compliant loans.

13.     <u>Fifth</u>, the PSAs required BNY Mellon to take steps to protect Plaintiffs whenever it became aware of uncured loan servicing failures by the Covered Trusts' Master Servicers or Servicers.  The Master Servicers and Servicers were supposed to ensure the proper servicing and administration of the mortgage loans in the Covered Trusts for the benefit of Plaintiffs and other Certificateholders.  The PSAs required the Master Servicers and Servicers (and their subservicers) to exercise customary and "prudent" loan servicing practices in servicing the mortgage loans.  The Master Servicers and Servicers failed to meet prudent servicing standards because they regularly overcharged for various default services

provided in connection with the mortgage loans and failed to prudently perform loss mitigation procedures.  The Master Servicer for the Countrywide Trusts also breached its obligations by modifying loans without requiring the Sponsor to repurchase them, as the Sponsor was required to do under the PSA.  BNY Mellon failed to take steps to address these defaults.

14.     By failing to perform these duties, BNY Mellon has caused Plaintiffs to suffer well over $269 million of damages.

## PARTIES

15.     Plaintiff Phoenix Light SF Limited ("Phoenix Light") is a private limited company incorporated under the laws of Ireland.  Phoenix Light brings this action first in its own right as a collateralized debt obligation ("CDO") that holds Certificates that were issued by certain of the Covered Trusts.

16.     Plaintiff Blue Heron Funding V Ltd. is a special purpose company incorporated under the laws of the Cayman Islands.  Blue Heron Funding V Ltd. brings this action in its own right as a CDO that holds Certificates that were issued by certain of the Covered Trusts.

17.     Plaintiff Blue Heron Funding VI Ltd. is a special purpose company incorporated under the laws of the Cayman Islands.  Blue Heron Funding VI Ltd. brings this action in its own right as a CDO that holds Certificates that were issued by certain of the Covered Trusts.

18.     Plaintiff Blue Heron Funding VII Ltd. is a special purpose company incorporated under the laws of the Cayman Islands.  Blue Heron Funding VII Ltd. brings this action in its own right as a CDO that holds Certificates that were issued by certain of the

Covered Trusts.

19.     Plaintiff Blue Heron Funding IX Ltd. is a special purpose company incorporated under the laws of the Cayman Islands.  Blue Heron Funding IX Ltd. brings this action in its own right as a CDO that holds Certificates that were issued by certain of the Covered Trusts.

20.     Plaintiff Kleros Preferred Funding V PLC is a public limited company incorporated and existing under the laws of Ireland.  Kleros Preferred Funding V PLC brings this action in its own right as a CDO that holds certificates that were issued by certain of the Covered Trusts.

21.     Plaintiff Silver Elms CDO PLC is a special purpose company incorporated under the laws of Ireland.  Silver Elms CDO PLC brings this action in its own right as a CDO that holds Certificates that were issued by certain of the Covered Trusts.

22.     Plaintiff Silver Elms CDO II Limited is a private limited company incorporated under the laws of Ireland.  Silver Elms CDO II Limited brings this action in its own right as a CDO that holds Certificates that were issued by certain of the Covered Trusts.

23.     Plaintiffs bring their claims against Defendant as assignees of claims regarding Certificates that were initially purchased by WestLB AG ("WestLB").  During the relevant time period, WestLB was a German corporation with its principal place of business in Düsseldorf, Germany.  On July 1, 2012, WestLB underwent a restructuring, pursuant to which WestLB transferred the majority of its remaining assets to a public winding-up agency known as Erste Abwicklungsanstalt.  As a result of the restructuring measures, WestLB discontinued its banking business and now operates solely as a global provider of portfolio management services, under the name of Portigon AG.

24.     Plaintiffs have standing to sue Defendant to recover those damages pursuant to Section 13-107 of the New York General Obligations Law and as assignees of all rights, title, interest, causes of action and claims regarding securities initially purchased by the assignor identified above.  Plaintiffs acquired the legal claims at issue in this case in exchange for rescue financing and other good and valuable consideration.  The Certificates at issue in this case were severely damaged on or before the day they were transferred to Plaintiffs, and continue to be damaged, in an amount to be proven at trial.  Use of the term "Plaintiffs" herein shall also refer to WestLB.

25.     In addition, Phoenix Light holds more than 50% of the controlling class of notes issued by, and thus is the Controlling Party and/or the Majority for, each of the following other CDOs that purchased Certificates from other Covered Trusts: (i) Blue Heron Funding V Ltd.; (ii) Blue Heron Funding VI Ltd.; (iii) Blue Heron Funding VII Ltd.; (iv) Blue Heron Funding IX Ltd.; (v) Kleros Preferred Funding V PLC; (vi) Silver Elms CDO PLC; (vii) Silver Elms CDO II Limited; (viii) C-BASS CBO XVII Ltd., an exempted company organized with limited liability under the laws of the Cayman Islands; and (ix) C-BASS CBO XIV Ltd., an exempted company organized with limited liability under the laws of the Cayman Islands.

26.     Defendant BNY Mellon is a bank organized under the laws of the State of New York, with its principal place of business located in New York at One Wall Street, New York, New York 10286.  It serves as the trustee for the Covered Trusts.  For each of these Covered Trusts, BNY Mellon signed Certificates incorporating the PSAs.[2]  As the trustee for the Covered

---

[2] The Bank of New York signed the Certificates incorporating the PSAs, as Trustee. Effective July 1, 2007, The Bank of New York and Mellon Financial Corporation merged with and into a newly formed company called The Bank of New York Mellon Corporation. All references herein to BNY Mellon also refer to The Bank of New York, as it existed pre-merger. BNY Mellon became the successor trustee of the FNLC Trusts, C-BASS Trusts and

Trusts, BNY Mellon owed Certificateholders certain statutory, contractual and fiduciary duties with respect to the mortgage loans owned by the Covered Trusts, which it violated.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over the TIA claims asserted in this matter under 15 U.S.C. § 77v.  This Court has jurisdiction over the other claims asserted under 28 U.S.C. § 1367.  This Court also has jurisdiction pursuant to 28 U.S.C. §1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

28.     Venue is proper pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 77v as BNY Mellon resides and transacts business in this District and a substantial part of the events and omissions giving rise to the claims asserted herein occurred in this District.

29.     This Court has personal jurisdiction over BNY Mellon because BNY Mellon is organized under the laws of New York and maintains its principal place of business in New York and a substantial part of the administration of the Covered Trusts, out of which the claims asserted herein arise, is performed in New York.  Additionally, the Covered Trusts are New York trusts, the governing agreements are governed by New York law and, in certain of the PSAs, BNY Mellon expressly consented to this Court's jurisdiction.

## FACTUAL ALLEGATIONS

**I.      THE SECURITIZATION PROCESS**

30.     The process through which RMBS are created and sold is known as mortgage loan securitization.  In broad terms, mortgage loans are acquired from mortgage originators and pooled together in a trust, which issues securities representing interests in the cash flow

---

CWHEL Trust after acquiring JPMorgan Chase Bank, N.A.'s business in October 2006.  Prior to October 2006, JPMorgan Chase Bank, N.A. had replaced HSBC Bank USA, N.A. as trustee of FNLC 2005-1.

from principal and interest payments on the pool of loans after certain costs and fees are deducted.

31.     The first step in each securitization is generally the acquisition of mortgage loans by a sponsor (or "seller"), such as Countrywide, and the sale of a large pool of such loans by the sponsor to a depositor, typically a special-purpose affiliate of the sponsor.

32.     The depositor then conveys the pool of loans to a trustee, such as BNY Mellon, pursuant to a "pooling and servicing agreement" that establishes various prioritized "tranches" of interests in payments made by borrowers on the loans.  The trust issues certificates representing those tranches; the certificates are sold to an underwriter; and the underwriter re-sells the certificates at a profit to investors.  The sponsor (through its affiliated depositor) earns a profit on the excess of the proceeds of the sale of certificates to the underwriter over the cost of purchasing the mortgage loans.  Here, BNY Mellon acted as the trustee in connection with the relevant RMBS transactions.

33.     Pursuant to the PSA for each trust, a "servicer" is appointed to manage the collection of payments on the mortgage loans in return for a monthly fee.  The servicer's duties include monitoring delinquent borrowers, foreclosing on defaulted loans, monitoring compliance with representations and warranties regarding loan origination, tracking mortgage documentation and managing and selling foreclosed properties.

34.     The trustee delivers monthly remittance reports to holders of certificates describing the performance of underlying loans and compliance with the PSA.  The contents of those reports are specified in the PSA and in Item 1121 of SEC Regulation AB.  *See* 17 C.F.R. § 229.1121.  The servicer provides data to the trustee to include in these remittance reports.

35.     Each tranche in a loan securitization has a different level of risk and reward, and its own rating issued by a nationally recognized credit-rating agency such as Standard & Poor's or Moody's.  The most senior tranches generally receive the highest ratings, AAA or AA.  Junior tranches receive lower ratings, but offer higher potential returns.  Senior tranches are generally entitled to payment in full ahead of junior tranches, and shortfalls in principal and interest payments are generally allocated first to junior tranches.  This division of cash flows and losses is referred to as the "waterfall."

36.     Because the cash flow from payments made by mortgage borrowers on the underlying mortgage loans is the sole source of funds to pay holders of a mortgage-backed security, the credit quality of the security turns on the credit quality of, and the collateral securing, the underlying loans, which often number in the thousands.

## II.     <u>BNY MELLON'S DUTIES AND OBLIGATIONS</u>

37.     BNY Mellon's duties and obligations as the trustee for the Covered Trusts are spelled out in the PSAs or, as was the case for the CWHEL Trust, one FNLC Trust and the ECR Trust, an Indenture, and under applicable state and federal law.  These agreements govern the parties' respective rights and responsibilities in connection with the Covered Trusts.  BNY Mellon (or JP Morgan) entered into the PSAs or Indentures with:

> (A) For fifteen of the Countrywide Trusts: (i) various special purpose vehicles established by Countrywide, as the Depositors; (ii) Countrywide Home Loans, Inc. and certain of its affiliates, as the Sponsors; and (iii) Countrywide Home Loan Servicing LP, as the Master Servicer;
>
> (B) For three of the C-BASS Trusts (C-BASS 2005-CB4, C-BASS 2005-CB8 and C-BASS 2006-CB3): (i) Citigroup Mortgage Loan Trust Inc., as Depositor; (ii) C-BASS, as Seller; and (iii) Litton Loan Servicing LP, as Servicer;
>
> (C) For one C-BASS Trust (Ownit 2006-1): (i) Merrill Lynch Mortgage Investors, Inc., as Depositor; (ii) C-BASS, as Sponsor; and (iii) Litton Loan

11

Servicing LP, as Servicer;

(D) For CWHEL 2005-H: an Indenture with (i) the Trust as Issuer; and (ii) JP Morgan Chase Bank, N.A., as Indenture Trustee; a Sale and Servicing Agreement with (i) Countrywide Home Loans, Inc., as Sponsor and Master Servicer; and (ii) JPMorgan Chase Bank, N.A., as Indenture Trustee; and a Trust Agreement with CWHEQ, Inc., as Depositor;

(E) For the ECR Trust (ECR 2005-1): an Indenture with the Trust, as Issuer; an Amended and Restated Trust Agreement with CWABS, Inc., as Depositor; and Servicing Agreements with (i) Countrywide Home Loan Servicing LP, as Master Servicer; (ii) CWABS, Inc., as Owner; and (iii) ECC Capital Corporation, as Servicer;

(F) For the First Horizon Trusts (FHAMS 2005-FA5 and FHAMS 2005-FA7): (i) First Horizon Asset Securities Inc., as Depositor; and (ii) First Horizon Home Loan Corporation, as Master Servicer;

(G) For one FNLC Trust (FNLC 2005-2): (i) FBR Securitization, Inc., as Depositor; (ii) First NLC Financial Services, LLC, as Originator and Seller; (iii) NLC Finance II, LLC, as Seller; (iv) Litton, as Servicer; and (v) Ocwen Federal Bank FSB, as Interim Servicer;

(H) For one FNLC Trust (FNLC 2005-1): an Indenture with (i) the Trust as Issuer; and (ii) JPMorgan Chase Bank, N.A., as Securities Administrator; and a related Transfer and Servicing Agreement with (i) FBR Securitization, Inc., as Depositor; (ii) FBR Trust Investments, LLC, as Servicing Rights Owner; (iii) First NLC Financial Services, LLC, as Originator and Seller; (iv) NLC Funding I, LLC, NLC Finance I, LLC and MHC I, Inc., as Sellers; (v) JPMorgan Chase Bank, NA, as Securities Administrator and Master Servicer; and (vi) Ocwen Federal Bank FSB, as Subservicer; and

(I) For the GE Trusts (GE-WMC 2005-2 and GE-WMC 2006-1): (i) GE-WMC Mortgage Securities, LLC, as Depositor; and (ii) Litton Loan Servicing LP, as Servicer.

## A.   BNY Mellon Had a Duty to Take Physical Possession of Complete Mortgage Files and Enforce Related Repurchase Obligations

38.    Each PSA sets forth a process for conveying the mortgage loans to the

Covered Trusts.  Typically, the Sponsor conveyed the loans to the Depositor for the Covered

Trusts.  Then the Depositor conveyed the mortgage loans to BNY Mellon in its capacity as

the trustee for the Covered Trusts to hold for the benefit of the Certificateholders.  This

process is set forth in Section 2.01 ("Conveyance of Mortgage Loans") of the Countrywide

PSA,[3] which provides in relevant part:

> (a) Each Seller concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise conveys to the Depositor, without recourse, all its respective right, title and interest in and to the related Mortgage Loans, including all interest and principal received or receivable by such Seller, on or with respect to the Mortgage Loans after the Cut-off Date . . . On or prior to the Closing Date, Countrywide shall deliver to the Depositor or, at the Depositor's direction, to the Trustee or other designee of the Depositor, the Mortgage File for each Mortgage Loan listed in the Mortgage Loan Schedule . . .

> (b) Immediately upon the conveyance of the Mortgage Loans referred to in clause (a), the Depositor sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the benefit of the Certificateholders, without recourse, all the right, title and interest of the Depositor in and to the Trust Fund together with the Depositor's right to require each Seller to cure any breach of a representation or warranty made herein by such Seller or to repurchase or substitute for any affected Mortgage Loan in accordance herewith.

39.     The PSAs for the C-BASS, CWHEL, ECR, First Horizon, FNLC and GE

Trusts set forth a substantially similar process.  *See* Ex. C § I.

40.     In addition, Section 2.02 of the Countrywide PSA ("Acceptance by Trustee of

the Mortgage Loans") provides that BNY Mellon is required to take physical possession of

the mortgage loans and the accompanying mortgage files for the exclusive use and benefit

of all current and future Certificateholders.  It provides:

> (a) The Trustee acknowledges receipt of the documents identified in the Initial Certification in the form annexed hereto

---

[3] Quotations to the Countrywide PSA herein are to the PSA executed in connection with the CWALT 2006-27CB securitization.  Fourteen of the other Countrywide Trusts in this action were issued pursuant to PSAs with substantially similar language and any differences are immaterial to the issues addressed in this Complaint. CWHEL 2005-H was issued pursuant to indentures, servicing agreements, trust agreements and purchase agreements.  The relevant provisions of the governing agreements for CWHEL 2005-H are set forth in Exhibit C hereto.

as Exhibit F-1 and declares that it holds and will hold such documents and the other documents delivered to it constituting the Mortgage Files, and that it holds or will hold such other assets as are included in the Trust Fund, in trust for the exclusive use and benefit of all present and future Certificateholders. The Trustee acknowledges that it will maintain possession of the Mortgage Notes in the State of California, unless otherwise permitted by the Rating Agencies.

The PSAs for the C-BASS, CWHEL, ECR, First Horizon, FNLC and GE Trusts set forth a substantially similar process. *See* Ex. C § II.

41.     Section 2.01(c) of the Countrywide PSA also specifically sets forth the operative documents that must be contained in the mortgage file for the mortgage loans.  It provides:

(c) In connection with the transfer and assignment set forth in clause (b) above, ***the Depositor has delivered or caused to be delivered to the Trustee . . . for the benefit of the Certificateholders the following documents or instruments with respect to each Mortgage Loan so assigned***:

(i) (A) the ***original Mortgage Note endorsed*** by manual or facsimile signature in blank in the following form: "Pay to the order of _____ without recourse," ***with all intervening endorsements showing a complete chain of endorsement from the originator to the Person endorsing the Mortgage Note*** . . . or

(B) with respect to any Lost Mortgage Note, a lost note affidavit from Countrywide stating that the original Mortgage Note was lost or destroyed, together with a copy of such Mortgage Note;

(ii) except as provided below and for each Mortgage Loan that is not a MERS Mortgage Loan, ***the original recorded Mortgage or a copy of such Mortgage, with recording information, certified by Countrywide as being a true and complete copy of the Mortgage*** . . . and in the case of each MERS Mortgage Loan, the original Mortgage, or a copy of such mortgage with recording information, noting the presence of the MIN of the Mortgage Loans and either language indicating that the Mortgage Loan is a MOM Loan if the Mortgage Loan is

a MOM Loan or if the Mortgage Loan was not a MOM Loan at origination, the original Mortgage and the assignment thereof to MERS, with evidence of recording indicated thereon, or a copy of the Mortgage certified by the public recording office in which such Mortgage has been recorded;

(iii) in the case of each Mortgage Loan that is not a MERS Mortgage Loan, *a duly executed assignment of the Mortgage, or a copy of such assignment, with recording information, (which may be included in a blanket assignment or assignments), together with, except as provided below, all interim recorded assignments of such mortgage, or a copy of such assignment, with recording information, (each such assignment, when duly and validly complete, to be in recordable form and sufficient to effect the assignment of and transfer to the assignee thereof, under the Mortgage to which the assignment relates);* provided that, if the related Mortgage has not been returned from the applicable public recording office, such assignment of the Mortgage may exclude the information to be provided by the recording office . . .;

(iv) the original or copies of each assumption, modification, written assurance or substitution agreement, if any;

(v) except as provided below, *the original or duplicate original lender's title policy or a printout of the electronic equivalent and all riders thereto*….

\*        \*        \*

In addition, in connection with the assignment of any MERS Mortgage Loan, each Seller agrees that it will cause, at the Trustee's expense, the MERS ® System to indicate that the Mortgage Loans sold by such Seller to the Depositor have been assigned by that Seller to the Trustee in accordance with this Agreement . . . for the benefit of the Certificateholders by including . . . in such computer files the information required by the MERS ® System to identify the series of the Certificates issued in connection with such Mortgage Loans.

(Emphasis added.)  The PSAs for the C-BASS, CWHEL, ECR, First Horizon, FNLC and GE Trusts set forth a substantially similar process.  *See* Ex. C § III.

42.     Physical possession of these documents by BNY Mellon was necessary to transfer the ownership rights to the mortgage loans from the Sponsors and Depositors to the Covered Trusts.

43.     BNY Mellon had a contractual and common law obligation under the PSAs to review each of the mortgage files for the mortgage loans and certify that the documentation for each of the loans was accurate and complete.

44.     The first step in the certification process was the preparation of an initial certification acknowledging that BNY Mellon (or the custodian acting on behalf of BNY Mellon) had received and reviewed the two key documents for the mortgage loan: (1) the original mortgage note with a complete chain of endorsements from the originator to BNY Mellon as the trustee for the Covered Trusts; and (2) a duly executed assignment of mortgage.

45.     BNY Mellon (or the custodian acting on behalf of BNY Mellon) was then required to attach to the certification a mortgage loan schedule identifying those loans for which it had obtained the original mortgage note with endorsements and a duly executed assignment of mortgage, and a schedule identifying the mortgage loans for which it had not obtained the original mortgage note with endorsements or the assignment of mortgage.  This is spelled out in Section 2.02 of the Countrywide PSA, which provides:

> The Trustee agrees to execute and deliver on the Closing Date to the Depositor, the Master Servicer and Countrywide . . . an Initial Certification in the form annexed hereto as Exhibit F-1. ***Based on its review and examination, and only as to the documents identified in such Initial Certification, the Trustee acknowledges that such documents appear regular on their***

> ### *face and relate to such Mortgage Loan*.

(Emphasis added.)  The PSAs for the C-BASS, CWHEL, ECR, First Horizon, FNLC and GE Trusts set forth substantially similar requirements.  *See* Ex. C § IV.

46.     The second step in the certification process was the preparation of what was typically referred to as the "Delay Delivery Certification."  The purpose of the "Delay Delivery Certification" was two-fold: (1) to specifically identify those loans listed on the schedule to the initial certification for which BNY Mellon subsequently received a complete and accurate loan file; and (2) to provide a new schedule specifically identifying those loans for which Countrywide was unable to provide proper documentation.  This is spelled out in Section 2.02(a) of the Countrywide PSA, which provides:  "On or about the thirtieth (30th) day after the Closing Date, the Trustee shall deliver to the Depositor, the Master Servicer and Countrywide . . . a Delay Delivery Certification with respect to the Mortgage Loans in the form annexed hereto as Exhibit G-1, with any applicable exceptions noted thereon."  The PSAs for the CWHEL and First Horizon Trusts contain substantially similar requirements.  *See* Ex. C § V.

47.     The third and final step in the certification process was the creation of a final certification and document exception report.  BNY Mellon's obligation to prepare the "Final Certification of Trustee" and "Document Exception Report" was spelled out in Section 2.02(a) of the Countrywide PSA, which provides:  "Not later than 90 days after the Closing Date, the Trustee shall deliver to the Depositor, the Master Servicer and Countrywide . . . a Final Certification with respect to the Mortgage Loans in the form annexed hereto as Exhibit H-1, with any applicable exceptions noted thereon."  The PSAs for the C-BASS, CWHEL, ECR, First Horizon, FNLC and GE Trusts contain substantially similar requirements.  *See*

Ex. C § VI.

48.     After a designated period, BNY Mellon was required to issue a Final

Certification.  The "Form of Final Certification of the Trustee," which was attached to the

Countrywide PSA as Exhibit H-1, provides:

> Gentlemen:
>
> In accordance with Section 2.02 of the above-captioned Pooling and Servicing Agreement (the "Pooling and Servicing Agreement"), ***the undersigned, as Trustee, hereby certifies that as to each Initial Mortgage Loan listed in the Mortgage Loan Schedule (other than any Initial Mortgage Loan paid in full or listed on the attached Document Exception Report) it has received***:
>
> (i) ***the original Mortgage Note, endorsed by Countrywide or the originator of such Mortgage Loan***, without recourse in the following form: "Pay to the order of ___ without recourse", ***with all intervening endorsements that show a complete chain of endorsement from the originator to Countrywide***, or, if the original Mortgage Note has been lost or destroyed and not replaced, an original lost note affidavit from Countrywide, stating that the original Mortgage Note was lost or destroyed, together with a copy of the related Mortgage Note;
>
> (ii) in the case of each Initial Mortgage Loan that is not a MERS Mortgage Loan, ***the original recorded Mortgage***, [and in the case of each Initial Mortgage Loan that is a MERS Mortgage Loan, ***the original Mortgage***, noting thereon the presence of the MIN of the Mortgage Loan and language indicating that the Mortgage Loan is a MOM Loan if the Mortgage Loan is a MOM Loan, with evidence of recording indicated thereon, or a copy of the Mortgage certified by the public recording office in which such Mortgage has been recorded];
>
> (iii) in the case of each Initial Mortgage Loan that is not a MERS Mortgage Loan, ***a duly executed assignment of the Mortgage to "The Bank of New York, as trustee*** under the Pooling and Servicing Agreement dated as of [month] 1, 2004, without recourse", or, in the case of each Initial Mortgage Loan with respect to property located in the State of California that is not a MERS Mortgage Loan, a duly executed assignment of the

Mortgage in blank (each such assignment, when duly and validly completed, to be in recordable form and sufficient to effect the assignment of and transfer to the assignee thereof, under the Mortgage to which such assignment relates);

(iv) *the original recorded assignment or assignments of the Mortgage together with all interim recorded assignments of such Mortgage* [(noting the presence of a MIN in the case of each Initial Mortgage Loan that is a MERS Mortgage Loan)];

(v) the original or copies of each assumption, modification, written assurance or substitution agreement, if any, with evidence of recording thereon if recordation thereof is permissible under applicable law; and

(vi) *the original or duplicate original lender's title policy* or a printout of the electronic equivalent and all riders thereto or, in the event such original title policy has not been received from the insurer, any one of an original title binder, an original preliminary title report or an original title commitment, or a copy thereof certified by the title company, with the original policy of title insurance to be delivered within one year of the Closing Date.

In the event that in connection with any Initial Mortgage Loan that is not a MERS Mortgage Loan Countrywide cannot deliver the original recorded Mortgage or all interim recorded assignments of the Mortgage satisfying the requirements of clause (ii), (iii) or (iv), as applicable, the Trustee has received, in lieu thereof, a true and complete copy of such Mortgage and/or such assignment or assignments of the Mortgage, as applicable, each certified by Countrywide, the applicable title company, escrow agent or attorney, or the originator of such Initial Mortgage Loan, as the case may be, to be a true and complete copy of the original Mortgage or assignment of Mortgage submitted for recording.

*Based on its review and examination and only as to the foregoing documents, (i) such documents appear regular on their face and related to such Initial Mortgage Loan, and (ii) the information set forth in items (i), (iv), (v), (vi), (viii), (xi) and (xiv) of the definition of the "Mortgage Loan Schedule" in Article I of the Pooling and Servicing Agreement accurately reflects information set forth in the Mortgage File*.

The Trustee has made no independent examination of any

documents contained in each Mortgage File beyond the review specifically required in the above-referenced Pooling and Servicing Agreement.  The Trustee makes no representations as to: (i) the validity, legality, sufficiency, enforceability or genuineness of any of the documents contained in each Mortgage File of any of the Initial Mortgage Loans identified on the [Mortgage Loan Schedule] [Loan Number and Borrower Identification Mortgage Loan Schedule] or (ii) the collectability, insurability, effectiveness or suitability of any such Initial Mortgage Loan.

Capitalized words and phrases used herein shall have the respective meanings assigned to them in the Pooling and Servicing Agreement.

THE BANK OF NEW YORK,
as Trustee

(Emphasis added.)  The PSAs for the C-BASS, CWHEL, ECR, First Horizon, FNLC and GE Trusts contain a substantially similar form of final certification.  *See* Ex. C § VII.

49.     The final certification and document exception report are the two key certifications that BNY Mellon was required to prepare for the Covered Trusts.  In these documents BNY Mellon certified that: (i) there was full and complete loan documentation in accordance with the requirements of the PSAs for those loans specifically identified on the mortgage loan schedule; and (ii) BNY Mellon had not obtained complete required documentation for those loans identified on the document exception report.  If there was a defect with any mortgage file, then BNY Mellon was obligated to demand that the Sponsor cure the defect leading to the exception within 90 days or repurchase or substitute the defective loans.  This is set forth in Section 2.02(a) of the Countrywide PSA, which provides:

> *If, in the course of such review, the Trustee finds any document constituting a part of a Mortgage File which does not meet the requirements of Section 2.01, the Trustee shall list such as an exception in the Final Certification*; provided,

20

however, that the Trustee shall not make any determination as to whether (i) any endorsement is sufficient to transfer all right, title and interest of the party so endorsing, as noteholder or assignee thereof, in and to that Mortgage Note or (ii) any assignment is in recordable form or is sufficient to effect the assignment of and transfer to the assignee thereof under the mortgage to which the assignment relates. ***Countrywide . . . shall promptly correct or cure such defect within 90 days from the date it was so notified of such defect and, if Countrywide does not correct or cure such defect within such period, Countrywide . . . shall either (a) substitute for the related Mortgage Loan a Substitute Mortgage Loan, which substitution shall be accomplished in the manner and subject to the conditions set forth in Section 2.03, or (b) purchase such Mortgage Loan from the Trustee within 90 days from the date Countrywide . . . was notified of such defect in writing at the Purchase Price of such Mortgage Loan; provided, however, that in no event shall such substitution or purchase occur more than 540 days from the Closing Date***.

(Emphasis added.)  The PSAs for the C-BASS, CWHEL, ECR, First Horizon, FNLC and GE Trusts contain substantially similar requirements.  *See* Ex. C § VIII.

50.     Under the Countrywide and First Horizon PSAs, the Trustee generally cannot force repurchase or substitution obligations relating to document delivery failures after 540 days from closing.  *See* Ex. C § VIII.  Under the PSAs for the CBASS, ECR, FNLC and GE Trusts, the Sponsor's obligation to substitute lapses after the passage of a specified period of time, but its obligation to repurchase does not.  For example, Section 2.03 of the PSA for the C-BASS Trusts provides that substitution is not an available remedy more than two years from closing.  *See also* Ex. C § VIII.

### B.     BNY Mellon Had a Duty to Provide Notice of Defaults and Enforce Repurchase Obligations Triggered by Such Notice

51.     Congress enacted the TIA to ensure, among other things, that investors in certificates, bonds and similar instruments, have adequate rights against, and receive adequate performance from, the responsible trustees. 15 U.S.C. § 77bbb.

52.     Under Section 315(b) of the TIA, BNY Mellon was required to give Certificateholders notice of a default under the PSAs within ninety days of learning of such default.  15 U.S.C. § 77ooo(b).  As set forth in Section III hereof, BNY Mellon failed to give notice of numerous defaults as required under the TIA.

### C.     BNY Mellon Had a Duty to Exercise Due Care to Enforce Repurchase Obligations and Avoid Conflicts of Interest

53.     Under the PSAs and applicable law, BNY Mellon owed a fiduciary duty to Certificateholders upon the occurrence of an Event of Default.  BNY Mellon's post-default fiduciary duty is described in Section 8.01 of the Countrywide PSA, which provides in relevant part, "[i]n case an Event of Default has occurred . . . the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent person would exercise under the circumstances in the conduct of such person's own affairs."  The PSAs for the C-BASS, CWHEL, ECR, First Horizon, FNLC and GE Trusts impose substantially similar obligations on BNY Mellon. *See* Ex. C § IX.

54.     Every trustee—including BNY Mellon—has an absolute duty to avoid conflicts of interest and a duty of undivided loyalty to trust investors.  This duty is non-waivable and arises independently of the PSAs.

55.     In addition, Section 315(c) of the TIA provides that upon the occurrence of a "default" the indenture trustee must exercise such of the rights and powers vested in it by the indenture, and must use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.  15 U.S.C. § 77ooo(c).

56.     The Streit Act provides that upon the occurrence of an "Event of Default," as that term is defined in the trust indenture, an indenture trustee must exercise such of the rights and powers vested in it by the indenture, and must use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.  The Streit Act also requires trustees to avoid conflicts of interest.

57.     Section 124 of the Streit Act further requires that a trustee carry out its duties under the applicable indenture with reasonable care.

58.     As set forth in Section III hereof, BNY Mellon failed to exercise its duties both prior to and after the occurrence of defaults and Events of Default.

### D.     BNY Mellon Had a Duty to Provide Accurate Remittance Reports and Certifications Under Regulation AB

59.     Each PSA requires BNY Mellon (or in the case of the First NLC 2005-1 Trust, the Securities Administrator) to forward to rating agencies and to make available to Certificateholders monthly remittance reports describing the performance of underlying loans.  For example, Section 4.06 of the Countrywide PSA provides that "[c]oncurrently with each distribution on a Distribution Date, the Trustee will forward by mail to each Rating Agency and make available to Certificateholders on the Trustee's website . . . a statement generally setting forth the information contained in Exhibit U hereto."  The PSAs for the C-BASS, CWHEL, ECR, First Horizon, FNLC and GE Trusts contain substantially similar requirements.  *See* Ex. C § X.

60.     Under item 1121 of SEC Regulation AB, such reports must disclose "[m]aterial breaches of pool asset representations or warranties or transaction covenants." *See* 17 C.F.R. § 229.1121(a)(12).

61.     Regulation AB also requires the Depositor and Trustee to certify on a Form 10-K filed a year after each RMBS transaction that "[p]olicies and procedures are instituted to monitor any performance or other triggers and events of default in accordance with the transaction agreements," collateral securing the loans held by the Covered Trust had been maintained as required by the relevant transaction agreements, pool assets and related documents were safeguarded and the remittance reports provided to investors complied with SEC rules.  *See* 17 C.F.R § 229.1122(d)(1)(i), (3)(i)(C), (4)(i) and (ii).  The Trustee further provides a similar certification annually that covers all trusts that it administers.

62.     As set forth in Section III(D) hereof, BNY Mellon breached its statutory, fiduciary and contractual duties by failing to provide accurate certifications under Regulation AB.

**E.     BNY Mellon Had a Duty to Address the Master Servicers' and Servicers' Failure to Meet Prudent Servicing Standards**

63.     Each PSA required the Master Servicer or Servicer to service the loans underlying the Covered Trusts prudently.

64.     For example, Section 3.01 of the Countrywide PSA provides:  "For and on behalf of the Certificateholders, the Master Servicer shall service and administer the Mortgage Loans in accordance with the terms of this Agreement and customary and usual standards of practice of prudent mortgage loan servicers."  Section 3.01 further provides: "the Master Servicer shall not take any action that is inconsistent with or prejudices the interests of the Trust Fund or the Certificateholders in any Mortgage Loan or the rights and interests of the Depositor, the Trustee and the Certificateholders under this Agreement." The PSAs for the C-BASS, CWHEL, ECR, First Horizon, FNLC and GE Trusts contain substantially similar requirements.  *See* Ex. C § XII.

24

65.     The PSAs for the Countrywide, CWHEL, ECR and First Horizon Trusts provide that failure to meet prudent servicing standards is an Event of Default if left uncured for 60 days after notice of the default.  *See* Ex. C § XI.

66.     Further, for the Countrywide, ECR and First Horizon Trusts, if the default relates to a failure to deliver mortgage files to the Covered Trust, the Event of Default is triggered immediately upon service of the exception report that identifies the document delivery failure.

67.     For example, Section 7.01 of the Countrywide PSA provides that an Event of Default is triggered by

> any failure by the Master Servicer to observe or perform in any material respect any other of the covenants or agreements on the part of the Master Servicer contained in this Agreement . . . which failure materially affects the rights of Certificateholders, that failure continues unremedied for a period of 60 days after the date on which written notice of such failure shall have been given to the Master Servicer by the Trustee or the Depositor, or to the Master Servicer and the Trustee by the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates; ***provided, however, that the sixty-day cure period shall not apply to the initial delivery of the Mortgage File for Delay Delivery Mortgage Loans nor the failure to substitute or repurchase in lieu of delivery***.

(Emphasis added.)  *See also* ECR Servicing Agreement § 6.01 (same); First Horizon PSA § 7.1 (same).

68.     The PSAs for the C-BASS, FNLC and GE Trusts provide that the failure to follow prudent servicing standards is an Event of Default 30–60 days after a Servicing Officer becomes aware of such breach, without regard to whether notice was provided.  *See* Ex. C § XI.

69.     Upon a Master Servicer or Servicer default or Event of Default, the Trustee was obligated to act.  For example, the Countrywide PSA provides that once a Master

Servicer Event of Default occurred, the Trustee had the authority and obligation to "terminate all of the rights and obligations of the Master Servicer," Countrywide PSA § 7.01 (*see also* Ex. C § XI), and "assume all of the rights and obligations of the Master Servicer." Countrywide PSA § 3.05.  The PSAs for the C-BASS, CWHEL, ECR, First Horizon, FNLC and GE Trusts impose substantially similar obligations on BNY Mellon.  *See* Ex. C § XIII. More generally, BNY Mellon, as trustee, had a duty to exercise all rights available under the PSAs to protect the Certificateholders' interests and do so with due care.

70.     As set forth in Sections III(A) and (C) hereof, BNY Mellon breached its statutory, fiduciary and contractual duties by failing to take actions to address Master Servicer and Servicer defaults and Events of Default.

**F.     BNY Mellon Is Liable For Negligence in Performing Its Duties**

71.     Under the plain language of the PSAs, the TIA, the Streit Act and applicable common law, BNY Mellon had a duty to perform its duties under the PSAs competently and is liable for its negligent failure to do so.  Section 8.01 of the Countrywide PSA provides in relevant part:

> *No provision of this Agreement shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct*; provided, however, that:
>
> (i) unless an Event of Default known to the Trustee shall have occurred and be continuing, the duties and obligations of the Trustee shall be determined solely by the express provisions of this Agreement, the Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Agreement, no implied covenants or obligations shall be read into this Agreement against the Trustee and the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee and conforming to the requirements of this Agreement which it believed in good

faith to be genuine and to have been duly executed by the proper authorities respecting any matters arising hereunder;

(ii) the Trustee shall not be liable for an error of judgment made in good faith by a Responsible Officer or Responsible Officers of the Trustee, unless ***it shall be finally proven that the Trustee was negligent in ascertaining the pertinent facts***.

(Emphasis added.)  The PSAs for the C-BASS, CWHEL, ECR, First Horizon, FNLC and GE Trusts contain substantially similar provisions.  *See* Ex. C § IX.

72.     The PSAs make clear that BNY Mellon can be held liable for its own negligence in failing to perform its duties, including, among other things, its responsibilities to: (i) take physical possession of the operative documents for the mortgage loans in the Covered Trusts; (ii) identify those mortgage loans for which there was missing, defective or incomplete documentation on the document exception report attached to the Final Certification; (iii) make accurate representations in the certifications provided; (iv) render accurate reports under Regulation AB; (v) take steps to cause the Sponsors or Originators to repurchase loans lacking adequate documentation; (vi) give notice to all parties to the PSAs of the breaches of representations and warranties relating to the mortgage loans once it discovered the Sponsors' widespread practice of including in securitizations trust loans which breached such representations and warranties; and (vii) make prudent decisions concerning the exercise of appropriate remedies following Events of Default under the PSAs.  These are duties that BNY Mellon was required to perform under the PSAs, and BNY Mellon can be held liable for its own negligence when performing these duties on behalf of Certificateholders.

III.     **BNY MELLON BREACHED ITS
         <u>CONTRACTUAL, FIDUCIARY AND STATUTORY DUTIES</u>**

   A.     **BNY Mellon Failed to Take Possession of Complete Mortgage Files**

   73.     BNY Mellon breached its contractual and fiduciary duties under the PSAs and
its obligations under the TIA and the Streit Act by failing to take physical possession of
many of the operative documents for the mortgage loans in the Covered Trusts.  Indeed,
there is substantial evidence showing that BNY Mellon accepted incomplete mortgage files
without requiring the Sponsors or Originators to cure document defects or to substitute[4] or
repurchase those loans.

   74.     BNY Mellon's failure to take physical possession of the key mortgage loan
documents, and its failure to review the mortgage files for missing documents or
irregularities and then ensure that identified irregularities were corrected, was not a mere
technicality, as explained by Georgetown Law School Professor Adam Levitin in his
testimony before the House Financial Services Committee in November 2010.  Professor
Levitin described the implications of the failure by a securitization trustee such as BNY
Mellon to take physical possession of the key documents in the loan file:

> If mortgages were not properly transferred in the securitization
> process, then mortgage-backed securities would in fact not be
> backed by any mortgages whatsoever.   The chain of title
> concerns stem from transactions that make assumptions about
> the resolution of unsettled law.   If those legal issues are
> resolved differently, then there would be a failure of the transfer
> of mortgages into securitization trusts.
>
>                     *      *      *
>
> Recently,  arguments  have  been  raised  in  foreclosure  litigation

---

[4] As noted above in Section II(A), the ability to seek substitution lapses under the PSAs within a specified period
after closing under the CBASS, ECR, FNLC and GE Trusts.  The Countrywide and First Horizon PSAs provide
that both repurchase and substitution obligations generally lapse 540 days from closing for breaches
concerning document delivery failures, but this provision does not apply to representation and warranty
violations.

about whether the notes and mortgages were in fact properly transferred to the securitization trusts.  This is a critical issue because the trust has standing to foreclose if, and only if, it is the mortgagee.  If the notes and mortgages were not transferred to the trust, then the trust lacks standing to foreclose.

\*       \*       \*

If the notes and mortgages were not properly transferred to the trusts, then the mortgage-backed securities that the investors purchased were in fact non-mortgage-backed securities.   In such a case, investors would have a claim for the rescission of the MBS, meaning that the securitization would be unwound, with investors receiving back their original payments at par (possibly with interest at the judgment rate).  Rescission would mean that the securitization sponsor would have the notes and mortgages on its books, meaning that the losses on the loans would be the securitization sponsor's, not the MBS investors.

*Problems in Mortgage Servicing from Modification to Foreclosure: Before S. Comm. on Banking, Housing, and Urban Affairs* (2010) (statement of Adam Levitin, Associate Professor of Law, Georgetown University Law Center).

75.     BNY Mellon failed to exercise due care in reviewing the mortgage files for missing, incomplete and defective documentation.  If BNY Mellon had performed a reasonable review, it would have identified additional non-compliant mortgage loans and listed them on the final document exception report.  It also would have ensured that the Sponsors or Originators either cured the documentation problems or repurchased or substituted another mortgage loan for the improperly documented mortgage loan within the deadlines set forth in the PSAs.

76.     That the original mortgage note was missing from the loan file, or there was a missing link in the chain of endorsements from the originator to BNY Mellon, or there was no duly executed assignment of the mortgage to BNY Mellon, or the original lender's title policy was missing would have been obvious to a reasonably competent trustee performing

its contractual duties with due care.  In many cases, BNY Mellon did identify these obvious defects and noted them on the final exception reports for the Covered Trusts, but it did not require that they be corrected.

77.     On the same basis, BNY Mellon knew of (or failed to identify) numerous instances where it did not receive the original mortgage note with all intervening endorsements that showed a complete chain of endorsement from the Originator to the Sponsor or Depositor or a lost mortgage note affidavit, as well as a duly executed assignment of mortgage for each loan that was not a MERS loan, the original recorded mortgage for each loan that was not a MERS loan, the original mortgage for those loans that were MERS loans, or the original recorded assignment or assignment of the mortgage together with all interim recorded assignments and the original lender's title policy.

      1.      **The Servicers' and Master Servicers'
Cover-up of the Sponsors' Document Delivery Failures**

78.     The chart below identifies each of the entities disclosed to be Sponsors, Servicers and Master Servicers of the Covered Trusts, each of which engaged in a cover-up of the relevant Sponsors' and Depositors' systemic document delivery failures (as fully described below).

|   | **Trust** | **Sponsor** | **Servicer** | **Master Servicer** |
|---|---|---|---|---|
| 1 | CBASS 2005-CB4 | Credit-Based Asset Servicing and Securitization LLC | Litton Loan Servicing LP | |
| 2 | CBASS 2005-CB8 | Credit-Based Asset Servicing and Securitization LLC | Litton Loan Servicing LP | |
| 3 | CBASS 2006-CB3 | Credit-Based Asset Servicing and Securitization LLC | Litton Loan Servicing LP | |

|  | **Trust** | **Sponsor** | **Servicer** | **Master Servicer** |
|---|---|---|---|---|
| 4 | CWALT 2005-AR1 | Countrywide Home Loans, Inc. | | Countrywide Home Loans Servicing LP |
| 5 | CWALT 2006-27CB | Countrywide Home Loans, Inc. | | Countrywide Home Loans Servicing LP |
| 6 | CWALT 2006-OA10 | Countrywide Home Loans, Inc. | | Countrywide Home Loans Servicing LP |
| 7 | CWALT 2006-OA11 | Countrywide Home Loans, Inc. | | Countrywide Home Loans Servicing LP |
| 8 | CWALT 2006-OA3 | Countrywide Home Loans, Inc. | | Countrywide Home Loans Servicing LP |
| 9 | CWALT 2006-OA6 | Countrywide Home Loans, Inc. | | Countrywide Home Loans Servicing LP |
| 10 | CWHEL 2005-H | Countrywide Home Loans, Inc. | | Countrywide Home Loans, Inc. |
| 11 | CWL 2005-6 | Countrywide Home Loans, Inc. | | Countrywide Home Loans Servicing LP |
| 12 | CWL 2005-AB4 | Countrywide Home Loans, Inc. | | Countrywide Home Loans Servicing LP |
| 13 | CWL 2005-AB5 | Countrywide Home Loans, Inc. | | Countrywide Home Loans Servicing LP |
| 14 | CWL 2005-BC1 | Countrywide Home Loans, Inc. | | Countrywide Home Loans Servicing LP |
| 15 | CWL 2005-IM3 | Countrywide Home Loans, Inc. | | Countrywide Home Loans Servicing LP |
| 16 | CWL 2006-1 | Countrywide Home Loans, Inc. | | Countrywide Home Loans Servicing LP |
| 17 | CWL 2006-14 | Countrywide Home Loans, Inc. | | Countrywide Home Loans Servicing LP |
| 18 | CWL 2006-4 | Countrywide Home Loans, Inc. | | Countrywide Home Loans Servicing LP |

| | Trust | Sponsor | Servicer | Master Servicer |
|---|---|---|---|---|
| 19 | CWL 2006-9 | Countrywide Home Loans, Inc. | | Countrywide Home Loans Servicing LP |
| 20 | ECR 2005-1 | ECC Capital Corporation | ECC Capital Corporation | Countrywide Home Loans Servicing LP |
| 21 | FHAMS 2005-FA5 | First Horizon Home Loan Corporation | | First Horizon Home Loan Corporation |
| 22 | FHAMS 2005-FA7 | First Horizon Home Loan Corporation | | First Horizon Home Loan Corporation |
| 23 | FNLC 2005-1 | First NLC Financial Services, LLC | | JPMorgan Chase Bank N.A. |
| 24 | FNLC 2005-2 | First NLC Financial Services, LLC | Litton Loan Servicing LP | |
| 25 | GE-WMC 2005-2 | GE Mortgage Holding LLC | Litton Loan Servicing LP | |
| 26 | GE-WMC 2006-1 | GE Mortgage Holding LLC | Litton Loan Servicing LP | |
| 27 | OWNIT 2006-1 | Credit-Based Asset Servicing and Securitization LLC | Litton Loan Servicing LP | |

a. **Credit-Based Asset Servicing and
   Securitization LLC and Litton Loan Servicing LP**

79.     As of 2007, Litton Loan Servicing LP ("Litton") was a wholly owned

subsidiary of Credit-Based Asset Servicing and Securitization LLC ("C-BASS").

Thereafter, in or around December 2007, Goldman Sachs Group Inc. ("Goldman Sachs")

acquired Litton from C-BASS.  From January 2009 to December 31, 2010 alone, Litton

initiated over 135,000 foreclosure actions.

80.     Litton and its affiliates or agents have engaged in widespread misconduct to cover

up the systemic failure of depositors and sponsors (including C-BASS), for securitizations in

which Litton was servicer, to properly assign the underlying mortgage loans to the issuing trusts.

Litton utilized so-called "robo-signers" who executed tens of thousands of foreclosure affidavits a month, all necessarily false because they were purportedly based on personal knowledge when the robo-signers lacked any such knowledge and many of the false affidavits lacked proper documentation including evidence of possession of the underlying mortgage note.

81.      In one proceeding, *MTGLQ Investors, L.P. v. Chasteen*, No. 09-cv-02726 (C.P. Montgomery Cnty., Apr. 3, 2009), Litton submitted an assignment purporting to transfer a mortgage to MTGLQ Investors L.P. (a Goldman Sachs affiliate) c/o Avelo Mortgage LLC (another Goldman Sachs affiliate).  Litton employee Marti Noriega falsely signed the assignment as an assistant secretary of MERS.

82.      Litton employee Denise Bailey testified in a deposition that she routinely executed mortgage assignments as an officer of MERS, but could not explain how she came to be an officer of MERS (which she never was) nor exactly what MERS did.  Bailey Dep. at 22-32, 41, *U.S. Bank Nat'l Ass'n v. Austin*, No. CACE0847335 (Fla. Cir. Ct. June 8, 2009).

83.      Again in *MTGLQ Investors, L.P. v. Chasteen*, No. 09-cv-02726, Litton submitted an assignment purporting to transfer a mortgage to MTGLQ Investors L.P., this time falsely signed by Bailey as a vice president of MERS.

84.      On September 1, 2011, after an investigation undertaken by the Board of Governors of the Federal Reserve System (the "Federal Reserve"), Goldman Sachs entered into a Consent Order that required Goldman Sachs to retain an independent consultant to review Litton foreclosure proceedings pending at any time in 2009 or 2010 and to compensate borrowers who suffered financial injury as a result of wrongful foreclosures.  *In re The Goldman Sachs Group, Inc. and Goldman Sachs Bank USA*, 11-112-B-HC, 11-12-B-

SM, Consent Order (Sept. 1, 2011), *available at*

http://www.federalreserve.gov/newsevents/press/enforcement/enf20110901f1.pdf.

85.     Courts have also found that C-BASS has failed to transfer proper documentation

for mortgage loans and/or that the required paperwork to transfer title was faulty, missing, or

inadequate, which at a minimum caused a delay in the foreclosure proceedings.  *See, e.g.*, *Credit-*

*Based Asset Servicing & Securitization, LLC v. Akitoye*, No. 1132/2007, 2009 WL 116956, at

*5–6 (N.Y. Sup. Ct. 2009) (internal citations and quotations omitted) ("Plaintiff C-BASS offers

no evidence that it took physical possession of the note and mortgage before commencing this

action, and again, the written assignment was signed after defendant was served.  The

assignment's language purporting to give it retroactive effect, absent a prior or contemporary

delivery of the note and mortgage is insufficient to grant it standing").

### b.     Countrywide Home Loans, Inc. and Countrywide Home Loans Servicing LP

86.     In August 2007, Bank of America Corporation ("BAC") acquired Countrywide

Financial Corporation, including Countrywide Home Loans Servicing LP, Countrywide Home

Loans, Inc. ("Countrywide Home Loans") and Countrywide Bank, N.A. (collectively,

"Countrywide").

87.     Countrywide and its affiliates or agents, both before and after Countrywide's

acquisition by BAC, have engaged in widespread misconduct to cover up the fact that

Countrywide (or its affiliates) systemically failed to properly assign securitized mortgage loans

to the issuing trusts.

88.     The Federal Reserve System, Office of the Comptroller of the Currency

("OCC"), Federal Deposit Insurance Corporation ("FDIC") and Office of Thrift Supervision

("OTS") issued a report finding that BAC and its affiliates, including Countrywide,

routinely did not transfer the original mortgage loan documents to the issuing trusts for mortgage-backed securities transactions.  Interagency Review of Foreclosure Policies and Practices (2011), *available at*

http://www.federalreserve.gov/boarddocs/rptcongress/interagency/interagency.htm.  In the report, the regulators noted that their review of the mortgage servicers' loan files showed that there may be "disputes over note ownership or authority to foreclose." *Id.* at 6.  The regulators also noted "concerns about the prevalence of irregularities in the documentation of ownership [that] may cause uncertainties for investors of securitized mortgages." *Id.*

89.     As a direct result of this misconduct, in September 2010 BAC and its affiliates had to suspend foreclosures in 23 states to allow the company to undertake a review of internal procedures while publicly acknowledging that tens of thousands of foreclosure proceedings were improperly filed.  Robbie Whelan, *WSJ: Bank of America Suspends Foreclosures*, Wall St. J., http://online.wsj.com/articles/SB1000142405274870 3859204575526491393115712 (last updated Oct. 2, 2010 10:41AM).  On October 9, 2010, BAC and its affiliates' documentation failures and lack of internal controls forced them to suspend foreclosures nationwide.  David Streitfeld & Nelson D. Schwartz, *Largest U.S. Bank Halts Foreclosures in All States*, N.Y. Times, Oct. 8, 2010, at A1.

90.     In April 13, 2011, the OCC filed a Consent Order based upon findings that Bank of America, N.A. ("Bank of America"), including in its role as successor to Countrywide, engaged in fraudulent and improper foreclosure practices to cover up the fact that issuing trusts lacked legal title sufficient to foreclose upon the underlying mortgage loans.  *In re Bank of America, N.A.*, AA-EC-11-12, Consent Order (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47b.pdf.

Bank of America stipulated to the OCC Consent Order.

91.     On August 4, 2011, the New York State Attorney General ("NYAG") filed fraud claims against BNY Mellon, as trustee for the Certificates and other securitizations created and serviced by BAC and its affiliates.  The fraud claim concerned BNY Mellon's attempt to orchestrate a collusive settlement to brush Countrywide's RMBS related misconduct under the rug.  The NYAG's claims followed an extensive investigation of BAC's foreclosure practices which found that BNY Mellon systemically disregarded its duties under the PSAs.

92.     The NYAG found that the blatant disregard for the rules governing assignment by BAC and its affiliates has caused, and is continuing to cause, serious harm to Certificateholders.  As the NYAG stated in his verified pleading in *In re Bank of New York Mellon*, No. 651786/2011, 11 (Aug. 5, 2011) (the "BNY Article 77 Proceeding"):

> [Assignment] provisions are central to any mortgage securitization, but they are now vitally important to trust investors in light of the housing market collapse.  Any action to foreclose requires proof of ownership of the mortgage.  This must be demonstrated by actual possession of the note and mortgage, together with proof of any chain of assignments leading to the alleged ownership.  Moreover, complete mortgage files give borrowers assurance that their properties are properly foreclosed upon.  The failure to properly transfer possession of complete mortgage files has hindered numerous foreclosure proceedings and resulted in fraudulent activities including, for example, "robo-signing."

93.     The NYAG's petition reported that an extensive review of foreclosure proceedings commenced by BAC and its affiliates found widespread misconduct.  For example, Bank of New York and BNY Mellon admitted in *Bank of New York v. Kirkland*, No. 07-16839 (N.Y. Sup. Ct. Dec. 11, 2007) that an action to foreclose on a mortgage had been commenced despite the fact that the promissory note had not been assigned to the trust

that purportedly owned the note.  Similarly, in *Bank of New York v. Gioio*, No. 08-9865

(N.Y. Sup. Ct. Sept. 22, 2008), Bank of America and BNY Mellon admitted that a note

assignment had been executed two days prior to commencement of the action, contrary to

requirements of state law.

94.     And finally, the NYAG reported in documents filed in the BNY Article 77

Proceeding, that BNY Mellon had failed to ensure the proper transfer of loans from

Countrywide to the Trusts and that this "failure of Countrywide to transfer complete

mortgage loan documentation to the trusts hampered the Trusts' ability to foreclose on

delinquent mortgages thereby impairing the value of the notes secured by those mortgages."

Schneiderman Verified Pleading ¶ 23, *In re Bank of N.Y. Mellon*, No. 651786/2011 (N.Y.

Sup. Ct. Aug. 5, 2011).

95.     BAC, including as successor to Countrywide, was one of five banks that

agreed to a $25 billion settlement with 49 state Attorneys General as a result of their robo-

signing misconduct.  The agreement required servicers to implement comprehensive new

mortgage loan servicing standards to remedy violations of state and federal law.  These

violations included servicers' use of robo-signed affidavits, improper documentation and

lost paperwork. Under the terms of the settlement, BAC receives credit for modifying loans,

including securitized loans.  BAC has modified loans that did not qualify for modification under

prudent servicing standards or the governing servicing agreements in order to receive credit

because the investors, not BAC, would bear the loss. This settlement has caused or will cause

additional damages to Certificateholders because it is to be paid for in part through

reductions in principal amounts of loans included in the Countrywide Trusts, reducing

payments of principal and interest to Certificateholders, unless the modified loans are

repurchased as required by the terms of the PSAs.  *See* Press Release, U.S. Dep't of Justice, Federal Government and State Attorneys General Reach $25 Billion Agreement with Five Largest Mortgage Servicers to Address Mortgage Loan Servicing and Foreclosure Abuses (Feb. 9, 2012), *available at* http://www.justice.gov/opa/pr/2012/February/12-ag-186.html.

96.     On March 12, 2012, the U.S. Department of Housing and Urban Development ("HUD"), Office of Inspector General issued a report of its examination of BAC and Countrywide or their affiliates' foreclosure process from October 1, 2008 to September 30, 2010.  Bank of America Corporation Foreclosure and Claims Process Review (2012), *available at* www.hudoig.gov/sites/default/files/Audit_Reports/2012-FW-1802.pdf.  The HUD inspector performed a review of loan or foreclosure files and determined that they were "consistently" deficient because they were missing documentation.  *Id.* at 5, 12.  HUD found that BAC relied on "foreclosure mills" and "routinely signed foreclosure documents" that falsely claimed the affiant had personal knowledge of the facts contained therein.  *Id.* at 5.  HUD also reported that BAC and Countrywide "significantly hindered" HUD's investigation by refusing to cooperate.  *Id*. at 4.

97.     As a result of Countrywide's systemic failure to transfer essential mortgage documentation to securitization trusts, Phillip R. Burnaman II, an expert retained by BNY Mellon in the BNY Article 77 Proceeding, issued an expert report revealing that BNY Mellon's exception reports for Countrywide securitizations (including numerous Covered Trusts) as of June 2011 showed **117,899** loans lacking complete documentation.  Burnaman Expert Report at 50, *In re Bank of N.Y. Mellon*, No. 651786/2011 (N.Y. Sup. Ct. Mar. 14, 2013) (emphasis added).  The document cure provisions in the Countrywide-BAC Settlement Agreement apply to only 1,116 of the 117,899 loans with defective documentation.  *Id*.

### c.   First Horizon Home Loan Corporation

98.   First Horizon Home Loan Corporation ("First Horizon") and its affiliates or agents have engaged in widespread misconduct to cover up the fact that they systematically failed to properly assign securitized mortgage loans to the issuing trusts.  First Horizon utilized robo-signers who executed tens of thousands of foreclosure affidavits a month, all necessarily false because they were purportedly based on personal knowledge when the robo-signers lacked any such knowledge and many of the false affidavits lacked proper documentation including evidence of possession of the underlying mortgage note.

99.   First Horizon's systemic failures to transfer proper documentation for the mortgage loans to securitization trusts has negatively impacted foreclosure proceedings involving First Horizon mortgage loans in courts nationwide, where courts have found required paperwork to transfer title to the securitization trusts to be faulty, missing or inadequate, which at a minimum caused a delay in the foreclosure proceedings.  *See, e.g.*, *Grunberg v. First Horizon Home Loans*, No. FSTCV126012649S, 2014 Conn. Super. LEXIS 359 (Conn. Super. Ct. Feb. 14, 2014); *Rosario v. Mortg. Elec. Reg. Sys.*, No. C.A. No. PC 2011-2999, 2013 R.I. Super. LEXIS 30 (R.I. Super. Ct. Feb. 11, 2013); *Grant v. First Horizon Home Loans*, No. 66721-1-I, 2012 Wash. App. LEXIS 1246 (Wash. Ct. App. May 29, 2012); *Murphy v. First Horizon Home Loan*, No. 12-cv-000818, 2013 U.S. Dist. LEXIS 42353 (D. Or. Mar. 26, 2013).

100.   First Horizon (or its successor, MetLife Bank, N.A. ("MetLife")) also is the subject of administrative and consent orders concerning the very same practices.  *See, e.g.*, *In re MetLife Bank, N.A.*, Consent Order, AA-EC-11-16 (Mar. 29, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47g.pdf.

101.    Additionally, in October 2010, the Texas Attorney General ordered First Horizon to stop all foreclosures in the state of Texas due to improprieties relating to First Horizon's practice of using robo-signers.

### d.    First NLC Financial Services, LLC

102.    First NLC Financial Services, LLC ("First NLC") systemically submitted forged or otherwise improper documentation in foreclosure proceedings.  *See, e.g.*, *In re Schwartz*, 461 B.R. 93 (Bankr. D. Mass. Aug. 2011); *Smith v. HSBC Bank*, No. WOCV201002724, 2012 WL 6970191 (Mass. Super. Ct. Dec. 11, 2012); *Robinson v. Leone*, No. 266319, 2007 WL 624690 (Mich. Ct. App. Mar. 1, 2007).

### e.    GE Mortgage Holding LLC

103.    GE Mortgage Holding LLC ("GE Mortgage") systematically failed to transfer necessary mortgage documents or transferred materially defective documents to the issuing trusts, including GE-WMC 2006-1 (one of the Covered Trusts).  Indeed, in just one example, on January 11, 2013, BNY Mellon filed a complaint against GE Mortgage at the direction of certain unnamed certificateholders for breaches of representations and warranties and other PSA violations, including the failure to transfer required mortgage documents, the transfer of materially defective documents and the failure to properly execute assignments with respect to the mortgage loans in that trust.  Compl., *Bank of N.Y. Mellon v. WMC Mortgage, LLC*, No. 12-cv-07096 (S.D.N.Y. Jan. 11, 2013).  BNY Mellon filed as an exhibit to its complaint in that action a schedule listing 127 mortgage loans where the chain of assignment to the trust was incomplete, as determined through an examination of public records concerning the mortgage loans.

f.  **JPMorgan Chase Bank, N.A.**
**and ECC Capital Corporation**

104.    In February 2007, Bear Stearns Companies Inc. ("Bear Stearns") acquired ECC

Capital Corporation ("ECC").  JPMorgan Chase Bank, N.A. is a subsidiary of JPMorgan Chase

& Co. (collectively "JPMorgan").   In early 2008, JPMorgan Chase & Co. acquired Bear Stearns.

105.    Courts have concluded that JPMorgan, ECC and its affiliates have committed

outright fraud to cover up the systemic failure of depositors and sponsors (including ECC), for

securitizations in which JPMorgan and ECC were servicers, to properly assign the underlying

mortgage loans to the issuing trusts, including through the use of robo-signers.

106.    For example, in *JP Morgan Chase Bank, N.A. v. Pocopanni*, No. 16-2008-CA-

3989, at 5 (Fla. Cir. Ct. Aug. 9, 2010) (internal citation omitted) , the Court stated:

> The Court finds by clear and convincing evidence that WAMU,
> Chase and [counsel for JPMC Bank] committed fraud on this
> Court. . . .   The Court finds that WAMU and Chase made
> representations to this Court during the course of the instant action
> that are known to be false. . . .  Throughout the litigation, WAMU
> and Chase and [their counsel] have represented to this Court that
> plaintiff owns and holds the note and mortgage. . . .  Moreover,
> WAMU and [counsel] created a false Assignment of Mortgage
> dated April 11, 2008 as evidence of these assertions. . . .   The
> Court finds by clear and convincing evidence that these acts
> committed by WAMU, Chase and [counsel] amount to a "knowing
> deception intended to prevent the defendants from discovery
> essential to defending the claim" and are therefore fraud.

107.    Beth Ann Cottrell, a JPMorgan robo-signer based in Franklin County, Ohio,

testified that she signed 18,000 foreclosure related documents a month, candidly admitting that

she had absolutely no personal knowledge regarding assertions made in the documents she was

signing.  It was absolute fiction.  Cottrell Dep., *Chase Home Finance, LLC v. Fleming*, No. 50-

2009-CA-026599 (Fla. Cir. Ct. May 17–18, 2010).

108.     Barbara Hindman is another JPMorgan robo-signer, based in Jacksonville, FL.  In some foreclosure documents filed in state courts Ms. Hindman represents that she is "Vice President of Mortgage Electronic Registration Systems, Inc."  Sometimes she is "Vice President, Bank of America, N.A."  Other times she is "Vice President, JP Morgan Chase Bank, N.A., as successor-in-interest to Washington Mutual Bank."  Ms. Hindman works with Margaret Dalton, another JPMorgan robo-signer based in Jacksonville, Florida.

109.     Upon information and belief, other JPMorgan robo-signers include Whitney Cook, Christina Trowbridge and Stacy Spohn.

110.     As a direct result of JPMorgan's misconduct, in September 2010 JPMorgan and its affiliates had to suspend foreclosures in 23 states to allow the company to undertake a review of internal procedures and publicly acknowledged that they systemically submitted forged or otherwise improper documentation in foreclosure proceedings.

111.     In November 2010, Legal Services of New Jersey provided a report to the New Jersey Supreme Court detailing numerous instances of robo-signing and false affidavits in connection with foreclosure proceedings in New Jersey and throughout the nation.  Report and Recommendations to the New Jersey Supreme Court Concerning False Statements and Swearing in Foreclosure Proceedings (2010), *available at* http://www.lsnj.org/NewsAnnouncements/Foreclosure/materials/LSNJReport.pdf.  The report, which was supported by evidentiary exhibits such as deposition transcripts of robo-signers indicating that they lied in court documents, falsified and back-dated documents, and other evidence of fraud, concluded that "[a] great volume of national information . . . suggests a pervasive, industry-wide pattern of false statements and certifications at various stages of foreclosure proceedings."  The report specifically implicated JPMorgan.  *Id.* at 9–10.

112.    The OCC issued a Consent Order dated April 13, 2011, finding that, among other affiliates, JPMorgan tried to cover up that securitization trusts lacked legal title sufficient to foreclose on underlying mortgage loans by engaging in improper foreclosure practices.  *In re JP Morgan*, Consent Order, AA-EC-11-15 (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47e.pdf.

113.    On December 1, 2011, the Massachusetts Attorney General commenced an action against, among others, JPMorgan, alleging "rampant violations" of state law in foreclosure proceedings.  Compl., *Massachusetts v. Bank of Am., N.A.*, No. 11-cv-4363 (Mass. Super. Ct. Dec. 1, 2011).

114.    Further, the February 3, 2012 NYAG Complaint charges various loan servicers, including JPMorgan, with persistent fraud and deceptive acts in connection with mortgage foreclosure proceedings.  Compl., *New York v. JP Morgan*, No. 2768/12 (N.Y. Sup. Ct. July 12, 2012).  The Complaint points out that servicers such as JPMorgan "have repeatedly submitted court documents containing false and misleading information that made it appear that the foreclosing party had the authority to bring a case when in fact it may not have."  Press Release, N.Y. Attorney Gen., A.G. Schneiderman Announces Major Lawsuit Against Nation's Largest Banks for Deceptive & Fraudulent Use of Electronic Mortgage Registry (Feb. 3, 2012), *available at* http://www.ag.ny.gov/press-release/ag-schneiderman-announces-major-lawsuit-against-nation%E2%80%99s-largest-banks-deceptive.

115.    JPMorgan was one of five banks that agreed to a $25 billion settlement with 49 state Attorneys General as a result of its robo-signing misconduct.  The agreement requires servicers to implement comprehensive new mortgage loan servicing standards to remedy violations of state and federal law.  These violations included servicers' use of robo-

43

signed affidavits, improper documentation and lost paperwork.  Under the terms of the

settlement, JPMorgan receives credit for modifying loans, including securitized loans.

JPMorgan has modified loans that did not qualify for modification under prudent servicing

standards or the governing servicing agreements in order to receive credit because the investors,

not JPMorgan, would bear the loss. *See* Press Release, U.S. Dep't of Just., Federal Government

and State Attorneys General Reach $25 Billion Agreement with Five Largest Mortgage Servicers

to Address Mortgage Loan Servicing and Foreclosure Abuses (Feb. 9, 2012), *available at*

http://www.justice.gov/opa/pr/2012/February/12-ag-186.html.

116.    Also, on March 30, 2012, Jamie Dimon, CEO of JPMorgan, sent a letter to

JPMorgan's shareholders admitting that JPMorgan and its affiliates engaged in robo-signing:

"Our servicing operations left a lot to be desired: There were too many paperwork errors,

including affidavits that were improperly signed because the signers did not have personal

knowledge about what was in the affidavits but, instead, relied on the company's processes."  JP

Morgan Chase & Co., 2011 Annual Report 27 (2011), *available at*

http://files.shareholder.com/downloads/ONE/ 1766191294x0x556139/75b4bd59-02e7-4495-

a84c-06e0b19d6990/JPM_2011_annual_report_ complete.pdf.

### B.    BNY Mellon Was Aware of but Failed to Provide Notice of Defaults

117.    As set forth above, BNY Mellon was aware that the Sponsors, Depositors,

Servicers and/or Master Servicers breached the PSAs by failing to provide complete mortgage

files in their possession.  These breaches constituted "defaults" under the PSAs, and all parties to

the PSAs (but not Certificateholders) received notice of the defaults in the form of BNY

Mellon's document exception reports.  BNY Mellon was required to provide notice of these

defaults to Certificateholders, among others.  It did not.  If it had, the Sponsors or Originators

would have been forced to repurchase or substitute[5] many of the loans that ultimately caused Plaintiffs' losses.

118.    BNY Mellon also failed to give notice of defaults that occurred when the Sponsors or Originators breached representation and warranty provisions providing that all loans met applicable loan origination guidelines.  In reality, during the 2005–2007 time period, the Sponsors and Originators regularly disregarded their underwriting guidelines and the representations and warranties made to securitization trusts.

119.    For example, for the Countrywide Trusts, Countrywide Home Loans represented and warranted in the Countrywide PSA that "[e]ach Mortgage Loan was underwritten in all material respects in accordance with Countrywide's underwriting guidelines."  Countrywide PSA Schedule IIIA, § 36.  Countrywide Home Loans further represented and warranted the following:

> (1) The information set forth on Schedule I to the Pooling and Servicing Agreement with respect to each Mortgage Loan is true and correct in all material respects as of the Closing Date.
>
> (2) As of the Cut-off Date, none of the Mortgage Loans is 30 days or more delinquent.
>
> (3) No Mortgage Loan had a Loan-to-Value Ratio at origination in excess of 100.00%.
>
> (4) Each Mortgage is a valid and enforceable first lien on the Mortgaged Property . . . .
>
> (10) Each Mortgage Loan at origination complied in all material respects with applicable local, state and federal laws, including, without limitation, usury, equal credit opportunity, predatory and abusive lending laws, real estate settlement procedures, truth-in-lending and disclosure laws, and consummation of the transactions contemplated hereby will not involve the violation of any such laws. . . .

---

[5] As noted above in Section II(A), the ability to seek substitution lapses under certain of the PSAs within a specified period after closing.

(12) A lender's policy of title insurance together with a condominium endorsement and extended coverage endorsement, if applicable, in an amount at least equal to the Cut-off Date Stated Principal Balance of each such Mortgage Loan or a commitment (binder) to issue the same was effective on the date of the origination of each Mortgage Loan, each such policy is valid and remains in full force and effect . . . .

(16) Each Mortgage Note and the related Mortgage are genuine, and each is the legal, valid and binding obligation of the maker thereof, enforceable in accordance with its terms and under applicable law.  To the best of Countrywide's knowledge, all parties to the Mortgage Note and the Mortgage had legal capacity to execute the Mortgage Note and the Mortgage and each Mortgage Note and Mortgage have been duly and properly executed by such parties. . . .

(20) Each Mortgage Note and each Mortgage is in substantially one of the forms acceptable to FNMA or FHLMC, with such riders as have been acceptable to FNMA or FHLMC, as the case may be. . . .

(22) The origination, underwriting and collection practices used by Countrywide with respect to each Mortgage Loan have been in all respects legal, prudent and customary in the mortgage lending and servicing business. . . .

(27) Each Mortgage Loan which had a Loan-to-Value Ratio at origination in excess of 80.00% is the subject of a Primary Insurance Policy that insures that portion of the principal balance equal to a specified percentage times the sum of the remaining principal balance of the related Mortgage Loan . . . .

(29) If the Mortgaged Property is in an area identified in the Federal Register by the Federal Emergency Management Agency as having special flood hazards, a flood insurance policy in a form meeting the requirements of the current guidelines of the Flood Insurance Administration is in effect with respect to such Mortgaged Property . . . .

(37) Other than with respect to any Streamlined Documentation Mortgage Loan as to which the loan-to-value ratio of the related Original Mortgage Loan was less than 90% at the time of the origination of such Original Mortgage Loan, prior to the approval of the Mortgage Loan application, an appraisal of the

related Mortgaged Property was obtained from a qualified appraiser, duly appointed by the originator, who had no interest, direct or indirect, in the Mortgaged Property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the Mortgage Loan; such appraisal is in a form acceptable to FNMA and FHLMC. . . .

(40) The Mortgage Loans were selected from among the outstanding fixed-rate one- to four-family mortgage loans in the portfolios of the Sellers at the Closing Date as to which the representations and warranties made as to the Mortgage Loans set forth in this Schedule III-A can be made. Such selection was not made in a manner intended to adversely affect the interests of Certificateholders. . . .

(42) With respect to any Mortgage Loan as to which an affidavit has been delivered to the Trustee certifying that the original Mortgage Note is a Lost Mortgage Note, if such Mortgage Loan is subsequently in default, the enforcement of such Mortgage Loan or of the related Mortgage by or on behalf of the Trustee will not be materially adversely affected by the absence of the original Mortgage Note. A "Lost Mortgage Note" is a Mortgage Note the original of which was permanently lost or destroyed and has not been replaced.

(43) The Mortgage Loans, individually and in the aggregate, conform in all material respects to the descriptions thereof in the Prospectus Supplement. . . .

(46) The Master Servicer has fully furnished, in accordance with the Fair Credit Reporting Act and its implementing regulations, accurate and complete information (i.e., favorable and unfavorable) on its borrower credit files related to the Mortgage Loans to Equifax, Experian and Trans Union Credit Information Company (three of the nationally recognized credit bureaus) on a monthly basis. . . .

(49) None of the Mortgage Loans are "high cost" loans as defined by applicable predatory and abusive lending laws. . . .

(55) All of the Mortgage Loans were originated in compliance with all applicable laws, including, but not limited to, all applicable anti-predatory and abusive lending laws. . . .

(61) The methodology used in underwriting the extension of

> credit for each Mortgage Loan employs objective mathematical principles which relate the borrower's income, assets and liabilities to the proposed payment and such underwriting methodology does not rely on the extent of the borrower's equity in the collateral as the principal determining factor in approving such credit extension.   Such underwriting methodology confirmed that at the time of origination (application/approval) the borrower had the reasonable ability to make timely payments on the mortgage loan.

The PSAs for the C-BASS, CWHEL, ECR, First Horizon, FNLC and GE Trusts contain substantially similar provisions.  *See* Ex. C § XIV.

120.    Each party had an obligation to provide notice of breaches of these representations and warranties and such notice triggered the Sponsor's or Originator's obligation to repurchase or substitute the defective loan.  For example, Section 2.03(c) of the Countrywide PSA provides:

> Upon discovery by any of the parties hereto of a breach of a representation or warranty with respect to a Mortgage Loan made pursuant to Section 2.03(a) that materially and adversely affects the interests of the Certificateholders in that Mortgage Loan, the party discovering such breach shall give prompt notice thereof to the other parties.   Each Seller hereby covenants that within 90 days . . . it shall cure such breach in all material respects, and if such breach is not so cured, shall, (i) if such 90-day period expires prior to the second anniversary of the Closing Date, remove such Mortgage Loan (a "Deleted Mortgage Loan") from the Trust Fund and substitute in its place a Substitute Mortgage Loan, in the manner and subject to the conditions set forth in this Section; or (ii) repurchase the affected Mortgage Loan or Mortgage Loans from the Trustee at the Purchase Price . . . .   The Seller repurchasing a Mortgage Loan pursuant to this Section 2.03(c) shall promptly reimburse the Master Servicer and the Trustee for any expenses reasonably incurred by the Master Servicer or the Trustee in respect of enforcing the remedies for such breach.

The PSAs for the C-BASS, CWHEL, ECR, First Horizon, FNLC and GE Trusts contain substantially similar provisions.  *See* Ex. C § VIII.

121.    BNY Mellon knew that the Sponsors and Originators regularly disregarded their underwriting guidelines and representations and warranties made to securitization trusts long before Certificateholders.

122.    BNY Mellon served as trustee of hundreds, if not thousands, of RMBS trusts from 2004–2007, including many transactions involving the Sponsors and Originators.  In the course of administering these trusts, BNY Mellon learned that the Sponsors and Originators had departed from their underwriting guidelines, engaged in predatory lending and failed to ensure that mortgage loans complied with state and federal laws.

123.    For example, while serving as trustee for various RMBS trusts, BNY Mellon was presented with a large number of defaulted loans that were originated by the Sponsors and Originators here and foreclosures were often commenced in BNY Mellon's name.

124.    BNY Mellon commenced foreclosure actions in 2005–2008 for numerous loans in which the Sponsors or Originators were at issue, including, for example, foreclosure actions in which:

> (a)    Countrywide served as Sponsor, including with respect to loans in the Countrywide Trusts.  *See, e.g.*, *Bank of N.Y. v. Lariviere*, No. RE-07-243 (W. York. Dist. Ct. Jan. 16, 2008) (foreclosing on mortgage loan which was part of the CWL 2006-9 Trust); *Bank of N.Y. v. Sigworth*, No. 2009 F 00472 (C.P. Hancock Cnty. May 29, 2009) (foreclosing on mortgage loan which was part of the CWL 2006-1 Trust);

> (b)    Countrywide served as Originator.  *See, e.g.*, *Bank of N.Y. v. Cupo*, 2012 WL 611849 (N.J. Super. Ct. App. Div. Feb. 28, 2012); *Bank of N.Y. v. Batad*, 204 P.3d 501 (Haw. Ct. App. 2009); *Bank of N.Y. v. Sullivan*, No. 2007-09-6810 (C.P. Summit Cnty. Sept. 28, 2007); *Bank of N.Y. v. Scott*, No. 2008-10-7076 (C.P. Summit Cnty. Oct. 9, 2008); *Bank of N.Y. v. Eatmon*, No. 2007-10-7093 (C.P. Summit Cnty. Oct. 10, 2007); *Bank of N.Y. v. Brumit*, *No*. 2006-12-7889 (C.P. Summit Cnty. Dec. 5, 2006);

> (c)    WMC Mortgage Corporation served as Originator, including with respect to loans in the GE Trusts.  *See, e.g.*, *WMC Mortgage Corp. v. Brown*, No.

06-005359 (N.Y. Sup. Ct. 2007) (foreclosing on mortgage loan which was part of the GE-WMC 2005-2 Trust);

(d)     First NLC served as Originator, including loans in the First NLC Trusts. *See, e.g.*, *Bank of N.Y. v. Sowle*, No. CI0200706647 (C.P. Lucas Cnty. Oct. 5, 2007);

(e)     Decision One Mortgage Company LLC served as Originator. *See, e.g.*, *Bank of N.Y. v. Mulligan*, 958 N.Y.S.2d 59 (N.Y. Sup. Ct. 2010); and

(f)     Encore Credit Corporation served as Originator. *See, e.g.*, *Bank of N.Y. v. Orosco*, No. 32052/07 (N.Y. Sup. Ct. Nov. 29, 2007); *Bank of N.Y. v. Russell*, No. 2007-F-790 (C.P. Hancock Cnty. Nov. 14, 2007); *Bank of N.Y. v. Hahn*, No. CI0200708222 (C.P. Lucas Cnty. Dec. 19, 2007).

125.    Sometimes the defaults and foreclosures occurred just months after the loan was originated or securitized.  In each foreclosure, BNY Mellon had a duty to examine foreclosure filings.  *See, e.g.*, Countrywide PSA § 8.01 ("The Trustee, upon receipt of all resolutions, certificates, statements, opinions, reports, documents, orders or other instruments furnished to the Trustee that are specifically required to be furnished pursuant to any provision of this Agreement shall examine them to determine whether they are in the form required by this Agreement").

126.    Through its review of these filings, BNY Mellon knew that the borrowers either (i) did not qualify for the loans because they did not have the ability to repay the loans; (ii) were victims of predatory lending; or (iii) were given a loan that did not comply with state or federal law.

127.    Beginning in 2009 or 2010, facts began to emerge publicly demonstrating that the Sponsors and Originators had violated the representations and warranties provided in connection with the Covered Trusts.  These facts, some of which are detailed below, demonstrated that the Sponsors and Originators regularly included loans in securitizations that did not comply with applicable underwriting guidelines, made predatory loans and

failed to meet state and federal lending guidelines.  While investors such as Plaintiffs lacked

the ability to determine whether the publicly reported misconduct by the Sponsors and

Originators impacted specific loans backing the Covered Trusts, BNY Mellon had

knowledge of specific problems with specific loans as well as access to the mortgage loan

files.  At a minimum, in its role as trustee to more than a thousand RMBS trusts, BNY

Mellon was privy to information that would have provided the "scent" of a problem with the

loans underlying the Covered Trusts.  Having caught wind of the problem, BNY Mellon had

statutory and common law duties requiring it to "nose to the source."

128.    BNY Mellon also commenced repurchase actions against Sponsors or

Originators at issue here.  However, these actions did not include the Covered Trusts despite

allegations by BNY Mellon that the Sponsors' and Originators' misconduct was widespread

and systemic.  For example, at the direction of certain certificateholders, BNY Mellon, in its

role as trustee or securities administrator, commenced actions against, among other

originators and sponsors, WMC Mortgage Corp. (the Originator of loans for two of the

Covered Trusts) to compel repurchase of loans that breached representations and warranties.

Compl., *The Bank of N.Y. Mellon v. WMC Mortg., LLC*, No. 654464/2012 (N.Y. Sup. Ct. Feb.

24, 2013).  In each of the repurchase actions brought by BNY Mellon, loan level reviews

were conducted which identified breach rates with respect to loans originated during the

same period as the loans in the Covered Trusts as high as 99%.

129.    BNY Mellon also received written notice of systemic and widespread Sponsor

breaches from monoline insurers.

130.    Monoline insurance is a form of credit enhancement that involves purchasing

insurance to cover losses from any defaults.  Many RMBS trusts were insured by monoline

insurers.  The sponsors of the mortgage loans made representations and warranties concerning

the underwriting standards of the loans in the governing agreements for the insured RMBS.  The

governing agreements for the insured RMBS transactions have a repurchase procedure through

which the monoline insurers must provide notice of a breach of representation and warranty to

the responsible mortgage loan sponsor and the parties to the agreement, including the trustee.

131.    Monoline insurers have filed many complaints against the Sponsors and

Originators of the Covered Trusts for breaches of their representations and warranties in

connection with other RMBS trusts.  Prior to filing suit against the mortgage loan sponsors, the

monoline insurers were often able to obtain and carry out a forensic loan level review of the

loans at issue.

132.    For example, in *MBIA Ins. Co. v. Countrywide Home Loans, Inc.*, No.

602825/2008 (N.Y. Sup. Ct. Aug. 24, 2009), the monoline insurer MBIA Insurance Corporation

("MBIA") sued Bank of America and Countrywide, reporting that its review of loan files

securitized by the defendants revealed breaches of representations and warranties, including an

extraordinarily high incidence of material deviations from the underwriting standards that

defendants represented would be followed.  Of the loan files that were re-underwritten by MBIA,

91% of defaulted or delinquent loans in fifteen Countrywide securitizations contained material

discrepancies from underwriting guidelines.  *Id. ¶* 80.

133.    The parties settled the case in May 2013 and Bank of America agreed to, among

other things, pay MBIA $1.6 billion in cash.

134.    Additionally, in Am. Compl., *Syncora v. Countrywide Home Loans Inc.*, No.

6540042/2009 (N.Y. Sup. Ct. May 6, 2010), the monoline insurer Syncora sued Countrywide

and Bank of America.  Syncora reported that its review of loan files securitized by the

defendants revealed breaches of representations and warranties, including an extraordinarily high incidence of material deviations from the underwriting standards that defendants represented would be followed.  Syncora reported that of the 4,098 loans reviewed, 72% contained severe breaches of Countrywide's underwriting guidelines.  *Id.* ¶ 82.

135.   BNY Mellon received notice of the Countrywide monoline actions as it was the trustee for the trusts in that action.

136.   Because these monoline insurers' findings from loan level reviews set forth both in their breach notices and publicly available lawsuits reflected these common mortgage loan sellers' systemic and pervasive violations of underwriting and securitization guidelines, BNY Mellon discovered that these same defective underwriting and securitization practices applied equally to the Covered Trusts containing loans originated and securitized by these same Originators and Sponsors.

137.   BNY Mellon should have provided Certificateholders notice of these defaults. Instead, BNY Mellon did nothing.  If BNY Mellon had provided notice to Certificateholders, it would have forced the Sponsors or Originators to repurchase or substitute the relevant loans and the Sponsors would not have been able to issue additional fraudulent RMBS certificates.

### 1.   The Originators' and Sponsors' Pervasive Breaches of Representations and Warranties

138.   Either the Sponsors or Originators, and sometimes both, provided representations and warranties to the Covered Trusts.

139.   The Master Servicers' or Servicers' failure to provide notice of their breaches of representations and warranties constituted a default that would have ripened into an Event of Default had BNY Mellon provided notice of the default.

140.    The chart below identifies each of the entities disclosed to be the Sponsors,

Originators and obligors of the loans included in the Covered Trusts:

| | Trust | Sponsor | Originators | Obligors |
|---|---|---|---|---|
| 1 | CBASS 2005-CB4 | Credit-Based Asset Servicing and Securitization LLC | Wilmington Finance, Inc.; Lime Financial Services, Ltd.; Millennium Funding; NC Capital Corporation | Credit-Based Asset Servicing and Securitization LLC |
| 2 | CBASS 2005-CB8 | Credit-Based Asset Servicing and Securitization LLC | New Century Mortgage Corporation; Ameriquest Mortgage Company; First NLC Financial Services Inc. | Credit-Based Asset Servicing and Securitization LLC |
| 3 | CBASS 2006-CB3 | Credit-Based Asset Servicing and Securitization LLC | New Century Mortgage Corporation; Ownit Mortgage Solutions Inc.; Encore Credit Corporation | Credit-Based Asset Servicing and Securitization LLC |
| 4 | CWALT 2005-AR1 | Countrywide Home Loans, Inc. | MILA, Inc.; Decision One Mortgage Company LLC | Countrywide Home Loans, Inc. |
| 5 | CWALT 2006-27CB | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. |
| 6 | CWALT 2006-OA10 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. |
| 7 | CWALT 2006-OA11 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; MortgageIT, Inc. | Countrywide Home Loans, Inc. |
| 8 | CWALT 2006-OA3 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. |
| 9 | CWALT 2006-OA6 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; MortgageIT, Inc. | Countrywide Home Loans, Inc. |
| 10 | CWHEL 2005-H | Countrywide Home Loans, Inc. | Countrywide Bank, N.A.; Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. |
| 11 | CWL 2005-6 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. |

|    | **Trust** | **Sponsor** | **Originators** | **Obligors** |
|----|-----------|-------------|-----------------|--------------|
| 12 | CWL 2005-AB4 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. |
| 13 | CWL 2005-AB5 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. |
| 14 | CWL 2005-BC1 | Countrywide Home Loans, Inc. | Encore Credit Corporation; Decision One Mortgage | Countrywide Home Loans, Inc. |
| 15 | CWL 2005-IM3 | Countrywide Home Loans, Inc. | Impac Funding Corporation | Countrywide Home Loans, Inc. |
| 16 | CWL 2006-1 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. |
| 17 | CWL 2006-14 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. |
| 18 | CWL 2006-4 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. |
| 19 | CWL 2006-9 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. |
| 20 | ECR 2005-1 | ECC Capital Corporation | Encore Credit Corporation | ECC Capital Corporation |
| 21 | FHAMS 2005-FA5 | First Horizon Home Loan Corporation | First Horizon Home Loan Corporation | First Horizon Home Loan Corporation |
| 22 | FHAMS 2005-FA7 | First Horizon Home Loan Corporation | First Horizon Home Loan Corporation | First Horizon Home Loan Corporation |
| 23 | FNLC 2005-1 | First NLC Financial Services, LLC | First NLC Financial Services, LLC | First NLC Financial Services, LLC |
| 24 | FNLC 2005-2 | First NLC Financial Services, LLC | First NLC Financial Services, LLC | First NLC Financial Services, LLC |
| 25 | GE-WMC 2005-2 | GE Mortgage Holding LLC | WMC Mortgage Corporation | WMC Mortgage Corp. |
| 26 | GE-WMC 2006-1 | GE Mortgage Holding LLC | WMC Mortgage Corporation | WMC Mortgage Corporation |
| 27 | OWNIT 2006-1 | Credit-Based Asset Servicing and Securitization LLC | Ownit Mortgage Solutions, Inc. | Credit-Based Asset Servicing and |

| | **Trust** | **Sponsor** | **Originators** | **Obligors** |
|---|---|---|---|---|
| | | | | Securitization LLC |

141.    As detailed below, in 2009 and 2010 facts began to emerge that demonstrated that the Sponsors and Originators systematically abandoned applicable underwriting guidelines and therefore breached representations and warranties in all securitizations.

142.    The Sponsors and Originators have been the subject of numerous investigations and lawsuits alleging systematic abandonment of underwriting guidelines in the pursuit of profits.  These investigations and lawsuits contain ample evidence available to BNY Mellon that mortgage loans originated and sponsored by the relevant Originators and Sponsors breached the associated representations and warranties.  Not only do these investigations and lawsuits contain accounts from confidential witnesses and former employees, but many complaints contain detailed information based on forensic reviews of individual loans.  Further, these lawsuits and investigations demonstrate that the originators originated mortgage loans with the goal of increasing volume, rather than evaluating the mortgagor's ability to repay the loan and regularly made exceptions to underwriting guidelines in the absence of sufficient compensating factors.  These lawsuits, in conjunction with the poor performance of the underlying loans (which BNY Mellon was aware of as it issued regular reports regarding performance) and the public information concerning widespread issues among all originators, were more than sufficient to provide BNY Mellon with notice that large numbers of loans originated and sponsored by the relevant Originators and Sponsors breached the associated representations and warranties.

143.    BNY Mellon was aware of these reports, investigations, lawsuits and it also has additional information concerning representation and warranty violations it learned in the course of administering the Covered Trusts.  It also had access to non-public information regarding the

Covered Trusts that would have confirmed the representation and warranty violations if BNY Mellon had conducted even a limited investigation.  Thus, BNY Mellon was aware of the defaults, but failed to provide the required notice and pursue repurchase claims.

### a.   Ameriquest Mortgage Company

144.    Ameriquest Mortgage Company ("Ameriquest") systemically violated its mortgage underwriting guidelines, including, among other things, by disregarding or misstating income, assets and employment information of borrowers.  Ameriquest originated mortgage loans included in the CBASS 2005-CB8 Trust.

145.    As a result of a multi-state investigation by state attorneys general, many states commenced litigation against Ameriquest on the basis of Ameriquest's systemic disregard for its underwriting standards and predatory lending.  For example, in *Washington v. ACC Capital Holdings*, No. 06-2-09702 (Wash. Super. Ct. Mar. 21, 2006), the complaint alleged that Ameriquest engaged in unfair or deceptive acts or practices by making deceptive representations or omissions regarding loan terms, prepayment penalties, repeat financing, inflated appraisals and income and loan unsuitability, among other things.

146.    In connection with the multi-state investigation, the Connecticut Attorney General stated that:

- Ameriquest pressured appraisers to inflate property values so borrowers could get bigger loans, imposed upfront fees without reducing interest rates as promised and told borrowers to ignore written information about interest rates because they would give them lower rates later.  The company is alleged to have given them higher interest rates instead.

- Ameriquest also assured some borrowers their loans would have no prepayment penalties, then inserted such payments into the final loan documents; delayed the time period between the loan closing and the funding; and misrepresented fees and costs. . . .

- Other Ameriquest predatory practices included telling consumers that the initial fixed rate on an adjustable rate loan lasted longer than it did, and instructing them to ignore or disparaging federal truth in lending requirements.

- The company routinely fabricated consumers' income by claiming that recipients had phony "sewing" or "lawn" businesses. In one instance, the company falsely claimed that an elderly Connecticut woman operated a sewing business, even though she was blind.

News Release, Conn. Dep't of Banking, Conn. Dep't of Consumer Protection, & The Attorney Gen., Ameriquest to Pay $325 Million for Predatory Lending Practices that Bilked Consumers (Jan. 23, 2006), *available at* http://www.ct.gov/dob/cwp/view.asp?a=2245&q=309018.

147.    Illinois Attorney General Lisa Madigan testified before the Financial Crisis Inquiry Commission ("FCIC") that Ameriquest engaged in fraudulent practices, which included inflating home appraisals, increasing the interest rates on borrowers' loans from fixed to adjustable interest rates at closing and promising borrowers that they could refinance costly loans with better terms in a short period of time, despite having no equity to absorb another refinance. *See Causes and Current State of the Financial Crisis: Hearing Before the Fin. Crisis Inquiry Comm., Permanent Subcomm. On Investigations* (2010) (statement of Lisa Madigan, Attorney Gen. of Ill.), *available at* http://www.gpo.gov/fdsys/pkg/GPO-FCIC/content-detail.html.

148.    Ed Parker, the former head of Ameriquest's Mortgage Fraud Investigations Department, testified before the FCIC that he detected and reported fraud "at the company within one month of starting his job there[], but senior management did nothing." *See id.* at 12.

149.    According to Prentiss Cox, a former Minnesota Assistant Attorney General, he reviewed a sampling of Ameriquest loan files and "found blatant misrepresentations of

employment."  *See id.*

150.    Based on a 2010 OCC report, Ameriquest was ranked as the ninth worst

mortgage originator based on the number of foreclosures.  Press Release, John C. Dugan,

Comptroller of the Currency, Appendix B: Activities of National Banks Related to Subprime

Lending, remarks before the FCIC, Washington, D.C. (Apr. 8, 2010), *available at*

http://www.occ.treas.gov/ftp/release/2010-39d.pdf.

### b.  Countrywide Home Loans,
### Inc. and Countrywide Bank, N.A.

151.    Countrywide originated mortgage loans included in 14 of the Countrywide

Trusts and sponsored 17 Covered Trusts, as set forth in the chart above.  *See* supra pp. 53–55.

152.    From 2000–2003, Countrywide rose to prominence as a mortgage lender

originating hundreds of billions of dollars' worth of loans annually and securitizing them for

sale.  Business expanded so rapidly that Countrywide's founder and CEO, Angelo Mozilo,

stated publicly that, by 2006, Countrywide would be the Nation's "dominant" home-

mortgage lender.  By 2004, however, Countrywide recognized that it would be unable to

reach its lofty goals if it limited itself to lending to borrowers who qualified under prudent

loan underwriting standards.

153.    In order to fuel Countrywide's growth, Countrywide resolved to approve any

loan that could be securitized for sale to third parties, without regard to whether the loan

complied with Countrywide's already lax underwriting standards.  As Countrywide's CFO,

David Sambol, stated in a February 13, 2005 email (which was not made public until years

later):  "We should be willing to price virtually any loan that we reasonably believe we can

sell/securitize without losing money, even if other lenders can't or won't do the deal."

Amanda Bransford, *MassMutual Brings New RMBS Suit Against Countrywide Execs*,

Law360 (Apr. 24, 2012), http://www.law360.com/articles/333621/

massmutual-brings-new-rmbs-suit-against-countrywide-execs.

154.    Additionally, the SEC has released documents showing that Countrywide adopted

a "matching" strategy whereby it would provide any mortgage product feature offered by a

competitor.  This "matching" strategy could only be implemented through abandonment of

Countrywide's supposed credit-risk-reducing underwriting guidelines.  To get around its own

requirements, Countrywide set up a system whereby any loan could be approved by way of

underwriting "exceptions" and coached borrowers on how to apply for loan products that

required little or no income or asset verification.

155.    Internal documents show that "exceptions" were involved in upwards of one-third

of all loans, and were based purely on the desire to increase loan volume (and profits) and not on

"compensating factors" as represented.  Countrywide deliberately offloaded the worst of these

loans to securitizations sold to investors such as Plaintiffs.

156.    In 2006, Countrywide internal reviews concluded that one third of all

Countrywide loans violated its underwriting guidelines.  As set forth in the complaint in

*American Fiduciary Assurance Company v. Countrywide Financial Corporation*, "Frank

Aguilera, a Countrywide Managing Director responsible for risk management, reported the

'particularly alarming' result . . . that 23% of the subprime loans," which were often included as

prime or Alt-A loans in Countrywide's securitizations,

> were generated as exceptions, even taking into account "all
> guidelines, published and not published, approved and not yet
> approved."  The exception rate for "80/20" products (which [were]
> particularly risky because they required 100% financing) was even
> higher.  Aguilera wrote at the time: "[t]he results speak towards
> our inability to adequately impose and monitor controls on
> production operations."

Compl. ¶ 124, *Am. Fid. Assurance Co. v. Countrywide Fin. Corp.*, No. 11-cv-361D (W.D. Okla.

Apr. 1, 2011).  Another internal review conducted around the same time concluded that

"approximately 40% of the Bank's reduced documentation loans . . . could potentially have

income overstated by more than 10% and a significant percent of those loans would have income

overstated by 50% or more."  *See id.* ¶ 116 (omitted text in original).

157.    In a television special titled, "*If You Had a Pulse, We Gave You a Loan*," Dateline

NBC reported on March 27, 2009:

- To highlight just how simple it could be to borrow money, Countrywide marketed one of its stated-income products as the "Fast and Easy loan."

- As manager of Countrywide's office in Alaska, Kourosh Partow pushed Fast and Easy loans and became one of the company's top producers.

- He said the loans were "an invitation to lie" because there was so little scrutiny of lenders.  "We told them the income that you are giving us will not be verified.  The asset that you are stating will not be verified."

- He said they joked about it:  "If you had a pulse, we gave you a loan.  If you fog the mirror, give you a loan."

- Partow said that the practice of pushing through loans with false information was common and was known by top company officials.  "It's impossible they didn't know."

- He lamented the decline of what he saw as a great place to work, suggesting a push to be number one in the business led Countrywide astray.  He blamed Angelo Mozilo, a man he long admired, for taking the company down the wrong path. According to former senior account executive Bob Feinberg, Countrywide's problem was not limited to stated income loans. Countrywide also became a purveyor of loans that many consumer experts contend were a bad deal for borrowers, with low introductory interest rates that later could skyrocket.

- In many instances, Feinberg said, that meant borrowers were getting loans that were 'guaranteed to fail.'

*If You Had a Pulse, We Gave You a Loan* (Chris Hansen, NBC Dateline Mar. 22, 2009),

*available at*

http://www.msnbc.msn.com/id/29827248/ns/dateline_nbc_the_hansen_files_with_chris_hansen.

158.    On June 4, 2009, the SEC sued Angelo Mozilo and other Countrywide executives,

alleging securities fraud.  Specifically, the SEC alleged that Mozilo and the others misled

investors about the credit risks that Countrywide created with its mortgage origination business,

telling investors that Countrywide was primarily involved in prime mortgage lending, when it

was actually heavily involved in risky sub-prime loans with expanded underwriting guidelines.

*See* Compl., *SEC v. Mozilo*, No. 09-cv-3994 (C.D. Cal. June 4, 2009).  Mozilo and the other

executives settled the charges with the SEC for $73 million on October 15, 2010.  *See* Walter

Hamilton & E. Scott Reckard, *Angelo Mozilo, Other Former Countrywide Execs Settle Fraud

Charges*, L.A. Times, Oct. 16, 2010, at A1.

159.    Internal Countrywide e-mails the SEC released in connection with its lawsuit

show the extent to which Countrywide systematically deviated from its underwriting guidelines.

For example, in an April 13, 2006 e-mail from Mozilo to other top Countrywide executives,

Mozilo stated that Countrywide was originating home mortgage loans with "serious disregard for

process, compliance with guidelines and irresponsible behavior relative to meeting timelines."

E-mail from Angelo Mozilo, CEO, Countrywide Financial, to Eric Sieracki, Stan Kuland, Dave

Sambol, David Spector & John Murray, Managing Directors, Countrywide Financial (Apr. 23,

2006 7:42 PM PST), *available at*

www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.  Mozilo also wrote that he had

"personally observed a serious lack of compliance within our origination system as it relates to

documentation and generally a deterioration in the quality of loans originated versus the pricing

of those loan[s]."  *Id.*

160.    Indeed, in September 2004, Mozilo had voiced his concern over the "clear deterioration in the credit quality of loans being originated," observing that "the trend is getting worse" because of competition in the non-conforming loans market.  With this in mind, Mozilo argued that Countrywide should "seriously consider securitizing and selling ([Net Interest Margin Securities]) a substantial portion of [Countrywide's] current and future sub prime [sic] residuals."  E-mail from Angelo Mozilo, CEO, Countrywide to Stan Kurland & Keith McLaughlin, Managing Directors, Countrywide Financial (Sept. 1, 2004 8:17 PM PST), *available at* www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.

161.    To protect themselves against poorly underwritten loans, parties that purchase loans from an originator frequently require the originator to repurchase any loans that suffer Early Payment Default.

162.    Countrywide sold a product called the "Pay Option ARM."  This loan was a 30-year adjustable rate mortgage that allowed the borrower to choose between various monthly payment options, including a set minimum payment.  In a June 1, 2006 e-mail, Mozilo noted that most of Countrywide's Pay Option ARMs were based on stated income and admitted that "[t]here is also some evidence that the information that the borrower is providing us relative to their income does not match up with IRS records."  E-mail from Angelo Mozilo to Carlos Garcia, former CFO, Countrywide Financial, Jim Furash, former President, Countrywide Bank, Stan Kurland & Dave Sambol, Managing Directors, Countrywide Financial (June 1, 2006 10:38 PM PST), *available at* www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.

163.    An internal quality control report e-mailed on June 2, 2006, showed that for stated income loans, 50.3% of loans indicated a variance of 10% or more from the stated income in the

loan application.  *See* E-mail from Clifford Rossi, Chief Risk Officer, Countrywide, to Jim

Furash, Executive, CEO, Countrywide Bank, N.A., among others (June 2, 2006 12:28 PM PST),

*available at* www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.

164.    Countrywide, apparently, was "flying blind" on how one of its popular loan

products, the Pay Option ARM loan, would perform, and admittedly, had "no way, with any

reasonable certainty, to assess the real risk of holding these loans on [its] balance sheet."  E-mail

from Angelo Mozilo to David Sambol, Managing Director, Countrywide Financial (Sept. 26,

2006 10:15 AM PST), *available at*

www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.  Yet such loans were

securitized and passed on to unsuspecting investors such as the Plaintiffs.

165.    With growing concern over the performance of Pay Option ARM loans in the

waning months of 2007, Mozilo advised that he "d[id]n't want any more Pay Options originated

for the Bank."  E-mail from Angelo Mozilo to Carlos Garcia, former Managing Director,

Countrywide Financial (Nov. 3, 2007 5:33 PM PST), *available at*

www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.  In other words, if

Countrywide was to continue to originate Pay Option ARM loans, it was not to hold onto the

loans.  Mozilo's concerns about Pay Option ARM loans were rooted in "[Countrywide's]

inability to underwrite [Pay Option ARM loans] combined with the fact that these loans [we]re

inherently unsound unless they are full doc, no more than 75% LTV and no piggys."  *Id*.

166.    In a March 27, 2006 e-mail, Mozilo reaffirmed the need to "oversee all of the

corrective processes that will be put into effect to permanently avoid the errors of both

judgement [sic] and protocol that have led to the issues that we face today" and that "the people

responsible for the origination process understand the necessity for adhering to the guidelines for

100% LTV sub-prime product.  This is the most dangerous product in existence and there can be

nothing more toxic and therefore requires that no deviation from guidelines be permitted

irrespective of the circumstances."  E-mail from Angelo Mozilo to the former Countrywide

Managing Directors (Mar. 27, 2006 8:53 PM PST), *available at*

www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.

167.    Yet Countrywide routinely found exceptions to its underwriting guidelines

without sufficient compensating factors.  In an April 14, 2005 e-mail, Frank Aguilera, a

Countrywide managing director, explained that the "spirit" of Countrywide's exception policy

was not being followed.  He noted a "significant concentration of similar exceptions" that

"denote[d] a divisional or branch exception policy that is out side [sic] the spirit of the policy."

E-mail from Frank Aguilera, Managing Director, Countrywide, to John McMurray, Managing

Director, Countrywide (Apr. 14, 2005 12:14 PM PDT), *available at*

www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.  Aguilera continued: "The

continued concentration in these same categories indicates either a) inadequate controls in place

to mange [sic] rogue production units or b) general disregard for corporate program policies and

guidelines."  *Id.*  Aguilera observed that pervasive use of the exceptions policy was an industry-

wide practice.

> It appears that [Countrywide Home Loans]' loan exception policy
> is more loosely interpreted at [Specialty Lending Group] than at
> the other divisions.  I understand that [Correspondent Lending
> Division] has decided to proceed with a similar strategy to appease
> their complaint customers. . . . [Specialty Lending Group] has
> clearly made a market in this unauthorized product by employing a
> strategy that Blackwell has suggested is prevalent in the industry. .
> . .

*Id.*

168.    Internal reports months after an initial push to rein in the excessive use of exceptions with a "zero tolerance" policy showed the use of exceptions remained excessive. E-mail from Frank Aguilera, Managing Director, Countrywide, to Brian Kuelbs, Managing Director, Countrywide, among others (June 12, 2006 10:13 AM PST), *available at* www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.

169.    In February 2007, nearly a year after pressing for a reduction in the overuse of exceptions and as Countrywide claimed to be tightening lending standards, Countrywide executives found that exceptions continued to be used at an unacceptably high rate.  Frank Aguilera stated that any "[g]uideline tightening should be considered purely optics with little change in overall execution unless these exceptions can be contained."  E-mail from Frank Aguilera, Managing Director, Countrywide, to Mark Elbuam, Managing Director, Countrywide, among others (Feb. 21, 2007 4:58 PM PST), *available at* www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.

170.    John McMurray, a former Countrywide managing director, expressed his opinion in a September 2007 e-mail that "the exception process has never worked properly."  E-mail from John McMurray, Managing Director, to Jess Lederman, Managing Director, Countrywide (Sept. 7, 2007 10:12 AM PST), *available at* www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.

171.    Countrywide conceded that the poor performance of loans it originated was, in many cases, due to poor underwriting.  In April 2007, Countrywide noticed that its high CLTV ratio stated income loans were performing worse than those of its competitors.  After reviewing many of the loans that went bad, a Countrywide executive stated that "in most cases [poor performance was] due to poor underwriting related to reserves and verification of assets to

support reasonable income."  E-mail from Russ Smith, Countrywide, to Andrew Gissinger,

Managing Director, Countrywide (Apr. 11, 2007 7:58 AM PST), *available at*

www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.

172.    On July 1, 2008, NBC Nightly News aired the story of a former Countrywide

regional Vice President, Mark Zachary, who sued Countrywide after he was fired for questioning

his supervisors about Countrywide's poor underwriting practices.

173.    According to Mr. Zachary, Countrywide pressured employees to approve

unqualified borrowers.  Countrywide's mentality, he said, was "what do we do to get one more

deal done.  It doesn't matter how you get there [i.e., how the employee closes the deal] . . . ."

*NBC Nightly News: Countrywide Whistleblower Reports "Liar Loans"* (NBC July 1, 2008)

("July 1, 2008 NBC Nightly News").  Zachary also stated that the practices were not the work of

a few bad apples, but rather:  "It comes down, I think from the very top that you get a loan done

at any cost." *Id.*

174.    Mr. Zachary also told of a pattern of: 1) inflating home appraisals so buyers could

borrow enough to cover closing costs, but leaving the borrower owing more than the house was

truly worth; 2) employees steering borrowers who did not qualify for a conventional loan into

riskier mortgages requiring little or no documentation, knowing they could not afford it; and

3) employees coaching borrowers to overstate their income in order to qualify for loans.  *Id*.

175.    NBC News interviewed six other former Countrywide employees from different

parts of the country who confirmed Zachary's description of Countrywide's corrupt culture and

practices.  Some said that Countrywide employees falsified documents intended to verify

borrowers' debt and income to clear loans.  NBC News quoted a former loan officer:  "I've seen

supervisors stand over employees' shoulders and watch them . . . change incomes and things like

that to make the loan work." *Id.*

176.    Not surprisingly, Countrywide's complete disregard for proper loan underwriting has spawned numerous lawsuits, including many regarding the Covered Trusts. As part of these lawsuits, plaintiffs have performed forensic analyses and re-underwritten entire loan files. The staggering number of loans breaching the associated representations and warranties discovered in these cases would have alerted even the most casual of observers that Countrywide loans were highly likely to have breached the associated representations and warranties.

177.    For example, on December 27, 2010, Allstate Insurance Company and its affiliates filed an action against Bank of America, Countrywide and others concerning certain Countrywide sponsored RMBS offerings, including two of the Covered Trusts—CWL 2006-1 and CWL 2006-9. *See* Compl., *Allstate Ins. Co. v. Countrywide Fin. Corp.*, No. 10-cv-09591 (S.D.N.Y. Dec. 27, 2010). In that action, Allstate alleged that Countrywide systemically ignored its stated underwriting guidelines and misrepresented LTV ratios, CLTV ratios and owner occupancy levels for the loans sold to these Covered Trusts. *Id.*; *see also* Compl., *Allstate Ins. Co., v. Countrywide Fin. Corp.*, No. 11-cv-05236 (C.D. Cal. Nov. 10, 2011) (action based on, among other things, misrepresentations concerning two Covered Trusts—CWL 2006-1 and CWL 2006-9); Compl., *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 10-cv-00302 (C.D. Cal. June 6, 2011) (action involving misrepresentations concerning 16 out of the 17 Countrywide Trusts); Compl., *Ret. Bd. of the Policemen's Annuity and Benefit Fund of the City of Chicago v. Bank of N.Y. Mellon*, No. 11-cv-05459 (S.D.N.Y. Aug. 5, 2011) (action involving misrepresentations concerning 15 out of the 17 Countrywide Trusts); Compl., *Northern Rock (Asset Management) PLC v. USB Inv. Bank*, No. 650623/2013 (N.Y. Sup. Ct. Aug. 1, 2013) (action involving misrepresentations concerning CWALT 2006-OA10 and CWALT 2006-

OA11); Compl., *Fed. Home Loan Bank of Seattle v. Countrywide Sec. Corp.*, No. 09-2-46321-2 (King Cnty. Super. Ct. Dec. 23, 2009) (action involving misrepresentations concerning CWALT 2006-OA6); Compl., *Anh Nguyet Tran v. Bank of N.Y.*, No. 13-cv-00580 (S.D.N.Y. Jan. 25, 2013) (same); Compl., *Waterfall Eden Master Fund, Ltd. v. Countrywide Fin. Corp.*, No. 11-cv-03871 (S.D.N.Y. June 6, 2011) (action involving misrepresentations concerning CWL 2006-9).

178.    Further, on August 8, 2011, American International Group, Inc. ("AIG") and several of its affiliates filed a highly publicized securities fraud action against Bank of America Corporation and several affiliated entities concerning certain Countrywide sponsored RMBS offerings.  Compl., *AIG v. Bank of Am.*, No. 652199/2011 (N.Y. Sup. Ct. Aug. 8, 2011).  The action involved ten Covered Trusts that contain high percentages of Countrywide originated loans: CWALT 2005-AR1, CWALT 2006-OA11, CWL 2006-6, CWL 2005-AB4, CWL 2005-AB5, CWL 2005-IM3, CWL 2006-1, CWL 2005-6, CWL 2006-4 and CWL 2006-9.  AIG alleged that Countrywide systemically ignored its stated underwriting guidelines and misrepresented LTV ratios, CLTV ratios and owner occupancy levels for the loans sold to these Covered Trusts.  *See id.*

179.    Additionally, in September 2011, Massachusetts Mutual Life Ins. Co. ("Mass. Mutual"), an RMBS investor, sued Countrywide and others regarding RMBS for which Countrywide was the sponsor, including for four of the Covered Trusts: CWALT 2006-OA3, CWALT 2006-OA6, CWALT 2006-OA10 and CWALT 2006-OA11.  Mass. Mutual conducted a forensic analysis of loans underlying several RMBS trusts including those four Covered Trusts, which revealed that for those Covered Trusts, between 47–50% of the loans tested had appraisals inflated by 10% or more, and 37–41% of the loans tested had LTVs that were 10 or more points more than represented.  *See* Compl., ¶¶ 239–43, 249-53, 264–68, 269–73, *Mass. Mutual Life Ins.*

*Co. v. Countrywide Fin. Corp.*, No. 11-cv-10414 (D. Mass. Sept. 1, 2011).

180.     Further, in September 2011, the Federal Housing Finance Agency ("FHFA") filed an action against Countrywide and others in which FHFA performed a review of loans from six of the Covered Trusts—CWALT 2005-AR1, CWL 2005-AB4, CWL 2005-AB5, CWL 2006-14, CWL 2006-4 and CWL 2006-9.  Compl., *FHFA v. Countrywide Financial Corporation*, No. 652436/2011 (N.Y. Sup. Ct. Sept. 2, 2011).  FHFA found that the offering materials had understated the actual amount of loans with LTV ratios of: (i) 80% or greater by 17–54%; and (ii) 100% or greater by 6–14%.  *Id.* ¶ 136.  FHFA further found that the offering materials overstated the actual percentage of owner-occupied properties by 8–13%, and that more than 61% of the sampled loans were currently in default.  *Id.* ¶¶ 132, 198.

181.     In August 2014, BAC reached a $16.65 billion settlement with the Department of Justice to resolve federal and state claims against BAC and its former and current subsidiaries, including Countrywide.  The resolution required BAC to provide much needed relief to underwater homeowners and potential homebuyers.  Under the terms of the settlement, BAC receives credit for modifying loans, including securitized loans.  BAC has modified loans that did not qualify for modification under prudent servicing standards or the governing servicing agreements in order to receive credit because the investors, not BAC, would bear the loss.

182.     BNY Mellon is and was aware of BAC's misconduct, including its effort to shift the cost of regulatory fines to investors, such as Plaintiffs, and yet has failed to act to protect their interests.

183.     Countrywide's systemic abandonment of its underwriting guidelines has had a devastating effect on the performance of the Countrywide Trusts.  Most of the Certificates acquired by Plaintiffs were triple-A or double-A rated at the time of purchase.  *See* Ex. D.

Now most are "junk" bonds that do not qualify for any investment grade rating. *See id.* These downgrades were prompted by the alarming rate of defaults and delinquencies of the mortgage loans backing the Covered Trusts and the information that has emerged concerning Countrywide's systemic abandonment of underwriting guidelines. *See* Ex. E.

184.    Countrywide's failure to adhere to applicable underwriting guidelines constituted a default under the PSAs because Countrywide represented and warranted that the loans included in the Covered Trusts complied with Countrywide's underwriting guidelines. The Master Servicer, the Depositors, Countrywide and BNY Mellon failed to provide notice of those breaches as they were required to do under the PSAs. If BNY Mellon had provided notice, Countrywide would have had to replace or repurchase the relevant loans and stop including large numbers of defective and non-compliant loans in mortgage loan securitizations.

<b>c.      Credit-Based Asset Servicing and Securitization LLC</b>

185.    C-BASS frequently served as the sponsor of securitizations, including the CBASS 2005-CB4, CBASS 2005-CB8 and CBASS 2006-CB3 Trusts.

186.    C-BASS breached its representations and warranties under the PSAs for the C-BASS Trusts by failing to properly review and determine borrowers' ability and willingness to repay debts. *See* C-BASS PSA § 2.04.

187.    As alleged herein, the Originators from whom C-BASS purchased loans systematically disregarded their underwriting standards, originated mortgage loans with the goal of increasing volume, rather than evaluating the mortgagor's ability to repay the loan and regularly made exceptions to their underwriting guidelines in the absence of sufficient compensating factors.

188.     C-BASS retained a third-party vendor called Clayton Holdings ("Clayton") to perform due diligence on loans that it acquired for securitization.  Clayton performed similar services to most major securitization sponsors.  In response to post-financial crisis government inquires, Clayton has made public the results of some due diligence reviews.  With respect to C-BASS, Clayton found that 29% of the total loans underwritten by C-BASS failed to meet the underwriting standards, but that C-BASS waived its right to reject 43% of these non-conforming loans, and included these breaching loans in the securitizations anyway.

189.     Investor lawsuits have documented C-BASS's systematic failure to ensure that loans in its securitizations complied with applicable underwriting guidelines during the 2005 through 2007 timeframe.  In the amended complaint filed on March 18, 2010, in *Fulton County Employees' Retirement System v. MGIC Investment Corp.*, No. 08-cv-00458 (E.D. Wisc. Mar. 18, 2010), a securities fraud class action against MGIC, a controlling shareholder of C-BASS, the class plaintiffs quoted several former senior executives of C-BASS confirming C-BASS's flawed due diligence practices.  For example, a senior forensic underwriting analyst at C-BASS from 2004 until mid-2008 responsible for reviewing defaulted loans stated "that of the defaulting loans sent to her department, she estimated that 75% of those were fraudulent."  *Id. ¶* 119.

190.     Similarly, a Due Diligence Underwriter Contractor for C-BASS from 2004 through 2007 stated:

> from about 2004 on forward through the 2005–2007 timeframe, the quality of loans was falling and consequently the risk component was rising.  He explained that occasionally he would find pools of loans that were all "very poor," and that "it looked like they [C-BASS] were just slapping loans together."  He recalled that in some cases the pools were so bad that 80% to 90% of the loans in the pool were "no good," noting that the continued decrease in underwriting guidelines [loan quality] resulted from a decrease in the integrity of the seller/originator, such as Countrywide.

*Id.* ¶ 125 (bracketed terms in original).

191.    Additionally, on September 2, 2011, FHFA filed an action against Merrill Lynch

and others in which FHFA performed a review of loans from, among other securitizations, two

of the Covered Trusts—CBASS 2006-CB8 and OWNIT 2006-1.  FHFA found that over 30.82%

of the loans with CBASS 2006-CB8 and 8.8% of the loans within OWNIT 2006-1 had LTV

ratios exceeding 100%.  Compl. at Table 9, *FHFA v. Merrill Lynch*, No. 11-cv-6202 (S.D.N.Y.

Sept. 2, 2011).

192.    The results of other investors' loan level reviews of C-BASS-label securitization

trusts that are substantially similar to, and contemporaneous with, the C-BASS Trusts further

demonstrates the faulty securitization practices of C-BASS.  For example, in *FHFA v. Barclays

Bank PLC*, No. 11-cv-06190 (S.D.N.Y. Sept. 2, 2011), FHFA performed a review of loans from

the CBASS 2006-CB1 and CBASS 2007-CB2 offerings, which are similar in vintage and

collateral type to the C-BASS Trusts.  FHFA found that at least 83% of the reviewed loans from

CBASS 2007-CB2 were not underwritten in accordance with underwriting guidelines.  *Id.* ¶ 91,

Table 6-7.  FHFA further found that over 12.82% of the loans with CBASS 2006-CB1 and

29.27% of the loans within CBASS 2007-CB2 had LTV ratios exceeding 100%.  *Id.* at Table 7.

### d.    Decision One Mortgage Company LLC

193.    In 2006, Decision One Mortgage Company LLC ("Decision One") was the 14th

largest subprime lender in the nation.  It specialized in mortgage loans known as Alt-A lending

options, and non-conforming or sub-prime loans.  Decision One originated mortgage loans

included in the CWALT 2005-AR1 and CWL 2005-BC1 Trusts.

194.    According to testimony and documents submitted to the FCIC by a Clayton

executive, during 2006 and the first half of 2007, Clayton reviewed 911,039 loans issued by

originators, including Decision One, for securitization.  Clayton determined over 10% of

Decision One's loans did not comply with its underwriting guidelines and had no compensating

factors.  *See* Clayton All Trending Report, 10 (2006–2007), *available at* http://fcic-

static.law.stanford.edu/cdn_media/fcic-testimony/2010-0923-Clayton-All-Trending-Report.pdf.

195.    Indeed, Decision One's reckless lending practices earned it a spot on the OCC's

2008 "Worst Ten in the Worst Ten" report, a report which identified the ten originators with the

largest number of non-prime mortgage foreclosures for 2005–2007 originations in each of the ten

metropolitan areas with the highest rates of foreclosure in the first half of 2008.  Press Release,

Office of the Comptroller of the Currency, Worst Ten in the Worst Ten (Nov. 13, 2008),

http://www.occ.gov/news-issuances/news-releases/2010/nr-occ-2010-39d.pdf (the "2008 Worst

Ten Report").

196.    Additionally, a complaint filed by Allstate Insurance Company contains

confidential witness statements in which former Decision One employees "described Decision

One's lax attitude towards its own origination and underwriting standards and explained that

Decision One had been approving loans that should have never been issued."  Compl. ¶ 95,

*Allstate Ins. Co. v. Morgan Stanley*, No. 651840/2011 (N.Y. Sup. Ct. July 5, 2011).  On March

15, 2013, the Court granted Morgan Stanley's Motion to Dismiss with respect to a negligent

misrepresentation claim, but denied the motion in all other respects.  *Allstate Ins. Co. v. Morgan

Stanley*, No. 651840/2011, 2013 WL 2369953 (N.Y. Sup. Ct. 2013).

> e.    **ECC Capital Corporation
> and Encore Credit Corporation**

197.    Encore Credit Corporation ("Encore"), founded in 2002, was a subprime lender

specializing in "nonconforming" borrowers and focused on Alt-A and subprime loans, including

"interest-only" loans and ARMs.  Encore (later known as Performance Credit Corp.) was

acquired by Bear Stearns in February 2007, to act as another channel for the origination of subprime loans.  As stated above, in 2007 Bear Stearns also acquired ECC; in 2008, JPMorgan Chase & Co. acquired Bear Stearns.  Encore originated mortgage loans included in the CBASS 2006-CB3, CWL 2005-BC1 and ECR 2005-1 Trusts and ECC served as the sponsor for ECR 2005-1.

198.    Encore has faced a number of TILA lawsuits alleging a host of deceptive loan origination practices.  Allegations against Encore include predatory lending, failing to disclose material terms of the loan, improperly inflating appraisals, forcing homebuyers to sign blank loan documents and altering documents without borrowers' consent.  *See* Compl., *Lindsay v. Encore Credit Corp.*, No. 10-cv-2464 (N.D. Ga. Aug. 6, 2010); Compl., *Pieleanu v. Mortg. Elec. Reg. Sys.*, No. 08-cv-07404 (N.D. Ill. Dec 29, 2008); Compl., *Smith v. Encore Credit Corp.*, No. 08-cv-01462 (N.D. Ohio June 17, 2008); Compl., *Welch v. Countrywide Home Loans*, No. 09-cv-00168 (E.D. Cal. Jan. 20, 2009); Compl., *Martinez v. Encore Credit Corp.*, No. 09-cv-05490 (C.D. Cal. July 27, 2009).

199.    In 2007, Encore reported that:

> ECC Capital experienced an increase in repurchase claims related to early payment defaults (EPD) on mortgage loans for which the borrower has missed the first payment due to the purchaser of the loan or investor.  This increase in repurchase claims led to the need to increase ECC Capital's reserve for losses that are incurred in connection with the repurchase and disposition of repurchased loans or the costs incurred in directly settling any repurchase obligation with an investor.  During the third and fourth quarters of 2006, ECC Capital entered into settlement agreements with 11 purchasers of its loans paying or accruing a total of $35.4 million to extinguish various EPD and representation and warranty repurchase claims.  Loans sold to these 11 purchasers during 2006 represented the majority of ECC Capital's sales volume for the year.

News Release, PR Newswire, ECC Capital Corporation Reports Results for Three Months Ended March 31, 2007 (June 22, 2007), *available at* http://www.prnewswire.com/news-releases/ecc-capital-corporation-reports-results-for-three-months-ended-march-31-2007-58267032.html.

200.    Further, in January 2009, a lawsuit was filed in the Eastern District of California against Encore and several other defendants alleging that Encore engaged in a scheme to coerce low-income borrowers into loans that they could not afford.  Compl., *Welch v. Countrywide Home Loans*, No. 09-cv-00168 (E.D. Cal. Jan. 20, 2009).  The complaint alleged that defendants did not assess borrowers' credit risk, Debt-to-Income ("DTI") ratios or any other objective factors designed to assess repayment ability.  Moreover, the plaintiffs claimed that Encore encouraged appraisers to overstate and did overstate appraisal values in order to push more loans through the system.  In July 2009, a similar complaint was filed in the Central District of California against Encore and several other defendants, alleging that Encore was involved in originating loans based upon false and inflated appraisal values.  Compl., *Martinez v. Encore Credit Corp.*, No. 09-cv-05490 (C.D. Cal. July 27, 2009).

201.    Media reports also exposed Encore's practice of ignoring its stated underwriting guidelines and failing to evaluate its borrowers' true repayment ability.  As illustrated in a news article published in *The Oregonian* on February 5, 2008, Encore ignored its stated underwriting guidelines, falsified incomes, did not determine whether the borrowers could afford to repay their loans, forged documents and put borrowers into loans they obviously could not afford to repay.  *Bill Would Help Declaw Mortgage Predators*, Oregonian (Feb. 5, 2008), http://satellite.tmcnet.com/news/2008/02/05/3251503.htm.  *The Oregonian* recounted the story of borrower Paul Hoffhine Jr., a mentally disabled man who subsisted on Social Security payments of $624 per month.  Hoffhine had inherited a house from his parents in the 1980s that

was completely paid for.  *Id.*  In February 2004, Encore cold-called Hoffhine and talked him into taking out a loan on the property so that Hoffhine could take equity out of the property in the form of cash.  *Id.*  The loan had monthly payments of $489.46.  *Id.*  Thus, Hoffhine's DTI ratio was over 78% based solely on the mortgage loan extended by Encore (the $489.46 loan payment divided by Hoffhine's monthly $624 Social Security payment equals 78.4%).  Hoffhine's other debts were not used to calculate the 78+% DTI ratio above, and therefore, if he had other debts, his DTI ratio would have been even higher.  *Id.*  However, in the offering documents describing Encore's underwriting guidelines, it was stated that the maximum DTI ratios allowed under Encore's guidelines were only 50%–55%.  Accordingly, Encore did not follow its underwriting guidelines for DTI ratios.

202.  Even worse, according to *The Oregonian*, a few months later, in December 2004, Encore persuaded Hoffhine to refinance and take out a new loan.  *Id.*  The monthly payment on the new loan increased to $617 per month, just $7 less than Hoffhine's entire monthly income, thus generating a DTI ratio of over 98%.  *Id.*  Thus, on the second loan, Encore again ignored its stated underwriting guidelines requiring DTI ratios of 55% or less, and gave Hoffhine a loan which generated a DTI ratio of over 98%, far in excess of the stated DTI ratio maximums under Encore's underwriting guidelines, and far beyond Hoffhine's ability to repay.

203.  Even more disturbing was the fact that Encore engaged in fraudulent activity related to the loan.  *The Oregonian* reported that, in Hoffhine's loan file, there was "a document claiming that Hoffhine was earning $3,500 a month as a handyman . . . [u]nderneath [which was] a scrawled signature – Paul Hauck Hoffhine Jr."  *Id.*  The news article reported that Hoffhine denied making the statement or signing the document, which was an obvious forgery containing fraudulent information.  *Id.*  The article quoted Hoffhine as follows on the document: "They

forged my signature, [and] they inflated my income." *Id.* After being threatened with a lawsuit, Encore quickly and quietly settled with Hoffhine. *Id.*

204.    As a result of these business practices, in May 2009, Encore was listed as number 17 on the Center for Public Integrity's list of top 25 subprime lenders responsible for the subprime economic meltdown, based on over $22 billion in high-risk, high-interest loans that the company originated between 2005 and 2007. *Who's Behind the Financial Meltdown?: The Subprime 25*, The Center for Public Integrity, http://www.publicintegrity.org/2009/05/06/13005/no-17-subprime-25-encore-credit-corp-ecc-capital-corpbear-stearns-cos-inc (last updated May 19, 2014 12:19 pm).

205.    In November 2013, JPMorgan entered into a $13 billion settlement with the Department of Justice to resolve federal and state civil claims, including the New York lawsuit, arising out of the fraudulent packaging, marketing, sale and issuance of RMBS by JPMorgan and WaMu. As part of the settlement, JPMorgan acknowledged it made serious misrepresentations to the public about numerous RMBS transactions. The resolution required JPMorgan to provide much needed relief to underwater homeowners and potential homebuyers. Under the terms of the settlement, JPMorgan receives credit for modifying loans, including securitized loans. JPMorgan has modified loans that did not qualify for modification under prudent servicing standards or the governing servicing agreements in order to receive credit because the investors, not JPMorgan, would bear the loss

206.    BNY Mellon is and was aware of JPMorgan's misconduct, including its scheme to shift the costs of its regulatory fines to investors, such as Plaintiffs, and yet has failed to act to protect their interests.

### f.    First Horizon Home Loan Corporation

207.    First Horizon was, at all relevant times, in the business of originating, purchasing, selling and servicing mortgage loans.  First Horizon sponsored and originated the mortgage loans included in the FHAMS 2005-FA5 and FHAMS 2005-FA7 Trusts.

208.    On May 9, 2008, a class action suit was filed against First Horizon, among others, for ERISA violations based on their investment of employee retirement plans in First Horizon's own stock.  Compl., *Sims v. First Horizon Nat'l Corp.*, No. 08-cv-2293 (W.D. Tenn. May 9, 2008).  There, the plaintiffs claimed that First Horizon required plan participants to invest in the company's stock, which was imprudent because, among other things, First Horizon failed to ensure compliance with its own underwriting standards.  *Id*.  In their Third Amended Complaint, the plaintiffs alleged:

- First Horizon placed insufficient emphasis on such functions as internal audit and accounting and governmental compliance, while pouring resources into production.

- As of the beginning of 2006, First Horizon's real estate valuation processes did not comply with regulatory guidance. While this significant problem was the subject of numerous regulatory examinations and communications, the flaws in First Horizon's processes were so serious that the company failed to attain compliance with applicable regulatory guidance during 2006 into 2007.  Internal reporting cited the fact that First Horizon did not have accurate locations recorded for all real estate collateral and was unable to keep up with the identification of problem assets in the residential commercial real estate portfolio, which delayed timely recognition of losses and appropriate provisioning.  The appraisal processes also had serious flaws, which caused significant problems in the valuation of real estate.

- Once First Horizon began to use more appropriate methodologies and data analytics in internal auditing, audit reporting described significant problems and issued "unsatisfactory" ratings, including in the processes, procedures and controls used in consumer appraisal ordering, compliance

> with loan collateral requirements and customer/credit risk due
> diligence for its products.

Third Am. Compl. ¶¶ 172, 93, 104, *Sims v. First Horizon Nat'l Corp.*, No. 08-cv-

2293 (W.D. Tenn. Feb. 25, 2011).

209.    On September 30, 2009, the District Court for the Western District of Tennessee

denied in part the defendants' motions to dismiss the plaintiffs' claims, holding that the plaintiffs

had adequately pleaded that the defendants breached their fiduciary duties to the plaintiffs by

investing in First Horizon stock when it was no longer prudent to do so.  *Sims v. First Horizon*

*Nat'l Corp.*, No. 08-cv-2293, 2009 WL 3241689 (W.D. Tenn. Sept. 30, 2009).  On October 10,

2010, the Court confirmed that order, denying the defendants' request for reconsideration.  First

Horizon reached a tentative $6 million settlement with the plaintiffs in November 2011, which

was preliminarily approved by the Court on May 16, 2012.

210.    Similarly, in June 2010, shareholders filed a derivative suit against First Horizon

National in the Western District of Tennessee, alleging that First Horizon engaged in unlawful

origination activities, falsified loan documents, concealed internal wrongdoing, failed to disclose

the true risks and losses of its origination activities and failed to implement and follow controls

designed to minimize risk and loss.  *See* Compl., *Reid v. First Horizon Nat'l*, No. 10-cv-02413

(W.D. Tenn. June 2, 2010).  Although the complaint was dismissed on statute of limitations

grounds, its allegations corroborate Plaintiffs' claim here that First Horizon systematically failed

to adhere to its underwriting guidelines.

211.    Forensic investigations and loan level reviews conducted by investors confirm the

pervasive breaches of representations and warranties in First Horizon-label RMBS.  For

example, on October 15, 2010, Federal Home Loan Bank of Indianapolis ("FHLB-Indianapolis")

filed a securities fraud action against a Bank of America affiliate for recovery of losses on nearly

$3 billion in RMBS in thirty-one securitizations.  Compl., *Fed. Home Loan Bank v. Banc of Am. Mortg. Sec., Inc.*, No. 10-cv-01463 (S.D. Ind. Nov. 15, 2010).  FHLB-Indianapolis performed a loan level review of loans underlying a First Horizon securitization (FHAS1 2004-7 lAl) and found that 8.82% of loans had a greater than 100% LTV ratio (contrary to First Horizon's representation that no loans had an LTV of greater than 100%); loans with greater than 90% LTV were understated by 32.8%; and loans with greater than 80% LTV were understated by 31.91%.  *Id.*

212.    On September 2, 2011, FHFA filed an action against First Horizon, alleging that First Horizon misrepresented the quality of the underlying mortgage loans, the creditworthiness of the borrowers and the practices used to originate such loans in connection with five First Horizon-sponsored securitizations.  Compl., *FHFA v. First Horizon Nat'l Corp.*, 11-cv-06193 (S.D.N.Y. Sept. 2, 2011).

213.    In *CIFG v. Bank of Am.*, No. 654028/2012 (N.Y. Sup. Ct. Nov. 20, 2012), CIFG Assurance North America, Inc. ("CIFG"), a New York-based monoline insurer, wrote insurance relating to two structured transactions arranged by Bank of America, which in turn were backed by twenty-two securitizations, including six Countrywide-label securitizations and two First Horizon-label securitizations.  Of the 1,656 loans reviewed, CIFG found that 834 loans (or 50.38%) contained at least one material defect.  *Id.* ¶ 8.  CIFG similarly found that First Horizon had understated the actual amount of loans with LTV ratios of: (i) 80% or greater by more than 39%; (ii) 90% or greater by more than 20%; and (ii) 100% or greater by more than 9%.  *Id.* ¶ 127–29.  CIFG further found that First Horizon overstated the actual percentage of owner occupied properties by more than 7% and that more than 11% of the sampled loans were assigned to third parties and still held in the originator's name instead of to the Trust.  *Id.* ¶ 148.

214.    In *FDIC v. Chase Mortg. Fin. Corp*, No. 12-cv-06166 (S.D.N.Y. Aug. 10, 2012), the FDIC filed an action against various investment banks in connection with its purchase of eleven RMBS, including a First Horizon-label securitization, FHAMS 2007-FA2.  The FDIC performed a loan level review of a large sample of loans from this offering and found that 27% of the loans had LTV ratios in excess of 105% (contrary to First Horizon's representation that no loans had an LTV of greater than 100%) and 17% of the loans misrepresented the owner occupancy status.  *Id.* ¶¶ 51, 76, 83.

215.    Administrative and regulatory proceedings have also brought to light fraudulent underwriting practices at First Horizon.  In July 2008, a former First Horizon corporate security investigator filed a whistleblower complaint with the Department of Labor alleging that the company routinely concealed mortgage and banking fraud prior to her termination in 2006.  *See* Marshall Eckblad, *Complaint Alleges First Horizon Concealed Mortgage Fraud*, Dow Jones Newswires (July 2, 2008), *available at* http://forum.ml-implode.com/viewtopic.php?t=4345&postdays=0&postorder=asc&start=375.  The investigator stated that she had uncovered over 50 separate cases of mortgage fraud during her time at First Horizon, including fraudulent conduct at a First Horizon branch in Idaho.  Examples of the perpetration of mortgage fraud included:

- At one First Horizon branch in Idaho, "a loan officer conceded that he had illegally altered loan documents and told the investigator that 'everyone in the branch is doing it.'"

- The same First Horizon branch "routinely submitted applications for borrowers for adjustable-rate mortgages that officers knew the borrower could not afford."  In order to accomplish this, First Horizon employees inflated the "borrowers' income on applications for 'stated income' loans – or subprime loans that did [not] require borrowers to substantiate their income –" even though the loan officers were in possession of income tax documents that disproved the stated income.

- According to the investigator, First Horizon, as a general rule, "allowed the loan officers – as long as they were raking in the money – to do whatever they wanted." As an example, "one top-producing loan officer fabricated and forged a lease agreement between an applicant and the applicant's mother, without either one's knowledge, in order to qualify the applicant for a loan."

- First Horizon also covered up allegations of fraud by removing from internal draft "Suspicious Activity Reports" any references to fraud committed by its loan officers before those reports were provided to regulators. Instead, First Horizon directed any allegations involving fraud toward the loan applicants themselves.

- When the investigator reported cases of loan fraud to her superiors at First Horizon, the supervisors "'[i]ntervened or overrode' her investigations[, or] 'took no action at all.'"

*Id.*

216.   A 2010 HUD investigation also illustrates First Horizon's non-compliance with underwriting standards. In January 2010, HUD Inspector General Kenneth M. Donohue subpoenaed First Tennessee Bank (First Horizon's parent) regarding failed loans issued by First Horizon that resulted in claims paid out by the Federal Housing Administration's ("FHA") mortgage insurance fund. The HUD Inspector General sought to "aggressively pursue indicators of fraud" at First Horizon based on FHA findings about First Horizon's origination and underwriting practices. *See* Eric Snyder, *First Tennessee Bank Mortgage Loan Records Subpoenaed*, Nashville Bus. J. (Jan. 13, 2010), http://www.bizjournals.com/nashville/stories/2010/01/11/daily17.html.

217.   At the time of HUD's investigation, First Horizon's "compare ratio," *i.e.*, the percentage of loan defaults and claims on FHA's mortgage insurance fund, was "in excess of 200 percent of the national average as listed" in HUD's Neighborhood Watch underwriting review system. *See* HUD, Office of Inspector General, Memorandum No. 2010-NY-1807, First Tennessee Bank, N.A., Memphis, TN, Did Not Properly Underwrite a Selection of FHA Loans

(Sept. 27, 2010), *available at* http://www.hud.gov/offices/oig/reports/files/ig1021807.pdf.

218.    The report on First Horizon released by HUD on September 27, 2010 concluded that 28% of the loans were not written in accordance with HUD/FHA underwriting regulations and were not made to qualified borrowers.  Specific examples of underwriting deficiencies identified by HUD included: (1) excessive debt-to-income ratios without adequate compensating factors; (2) inadequate gift fund documentation or verification of receipt of gift funds; and (3) failure to verify or document whether borrowers met the minimum cash investment requirement. The report recommended that HUD should "pursue remedies under the Program Fraud Civil Remedies Act" and/or civil money penalties as a result of these underwriting violations.  *See id.*

219.    First Horizon's poor origination practices eventually caught up to the company and many entities that purchased loans from First Horizon forced the company to buy them back. In First Horizon's 2010 Annual Report, First Horizon admitted that it had "observed loss severities ranging between 50 percent and 60 percent of the principal balance of the repurchased loans and rescission rates between 30 and 40 percent of the repurchase and make-whole requests."  First Horizon 2010 Annual Report (2010), *available at* http://ir.fhnc.com/financialdocs.aspx?iid=100292*.

220.    First Horizon has recently begun suing the mortgage brokers and appraisers it utilized in an effort to recoup some of these losses.  First Horizon—acting as plaintiff in those lawsuits—admits to the very underwriting, appraisal and owner-occupancy misrepresentations at the heart of this action.

221.    For example, in *First Horizon Home Loans v. Centerpiece Mortgage*, *LLC*, No. 11-cv-00995 (D. Ariz. May 19, 2011), First Horizon brought suit against Centerpiece Mortgage and four appraisers after it was "required to purchase the subject properties from Fannie Mae due

to the fact that the loans were based on incorrect income and/or employment information." According to First Horizon, "Centerpiece brokered certain loans based on incorrect income and/or employment information for thirty-two (32) real properties located in Maricopa, County, Arizona." *Id.* ¶ 14. Similarly, "all of the properties were consistently overvalued by the Defendant appraisers." *Id.* ¶ 17. As a result, loans securitized by First Horizon "were based on incorrect income, employment information and/or overvaluations." *Id.*

222.   Additionally, in *First Horizon Home Loans v. Security Mortgage Corp.*, No. 09-cv-2182 (N.D. Tex. Nov. 16, 2009), First Horizon sought relief for fraud, breach of contract and negligent misrepresentation against another mortgage broker, Security Mortgage Corporation ("SMC"). First Horizon's complaint alleged that, for a loan it ultimately approved and funded based on information provided to it by SMC, the mortgage broker failed to reveal that the loan applicant had "obtained four (4) mortgages totaling $590,000.00 prior to the loan application submitted to First Horizon" and "ultimately used the 'second home' as a rental property." *Id.* ¶ 10. First Horizon contended that, had it known the actual financial condition and occupancy status of the property, it "would not have approved [the] application and would not have funded the loan." *Id.* ¶ 11.

### g.   First NLC Financial Services, LLC

223.   First NLC was one of the largest subprime residential mortgage lenders in the United States. First NLC originated mortgage loans included in the CBASS 2005-CB8, FNLC 2005-1 and FNLC 2005-2 Trusts.

224.   In January 2008, First NLC announced that it had ceased loan origination and filed for bankruptcy later that month. Before closing, in response to costs associated with the company's obligation to buy back defective loans, First NLC disclosed large losses and that it

was increasing its reserves.  Indeed, First NLC's bankruptcy filings revealed that many of its

unsecured creditors were banks that were heavily involved in the securitization of mortgage

loans that had claims arising out of breaches of First NLC's representations and warranties.

225.    The Washington Department of Financial Institutions, Division of Consumer

Services' investigation found that First NLC did not maintain proper books and records, in

violation of the state Consumer Loan Act.  *See In re First NLC Fin. Servs. LLC*, No. C-07-516-

08-SC01 (Jan. 16, 2008), *available at* www.dfi.wa.gov/CS%20Orders/C-07-516-08-FO01.pdf.

This conclusion was based on First NLC's repeated failures to locate loan files that the

government had requested for examination, which shows the complete breakdown that occurred

within First NLC's operations.  *See id*.  With respect to the loan files First NLC was able to

actually produce, the Washington Department of Financial Institutions found that 22%

demonstrated on their face that lending-law violations had occurred.  *See id*.  These types of

lending-law violations represent a failure to originate loans within First NLC's stated guidelines.

*See id*.  A final order was entered against First NLC, revoking its license to conduct business in

the state of Washington and prohibiting it from participating in any other consumer loan

companies for a period of five years.  Final Order, *In re First NLC Fin. Servs. LLC*, C-07-516-

08-F001 (Mar. 4, 2008), *available at* www.dfi.wa.gov/CS%20Orders/C-07-516-08-FO01.pdf.

226.    A similar investigation by the California Department of Corporations also found

that First NLC was "conducting residential mortgage lending and/or servicing business . . . in

such an unsafe and injurious manner as to render further operations hazardous to the public or to

customers."  Order to Discontinue Residential Mortgage Lending, *In re The Comm'r of Corp. of

Ca. v. Southstar Funding*, No. 413 0318 (Feb. 19, 2008), *available at*

http://www.dbo.ca.gov/FSD/08pdf/4130318.pdf.  The Department of Corporations also later

found that First NLC had not maintained and filed the lending reports required by state law, such

as an Independent Auditor's Report on Internal Controls.  Order Revoking Residential Mortgage

Lender License, *In re The Comm'r of Corp. of Ca. v. First NLC Fin. Servs.*, *LLC*, No. 413 0318

(Nov. 24, 2008), *available at*

http://www.dbo.ca.gov/ENF/pdf/f/firstNLCfinancial_orderrevoking.pdf.  The company was

ordered to cease lending and servicing activities in the state and later had its license revoked.  *Id*.

227.    Several private investigations and lawsuits illustrate the fact that First NLC failed

to comply with its stated underwriting guidelines.  *See* Compl., *Royal Park Invs. v. Merrill*

*Lynch*, No. 652607/2012 (NY Sup. Ct. Dec. 14, 2012) (the "*Royal Park*" Complaint); Compl.,

*Allstate Ins. Co. v. Morgan Stanley*, No. 651840/2011 (N.Y. Sup. Ct. July 5, 2011) (the

"*Allstate*" Complaint); Compl., *Phoenix Light SF Ltd. v. Morgan Stanley*, No. 652986/2013

(N.Y. Sup. Ct. Aug. 26, 2013).

228.    As set forth in the *Royal Park* Complaint, a former First NLC Quality Control

Supervisor from November 2004 through April 2007, who was responsible for auditing samples

of loans that had already been closed and funded by First NLC, confirmed that First NLC did not

comply with its stated underwriting guidelines.  *Royal Park* Compl. ¶ 449.

229.    In this role, the former First NLC employee saw many "underwriting errors" in

the originated loans, including routinely finding "a lot of fraud in the loan files."  Specifically,

the fraud included numerous instances of appraisers who had been "paid off to bring in the

value" of a property higher than it actually merited, problems verifying a borrower's

employment, numerous stated income claims that were clearly unverified and unsupported by the

background information available about the borrower and discrepancies related to borrowers'

credit and assets.  This former employee routinely found falsified IRS Forms, W-2's, pay stubs

and bank statements.  Despite these numerous instances of fraud, the witness stated that First NLC operations managers would grant exceptions to these loan applications.  The former employee stated that by the time she found problems with the loans, it was too late and nothing was done to prevent the loan from being sold to investors.  First NLC's Loan Processors handling the pre-funding audit were under intense pressure from the company's sales managers at the wholesale branches to get the loans funded.  *Royal Park* Compl. ¶ 449.

230.    First NLC's improper and fraudulent lending practices were also documented in the *Allstate* Complaint.  The complaint in that case contains the following information from former First NLC employees:

- According to a former underwriter for First NLC in Deerfield Beach, Florida, from April 2004 until November 2006, "every loan had a problem with it.  Every loan seemed to have an exception on it."  Between half and three-quarters of the mortgage loans that were initially denied by the former underwriter and other First NLC underwriters were subsequently overruled and approved by First NLC management because the loans could be sold.  This former underwriter also stated that if a prospective borrower's tax return appeared to be fraudulent and the underwriter sought to request further documentation to verify the submitted information, First NLC account representatives would "scream bloody murder."  A loan application with this type of questionable documentation would still be approved by First NLC's underwriting manager or Vice President of Operations/Underwriting, who decided no further due diligence was necessary.  In regards to verifying the borrower's ability to repay the mortgage loan, this underwriter stated they were told by First NLC management that "[w]e don't need this, so just don't dig," and that verifying borrowers' income was discouraged, as it was considered "digging for problems."

- According to another former senior underwriter for First NLC in Deerfield Beach, Florida, from August 2004 until September 2005, First NLC made numerous unwarranted exceptions to its stated underwriting guidelines including appraisal exceptions and income exceptions.  Instead of denying the loan in accordance with First NLC's stated underwriting guidelines, according to the former senior underwriter, employees at First NLC would institute "premium pricing" and charge the prospective borrower a higher price to compensate for "overlook[ing] things."  This senior underwriter believed that 80% of First NLC's stated income loans contained inflated borrower incomes.

- According to a third First NLC senior underwriter in Anaheim, California, from September 2005 to December 2007, and whose unit was overseen by Charles Bryson, the former Chief Financial Officer of First NLC, the underwriter once alerted Bryson that a stated loan file lacked a signed income statement.  Bryson directed the underwriter to "make one up."

*Allstate* Compl. ¶¶ 108–11.

### h.      Impac Funding Corporation

231.    Impac Funding Corporation ("Impac") is a mortgage company that acquires, purchases and sells mortgage loans.  Impac is a California corporation headquartered in Irvine, California.  Impac originated mortgage loans included in the CWL 2005-IM3 Trust.

232.    Mass. Mutual, an RMBS investor, sued Impac regarding RMBS for which Impac was the sponsor.  Mass. Mutual conducted a forensic analysis of loans underlying an RMBS it had purchased.  The analysis revealed that 48% of the loans tested had appraisals inflated by 10% or more and 34% of the loans tested had LTVs that were 10 or more points more than represented.  Additionally, 15.45% of the loans that had been represented to be owner occupied were determined not to be owner occupied.  *See* Compl. ¶¶ 87–88, 95, *Mass. Mutual Life Ins. Co. v. Impac Funding Corp.*, No. 11- 30127 (D. Mass. May 6, 2011).

233.    Impac's faulty loan origination practices were the subject of a suit by a class of its shareholders.  The class action complaint contained detailed accounts of former employees regarding Impac's disregard of its underwriting guidelines.  *See* Third. Am. Compl., *Pittleman v. Impac. Mortg. Holdings, Inc.*, No. 07-970 (C.D. Cal. Oct. 27, 2008).

234.    As set forth in the *Pittleman* Complaint, one former employee ("Employee #1") was an underwriting manager in charge of loan due diligence from October 2003 until July 2006.  Employee #1's duties included performing due diligence on bulk loans by conducting a sampling of each loan pool and making recommendations as to whether or not Impac should buy particular

loans and/or loan portfolios, which were then resold in the secondary markets.

> Employee #1 reported to Kevin Gillespie, Vice President of Underwriting and Scott Hedbon, Chief Credit Officer. Both Gillespie and Hedbon reported to William Ashmore, Impac's President, and Gillespie and Ashmore (plus [Joseph] Tomkinson[, Impac's CEO]) were members of the Loan Committee. After conducting due diligence on a bulk loan, Employee #1 would generate a detailed report regarding that loan pool, which included an approval or rejection recommendation. Every report was then e-mailed to Employee #1's superiors, including Tomkinson and Ashmore.

*Id.* ¶¶ 46–47.

235.    Employee #1 stated "that when bulk loan pools did not satisfy [Impac's] guidelines, they were still approved by management on a regular basis, and specifically by Ashmore. Ashmore's rationale for constantly reversing rejection recommendations was that everyone in the industry was engaging in this type of practice. Ashmore would justify his overriding the underwriting department recommendations by stating that 'everybody is doing it' or 'if we didn't do it, someone else would.'"  *Id.* ¶ 48.

236.    "Employee #1 left [Impac] out of frustration because he said the majority of loans that were being recommended for rejection were regularly approved for sale to investors. As a result, he felt that performing due-diligence on bulk loan pools was a waste of his time when Ashmore would just override the results of the due diligence. According to Employee #1, all management was looking for was a due-diligence officer to 'rubber-stamp' the loan pools because investors in the securitized loan pools required a certain level of quality control concerning these financial instruments."  *Id.* ¶ 51.

237.    Another former employee ("Employee #2") was employed by Impac from January 2005 through October 2007, working in the Wholesale Loan Set-up Group. He reported that "many borrowers had credit scores that were low or did not have enough income. He also

reported that whatever loan came in, the goal was to pass it on to the next step for approval, which was underwriting."  Employee #2 further reported "that a low credit score would not 'kill' the loan.  Rather, the loan would then go to the 'deal desk,' where deals were regularly made to get loans approved."  *Id.* ¶ 56.  Employee #2 also explained that Impac inflated the reported incomes of applicants in order to approve loans for which the applicant would not otherwise qualify.  *Id.* ¶ 57.

238.    A former employee ("Employee 3") worked in Impac's Quality Control from May 2004 through October 2007.  Employee 3's duties and responsibilities included checking for and investigating fraud.  Employee 3 explained "that overstating the income of applicants made everyone happy, realtors, account executives, and Impac senior management."  *Id.* ¶ 59.

239.    Employee 3 further commented that

> in processing 15 loans a day, there would not be enough time to check and follow the seller guides . . . .  He confirmed that management encouraged the selling of loans to customers who should have not been eligible for Alt-A loans.  Employee 3 stated that this was accomplished because 90% of the loans done at [Impac] did not have documentation of income.

*Id.* ¶ 60.

240.    FHFA as conservator for Fannie Mae and Freddie Mac has also sued Bear Stearns in connection with material misstatements and omissions in RMBS Offering Documents.  *See* Am. Compl., *FHFA v. JP Morgan*, No. 11-6188 (S.D.N.Y. June 13, 2012).

### i.    Lime Financial Services, Ltd.

241.    Lime Financial Services, Ltd. ("Lime") was a wholesale non-prime residential lender offering first and second mortgage services.  Lime was founded in 1999 and based in Lake Oswego, Oregon.  Lime originated mortgages included in the CBASS 2005-CB4 Trust.

242.    In or around the summer of 2007, Credit Suisse AG (together with its affiliates, "Credit Suisse") acquired Lime.  Credit Suisse ultimately closed Lime's business operations in the end of 2008.

243.    On November 20, 2012, the NYAG filed claims against Credit Suisse alleging, in part, that:

- Lime frequently originated bad loans [that violated prudent underwriting guidelines].

- When a former colleague congratulated a senior RMBS trader at Credit Suisse on the impending acquisition of Lime and suggested the trader could now "teach those blockheads . . . how to write some decent guidelines," the trader said that he was "not sure if wolves [were] willing to learn eating veggie." In other words, as the trader recognized, a bad originator with bad practices was not going to change its core habits simply because [Credit Suisse] had acquired it.

- The Head of Due Diligence at Credit Suisse examined Lime loans during the summer of 2007, and concluded that "[o]verall," Lime's problems were "poor underwriting, uncompensated exceptions, unsupported values and high ltvs . . ."

Compl. ¶¶ 29–30, *New York v. Credit Suisse Sec.*, No. 451802/2012 (N.Y. Sup. Ct. Nov. 20, 2012).

### j.    MILA, Inc.

244.    MILA, Inc.  ("MILA") was a wholesale mortgage lender specializing in subprime loans.  MILA failed in April of 2007 in large part because the investment banks that held its mortgages were demanding that MILA buy back those mortgages that did not meet their lending standards.  MILA originated mortgage loans included in the CWALT 2005-AR1.

245.    MILA was an aggressive lender "catering to home buyers who for one reason or another—no down payment, unwilling to verify income, and so on—couldn't qualify for a

mortgage with a bank but who were still worthy risks. . . ."  By 2006, MILA had 640 employees and $4.5 billion in mortgages (mostly subprime) distributed across 26 states.  Harold C. Barnett, And Some with a Fountain Pen: The Securitization of Mortgage Fraud (Nov. 4, 2009) (presentation to American Society of Criminology, Philadelphia, PA) (the "Barnett Report").

246.    MILA utilized a web-based interactive loan production management system developed to streamline the entire loan application process.  Like other automated underwriting systems ("AUS"), it allowed online application, automated underwriting, and the generation of a loan commitment within minutes.  The software enabled loan applications to be submitted and processed in less than a day and eventually less than four hours.  *Id.* at 15–16.

247.    Despite what might have been, MILA neither developed a procedure to match its speed of validation and verification to its speed of approval nor examined its loan history to weed out borrowers that were likely to default soon after their loans closed.  MILA increasingly approved loans that would experience early payment default, many of which were presumably fraudulent and based on misrepresentations.  *Id.* at 11.

248.    These deficiencies are evident in the growing rate of loans MILA was forced to repurchase.  It repurchased about $2.7 million loans in 2002, $8.26 million in 2003 and $37.66 million in 2004.  Repurchases represented 0.53% of loan sale in 2002 and had risen to 1.27% in 2004.  "MILA projected that its loan repurchases as a percentage of total loan sales would triple in 2005 through 2007."  *Id.* at 17.

249.    Goldman Sachs' relationship to MILA was a subject of the Barnett Report.

250.    The Barnett Report follows a loan from origination by MILA to securitization by Goldman Sachs that Dr. Barnett alleges was used to "fraudulently strip equity" from an elderly couple, Henderson Hall and Mary Hawthorne in Chicago.  Hall and Hawthorne responded to a

foreclosure rescue ad to try to save their home, but instead, their home was sold to a straw buyer, Charlotte Delaney (who was in fact the office manager of the company that would be purportedly rescuing Hall and Hawthorne from foreclosure), using a no-money-down, stated income loan from MILA.  *Id.* at 1.

251.    Dr. Barnett found that MILA approved the Delaney loan despite "obvious indications of fraud," including documentation of a prior lien, contradictory information regarding Delaney's income and no reserves.  *Id*. at 13–14.

252.    Dr. Barnett concluded by stating that MILA's "originate to securitize" business model resulted in its demise and made victims out of "homeowners like Hall and Hawthorne who lost their equity to a fraud facilitated with a MILA loan and the investors in the Goldman Sachs RMBS [such as Plaintiffs here] who owned the foreclosed Delaney loan."  *Id*. at 19.

253.    These poor origination practices partially resulted in a suit brought by the trustee in MILA's Chapter 11 bankruptcy case.  In that proceeding, the trustee exposed many of the facts cited above and accused the former CEO of MILA of fraud and other violations of state financial regulations.  Compl., *In re MILA, Inc.*, No. 07-bk-13059 (W.D. Wash. Aug. 29. 2008).

### k.    Millennium Funding

254.    Millennium Funding ("Millennium") was a subprime mortgage lender that merged with American Mortgage Express Financial in 2005.  In December 2006, Ace Mortgage acquired Millennium from American Mortgage Express Financial.  Millennium originated loans included in the CBASS 2005-CB4 Trust.

255.    In *In re Trejo*, No. 10-5392, 2011 WL 5557423 (Bankr. N.D. Cal. Nov. 3, 2011), the court held that, in the face of Trejo's claims that he earned $9,500 per month as the owner of a consulting business called Trejo Networks, Millennium ignored obvious issues with the

application and statements that should have made Millennium suspicious.  The court further held that contrary to Millennium's stated underwriting guidelines, Millennium did not request supporting documentation for the application, such as tax returns, earnings statements or bank records and that "[a]ny of these documents would have identified the obvious problems in Trejo's Application."  *Id.* at *5.

256.    Further, in the December 2012 *Royal Park* Complaint, Royal Park Investments SA/NV filed an action against various investment banks in which Royal Park performed a review of loans from Covered Trust CBASS 2005-CB4 for which Millennium originated loans.  Royal Park found that the offering materials had understated the actual amount of loans with LTV ratios of: (i) 80% or greater by more than 25%; and (ii) 100% or greater by more than 7.5%.  *Id.* ¶ 859.  Royal Park further found that the offering materials overstated the actual percentage of owner occupied properties by more than 10%, and that more than 35% of the sampled loans were currently in default.  *Id.* ¶¶ 877, 661.

### l.    MortgageIT, Inc.

257.    MortgageIT, Inc. ("MortgageIT") is a residential mortgage banking company headquartered in New York, New York.  MortgageIT originated loans included in the CWALT 2006-OA11 and CWALT 2006-0A3 Trusts.  On January 3, 2007, MortgageIT was acquired by Deutsche Bank Structured Products.  Less than a year after the acquisition, MortgageIT began its precipitous decline from one of the largest mortgage originators in the country, laying off hundreds of employees and closing multiple branches.

258.    MortgageIT faced a civil mortgage fraud lawsuit brought in May 2011 by the United States Department of Justice ("DOJ") that alleged MortgageIT made repeated false certifications to HUD in connection with its residential mortgage origination and sponsorship

practices.  *See* Compl., *United States v. Deutsche Bank AG*, No. 11-cv-02976 (S.D.N.Y. May 3, 2011).  An amended complaint was filed on August 22, 2011 ("DOJ Complaint").

259.     In the DOJ Complaint, the United States alleges that "MortgageIT repeatedly lied to be included in a Government program to select mortgages for insurance by Government. Once in that program, they recklessly selected mortgages that violated program rules in blatant disregard of whether the borrowers could make mortgage payments."  DOJ Complaint ¶ 1.

260.     The DOJ Complaint details how MortgageIT ignored its own quality control measures.  For example, MortgageIT contracted with an outside vendor to conduct quality control reviews of FHA-insured loans.  The vendor provided the reviews in letters detailing underwriting violations found in FHA-insured mortgages to MortgageIT.  The findings included identification of serious underwriting violations.  Instead of reading the letters, MortgageIT employees "stuffed the letters, unopened and unread, in a closet at MortgageIT's Manhattan headquarters."  It was not until MortgageIT hired its first quality control manager that these letters were taken out of the closet and read.  Accordingly, "MortgageIT's failure to read the audit reports from its outside vendor prevented MortgageIT from taking appropriate actions to address patterns of ongoing underwriting violations" ***and*** "Deutsche Bank's and MortgageIT's failure to implement the required quality control systems rendered them unable to prevent patterns of mortgage underwriting violations and mortgage fraud."  *Id*. ¶¶ 113–24, 145.

261.     Additionally, the DOJ Complaint alleged that "contrary to the certifications appearing on each and every mortgage endorsed by MortgageIT, MortgageIT engaged in a nationwide pattern of failing to conduct due diligence in accordance with HUD rules and with sound and prudent underwriting principles."  *Id.* ¶ 162.

262.    The DOJ Complaint cites many examples of MortgageIT's failure to perform due diligence.  These examples, all violations of HUD rules, include the following:

- failure to develop a credit score for borrowers who had no credit score;

- failure to verify a borrower's cash investment in a property;

- failure to verify employment by telephone and to record the name and telephone number of the person who verified employment on behalf of the employer;

- failure to verify the source of earnest money deposits that appear excessive in relation to the borrower's savings by completing a verification of deposit, or by collecting bank statements, to document that the borrower had sufficient funds to cover the deposit;

- failure to ensure that gift funds are not provided by a party to the sales transaction;

- failure to examine irregularities in mortgage applications such as conflicting records of employment in the same file;

- failure to obtain the required documentation to verify the borrower's mortgage payment history and income;

- failure to obtain the required documentation to verify the borrower's employment, income and depositary assets;

- failure to verify a borrower's current employment and obtain the borrower's most recent pay stub, along with failure to obtain income tax returns for a self-employed borrower or borrower paid on commission; and

- failure to obtain a credit report on all borrowers who will be obligated on the mortgage note.

*See id.* ¶¶ 162–230.

263.    On May 10, 2012, the parties settled the case for $202.3 million.  Stipulation and Order of Settlement and Dismissal, *United States v. Deutsche Bank AG*, No. 11-cv-02976 (S.D.N.Y. May 10, 2012).

264.     Several private investigations and lawsuits also illustrated the fact that MortgageIT failed to comply with its stated underwriting guidelines.  The complaint in *Landesbank Baden-Wurttemberg v. Deutsche Bank*, No. 654543/2012 (N.Y. Sup. Ct. Dec. 27, 2012) quotes confidential witnesses demonstrating that there was virtually no effort at compliance at MortgageIT.  The confidential witnesses said that loan officers did not care what happened with loans as long as MortgageIT received the commission; that the sales team rejected any attempt to stop using brokers because of likely fraudulent activity; that the due diligence was far from adequate; and that compensation was tied to loan volume and there was no disincentive to originate and sell loans that would later default.  *Id.* ¶¶ 87–89, 91.

265.     The second amended complaint in *Pension Trust Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*, No. 10-898 (D.N.J. Oct. 13, 2011), identified a confidential witness who was employed with MortgageIT as an underwriter from June 2005 through May 2007.  *Id.* ¶ 52.  That witness also confirmed the pressure to approve loans and the fact that his superiors instructed him to avoid over-analyzing loans so as not to lose business.  *Id.* ¶ 153.  The witness said that executives would often overrule decisions to seek more documentation and loans would be taken away from underwriters if the underwriter recommended non-approval.  *Id.*

266.     Deutsche Bank, MortgageIT's parent company, admitted in the Stipulation and Settlement it entered into with the Government on May 10, 2012, that loans originated by MortgageIT had serious deficiencies that were not disclosed.  Stipulation and Order of Settlement and Dismissal, *United States v. Deutsche Bank AG*, No. 11-cv-02976 (S.D.N.Y. May 10, 2012).

m.      **NC Capital Corporation and**
                 **New Century Mortgage Corporation**

267.    New Century Mortgage Corporation and NC Capital Corporation were subsidiaries of New Century Financial Corp. (collectively "New Century").  New Century was founded in 1995 in Irvine, California and grew to be one of the nation's largest subprime lenders—originating $60 billion in loans in 2006 alone.  New Century originated mortgage loans included in the CBASS 2005-CB4, CBASS 2005-CB8 and CBASS 2006-CB3 Trusts.

268.    New Century failed amid revelations that its financial records contained numerous accounting errors, government investigations and a liquidity crisis when its Wall Street backers pulled the financial plug on loan funding.  The circumstances leading to its collapse tell the story of a company that was far more concerned with originating mortgages to fuel the securitization machine than in the quality of those mortgages.

269.    A June 2, 2008 article in the Columbus Dispatch summarized New Century's reputation in the industry:

- The California-based mortgage company catered to the riskiest borrowers, even those with credit scores as low as 500.  Its brokers cut deals by asking few questions and reviewing even fewer documents, investigators say.

- Homeowners struggling to pay their existing mortgages signed up for what they believed to be redemption: a new loan.  They were unaware of the warnings from lending and legal experts that New Century loaned money with a devil-may-care-attitude.

- New Century typified the book-'em-at-any-cost mentality that fueled the national mania for high-rate mortgages, commonly called subprime.

Jill Riepenhoff & Doug Haddix, *Risky Refinancings Deepen Financial Hole*, Columbus Dispatch, June 2, 2008, at 1A.

270.     New Century's foreclosure rates reflected its inattention to underwriting standards.  Indeed, New Century appeared in the OCC's 2008 "Worst Ten in the Worst Ten" Report in every housing market highlighted.  *See* 2008 Worst Ten Report.  Incredibly, New Century appeared in the top five in every market—1st in Las Vegas, Nevada and Riverside, California; 2nd in Cleveland, Ohio, Denver, Colorado, Sacramento, California and Stockton, California; 3rd in Bakersfield, California and Detroit, Michigan; and 5th in Miami, Florida and Memphis, Tennessee.  *Id.*  When the OCC issued its updated 2009 "Worst Ten in the Worst Ten" Report, New Century rose to the top three in every one of the ten worst markets, holding 1st place in Reno, Nevada, Bakersfield, California, Riverside-San Bernardino, California and Fort Myers-Cape Coral, Florida; 2nd place in Modesto, California, Las Vegas, Nevada, Merced, California and Stockton-Lodi, California; and 3rd place in Fort Pierce-Port St. Lucie, Florida and Vallejo-Fairfield-Napa, California.  *See* 2009 Worst Ten Report.

271.     The U.S. Bankruptcy Court for the District of Delaware presiding over New Century's bankruptcy case appointed Michael J. Missal ("the Examiner") to examine "any and all accounting and financial statement irregularities, errors and misstatements" in connection with New Century's practices and procedures.  The Examiner engaged a law firm, forensic accountants and financial advisors to assist in his investigation and reporting.  His final report to the Bankruptcy Court dated February 29, 2008 was unsealed and publicly released on March 26, 2008.  Final Report of Michael J. Missal, *In re New Century TRS Holdings Inc*, No. 07-10416(KJC) (Bankr. D. Del. Feb. 29, 2008) (the "Examiner's Report").

272.     The Examiner concluded that New Century "engaged in a number of significant improper and imprudent practices related to its loan originations, operations, accounting and financial reporting processes."  Examiner's Report at 2.  The Examiner summarized the findings:

- New Century had a brazen obsession with increasing loan originations, without due regard to the risks associated with that business strategy.  Loan originations rose dramatically in recent years, from approximately $14 billion in 2002 to approximately $60 billion in 2006.  The Loan Production Department was the dominant force within the Company and trained mortgage brokers to originate New Century loans in the aptly named 'CloseMore University.'  Although a primary goal of any mortgage banking company is to make more loans, New Century did so in an aggressive manner that elevated the risks to dangerous and ultimately fatal levels.  *Id*. at 3.

- The increasingly risky nature of New Century's loan originations created a ticking time bomb that detonated in 2007.  Subprime loans can be appropriate for a large number of borrowers.  New Century, however, layered the risks of loan products upon the risks of loose underwriting standards in its loan originations to high risk borrowers.  *Id*.

- More than 40% of the loans originated by New Century were underwritten on a stated income basis.  These loans are sometimes referred to as 'liars' loans' because borrowers are not required to provide verification of claimed income, leading a New Century employee to tell certain members of Senior Management in 2004 that 'we are unable to actually determine the borrowers' ability to afford a loan.'  *Id*.

- New Century also made frequent exceptions to its underwriting guidelines for borrowers who might not otherwise qualify for a particular loan.  A Senior Officer of New Century warned in 2004 that the 'number one issue is exceptions to guidelines.'  Moreover, many of the appraisals used to value the homes that secured the mortgages had deficiencies.  *Id*. at 3–4.

- Senior Management turned a blind eye to the increasing risks of New Century's loan originations and did not take appropriate steps to manage those risks.  New Century's former Chief Credit Officer noted in 2004 that the Company had "no standard for loan quality.  Instead of focusing on whether borrowers could meet their obligations under the terms of the mortgages, a number of members of the Board of Directors and Senior Management told the Examiner that their predominant standard for loan quality was whether the loans New Century originated could be initially sold or securitized in the secondary market.  *Id*. at 4.

- The Examiner's Report also stated that New Century's underwriting and appraisal systems were antiquated.  Rather than undertaking sophisticated risk assessments, New Century relied on outdated manual systems that, according to a member of New Century management interviewed by the Examiner, allowed New Century to "finagle anything."  *Id*. at 54.

273.    Brad Morrice, New Century's CEO beginning in 2006, acknowledged that "bad appraisals were a frustrating source of concern and the main cause of loan 'kickouts,'" i.e., a rejection of certain loans by investors and that "improper appraisals were the biggest contributors to losses when loans went bad." *Id.* at 61–62.

274.    The Examiner identified several "red flags" that were indicative of the poor quality of New Century's loans and the fact that New Century was not adhering to its underwriting guidelines.  Specifically, the Examiner noted that "defective appraisals, incorrect credit reports and missing documentation" had led to a high number of kick-outs by investors, all of which "suggested that New Century's loan origination processes were not consistently producing loans that met New Century's underwriting standards and investor guidelines." *Id.* at 109.

275.    The Examiner found:

> New Century's Senior Management recognized that the Company had serious loan quality issues beginning as early as 2004.  For example, in April 2004, New Century's Chief Credit Officer reported that "the QA [quality assurance] results [pertaining to the loan origination processes] are still at unacceptable levels" and that "Investor Rejects [kickouts] are at an incline as well."  Two months later, in June 2004, the head of Secondary Marketing remarked in an e-mail that "we have so many issues pertaining to quality and process!"

*Id*. at 110 (brackets in original).

276.    Further adding to the problem was the fact that exceptions were frequently granted to underwriting guidelines, but "New Century had no formal exceptions policy." *Id.* at 174.  With no policy in place, the granting of exceptions was arbitrary.  Despite upper management's awareness of the tremendous problems regarding loan quality, the Examiner concluded that "New Century continued to focus on generating greater quantities of ever riskier

loans, devoting little effort to such basic issues as making sure that the Company's loan origination and underwriting policies and procedures were followed to avoid kickouts of loans offered for sale." *Id.* at 111.

277.    On April 7, 2010, Patricia Lindsay, former Vice President of Corporate Risk at New Century, who worked for the company from 1997 through December 2007, corroborated the Examiner's findings in her testimony before the FCIC.  She testified that at New Century, risk managers were often viewed as a roadblock rather than a resource and that:

> Account executives, who were New Century employees who brought loans in from brokers, were primarily compensated on commission of closed loans that they brought in. . . .  Many of the sales managers and account executives lacked any real estate or mortgage experience.  They were missing the depth of experience necessary to make an informed lending decision.  These same sales managers had the ability to make exceptions to guidelines on loans, which would result in loans closing with these exceptions, at times over the objections of seasoned appraisers, underwriters or risk personnel. . . .

*Subprime Origination and Securitization: Hearing Before the Fin. Crisis. Inquiry Comm'n, Sect. 2* (Apr. 7, 2010) (testimony of Patricia Lindsay, former Vice President of Corporate Risk, New Century).

278.    Ms. Lindsay also testified to systematic problems in the appraisal process:

> In my experience at New Century, fee appraisers hired to go to the properties were often times pressured into coming in "at value," fearing if they didn't, they would lose future business and their livelihoods.  They would charge the same fees as usual, but would find properties that would help support the needed value rather than finding the best comparables to come up with the most accurate value.

*Id.*

279.    Ms. Lindsay noted that at the end, New Century's approach to lending lacked "common sense"—that the business became "volume driven and automated" with a broker being

able to get a loan pre-approved in "12 seconds or less." *Id.*

280.    New Century's volume-driven abandonment of its underwriting guidelines resulted in enforcement actions by (and subsequent settlements with) numerous government agencies, including the SEC, Massachusetts and Ohio Attorneys General.

281.    Finally, private litigation has also illustrated the fact that New Century failed to comply with its stated underwriting guidelines.  For example, as set forth in the complaint in *Cambridge Place Investment Management Inc. v. Morgan Stanley & Co.*, No. 10-2741 (Mass. Super. Ct. July 9, 2010), confidential witnesses stated that New Century abandoned underwriting guidelines to approve more loans; employees were told to do whatever they had to in order to increase volume; and loans that were not initially approved by underwriters were often later approved by superiors.

### n.    Ownit Mortgage Solutions, Inc.

282.    Ownit Mortgage Solutions ("Ownit") was a California-based company that specialized in the origination of mortgages for individuals who earned less than $100,000 annually and had less than $100,000 in personal assets.  Ownit originated mortgage loans included in the CBASS 2006-CB3 and OWNIT 2006-1 Trusts.

283.    From December 2005 through May 2006, Ownit began to experience first payment defaults and early payment defaults (*i.e.*, defaults on any one of the first three mortgage repayments).  The Federal Reserve's 2008 Finance and Economics Discussion Series entitled "The Rise in Mortgage Defaults" noted:

> reports at the end of 2006 from lenders such as Ownit [] that an unusually high share of their loans were becoming delinquent almost immediately were a cause for alarm.  This surge in early payment defaults is evident in our data.  On average, 1.5 percent of subprime loans in the 2000-2004 vintages were in default after 12 months, and the situation was just a bit worse for the 2005 vintage

> (Figure 2).  However, 2 percent of outstanding loans in the 2007
> vintage were in default within six months of origination, and 8
> percent were in default after 12 months.

Christopher J. Mayer, Karen Pence & Shane M. Sherlund, The Rise in Mortgage Defaults 15–16

(Nov. 2008), *available at* http://www.federalreserve.gov/pubs/feds/2008/200859/200859pap.pdf.

284.    According to a December 11, 2006 article, Ownit, unsurprisingly, filed for

bankruptcy "amid reports that the subprime lender had been hit by huge loan buyback requests

from an investor."  Paul Muolo & Brad Finkelstein, *Did Loan Buybacks Cause Ownit, Sebring to*

*Shut?,* Nat'l Mortgage News (Dec. 11, 2006),

http://www.nationalmortgagenews.com/nmn_issues/31_12/-445080-1.html.

285.    Numerous lawsuits followed in the years after Ownit's bankruptcy.  These

lawsuits repeatedly alleged systematic abandonment of Ownit's underwriting guidelines and

many included specific loan re-underwriting results demonstrating remarkably high breach rates.

These complaints include *Stichting Pensioenfonds ABP v. Credit Suisse*, No. 653665/2011 (N.Y.

Sup Ct. Dec. 29, 2011), *John Hancock Life Ins. v. Ally*, No. 12-cv-1841 (D. Minn. July 27, 2012)

and the *Royal Park* Complaint.

286.    Another lawsuit was filed in August 2011 by several AIG companies against

Bank of America Corp., Merrill Lynch, Countrywide and others, alleging that the defendants had

defrauded plaintiffs in connection with their sale of RMBS to the plaintiffs.  *See* Compl., *Am.*

*Int'l Grp., Inc. v. Bank of Am. Corp.*, No. 652199/2011 (N.Y. Sup. Ct. Aug. 8, 2011).  In

connection with drafting the allegations, the plaintiffs interviewed several former Ownit

employees.  Those former employees confirmed that Ownit had abandoned its underwriting

guidelines, as follows:

- A former corporate underwriter at Ownit stated that Ownit was "the worst
  example" of a lender making risky loans that should never had been made in the

first place.  *Id.* ¶ 298.

- According to a former Ownit senior underwriter from September 2004 through July 2006, Ownit loan officers falsely inflated incomes on loan applications, and even when she complained to managers that "there's no way" the borrower could be making the claimed income, the amount was accepted anyway.  *Id.* ¶ 299.

- The former senior underwriter also observed "excessive adjustments" inflating appraisals at Ownit.  *Id.* ¶ 300.

- According to a former Ownit loan funder, from December 2004 to December 2006, when she brought questionable incomes to the attention of her supervisors she was told to "mind her own business" and was instructed to fund the loans.  *Id.* ¶ 299.

287.    In September 2011, FHFA filed an action against various investment banks in which FHFA performed a review of loans from one of the Covered Trusts—OWNIT 2006-1. *FHFA v. Merrill Lynch*, No. 11-cv-06202 (S.D.N.Y. Sept. 2, 2011).  FHFA found that the offering materials had understated the actual amount of loans with LTV ratios of: (i) 80% or greater by more than 32%; and (ii) 100% or greater by more than 8.5%.  *Id.* ¶ 105.  FHFA further found that the offering materials overstated the actual percentage of owner occupied properties by more than 7.5%.  *Id.* ¶ 101.

288.    Indeed, Ownit's systematic disregard of its own underwriting standards is confirmed by independent government analyses of Ownit's underwriting standards and the quality of its loans.  Based on figures the OCC updated in 2010, Ownit ranked among only 21 companies that "in various combinations occupy the Worst Ten slots in the Worst Ten metro areas."  2009 Worst Ten Report.

### o.    Wilmington Finance, Inc.

289.    Wilmington Finance Inc. ("Wilmington") is a subsidiary of American International Group, Inc ("AIG").  Wilmington originated loans in the CBASS 2005-CB4 Trust.

290.     Wilmington issued loans to borrowers that were a high default risk.  On May 11, 2007, the *Financial Times* reported that AIG's lending practices between 2003 and 2006 were the subject of "ongoing discussions" with the OTS.  *See AIG expects $128m in Subprime-loan Costs*, Financial Times, May 11, 2007, http://www.ft.com/cms/s/0/41f33e52-ff49-11db-aff2-000b5df10621.html#axzz3Gto4m6EN.  On June 8, 2007, the OTS announced the execution of a Supervisory Agreement with Wilmington for its failure to manage and control its loan origination services in a safe and sound manner. Supervisory Agreement (June 8, 2007), *available at* http://www.occ.gov/static/news-issuances/ots/press-releases/ots-pr-2007-41b.pdf. Wilmington and its affiliates were required to establish a $128 million reserve to cover costs associated with providing affordable loans to borrower whose creditworthiness was not adequately evaluated by AIG at time of origination and to reimburse borrowers for large broker and lender fees incurred at origination.  *Id.*  As part of the settlement, Wilmington agreed to review all loans originated from July 2003 to May 2006.  *Id.*

291.     Wilmington's poor loan oversight has also resulted in civil lawsuits.  In *Allstate Insurance Company v. Morgan Stanley* plaintiffs alleged Wilmington "abandoned its underwriting guidelines, verification procedures and quality control standards in order to increase loan originations" and "consistently failed to properly document prospective borrowers' ability to repay their mortgage loans."  *See* Am. Compl. ¶ 121, *Allstate Ins. Co. v. Morgan Stanley*, No. 11-cv-651840 (N.Y. Sup Ct. Sept. 9, 2011). The complaint also cites to numerous accounts from Wilmington or its affiliates' former employees/confidential witnesses regarding Wilmington or its affiliates' practice of originating loans to borrowers outside of the stated guidelines.  CW19, a former underwriter, stated that he was asked to sign off on fraud during his tenure at AIG.  CW20 admitted that Wilmington or its affiliates originated loans based on

inflated stated income and inadequate documentation, which he thought was "absolute fraud." *Id.* ¶ 124.  CW20 recalled an instance in which he denied a loan in which a housekeeper claimed to earn $8,000 per month.  After CW20 denied the loan, he was approached by an account executive to see if CW20 would approve a loan if the borrower claimed to earn $6,000 per month or $5,000 per month.  A vice president then approved the loan.  CW20 estimated that approximately 50% of loans were being originated by Wilmington or its affiliates in this manner. *Id.*

292.    This theme is echoed in the *Royal Park* Complaint.

### p.    WMC Mortgage Corporation and GE Mortgage Holding LLC

293.    In 2004, General Electric ("GE") purchased WMC Mortgage Corporation ("WMC") from a private equity firm.  At that time, WMC was the sixth-largest subprime lender in the country and specialized in nonprime loans and jumbo loans of up to $1 million.  GE mortgage is an affiliate of GE.  WMC originated mortgage loans and GE Mortgage sponsored mortgage loans included in the GE-WMC 2005-2 and GE-WMC 2006-1 Trusts.

294.    On January 20, 2012, it was reported that the FBI and the DOJ were investigating possible fraud at WMC.  Michael Hudson & E. Scott Reckard, *Feds Investigating Possible Fraud at GE's Former Subprime Unit*, iWatch News, http://www.publicintegrity.org/2012/01/20/7908/feds-investigating-possible-fraud-ge-s-former-subprime-unit (last updated May 19, 2014 12:19PM).  The article reported that, "the government is asking whether WMC used falsified paperwork, overstated borrowers' income and other tactics to push through questionable loans" with the probe focusing on whether "senior managers condoned improper practices that enabled fraudulent loans to be sold to investors."  *Id.*  The article further reported:

> The FBI's San Francisco office indicated that it has been looking into WMC's business practices for nearly two years, according to one of the people who has knowledge of the investigation. The bureau has examined individual WMC loan files and has begun contacting former employees about how the lender handled the sale of mortgages to investors . . . .

*Id.*

295.    In another article, Hudson provided a lengthy report on GE's purchase of WMC and the practices of WMC's sales staff to push through loans at any cost. According to the article, several ex-employees claim that many WMC sales staff "embraced fraud as a tool for pushing through loans that borrowers couldn't afford" and that WMC ignored reports of loans supported by falsified documents and inflated incomes. The article continues:

> Dave Riedel, a former compliance manager at WMC, says sales reps intent on putting up big numbers used falsified paperwork, bogus income documentation and other tricks to get loans approved and sold off to Wall Street investors.

> One WMC official, Riedel claims, went so far as to declare: "Fraud pays." . . . .

> The team, Riedel says, found many examples of fraud committed by in-house staffers or the independent mortgage brokers who helped bring in customers to the lender. These included faking proofs of loan applicants' employment and faking verifications that would-be home buyers had been faithfully paying rent for years rather than, say, living with their parents.

> Some employees also fabricated borrowers' incomes by creating bogus W-2 tax forms, he says. Some, he says, did it old-school, cutting and pasting numbers from one photocopy to another. Others, he says, had software on their computers that allowed them to create W-2s from scratch. . . .

> [Gail] Roman worked as a loan auditor at WMC's regional offices in Orangeburg, N.Y. She and other colleagues in quality control, she says, dug up persuasive evidence of inflated borrower incomes and other deceptions on loan applications. It did little good. Management ignored their reports and approved the loans anyway, she says.

> "They didn't want to hear what you found," Roman told iWatch

News.  "Even if you had enough documentation to show that there was fraud or questionable activity." . . . .

Argueta says one top sales staffer escaped punishment even though it was common knowledge he was using his computer to create fake documents to bolster applicants' chances of getting approved.

"Bank statements, W-2s, you name it, pretty much anything that goes into a file," Argueta says.  "Anything to make the loan look better than what was the real story." . . . .

Management gave him a pat on the back for pointing out the problem, he says, but did nothing about the salespeople he accused of using devious methods to make borrowers appear gainfully employed.

A former manager who worked for WMC in California claims that company officials transferred and essentially demoted her after she complained about fraud, including the handiwork of a sales rep who used an X-Acto knife to create bogus documents, cutting numbers from one piece of paper and pasting them onto another, then running the mock-up through a photocopier. . . .

By early 2006, Dave Riedel had begun to rebuild his career inside WMC.

He helped put together a presentation in May 2006 aimed at giving GE officials a sense of how serious WMC's fraud problems were. Riedel says an audit of soured loans that investors had asked WMC to repurchase indicated that 78 percent of them had been fraudulent; nearly four out of five of the loan applications backing these mortgages had contained misrepresentations about borrowers' incomes or employment.

Michael Hudson, *Fraud and Folly: The Untold Story of General Electric's Subprime Debacle*, iWatch News, http://www.publicintegrity.org/2012/01/06/7802/fraud-and-folly-untold-story-general-electric-s-subprime-debacle (last updated May 19, 2014 12:19PM).

296.    On the radio program "This American Life," broadcast May 9, 2008, reporter Alex Blumberg interviewed a WMC sales manager who made over a million dollars a year by making loans to "people [who] didn't have a pot to piss in."  Blumberg reported that the manager "didn't worry about whether the loans were good . . . .  That was someone else's problem."  *This*

*American Life, 355: The Giant Pool of Money* (May 9, 2008),

http://www.thisamericanlife.org/radio-archives/episode/355/the-giant-pool-of-money.

297.    In June 2008, the Washington State Department of Financial Institutions filed a

"Statement of Charges and Notice of Intention to Enter an Order to Revoke License, Prohibit

From Industry, Impose Fine, Order Restitution and Collect Investigation Fees" against WMC

and its owners.  The Statement of Charges stemmed from an investigation that found WMC had

originated loans with unlicensed or unregistered mortgage brokers, understated amounts of

finance charges on multiple loans, understated amounts of payments made to escrow companies,

understated annual percentage rates by almost 5% and committed numerous other violations of

Washington State deceptive and unfair practices laws.  In July 2009, WMC entered a consent

order under which it agreed to pay fines, restitution and the costs of the investigation to settle the

matter.  *In re WMC Mortg. Corp.*, Consent Order, C-07-557-09-CO02 (July 21, 2011), *available

at* www.dfi.wa.gov/CS%20Orders/C-07-557-09-CO02.pdf.

298.    Additional proof that WMC did not follow its underwriting guidelines is found in

the lawsuit against it by the trustee of the MSAC 2006-WMC2 Trust.  *See* Compl., *Deutsche

Bank Nat'l Trust Co. v. WMC Mortg. LLC*, No. 12-cv-00933 (D. Conn. June 25, 2012).  In that

action, the trustee commissioned an expert to review the actual loan files for over 1,400 loans

that were contained with this offering.  The expert found that a remarkable 99.7% of the

reviewed loans breached the representations and warranties WMC had made about the loans.  *Id.*

¶¶ 7–8.

299.    Similarly, in *MASTR Asset Backed Sec. Trust 2006-HE3 v. WMC Mortg. Corp.*,

No. 11-cv-02542 (D. Minn. Sept. 2, 2011), the RMBS trustee sued to require WMC to

repurchase loans that were fraudulent and did not comply with the stated underwriting

guidelines.  A review of a sample of 200 loans within the trust indicated that 75% of the loans were either fraudulent, not originated pursuant to the underwriting guidelines and/or did not reflect a proper determination of whether the borrower could afford to repay the loan.  *Id*. ¶ 20.

300.    On September 2, 2011, FHFA sued GE alleging that the company made inaccurate statements about the quality of loans underlying the securities, including those issued in 2005 by WMC, including one of the Covered Trusts—GE-WMC 2005-2.  *See* Compl., *FHFA v. Gen. Elec. Co.*, No. 11-cv-07048 (S.D.N.Y. Sept. 2, 2011).  FHFA's allegations in the complaint in *FHFA v. WMC Mortgage LLC*, No. 13-cv-00584 (S.D.N.Y. Jan. 25, 2013), that WMC misrepresented approximately $1 billion in mortgages it pooled and sold, were sustained by the court.  Investigations in 2011, 2012 and 2013 identified problems among at least 55% of the loans and these problems include loan documentation that understated credit risk by overvaluing properties or misstating their purpose.  These FHFA actions were widely publicized.  *See, e.g.*, Rachel Layne, *GE Says FHFA Filed Mortgage-Security Suit Without Warning*, Bloomberg (Sept. 7, 2011), http://www.bloomberg.com/news/2011-09-07/ge-plans-to-vigorously-contest-fhfa-litigation-notice.html; Nate Raymond, *FHFA Says Settlement Reached with GE In Mortgage Case*, Reuters (Jan. 23, 2013), http://www.reuters.com/article/2013/01/23/us-ge-fhfa-idUSBRE90M18R20130123.

301.    As alleged in a derivative suit against BNY Mellon:

> Bond insurance companies also filed actions to recoup losses arising from WMC's fraudulent loan originations.  For example, in *PMI Mortgage Insurance Co., v. WMC Mortgage Corp.*, No. BC381972 (L.A. Sup. Ct. filed Jan. 4, 2008), WMC and GE were sued for loans made in violation of the stated underwriting standards.  There, a review of loans found "a systemic failure by WMC to apply sound underwriting standards and practices." Reviewing a sample of the nearly 5,000 loans in the pool, PMI identified 120 "defective" loans for which borrowers' incomes and employment were incorrect or where the borrower's intention to

live in the home was incorrect. *The New York Times* reported on this action. *See If Everyone's Finger-Pointing, Who's to Blame?* N.Y. Times (Jan. 22, 2008).

Compl. ¶ 297, *Blackrock Allocation Target Shares v. Bank of N.Y.*, No 651866/2014 (N.Y. Sup.

Ct. June 18, 2014) (citations in original).

302.    The derivate suit further alleged:

> PMI filed another lawsuit against WMC in September 2009 after a review of WMC's loan files found that WMC "followed few, if any, objective standards or criteria in underwriting [mortgage loans] and showed little concern, if any, for any borrower's ability to repay." *PMI Mortg. Ins. Co. v. WMC Mortg. Corp.*, No. BC381972 (L.A. Super. Ct.).  According to PMI's complaint, a review of a sample of thousands of WMC-originated loans revealed that WMC "breached various representations and warranties [attesting that,] *inter alia*, the loan-to-value ratio at the time of origination was greater than 100%; fraud, errors, misrepresentations, or gross negligence took place on the part of WMC . . . ; the loans did not comply with WMC's own underwriting standards at the time of origination; certain documents were missing; and/or WMC had failed to utilize a methodology in underwriting the loans that employed objective mathematical principles designed to determine that, at the time of origination, the borrower had the reasonable ability to make timely payments on the [m]ortgage [l]oans." According to the PMI complaint, the investigation "demonstrate[d] a systemic failure by WMC to apply sound underwriting standards and practices which cuts across all of the [loans in the securitization]." In the defective loans, the investigation discovered "unreasonable stated income and/or misrepresentations of income and/or employment by the borrower."  Moreover, nearly a quarter of the loans sampled were shown to contain "misrepresentations of occupancy by the borrower."

*Id*. ¶ 298 (citations and brackets in original).

303.    These are just a handful of the complaints that have alleged that WMC's loans

breached the associated representations and warranties.  *See also, e.g.*, Compl., *Cambridge Place*

*Inv. Mgmt. Inc. v. Morgan Stanley & Co.*, Case No. 10-2741 (Mass. Super. July 9, 2010);

Compl., *Phoenix Light SF Ltd. v. Credit Suisse AG*, No. 653123/2013 (N.Y. Sup. Ct. Feb. 9,

2013) (action based on, among other things, misrepresentations concerning one of the Covered Trusts—GEWMC 2005-2); Compl., *Phoenix Light SF Ltd. v. J.P. Morgan Securities LLC*, No. 651755/2012 (N.Y. Sup. Ct. Oct. 5, 2012) (action involving misrepresentations concerning GEWMC 2005-2); Compl., *Sealink Funding Ltd. v. Morgan Stanley*, No. 650196/2012 (N.Y. Sup. Ct. Jan. 20, 2012) (same).  The complaints provide direct evidence based on re-underwriting that a substantial portion of the loans originated by WMC were likely in breach.

304.    Most tellingly, BNY Mellon itself has commenced repurchase actions against WMC involving other trusts.  In one such repurchase action against WMC, BNY Mellon asserted that a loan level review of a sample of 498 loan files showed that ***493*** of the loans—***99%***—materially breached one or more of WMC's representations and warranties.  Compl., *The Bank of N.Y. Mellon v. WMC Mortg., LLC*, No. 654464/2012 (N.Y. Sup. Ct. Feb. 24, 2013).  BNY Mellon further alleged that a review of an additional 350 origination files revealed material breaches in 347 or 99% of the WMC loans.  According to BNY Mellon, "[t]he enormity of defective loans uncovered to date strongly indicates systemic breaches throughout the collateral underlying the Trust."  *Id.* ¶ 67.

305.    In another repurchase action against WMC (involving one of the Covered Trusts—GE-WMC 2006-1), BNY Mellon alleged that the initial loan level review identified over ***2,600*** WMC loans that breach representations and warranties.  According to BNY Mellon, this sample represented "just the tip of the iceberg."  Compl., *The Bank of N.Y. Mellon v. WMC Mortg.*, No. 12-cv-07096 (S.D.N.Y. May 29, 2013).  In short, the incredibly high rates of representation and warranty breaches cited by BNY Mellon in support of its repurchase actions against WMC further demonstrates that BNY Mellon was well aware of the pervasive and systemic breaches of representations and warranties of the WMC loans in the Covered Trusts.

### C.   BNY Mellon Failed to Exercise Due Care and Enforce Repurchase Obligations

306.   As set forth above, BNY Mellon became aware of defaults under the PSAs. Once it became aware of a default it had a duty under the TIA to exercise with due care all rights available under the PSAs to protect Certificateholders' interests.

307.   BNY Mellon did not exercise due care when it learned of defaults.  When BNY Mellon provided its final exception reports to the Sponsors, Depositors and Master Servicers (or Servicers) indicating that mortgage files were missing required documents, it should have acted to require the Sponsors or Originators to repurchase or replace the non-compliant loans.  At a minimum, BNY Mellon should have notified Certificateholders that the mortgage files were incomplete and the Sponsors or Originators did not repurchase or substitute the loans.

308.   When BNY Mellon learned that the Master Servicers or Servicers failed to provide notice of numerous breaches of representation and warranty provisions as required under the PSAs, BNY Mellon should have (i) taken action against the Master Servicers or Servicers; (ii) taken steps to require the Sponsors or Originators to repurchase or substitute the loans; and (iii) notified Certificateholders of the Master Servicers' or Servicers' defaults and the breaches of representation and warranty provisions.

309.   In addition to its duty under the TIA to exercise due care upon learning of a default, BNY Mellon had a similar duty under the PSAs to exercise due care upon an Event of Default.  Events of Default occurred under each of the PSAs, but BNY Mellon failed to take the required actions to protect the rights of the Covered Trusts.  As set forth below in Section III(C)(2), BNY Mellon was aware of the Master Servicers', Servicers', Depositors' and Sponsors' representation and warranty violations that occurred in the Covered Trusts.

BNY Mellon, however, did not provide notice of such defaults as it was required to do. Because these defaults would have seasoned into Events of Default if notice had been provided, BNY Mellon had the duty to act prudently to enforce repurchase provisions once it learned of such defaults.

310.    As described below, additional Events of Default occurred under the terms of the PSAs.  BNY Mellon has engaged in repeated breaches of its duty to exercise due care throughout the life of the Covered Trusts.

**1.    Events of Default Relating to Delay Delivery
Mortgage Loans under the Countrywide and First Horizon PSAs**

311.    Events of Default occurred shortly after the closing of the RMBS transactions relating to the Countrywide Trusts and First Horizon Trusts because the Master Servicer breached its obligation to ensure that the Sponsor cured document exceptions identified on BNY Mellon's Final Certification.

312.    Section 7.01(ii) of the Countrywide PSA provides that an Event of Default occurs when the Master Servicer breaches its contractual obligations relating to delivery of mortgage files under the PSA, including but not limited to "the Mortgage File for Delay Delivery Mortgage Loans" and "the failure to substitute or repurchase in lieu of delivery." Delay Delivery Mortgage Loans are defined in the Countrywide PSA as "Mortgage Loans for which all or a portion of a related Mortgage File is not delivered to the Trustee on the Closing Date."  The PSAs for the First Horizon Trusts contain similar provisions.  *See* Ex. C § XI.

313.    The complete Mortgage File for all Delay Delivery Mortgage Loans that are Initial Mortgage Loans must be delivered to the Depositor or the Trustee within thirty days of the closing or Countrywide or First Horizon would have an obligation to repurchase or

substitute the loans in question.  Section 2.01(c) of the Countrywide PSA provides:

> [W]ithin thirty (30) days after the Closing Date with respect to the Initial Mortgage Loans, Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) shall either (i) deliver to the Depositor, or at the Depositor's direction, to the Trustee or other designee of the Depositor the Mortgage File as required pursuant to this Section 2.01 for each Delay Delivery Mortgage Loan or (ii) either (A) substitute a Substitute Mortgage Loan for the Delay Delivery Mortgage Loan or (B) repurchase the Delay Delivery Mortgage Loan.

The PSAs for the First Horizon Trusts contain similar provisions.  *See* Ex. C § I.

314.    The complete Mortgage File for all Delay Delivery Mortgage Loans that are Initial Mortgage Loans must be delivered to the Depositor or the Trustee within a designated period after the Supplemental Transfer Date or Countrywide would have an obligation to repurchase or substitute the loans in question.  Section 2.01 of the Countrywide PSA provides:

> Within thirty (30) days after the Closing Date, Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) shall either (i) deliver to the Depositor, or at the Depositor's direction, to the Trustee or other designee of the Depositor the Mortgage File as required pursuant to this Section 2.01 for each Delay Delivery Mortgage Loan or (ii) either (A) substitute a Substitute Mortgage Loan for the Delay Delivery Mortgage Loan or (B) repurchase the Delay Delivery Mortgage Loan.

The PSAs for the First Horizon Trusts contain similar provisions.  *See* Ex. C § I.

315.    Section 2.01(c) of the Countrywide PSA further provides "substitution[s] or repurchase[s] shall be accomplished in the manner and subject to the conditions set forth in Section 2.03 (treating each Delay Delivery Mortgage Loan as a Deleted Mortgage Loan for purposes of such Section 2.03)."  The Master Servicer is obligated to enforce these repurchase and substitution provisions and is reimbursed for the costs incurred doing so

pursuant to Section 2.03(c) of the Countrywide PSA.  As with the Master Servicer, the

Trustee is specifically reimbursed for any costs incurred in enforcing Countrywide's

obligation to repurchase defective loans pursuant to Section 2.03.  The PSAs for the First

Horizon Trusts contain similar provisions.  *See* Ex. C § I.

316.    BNY Mellon also had the ability and obligation to cause the repurchase and

substitution of Delay Delivery Mortgage Loans as they were required to be identified in an

exception report accompanying BNY Mellon's Final Certification provided under the PSAs.

Pursuant to Section 2.02 of the PSAs, Countrywide or First Horizon had an obligation to

substitute or repurchase mortgage loans identified as exceptions.

317.    As discussed above, Countrywide's practice was to entrust key mortgage

documentation to the Master Servicer, and it also historically lost, never obtained or failed

to create essential mortgage documentation.  When Countrywide failed to deliver complete

Mortgage Files to the Depositor or the Trustee, the Master Servicer was aware of this fact

because it often possessed the documents that were not delivered ***and*** the Trustee provided

notice of document exceptions to the Master Servicer through the delivery of the Final

Certification.  The Master Servicer was obligated to deliver the Mortgage File or cause the

repurchase or substitution of Delay Delivery Mortgage Loans if the requirements set forth in

the PSAs were not met.

318.    Pursuant to Section 7.01 of the Countrywide and First Horizon PSAs, the

Master Servicer's failure to cause the repurchase or substitution of Delay Delivery Loans is

an Event of Default.  *See* Ex. C § XI.  BNY Mellon was aware of this Event of Default

because it notified the Master Servicer, Countrywide and the Depositors of document

exceptions and, following such notice, neither Countrywide, the Master Servicer nor the

Depositor delivered the complete Mortgage File for these loans or caused Countrywide to substitute or repurchase the loans.  Events of Default under Section 7.01(ii) occurred in the first year of each Covered Trust's existence and remained uncured.  From that date, BNY Mellon had an affirmative obligation to exercise remedies on behalf of Certificateholders and to do so with the same degree of care that a prudent person would exercise in its own affairs.

319.    Despite the existence of uncured Events of Default, BNY Mellon did not adequately address the defaults and Events of Default.  If BNY Mellon had exercised due care, it would have exercised remedies to address the document delivery failures and numerous breaches of representations and warranties by the Sponsors and Originators and caused them to repurchase or, if within the specified time period, substitute the affected loans.  BNY Mellon's failure to do so damaged Plaintiffs.

### 2.    BNY Mellon Received Formal Notice of Representation and Warranty Violations Which Ripened into Events of Default

320.    In addition to the Events of Default discussed above, on December 16, 2011, BNY Mellon received written instructions from a group of major institutional mortgage investors in hundreds of RMBS trusts asking BNY Mellon to open investigations into large numbers of ineligible mortgages in the loan pools securing those trusts and deficient servicing of those loans (the "JPMorgan Putback Initiative").  The JPMorgan Putback Initiative identified and sought to compel the repurchase of large quantities of loans originated by many of the same lenders that also originated large quantities of the loans sold to the Covered Trusts, including Countrywide, and sought recovery of losses relating to servicing deficiencies by many of the same major servicers of loans backing the Covered Trusts, including Countrywide.  BNY Mellon accepted the settlement with JPMorgan with respect to certain trusts despite that the settlement would

reimburse the trusts for only a small fraction of the losses caused by JPMorgan's misconduct. *See* Compl. ¶¶ 10–11, *Blackrock Allocation Target Shares v. Bank of N.Y.*, No 651866/2014 (N.Y. Sup. Ct. June 18, 2014).  None of the Covered Trusts are part of this settlement.

321.    The JPMorgan Putback Initiative put BNY Mellon on notice of deficient servicing practices of JPMorgan and its affiliates.  Despite this knowledge, BNY Mellon has failed to exercise due care to protect the rights and interests of Certificateholders.

322.    Further, beginning in June 2010, a group of institutional investors purporting to hold over 25% of the outstanding notes for approximately 100 Countrywide trusts for which BNY Mellon serves as trustee provided notice of numerous defaults by the Master Servicer and Countrywide under the PSAs including, *inter alia*, the following:

- Countrywide sold a material number of loans to securitization trusts that did not comply with applicable underwriting guidelines in violation of representations and warranties provided by Countrywide;

- The Master Servicer failed to service and administer the mortgage loans in accordance with the "customary and usual standards of practice of prudent mortgage loan servicers" as required by Section 3.01 of the Countrywide PSA by failing to maintain loan and collateral files consistently with the standards of practice of a prudent mortgage loan servicer, demand that the Sponsors of loans found to be deficient cure such deficiencies and by collecting unnecessary servicing fees;

- The Master Servicer failed to provide notice under Section 2.03(c) of the Countrywide PSA of each "breach of a representation or warranty with respect to a Mortgage Loan . . . that materially and adversely affects the interests of Certificateholders";

- The Master Servicer agreed to modify loans that included illegal predatory lending terms in order to settle claims brought by state Attorneys General without requiring the Seller of such loans— its parent company— to bear the costs and expenses related to those modifications.  *See* Countrywide PSA § 2.03(c);

- The Master Servicer failed to use "reasonable efforts to foreclose upon or otherwise comparably convert the ownership of properties securing such of the Mortgage Loans as come into and continue in default and as to which no

satisfactory arrangements can be made for collection of delinquent payments."
*See* Countrywide PSA § 3.11(a).

323.    Under Section 7.01(ii) of the Countrywide PSA once the Master Servicer is provided notice of a breach of its duties under the PSA it becomes an "Event of Default" if it is not cured within sixty days.  The Master Servicer failed to cure the defaults within sixty days and, thus, Events of Default have occurred.

324.    Faced with these Events of Default, a reasonably diligent trustee would have demanded that the Master Servicer, Countrywide and Bank of America cure such defaults within the specified cure period.  BNY Mellon, however, failed to make a demand.

325.    Instead, BNY Mellon agreed to a settlement where it receives a substantial financial benefit in the form of an indemnity from Bank of America.  The settlement, which is currently subject to appellate proceedings, is also a windfall to Bank of America and Countrywide.

326.    The $8.5 billion to be paid by Bank of America pales in comparison to the value of the claims to be released.  The settlement includes repurchase claims owned by 530 trusts.  The aggregate amount of loans in such trusts, according to BNY Mellon, is $208 billion.  Based on analyses that have been conducted by monoline insurers with access to loan files for Countrywide's defaulted loans, 75%–90% of these loans violated representation and warranty provisions and, as a result, should have been repurchased by Countrywide.  Thus, the damage suffered by the 530 trusts easily exceeds $90 billion.  Nevertheless, despite the clear right of the trusts to put back defective loans to Countrywide, BNY Mellon agreed to release Countrywide and Bank of America for all breaches of representations and warranties and servicing-related claims in connection with the 530 trusts for only $8.5 billion.  Although $8.5 billion is a large sum of money in the abstract, it is only

a small fraction of the $90+ billion in damage caused by Countrywide's breaches.

327.    In the BNY Article 77 Proceeding, the New York Supreme Court found that BNY Mellon abused its discretion in entering into the settlement by releasing potential claims against Bank of America and Countrywide for the repurchase of modified loans without performing an appropriate investigation of the released claims.

328.    Although the court in the BNY Article 77 Proceeding held that BNY Mellon did not abuse its discretion in other respects in agreeing to the settlement, the court did not decide (i) whether any uncured Events of Default existed triggering BNY Mellon's affirmative duty to exercise remedies on behalf of Certificateholders and to act prudently in doing so or (ii) whether BNY Mellon acted in accordance with those duties.  As discussed further herein, there were uncured Events of Defaults with respect to each Countrywide Trust and, following such Events of Default, BNY Mellon failed to exercise due care.

329.    Moreover, BNY Mellon has had notice of Countrywide's defaults for years but failed to take any steps to protect Certificateholder rights.  If it had, it would have forced Countrywide to repurchase or substitute the loans that ultimately caused massive losses for Certificateholders at a time when Countrywide itself had ample assets.

330.    Further, BNY Mellon created conflicts of interest, rather than avoid them. BNY Mellon agreed to the proposed settlement of Countrywide's repurchase obligations only after Bank of America agreed to indemnify BNY Mellon for liabilities under the PSAs and the settlement agreement.

### 3.    Servicer Events of Default Relating to Document Delivery Failures in the Covered Trusts

331.    As detailed above in Section III(A), each of the Master Servicers and Servicers has engaged in widespread foreclosure misconduct necessitated by the fact that the Sponsors and

Originators failed to deliver to the Covered Trusts' custodians (or BNY Mellon) complete mortgage files.  A reasonably prudent servicer would have required the Sponsors and Originators to cure document deficiencies when they were identified on the exception reports provided by the Trustee.  Both the Servicers and BNY Mellon were aware that these loans were not put back to the Sponsors or Originators and, instead, as described in Section III(A), the Servicers robo-signed the documentation required to foreclose.  These acts of robo-signing were breaches of the applicable prudent servicing standard, as a prudent servicer would have insisted that the loans be repurchased.  Under the TIA, BNY Mellon was required to provide notice of such defaults and its failure to do so cannot avoid the occurrence of an Event of Default.  As a result, an Event of Default occurred in the first year of the existence of each Covered Trust.

332.    As set forth in Section II(E), the PSAs for the Countrywide, CWHEL, ECR and First Horizon Trusts each provide that an Event of Default occurs if the Servicer fails to prudently service the mortgage loans and such breach is not remedied after 60 days of notice of the breach.

333.    Further, as set forth in Section II(E), the PSAs for the CBASS, First NLC and GE Trusts each provide that the Servicers' failure to perform its covenant to prudently service the mortgage loans ripened into a Servicer Event of Default 30–60 days after a Servicing Officer learned of such failures—no formal notice is required.

334.    As these Events of Default occurred shortly after closing of the Covered Trusts and have remained uncured, BNY Mellon has had an obligation to exercise due care and ensure that all defective loans are tendered to the Sponsors and Originators for repurchase.  BNY Mellon's failure to do so damaged Plaintiffs.

### 4.      Events of Default Under the First NLC 2005-1 Indenture

335.      As noted, FNLC 2005-1 was documented using an Indenture, rather than a

Pooling and Servicing Agreement.  While the same type of Events of Default occurred

under the Indenture as described in Section III(C)(3) and Section III(E), the relevant

provisions are slightly different in that the Issuer's (i.e., the Trust's) breach of the Indenture

gives rise to an Event of Default rather than the Master Servicer's or Servicer's breaches.[6]

336.      Section 3.5 of the FNLC 2005-1 Indenture provides in relevant part, "The

Issuer will . . . take such other action necessary or advisable to: . . . (iii) enforce any rights

with respect to the Trust Fund; or (iv) preserve and defend title to the Trust Estate and the

rights of the Indenture Trustee and the Noteholders in such Trust Estate against the claims of

all persons and parties."

337.      The failure to do so is an Event of Default.  For example, the Indenture for

FNLC 2005-1 provides that an Event of Default occurs when the Issuer fails:

> to observe or perform any covenant or agreement of the Issuer
> made in this Indenture . . . and such default shall continue or not
> be cured . . . for a period of 30 days after there shall have been
> given, by registered or certified mail, to the Issuer by the
> Indenture Trustee or to the Issuer and the Indenture Trustee by
> Noteholders representing at least 25% of the Outstanding
> Balance of the Notes, a written notice specifying such
> default . . . and requiring it to be remedied and stating that such
> notice is a notice of Indenture Default hereunder.

338.      As discussed above, the Trustee provided written notice that the mortgage

files were incomplete.  The Issuer under the FNLC 2005-1 Indenture failed to protect the

collateral, a fact the Trustee was well aware of.  As a result, an Event of Default occurred

under the FNLC 2005-1 Indenture in the first year of the existence of the FNLC 2005-1

---

[6] The ECR Trust Indenture incorporates the Event of Default provisions from the related Servicing Agreement.  As a result, the Events of Default triggered by the Master Servicer's breaches under the Servicing Agreement similarly triggered Events of Default under the Indenture.

Trust.

339.    As detailed in Section III(C)(2), the Trustee became aware of public

information indicating that the Issuer failed to protect the collateral by enforcing the

Sponsors' or Originators' repurchase obligations triggered by representation and warranty

violations.  Events of Default occurred as a result.

**D.    BNY Mellon Provided False Regulation
AB Certifications and Remittance Reports**

340.    For the first year of its existence, each Covered Trust was a reporting entity

under the Securities Exchange Act of 1934.  For Covered Trusts offered 2006 and later, at

the end of the trust's first year, the Depositor filed with the SEC with respect to each

Covered Trust a report on Form 10-K that contained a certification from BNY Mellon that

collateral securing the loans held by the Covered Trust had been maintained as required by

the relevant transaction agreements, and that pool assets and related documents were

safeguarded.  *See* SEC Regulation AB, 17 C.F.R § 229.1122(d)(4)(i)–(ii).  The Servicers

made similar certifications.  BNY Mellon re-certified annually that the servicing

requirements were met with respect to all trusts that it administered.  These filings were

false and misleading in that they failed to disclose Sponsors' widespread failure to transfer

complete mortgage files to the Covered Trusts, and the Sponsors' and Originators' many

breaches of representations and warranties regarding the underwriting of the mortgage loans

and their obligations as to transfer of title.

341.    BNY Mellon regularly made available to Certificateholders remittance

reports.  Under Item 1121 of SEC Regulation AB, such reports must disclose "[m]aterial

breaches of pool asset representations or warranties or transaction covenants."  *See* 17

C.F.R. § 229.1121(a)(12).  BNY Mellon was required to certify that the remittance reports

complied with all SEC rules.  BNY Mellon, however, did not disclose the Sponsors', Originators', Master Servicers' and Servicers' numerous breaches of representations and warranties and transaction covenants, and their failure to provide complete and accurate remittance reports.

342.    The effect of the multiple disclosure failures concerning breaches of representations and warranties and contractual requirements has been to mislead Certificateholders and conceal BNY Mellon's breaches of its contractual, fiduciary and statutory duties.

343.    If BNY Mellon had filed an accurate certification, as it was required to do, the Sponsors or Originators would have been forced to repurchase, or substitute if within the specified period, all of the non-compliant loans and the certificate losses would have been substantially eliminated.  Moreover, if BNY Mellon had exercised a reasonable degree of care and issued accurate certifications, the Sponsors and Originators would not have been able to continue to unload defective and non-compliant mortgage loans in securitization transactions.

### E.    BNY Mellon Failed to Address the Master Servicers' and Servicers' Looting of Trust Assets

344.    The Master Servicers and Servicers failed to prudently service the mortgage loans underlying the Covered Trusts.  In addition to the Events of Default identified above in Section III(C), the Master Servicers and Servicers have failed to prudently service loans by modifying loans they were required to tender to the Sponsor for repurchase, failing to employ prudent loss mitigation processes and overcharging for default-related services.

345.    All but one of the Countrywide PSA's provides that the Master Servicer may not modify a loan unless Countrywide, the Sponsor, repurchases the loan.  *See* Section 3.12

126

of the CWL 2006-14, CWL 2006-9, CWL 2006-4, CWL 2006-1, CWL 2005-AB5 and CWL

2005-AB4 PSAs; Section 3.11(b) of the CWALT 2006-OA11, CWALT 2006-OA10,

CWALT 2006-OA6, CWALT 2006-OA3, CWALT 2006-27CB and CWALT 2005-AR1

PSAs; and Section 3.01 of the CWHEL 2006-H, CWL 2005-6 and CWL 2005-IM3 PSAs.

Justice Kapnick recently concluded that BNY Mellon failed to act reasonably when it was

presented with evidence of these breaches.  She noted "the Trustee acted 'unreasonably or

beyond the bounds of reasonable judgment.'"  *In re Bank of New York Mellon*, No.

651786/2011, 2014 WL 1057187, at *29 (N.Y. Sup. Ct. Jan. 31, 2014).

346.    To the extent that the PSAs permitted modifications without repurchase, the

Master Servicers and Servicers have also systemically refused to modify loans when it was

in the Covered Trusts' interest to do so rather than foreclose and to engage in otherwise

prudent loss mitigation practices.  The Master Servicers and Servicers have done so because

they have engaged in a variety of scams to overcharge borrowers (and ultimately the

Covered Trusts) for default-related services.

347.    From 2005 until today, the Servicers and Master Servicers have cheated

borrowers and the Covered Trusts after default by, *inter alia*, charging improper and

excessive fees (including without limitation fees for property maintenance prior to

foreclosure), failing to properly oversee third-party vendors and procuring insurance policies

for properties that were already insured.

348.    When a defaulting borrower's home is foreclosed upon and sold, the Servicers

and Master Servicers deduct their fees (which defaulting borrowers are in no position to pay

themselves) and any servicing advances from sale proceeds before any funds are transferred

to the securitization trust that purportedly owned the mortgage loan and was entitled to the

net sale proceeds.

349.    These servicing related defaults ripened into Events of Default under the

PSAs for the CBASS, First NLC and GE Trusts.  As set forth in Section II(E), each of these

PSAs provided that the Servicers' failure to perform its covenant to prudently service the

mortgage loans ripened into a Servicer Event of Default 30–60 days after a Servicing

Officer learned of such failures—no formal notice is required.

350.    These servicing related breaches were also defaults under the PSAs for the

Countrywide, CWHEL, ECR and First Horizon Trusts.  BNY Mellon had an obligation to

provide notice of such defaults under the TIA, which would have resulted in additional Events of

Default, but it failed to do so and, thus, was obligated to exercise due care and protect

Certificateholders' rights.

351.    The chart below identifies each of the entities disclosed to be Servicers and

Master Servicers of the Covered Trusts, each of which failed to prudently service the

mortgage loans underlying the Covered Trusts, as further detailed below.

|   | **Trust** | **Servicer** | **Master Servicer** |
|---|---|---|---|
| 1 | CBASS 2005-CB4 | Litton Loan Servicing LP | |
| 2 | CBASS 2005-CB8 | Litton Loan Servicing LP | |
| 3 | CBASS 2006-CB3 | Litton Loan Servicing LP | |
| 4 | CWALT 2005-AR1 | | Countrywide Home Loans Servicing LP |
| 5 | CWALT 2006-27CB | | Countrywide Home Loans Servicing LP |
| 6 | CWALT 2006-OA10 | | Countrywide Home Loans Servicing LP |
| 7 | CWALT 2006-OA11 | | Countrywide Home Loans Servicing LP |
| 8 | CWALT 2006-OA3 | | Countrywide Home Loans Servicing LP |
| 9 | CWALT 2006-OA6 | | Countrywide Home Loans |

|  | **Trust** | **Servicer** | **Master Servicer** |
|---|---|---|---|
|  |  |  | Servicing LP |
| 10 | CWHEL 2005-H |  | Countrywide Home Loans, Inc. |
| 11 | CWL 2005-6 |  | Countrywide Home Loans Servicing LP |
| 12 | CWL 2005-AB4 |  | Countrywide Home Loans Servicing LP |
| 13 | CWL 2005-AB5 |  | Countrywide Home Loans Servicing LP |
| 14 | CWL 2005-BC1 |  | Countrywide Home Loans Servicing LP |
| 15 | CWL 2005-IM3 |  | Countrywide Home Loans Servicing LP |
| 16 | CWL 2006-1 |  | Countrywide Home Loans Servicing LP |
| 17 | CWL 2006-14 |  | Countrywide Home Loans Servicing LP |
| 18 | CWL 2006-4 |  | Countrywide Home Loans Servicing LP |
| 19 | CWL 2006-9 |  | Countrywide Home Loans Servicing LP |
| 20 | ECR 2005-1 | ECC Capital Corporation | Countrywide Home Loans Servicing LP |
| 21 | FHAMS 2005-FA5 |  | First Horizon Home Loan Corporation |
| 22 | FHAMS 2005-FA7 |  | First Horizon Home Loan Corporation |
| 23 | FNLC 2005-1 |  | JPMorgan Chase Bank N.A. |
| 24 | FNLC 2005-2 | Litton Loan Servicing LP |  |
| 25 | GE-WMC 2005-2 | Litton Loan Servicing LP |  |
| 26 | GE-WMC 2006-1 | Litton Loan Servicing LP |  |
| 27 | OWNIT 2006-1 | Litton Loan Servicing LP |  |

1.      **Countrywide Home Loans, Inc. and
        Countrywide Home Loans Servicing LP's Servicing Scams**

352.    After Countrywide was acquired by BAC in 2008, Countrywide Home Loans Servicing L.P. was renamed BAC Home Loans Servicing L.P. ("BAC Servicing") and Countrywide Home Loans began operating under the name BAC Home Loans Inc., both of which merged into Bank of America.

353.    When a borrower defaults, the servicer is supposed to take action to preserve the value of the mortgaged property.  For example, BAC may order a property inspection for the purpose of verifying the occupancy status of defaulting borrower's home.  When homes are in the foreclosure process, BAC may provide maintenance services such as lawn mowing and security.

354.    BAC uses affiliated entities, including LandSafe Default, Inc. (also known as LandSafe National Default, "LandSafe") and ReconTrust Company, N.A. ("ReconTrust"), to hire third party vendors to perform default-related services.  BAC in turn charges the defaulting borrowers.  Notwithstanding that mortgage loan documents require BAC to charge no more than actual cost, it routinely marked up its servicing charges by up to 100%.

355.    David Sambol, former CEO of Countrywide Financial Corporation, touted this profiteering from default-related services during an October 2007 earnings call:

>       Now, we are frequently asked what the impact of our servicing costs and earnings will be from increased delinquencies and [loss] mitigation efforts, and what happens to costs.  And what we point out is, as I will now, is that increased operating expenses in times like this tend to be fully offset by increases in ancillary income in our servicing operation, greater fee income from items like late charges, and importantly from in-sourced vendor functions that represent part of our diversification strategy, a counter-cyclical diversification strategy such as our businesses involved in foreclosure trustee and default title services and property inspection services.

Lesley Fair, *$108 Million for Homeowners in Distress*, Bureau of Consumer Protection

Business Center (July 20, 2011), http://www.business.ftc.gov/blog/2011/07/108-million-

homeowners-distress.

356.   On June 7, 2010, the Federal Trade Commission ("FTC") commenced a

lawsuit against Countrywide Home Loans and BAC Servicing for gouging borrowers for

default-related services.  Countrywide Home Loans and BAC Servicing eventually paid

$108 million to settle the charges.

357.   The FTC has found that Countrywide Home Loans committed numerous

frauds in bankruptcy proceedings.  According to the FTC, "Countrywide made false or

unsupported claims to borrowers about amounts owed or the status of their loans.

Countrywide also failed to tell borrowers in bankruptcy when new fees and escrow charges

were being added to their loan accounts."  Press Release, FTC, Countrywide Will Pay $108

Million for Overcharging Struggling Homeowners; Loan Servicer Inflated Fees, Mishandled

Loans of Borrowers in Bankruptcy (June 7, 2010), *available at* http://www.ftc.gov/news-

events/press-releases/2010/06/countrywide-will-pay-108-million-overcharging-struggling.

358.   Countrywide also ran an insurance scam involving property and casualty

insurance.  When borrowers default on their mortgage loans, they often stop paying their

homeowners' insurance premiums.  When that happened, Countrywide replaced the

borrowers' homeowner policies with policies underwritten by Balboa Insurance, which until

recently was an affiliate of BAC.  Balboa Insurance charges substantially above-market

premiums for these so called forced-placed insurance policies, typically several times the

premium under the original policy.  This force-placed insurance scam violated

Countrywide's obligation to service loans prudently.

359.     Following a 16-month investigation led by Iowa Attorney General Tom Miller, a coalition of 49 State Attorneys General, the Departments of Justice, Treasury and HUD (collectively, the "Coalition") reached a settlement with, among others, BAC (the "Coalition Settlement").  In its complaint, the Coalition reported its investigative findings.  The Coalition concluded that BAC committed unfair and deceptive practices including (a) failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements; (b) charging excessive or improper fees for default-related services; (c) failing to properly oversee third-party vendors involved in servicing activities on behalf of the Servicers; and (d) imposing force-placed insurance without properly notifying the borrowers and when borrowers already had adequate coverage.  *See United States v. Bank of Am.*, No. 12-cv-00361 (D.D.C. Mar. 14, 2012).

## 2.     First Horizon Home Loan Corporation's Servicing Scams

360.     As set forth above, in 2008, First Horizon sold MetLife its loan servicing platforms.

361.     On April 13, 2011, the OCC issued a Consent Order finding that First Horizon (or MetLife), in connection with certain foreclosures of loans in its residential mortgage servicing portfolio, filed in state and federal courts affidavits executed by its employees concerning the fees and expenses chargeable to borrowers when, in many cases, the allegations were not based on personal knowledge or review of the relevant books and records.  *In re MetLife Bank, N.A.*, Consent Order, AA-EC-11-16 (April 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47g.pdf.

362.     MetLife stipulated to the Consent Order.  *Id.*

363.     The OCC ordered MetLife to undertake a sweeping review of its foreclosure

practices, including (i) instating processes to ensure that all fees, expenses and other charges

imposed on the borrower are assessed in accordance with the terms of the underlying mortgage

and in compliance with all applicable Legal Requirements and OCC supervisory guidance, and

(ii) determining (a) whether a delinquent borrower's account was only charged fees and/or

penalties that were permissible under the terms of the borrower's loan documents, applicable

state and federal law, and that the fees were reasonable and customary; and (b) whether the

frequency that fees were assessed to any delinquent borrower's account was excessive under the

terms of the borrower's loan documents and applicable state and federal law.  *Id.*

364.     Additionally, First Horizon was part of the Coalition's investigation and

eventually entered into the Coalition Settlement to resolve claims that First Horizon committed

unfair and deceptive practices including overcharging borrowers for default related services.

*See United States v. Bank of Am.*, No. 12-cv-00361 (D.D.C. Mar. 14, 2012).

### 3.     JPMorgan Chase Bank, N.A. and ECC Capital Corporation's Servicing Scams

365.     As set forth above, Bear Stearns acquired ECC. In early 2008, JPMorgan Chase

& Co. acquired Bear Stearns.

366.     The OCC issued a Consent Order dated April 13, 2011, finding that, in connection

with certain foreclosures of loans in its residential mortgage servicing portfolio, JPMorgan filed

with state and federal courts affidavits executed by its employees concerning the fees and

expenses chargeable to the borrower when, in many cases, the allegations were not based on

personal knowledge or review of the relevant books and records.  *In re JPMorgan Chase Bank,*

*N.A.*, Consent Order, AA-EC-11-15 (April 13, 2011), *available at* http://www.occ.gov/news-

issuances/news-releases/2011/nr-occ-2011-47e.pdf.

367.     JPMorgan stipulated to the Consent Order.  *Id.*

368.     The OCC ordered JPMorgan to undertake a sweeping review of its foreclosure practices, including (i) instating processes to ensure that all fees, expenses and other charges imposed on the borrower are assessed in accordance with the terms of the underlying mortgage and in compliance with all applicable Legal Requirements and OCC supervisory guidance, and (ii) determining (a) whether a delinquent borrower's account was only charged fees and/or penalties that were permissible under the terms of the borrower's loan documents, applicable state and federal law, and were reasonable and customary; and (b) whether the frequency that fees were assessed to any delinquent borrower's account was excessive under the terms of the borrower's loan documents and applicable state and federal law.

369.     In April 2011, the Federal Reserve System, the FDIC, the OCC and the OTS issued a report concerning foreclosure-processing reviews of 14 servicers, including JPMorgan. The report found that the foreclosure governance processes were underdeveloped and insufficient and that weaknesses included (i) lack of sufficient audit trails to show how information set out in servicer affidavits (including the amount of fees and penalties charged) was linked to Servicers' internal records, (ii) failure to ensure accurate foreclosure documentation, including documentation pertaining to the fees assessed, and (iii) lack of sufficient oversight of default management service providers.  Interagency Review of Foreclosure Policies and Practices (2011), *available at* http://www.federalreserve.gov/boarddocs/rptcongress/interagency/interagency.htm.

370.     Further, private litigation has brought to light that JPMorgan charged marked-up and unnecessary servicing fees (including through the use of default-related service vendors) and assessed them against borrowers' accounts for profits.  *See, e.g.*, *Ellis v. J.P. Morgan Chase &*

*Co.*, 950 F. Supp. 2d 1062 (N.D. Cal. 2013).

371.    Additionally, JPMorgan was part of the Coalition's investigation and eventually entered into the Coalition Settlement amidst claims that JPMorgan committed unfair and deceptive practices including overcharging borrowers for default related services.  *See United States v. Bank of Am.*, No. 12-cv-00361 (D.D.C. Mar. 14, 2012).

372.    JPMorgan also ran an insurance scam involving property and casualty insurance.  When borrowers default on their mortgage loans, they often stop paying their homeowners' insurance premiums.  When that happened, JPMorgan and its affiliate, Chase Insurance Agency, Inc., replaced the borrowers' homeowner policies with policies underwritten by insurance affiliates of JPMorgan or other insurance companies that agreed to provide authorized benefits—*i.e.*, kickbacks—to JPMorgan.  The force-placed insurance providers charge substantially above-market premiums for these so called forced-placed insurance policies, typically several times the premium under the original policy.  When a defaulted loan is foreclosed upon, the cost of the inflated force-placed insurance premiums are charged to the Covered Trusts.  This force-placed insurance scam violated JPMorgan's obligation to service loans in the JPMorgan Trusts prudently.

373.    On February 28, 2014, the United States District Court for the Southern District of Florida approved a $300 million settlement of claims by a class of mortgage borrowers against JPMorgan for inflated force-placed insurance premiums they were charged.  *Saccoccio v. J.P.Morgan Chase Bank, N.A.*, 297 FRD 683 (S.D. Fla. 2014).  That settlement did not address force-placed insurance premiums charged to RMBS trusts.  *See id*.

374.     Further, as fully set forth above in Section III(A)(1), BAC (including as successor to Countrywide) and JPMorgan agreed to a $25 billion settlement with 49 state Attorneys General as a result of their robo-signing misconduct.  Under the terms of the settlement, the Servicers receive credit for modifying loans, including securitized loans.  The Servicers have modified loans that did not qualify for modification under prudent servicing standards or the governing servicing agreements in order to receive credit because the investors, not the Servicers, would bear the loss.  *See* Press Release, U.S. Dep't of Just., Federal Government and State Attorneys General Reach $25 Billion Agreement with Five Largest Mortgage Servicers to Address Mortgage Loan Servicing and Foreclosure Abuses (Feb. 9, 2012), *available at* http://www.justice.gov/opa/pr/2012/February/12-ag-186.html.

### 4.     Litton Loan Servicing LP's Servicing Scams

375.     As set forth above, in or around December 2007, Goldman Sachs acquired Litton from C-BASS.  In or around 2011, Ocwen Loan Servicing LLC ("Ocwen") acquired Litton from Goldman Sachs.

376.     On September 1, 2011, Goldman entered into a Consent Order with the Federal Reserve that required Goldman to retain an independent consultant to review Litton foreclosure proceedings pending at any time in 2009 or 2010 and to compensate borrowers who suffered financial injury as a result of wrongful foreclosures.  *In re The Goldman Sachs Group, Inc. and Goldman Sachs Bank USA*, 11-112-B-HC, 11-12-B-SM, Consent Order (Sept. 1, 2011) *available at* http://www.federalreserve.gov/newsevents/press/enforcement/enf20110901f1.pdf.

377.     The Consent Order required an investigation into whether Litton charged any delinquent borrower's account fees or penalties that were not permissible under the terms of

the borrower's loan documents, state or federal law or were otherwise unreasonable.  *Id*.

378.    The Consent Order further required Goldman to reimburse or otherwise provide appropriate remediation to borrowers for any impermissible or otherwise unreasonable penalties, fees or expenses.  *Id*.

379.    In November 2012, the Central District of California enforced a settlement agreement in a class action brought against Litton for claims that, among other things, Litton (i) misapplied or failed to credit payments in a timely fashion, (ii) improperly charged erroneous late fees, (iii) prematurely referred accounts for collection, and (iv) procured insurance policies for properties that were already insured.  *See Schaffer v. Litton Loan Servicing, LP*, No. 05-cv-07673, 2012 U.S. Dist. LEXIS 189829 (C.D. Cal. Nov. 13, 2012).

380.    Litton also participated in an insurance scam involving property and casualty insurance.  When borrowers defaulted on their mortgage loans, Litton replaced the borrowers' homeowner policies with policies underwritten by insurance companies that agreed to provide fees, commissions and other improper benefits—*i.e.*, kickbacks—to Litton.  The force-placed insurance providers charge substantially above-market premiums for these so called forced-placed insurance policies, typically several times the premium under the original policy.  When a defaulted loan is foreclosed, the cost of the inflated force-placed insurance premiums is charged to the Covered Trusts.  This force-placed insurance scam violated Litton's obligation to service loans in the Covered Trusts prudently.

381.    In May 2009, a Louisiana bankruptcy court judge held that "[t]his is not the first time Ocwen has appeared before the Court for improperly administering a loan or attempting to collect fees and costs to which it was not entitled.  The Court has been involved with six other cases in the last four years where Ocwen either included improper fees in its claim; attempted to

collect, post-discharge, fees and costs that were undisclosed but assessed during a bankruptcy; or attempted to foreclose on disallowed or discharged debt." *See In re McKain*, No. 08-10411, 2009 Bankr. LEXIS 2519, at *5–8, *10–11 (Bankr. E.D. La. May 1, 2009), *rev'd on other grounds*, *Ocwen Loan Servicing, LLC v. McKain*, No. 09-3662, Slip Op., ECF (E.D. La. Aug. 15, 2011).

382.    Ocwen has engaged in similar practices.  In November 2011, the New York Department of Financial Services entered into an agreement with American Home and Ocwen, which addressed the unlawful servicing practices.  The agreement required that any force-placed insurance be reasonably priced in relation to claims incurred and prohibited force-placing insurance with an affiliated insurer.  In addition, the agreement required a strengthening of oversight on third party vendors and imposed new obligations to conduct reviews of foreclosure documents prepared by counsel and to terminate foreclosure attorneys whose documents practices were problematic.

383.    On February 18, 2014, *The New York Times* reported that "[s]hoddy paperwork, erroneous fees and wrongful evictions—the same abuses that dogged the nation's largest banks and led to [the National Mortgage Settlement]—are now cropping up among the specialty firms [such as Ocwen], according to dozens of foreclosure lawsuits and interviews with borrowers, federal and state regulators and housing lawyers."  Jessica Silver-Greenberg & Michael Corkery, *Loan Complaints by Homeowners Rise Once More*, N.Y. Times (Feb.18, 2014 9:16 PM), http://dealbook.nytimes.com/2014/02/18/loan-complaints-by-homeowners-rise-once-more/.

384.    On December 22, 2014, Ocwen announced a settlement with New York's Department of Financial Services wherein Ocwen admits that it mishandled requests for modifications, failed to pursue loss mitigation processes competently, failed to maintain

adequate servicing systems, and failed to ensure that its affiliated companies did not charge excessive fees to defaulted borrowers.  Ocwen was forced to pay $150 million and its chairman, William C. Erbey, was forced to resign.  Evan Weinberger, *Ocwen Chairman Forced out in $150M NY Servicing Settlement*, Law360 (Dec. 22, 2014), https://www.law360.com/articles/606868.

385.    BNY Mellon is and was aware of all of the servicing misconduct alleged herein, which has been the subject of high profile government investigations, lawsuits and press coverage, including articles in banking industry publications like *American Banker*, and yet has failed to act.

## IV.    BNY MELLON'S CONDUCT INJURED PLAINTIFFS

386.    BNY Mellon's breaches of its contractual, statutory and fiduciary duties have caused Plaintiffs over $269 million of damages.

387.    If BNY Mellon had performed its duties as trustee, it would have enforced the obligations of the Sponsors and Originators and caused them to buy back, or replace with non-defective loans, the vast majority, if not all, of the loans that ultimately defaulted and caused Plaintiffs' losses.  And if BNY Mellon had enforced these repurchase or substitution obligations, as it was required to do, the Certificates would have retained their market value, as highly rated bonds with similar coupon rates are now trading at a very significant premium.

388.    BNY Mellon's failure to address the Master Servicers' and Servicers' failure to adhere to prudent servicing practice also increased the loss severities (*i.e.*, the amount of principal loss caused by defaults) on defaulted loans dramatically.  The extended foreclosure timelines that resulted from document delivery failures and the robo-signing scandal resulted in increased servicing fees, a decline in value of the underlying properties and

ultimately less sale proceeds for the Covered Trusts and Certificateholders. The overcharging for default related services and forced-placed insurance further increased loss severities as those overcharges were collected by the Master Servicer or Servicer from foreclosure sale proceeds.

389.   If BNY Mellon had met its contractual, statutory and fiduciary duties to accept delivery of notes and mortgage loans files, inspect them, give notice as required and issue accurate certifications, it would have caused the Sponsors or Originators to substitute or repurchase all loans where the Servicers, Master Servicers, Sponsors and Originators failed to deliver required documentation to the trustee or breached representations and warranties regarding the mortgage loans. This would have included numerous loans that had already defaulted or would ultimately default. Moreover, BNY Mellon's failure to accept delivery of note and mortgage files or adequately inspect them has placed a cloud over title and has limited the Covered Trusts' ability to efficiently foreclose on properties underlying the Covered Trusts that has impacted the market value of the Certificates. Furthermore, BNY Mellon's failure to commence damages actions against the Master Servicers and Servicers caused further losses and emboldened these parties to continue their lucrative servicing scams.

390.   BNY Mellon's failure to meet its fiduciary duties and duties under the TIA, the Streit Act and the common law once it became aware of defaults relating to the numerous representation and warranty breaches by the Sponsors or Originators further caused harm. If BNY Mellon had provided notice of defaults and acted with due care as it was required to do upon the occurrence of a default or Event of Default, it would have caused the Sponsors or Originators to repurchase loans as they were required to do and,

required the Master Servicers and Servicers to replace the assets they have looted from the Covered Trusts.

391.    The repurchase or substitution claims described above have lapsed due to BNY Mellon's inaction as New York courts have held that the underlying representation and warranty claims that BNY Mellon failed to pursue accrued for statute of limitations purposes on the date of the closing of the relevant securitization.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION
### (Violation of Section 315(b) of the TIA (15 U.S.C. § 77ooo(b)))

392.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

393.    The PSAs underlying and establishing the Covered Trusts are "indentures," and BNY Mellon is an "indenture trustee," under the TIA.  15 U.S.C. § 77aaa(7), (10).

394.    As Certificateholders, Plaintiffs are trust beneficiaries entitled to the protections afforded under the TIA.

395.    The TIA applies to the PSAs and the related Certificates. 15 U.S.C. § 77ddd(a)(1).

396.    Section 315(b) of the TIA provides that the indenture trustee must give Certificateholders notice of a default under the PSAs within ninety days of learning of such default.  15 U.S.C. § 77ooo(b).  The term "default" includes any breach of the PSAs that after notice and lapse of time would constitute an Event of Default under the PSAs.

397.    The PSAs define an "Event of Default" to include:

> any failure by the Master Servicer to observe or perform in any material respect any other of the covenants or agreements on the part of the Master Servicer contained in this Agreement . . .

> which failure materially affects the rights of Certificateholders,
> that failure continues unremedied for a period of 60 days after
> the date on which written notice of such failure shall have been
> given to the Master Servicer by the Trustee . . . .

Countrywide PSA § 7.01(ii).  The Sponsors, Master Servicers and Servicers materially breached numerous covenants and agreements they made in the PSAs, which, either constituted Events of Default or would have ripened into Events of Default with notice from BNY Mellon and passage of time.  Such covenants and agreements include the obligations to:

    (a)    investigate and give notice to all parties to the PSAs of the breaches of representations and warranties relating to the mortgage loans;

    (b)    deliver and maintain complete mortgage files;

    (c)    comply with prudent mortgage servicing standards;

    (d)    transmit mortgage documentation to the Trustee;

    (e)    take steps to cause the Sponsors or Originators to repurchase loans lacking adequate documentation;

    (f)    avoid unnecessary servicing fees and overcharging for services;

    (g)    protect the interests of the beneficiaries of the Covered Trusts;

    (h)    render accurate certifications under Regulation AB; and

    (i)    enforce the repurchase obligations of the Sponsors and/or Originators.

398.   These breaches materially and adversely affected the interests of Certificateholders because they resulted in the Covered Trusts being saddled with large numbers of defective loans that should have been put back to the Sponsors and Originators and, further, resulted in very significant losses related to foreclosure irregularities such as robo-signing, the inability to foreclose in a timely and efficient fashion and servicer overcharges for default services and forced-placed insurance.

399.   BNY Mellon is liable to Plaintiffs for damages incurred as a result of its violations of the TIA.

### SECOND CAUSE OF ACTION
### (Violation of Section 315(c) of the TIA (15 U.S.C. § 77ooo(c)))

400.   Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

401.   As Certificateholders, Plaintiffs are a trust beneficiary entitled to the protections afforded under the TIA.

402.   The PSAs underlying and establishing the Covered Trusts are "indentures," and BNY Mellon is an "indenture trustee," under the TIA.  15 U.S.C. § 77aaa(7), (10).

403.   The TIA applies to the PSAs and the related certificates. 15 U.S.C. § 77ddd(a)(1).

404.   Section 315(c) of the TIA provides that upon the occurrence of a default the indenture trustee must exercise the rights and powers vested in it by the indenture and must use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.  15 U.S.C. § 77ooo(c).  Under Section 7.01(ii), any failure of the Master Servicer to observe or perform any covenants or agreements under the PSA, after notice and lapse of time, constitutes an Event of Default under the PSAs.

405.   As set forth above, BNY Mellon failed to exercise its rights under the PSA after becoming aware of such breaches and Events of Default by failing to:

    (a)    take physical possession of the operative documents for the mortgage loans in the Covered Trusts;

    (b)    identify those mortgage loans for which there was missing, defective or incomplete documentation on the "Document Exception Report"

attached to the "Final Certification of the Trustee";

(c)    make accurate representations in the "Initial Mortgage Certification," the "Delay Document Certification," the "Final Certification of the Trustee," and all schedules and attachments thereto;

(d)    render accurate reports under Regulation AB;

(e)    protect the interests of the beneficiaries of the Covered Trusts;

(f)    take steps to cause the Sponsors or Originators to repurchase loans lacking adequate documentation;

(g)    investigate and give notice to all parties to the PSAs of the breaches of representations and warranties relating to the mortgage loans once it discovered the Sponsors' and Originators' widespread practice of including securitization trusts loans which breached such representations and warranties;

(h)    make prudent decisions concerning the exercise of appropriate remedies following Events of Default;

(i)    take steps to remedy the Master Servicers' and Servicers' failure to adhere to prudent servicing standards; and

(j)    enforce the repurchase obligations of the Sponsors and/or Originators.

406.    BNY Mellon is liable to Plaintiffs for damages incurred as a result of its violations of the TIA.

<b><u>THIRD CAUSE OF ACTION</u></b><br/><b>(Breach of Contract)</b>

407.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

408.    The PSAs are valid and binding contracts entered into between BNY Mellon, each Covered Trust, the Sponsors, the Master Servicers, the Servicers and Depositors.

409.    The PSAs provide, among other things, the terms under which BNY Mellon acts as trustee for the Covered Trusts.

410.    As current holders of Certificates issued by each Covered Trust, Plaintiffs are express, intended third party beneficiaries under the PSAs entitled to enforce the performance of the Trustee.

411.    BNY Mellon breached several obligations that it undertook on behalf of Plaintiffs as Certificateholders including, without limitation, to:

> (a)    take physical possession of the operative documents for the mortgage loans in the Covered Trusts;
>
> (b)    identify those mortgage loans for which there was missing, defective, or incomplete documentation on the "Document Exception Report" attached to the "Final Certification of the Trustee";
>
> (c)    make accurate representations in the "Initial Mortgage Certification," the "Delay Document Certification," the "Final Certification of the Trustee," and all schedules and attachments thereto;
>
> (d)    render accurate reports under Regulation AB;
>
> (e)    protect the interests of the beneficiaries of the Covered Trusts;
>
> (f)    take steps to cause the Sponsors or Originators to repurchase loans lacking adequate documentation;
>
> (g)    investigate and give notice to all parties to the PSAs of the breaches of representations and warranties relating to the mortgage loans once it discovered the Sponsors' and Originators' widespread practice of including in securitization trusts loans which breached such representations and warranties;
>
> (h)    make prudent decisions concerning the exercise of appropriate remedies following Events of Default under Section 7.01 of the PSAs relating to repeated failures by the Master Servicer to require the repurchase or substitution of mortgage loans by the Sponsors or Originators (1) under Section 2.03, where such loans breached representations and warranties, and (2) under Sections 2.01 and 2.02, where such loans were lacking proper documentation;
>
> (i)    take steps to remedy the Master Servicers' and Servicers' failure to adhere to prudent servicing standards; and
>
> (j)    enforce the repurchase obligations of the Sponsors and/or Originators.

412.    The specific provisions breached by BNY Mellon are further detailed herein and in the Exhibits annexed hereto.

413.    BNY Mellon's breach of its duties set forth in the PSAs, as described above, caused Plaintiffs' losses on their Certificates and diminished their value.

414.    Plaintiffs have performed their obligations under the PSAs.

415.    BNY Mellon is liable to Plaintiffs for the losses they suffered as a direct result of BNY Mellon's failure to perform its contractual obligations under the PSAs.

## FOURTH CAUSE OF ACTION
### (Breach of Fiduciary Duty)

416.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

417.    As set forth in detail above, BNY Mellon owed Certificateholders, including Plaintiffs, a fiduciary duty to act in good faith, and with due care and undivided loyalty when performing the obligations set forth in the PSAs, and to exercise all powers under the PSAs prudently once an Event of Default occurred or payments to Certificateholders became impaired.  These obligations included, without limitation, duties to:

(a)    take physical possession of the operative documents for the mortgage loans in the Covered Trusts;

(b)    identify those mortgage loans for which there was missing, defective, or incomplete documentation on the "Document Exception Report" attached to the "Final Certification of the Trustee";

(c)    make accurate representations in the "Initial Mortgage Certification," the "Delay Document Certification," the "Final Certification of the Trustee," and all schedules and attachments thereto;

(d)    render accurate reports under Regulation AB;

(e)    protect the interests of the beneficiaries of the Covered Trusts;

(f)     take steps to cause the Sponsors or Originators to repurchase loans lacking adequate documentation;

(g)     investigate and give notice to all parties to the PSAs of the breaches of representations and warranties relating to the mortgage loans once it discovered the Sponsors' and Originators' widespread practice of including in securitization trusts loans which breached such representations and warranties;

(h)     make prudent decisions concerning the exercise of appropriate remedies following Events of Default under Section 7.01 of the PSAs relating to repeated failures by the Master Servicer to require the repurchase or substitution of mortgage loans by the Sponsors and Originators (1) under Section 2.03, where such loans breached representations and warranties, and (2) under Sections 2.01 and 2.02, where such loans were lacking proper documentation;

(i)     take steps to remedy the Master Servicers' and Servicers' failure to adhere to prudent servicing standards; and

(j)     enforce the repurchase obligations of the Sponsors and/or Originators.

418.   As set forth in detail above, BNY Mellon breached its fiduciary obligations by failing to perform these obligations and by failing to exercise due care and avoid conflicts of interest.

419.   The violations by BNY Mellon of its fiduciary obligations impaired Certificateholders' ability to fully collect the principal and interest due on their Certificates and caused losses in the value of Plaintiffs' Certificates.

## FIFTH CAUSE OF ACTION
### (Negligence and Gross Negligence)

420.   Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

421.   As set forth in detail above, BNY Mellon owed Certificateholders, including Plaintiffs, duties under the PSAs and as trustee for the Covered Trusts to act in good faith,

with undivided loyalty and with due care when performing its contractual obligations under the PSAs.  As described above, BNY Mellon failed to perform its responsibilities or performed them in a grossly inadequate and negligent manner.

422.    BNY Mellon's negligence and gross negligence impaired Certificateholders' ability to fully collect the principal and interest due on their Certificates and caused losses in the value of Plaintiffs' Certificates.

### SIXTH CAUSE OF ACTION
#### (Negligent Misrepresentation)

423.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

424.    This is a claim for negligent misrepresentation against BNY Mellon.  As BNY Mellon served in its capacity as trustee for thousands of trusts sponsored by the Sponsors or including loans originated by the Originators from 2005–2007, it had unique and special knowledge about the mortgage loans in the Covered Trusts and the mortgage files for those loans.  In particular, BNY Mellon had unique and special knowledge regarding: (i) whether the Master Servicers or Servicers had failed to perform their duties under the PSAs; (ii) whether the operative documents for the mortgage loans had been transferred to the Trustee, and its interests perfected, for the benefit of Certificateholders in the Covered Trusts; (iii) whether the mortgage files contained missing, defective or incomplete information; (iv) whether the improperly documented loans were identified on the final exception report and whether the irregularities remained uncorrected; and (v) whether the statements in the various certifications provided by BNY Mellon and described herein were accurate.

425.    Because Plaintiffs could not evaluate the mortgage files for the mortgage loans underlying the Certificates and because Plaintiffs could not examine whether those

files contained complete and accurate documentation for the mortgage loans, they were heavily reliant on BNY Mellon's unique and special knowledge regarding the mortgage loans and the mortgage files when determining whether or not to make each investment in the Certificates, and whether or not to demand that BNY Mellon exercise its powers under the PSAs to require the other parties to the PSAs to satisfy their obligations, including to repurchase or substitute the defective loans.  Plaintiffs were entirely reliant on BNY Mellon to provide accurate information regarding the loans and mortgage files with respect to these matters.

426.    Plaintiffs necessarily relied on BNY Mellon's unique and special knowledge regarding the mortgage loans and mortgage files for those loans in the Covered Trusts. BNY Mellon's status as the trustee for the Covered Trusts, coupled with its unique and special knowledge about the underlying loans and the mortgage files, created a special relationship of trust, confidence and dependence between BNY Mellon and Plaintiffs.

427.    BNY Mellon, in the exercise of due care, should have been aware that Plaintiffs relied on its unique and special expertise and experience and depended upon BNY Mellon for accurate and truthful information.  BNY Mellon also knew that the facts regarding the mortgage loans and the mortgage files were exclusively within its knowledge.

428.    Based on its expertise, superior knowledge and relationship with Plaintiffs, BNY Mellon owed a duty to Plaintiffs to provide complete, accurate and timely information regarding the mortgage loans and mortgage files for the Certificates.  BNY Mellon negligently breached its duty to provide such information to Plaintiffs.

429.    BNY Mellon's negligent misrepresentations impaired Certificateholders' ability to fully collect the principal and interest due on their Certificates and caused losses in

the value of Plaintiffs' Certificates.

## SEVENTH CAUSE OF ACTION
### (Violation of the Streit Act)

430.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

431.    As Certificateholders, Plaintiffs are trust beneficiaries entitled to the protections afforded under the Streit Act.  The Streit Act was enacted to provide for the proper administration of mortgage trusts and requires that the trustee must exercise due care in performing its obligations.  N.Y. Real Prop. Law § 124.

432.    The Certificates are "mortgage investments" subject to the Streit Act.  N.Y. Real Prop. Law § 125(1).

433.    The PSAs underlying and establishing the Covered Trusts are "indentures," and BNY Mellon is a "trustee," under the Streit Act.  N.Y. Real Prop. Law § 125(3).

434.    Prior to any Event of Default, as described above, BNY Mellon violated the Streit Act by failing to perform its pre-default obligations with due care.  Further, Events of Default occurred under each Covered Trust shortly after closing.

435.    Section 126(1) of the Streit Act provides that upon an event of default the indenture trustee must exercise such of the rights and powers vested in it by the indenture and must use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

436.    Section 124 of the Streit Act further imposes a duty upon trustees of mortgage trusts to discharge their duties under the applicable indenture with due care in order to ensure the orderly administration of the trust and protect trust beneficiary rights.

437.    As set forth above, BNY Mellon failed to exercise its rights under the PSA after becoming aware of defaults and Events of Default by failing to:

  (a)    take physical possession of the operative documents for the mortgage loans in the Covered Trusts;

  (b)    identify those mortgage loans for which there was missing, defective, or incomplete documentation on the "Document Exception Report" attached to the "Final Certification of the Trustee";

  (c)    make accurate representations in the "Initial Mortgage Certification," the "Delay Document Certification," the "Final Certification of the Trustee," and all schedules and attachments thereto;

  (d)    render accurate reports under Regulation AB;

  (e)    protect the interests of the beneficiaries of the Covered Trusts;

  (f)    take steps to cause the Sponsors or Originators to repurchase loans lacking adequate documentation;

  (g)    investigate and give notice to all parties to the PSAs of the breaches of representations and warranties relating to the mortgage loans once it discovered the Sponsors' and Originators' widespread practice of including in securitization trusts loans which breached such representations and warranties;

  (h)    make prudent decisions concerning the exercise of appropriate remedies following Events of Default;

  (i)    take steps to remedy the Master Servicers' and Servicers' failure to adhere to prudent servicing standards; and

  (j)    enforce the repurchase obligations of the Sponsors and/or Originators.

438.    BNY Mellon also violated the conflict of interest provisions of the Streit Act by continuing to act as trustee despite having a financial interest in indemnification under the proposed settlement with Countrywide and Bank of America.

439.    BNY Mellon is liable to Plaintiffs for damages incurred as a result of its violation of the Streit Act.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for relief and judgment, as follows:

A.      Awarding compensatory damages and/or equitable relief in favor of Plaintiffs against BNY Mellon for breaches of its statutory, contractual and fiduciary duties, its gross negligence, ordinary negligence and its negligent misrepresentations in an amount to be proven at trial, including interest thereon;

B.      Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

C.      Such other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues triable by jury.

Dated:  December 23, 2014

By: _____

David H. Wollmuth
Randall R. Rainer
Michael C. Ledley
Steven S. Fitzgerald
Melissa A. Finkelstein
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300
Fax: (212) 382-0050
dwollmuth@wmd-law.com
rrainer@wmd-law.com
mledley@wmd-law.com
sfitzgerald@wmd-law.com
mfinkelstein@wmd-law.com

George A. Zelcs
John A. Libra
Matthew C. Davies
Max C. Gibbons
KOREIN TILLERY LLC

Max C. Gibbons
KOREIN TILLERY LLC
205 North Michigan Plaza
Suite 1950
Chicago, Illinois 60601
Phone: (312) 641-9750
Fax: (312) 641-9760
gzelcs@koreintillery.com
jlibra@koreintillery.com
mdavies@koreintillery.com
mgibbons@koreintillery.com

Stephen M. Tillery
KOREIN TILLERY LLC
505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Phone: (314) 241-4844
Fax: (314) 241-3525
stillery@koreintillery.com

*Attorneys for Plaintiffs*