UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PHOENIX LIGHT SF LIMITED, in its own right and the right of BLUE HERON FUNDING V LTD., BLUE HERON FUNDING VI LTD., BLUE HERON FUNDING VII LTD., KLEROS PREFERRED FUNDING V PLC, SILVER ELMS CDO PLC, SILVER ELMS CDO II LIMITED, C-BASS CBO XVII LTD. and C-BASS CBO XIV LTD., and each of BLUE HERON FUNDING V LTD., BLUE HERON FUNDING VI LTD., BLUE HERON FUNDING VII LTD., KLEROS PREFERRED FUNDING V PLC, SILVER ELMS CDO PLC, SILVER ELMS CDO II LIMITED, C-BASS CBO XVII LTD. and C-BASS CBO XIV LTD., in their own right, | Case No. 14-cv-10104-VEC |
| Plaintiffs, | |
| v. | |
| THE BANK OF NEW YORK MELLON, as Trustee, | |
| Defendant. | |

# THE BANK OF NEW YORK MELLON'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Matthew D. Ingber
Mark G. Hanchet
Christopher J. Houpt
James Ancone
MAYER BROWN LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 506-2500

*Attorneys for Defendant*
*The Bank of New York Mellon*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

LEGAL STANDARD............................................................................................... 2

ARGUMENT ........................................................................................................... 2

I.     PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE 11 WRITTEN NOTICE TRUSTS ........................................................................ 2

II.    PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE 6 NON-COUNTRYWIDE TRUSTS ................................................................. 8

     A.    There Is No Evidence That BNYM Breached Any Prudent Person Duty In Five Non-Countrywide Trusts ............................................... 8

          1.    As a threshold matter, Plaintiffs have not shown that BNYM had reasonable grounds to believe it was assured of an adequate indemnity ....................................................... 8

          2.    In any event, there is no evidence BNYM breached any duty................. 10

     B.    There Is No Evidence That Events Of Default Due To Cumulative Losses Occurred In Two Non-Countrywide Trusts ........................................ 15

          1.    FNLC 2005-2 ...................................................................... 15

          2.    NHEL 2006-1 ...................................................................... 16

III.    PLAINTIFFS' REQUEST FOR DISCOVERY SANCTIONS IS MERITLESS .......... 19

CONCLUSION....................................................................................................... 21

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re AMR Corp.*,
730 F.3d 88 (2d Cir. 2013)....................................................................................13, 14

*Aramony v. United Way of Am.*,
254 F.3d 403 (2d Cir. 2001)..................................................................................13, 14

*Arrowgrass Master Fund Ltd. v. The Bank of New York Mellon*,
2012 WL 8700416 (N.Y. Sup. Ct., N.Y. Cnty. Feb. 24, 2012) ...............................16

*Beck v. Mfrs. Hanover Tr. Co.*,
218 A.D.2d 1 (1st Dep't 1995) ...............................................................................12

*Becker v. The Bank of N.Y. Mellon Trust Co., N.A.*,
172 F. Supp. 3d 777 (E.D. Pa. 2016) .....................................................................14

*Capitol Records, Inc. v. MP3Tunes, LLC*,
2014 WL 503959 (S.D.N.Y. Jan. 29, 2014) ...........................................................20

*Chesapeake Energy Corp. v. The Bank of New York Mellon Trust Co., N.A.*,
773 F.3d 110 (2d Cir. 2014)......................................................................................6

*Commerce Bank v. The Bank of New York Mellon*,
141 A.D.3d 413 (1st Dep't 2016) .............................................................................3

*FMS Bonds, Inc. v. The Bank of New York Mellon*,
2016 WL 4059155 (S.D.N.Y. July 28, 2016) .........................................................14

*Genger v. Genger*,
__ F. App'x __, 2016 WL 5539979 (2d Cir. Sept. 29, 2016)....................................2

*Harch Int'l Ltd. v. Harch Capital Mgmt.*,
2011 WL 11047191 (N.Y. Sup. Ct., N.Y. Cnty. Mar. 16, 2011).........................9, 10

*House of Europe Funding I, Ltd. v. Wells Fargo Bank, N.A.*,
2014 WL 1383703 (S.D.N.Y. Mar. 31, 2014) ...................................................16, 18

*John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co.*,
717 F.2d 664 (2d Cir. 1983).....................................................................................13

*Marx v. Gen. Revenue Corp.*,
__ U.S.__, 133 S. Ct. 1166 (2013) .............................................................................5

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
   514 U.S. 52 (1995) ........................................................................................5, 6

*Outley v. City of N.Y.*,
   837 F.2d 587 (2d Cir. 1988) ...................................................................20

*Peak Partners, LP v. Republic Bank*,
   No. 02-cv-01831 (D.N.J. Mar. 24, 2005), ECF No. 60 .....................................16, 18

*Process America Inc. v. Cynergy Holdings LLC*,
   2014 WL 3844626 (E.D.N.Y. Apr. 30, 2014), *aff'd and adopted* 654 F.
   App'x 507 (2d Cir. 2016) ...................................................................4

*SACO I Trust 2006–5 v. EMC Mort. LLC*,
   2014 WL 2451356, at *10 (N.Y. Sup. Ct., N.Y. Cnty. May 29, 2014) .....................9

*Topps Co., Inc. v. Cadbury Stani S.A.I.C.*,
   526 F.3d 63 (2d Cir. 2008) ...................................................................2

*Torrico v. Int'l Business Machines Corp.*,
   319 F. Supp. 2d 390 (S.D.N.Y. 2004) .........................................................11

*U.S. Bank N.A. v. DLJ Mortgage Capital, Inc.*,
   140 A.D.3d 518 (1st Dep't 2016) .............................................................9

*UBS Capital Ams. II, LLC v. Highpoint Telecomm's Inc.*,
   2002 WL 377537 (S.D.N.Y. Mar. 8, 2002) ...................................................4

*Upwood Investments Ltd. v. U.S. Bank Nat. Assoc.*,
   2012 WL 10007037 (N.Y. Sup. Ct., N.Y. Cnty. July 17, 2012) .............................9

*Ward v. Nat'l Geographic Soc'y*,
   2002 WL 27777 (S.D.N.Y. Jan. 11, 2002) ...................................................20, 21

## Other Authorities

11 Richard A. Lord, *Williston on Contracts* § 32:10 (4th ed.1999) .............................13

Rule 30(b)(6) ...............................................................................................11

Rule 37 ...............................................................................................20, 21

## PRELIMINARY STATEMENT

Plaintiffs' cross-motion for summary judgment on their breach of contract claims relating to the 11 Written Notice Trusts[1] and six non-Countrywide trusts must fail.[2] To prevail, Plaintiffs first would have to establish that BNYM was under a prudent person duty and then that BNYM had breached that duty – but they cannot make either showing. In its motion for summary judgment, BNYM already demonstrated that a prudent person duty never arose in the 11 Written Notice Trusts for threshold reasons:  (i) there is no evidence that the master servicer materially breached the PSAs, which Plaintiffs must prove to show that an Event of Default occurred; (ii) there is no evidence that the master servicer received written notice of any material breach, which Plaintiffs must also prove to establish the occurrence of an Event of Default; and (iii) there is no evidence that BNYM received written notice of any Event of Default, which Plaintiffs must prove to show that BNYM was under a prudent person duty. (ECF No. 132 at 11-13.) Plaintiffs' motion basically ignores these dispositive issues and the unambiguous contract language on which they are based.

BNYM's motion also addressed five non-Countrywide trusts. As to the C-BASS, OWNIT 2006-1, and NHEL 2006-1 trusts, BNYM established that summary judgment on these claims should be granted in its favor. (ECF No. 132 at 16-18.) In particular, Plaintiffs have no evidence that BNYM failed to take any action for which it was offered an indemnity – in fact, there is no evidence that any investor even asked BNYM to take any action after BNYM notified investors of certain Servicer Events of Termination and an Event of Default related to a tax issue. Because no investor offered BNYM an indemnity, there was no obligation to act under the PSAs

---

[1] These 11 trusts are CWALT 2006-OA10, CWALT 2006-OA11, CWALT 2006-OA3, CWALT 2006-OA6, CWL 2005-6, CWL 2005-BC1, CWL 2005-IM3, CWL 2006-1, CWL 2006-14, CWL 2006-4, and CWL 2006-9.

[2] The six trusts are C-BASS 2005-CB4, C-BASS 2005-CB8, C-BASS 2006-CB3 (collectively, the "C-BASS Trusts"), FNLC 2005-2, OWNIT 2006-1, and NHEL 2006-1.

and, thus, there could have been no breach of BNYM's duties. Even assuming that BNYM was required to act without an indemnity, the undisputed record shows that BNYM satisfied any and all applicable duties. With respect to the remaining issues,[3] Plaintiffs fail to establish that any Event of Default occurred in the first place and, therefore, they cannot demonstrate a breach of any prudent person duty. Plaintiffs' cross-motion should be denied in its entirety.

## LEGAL STANDARD

"[A] motion for summary judgment may be granted in a contract dispute only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning." *Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008). "Plaintiffs must prove four elements to make out a valid claim for breach of contract under New York law: [1] formation of a contract, [2] performance by the plaintiff, [3] breach and [4] resulting damage." *Genger v. Genger*, __ F. App'x __, 2016 WL 5539979, at *2 (2d Cir. Sept. 29, 2016).

## ARGUMENT

### I.     PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE 11 WRITTEN NOTICE TRUSTS.

Plaintiffs argue that BNYM failed to act prudently following the occurrence of alleged Events of Default in the 11 Written Notice Trusts. (Br. 16.) The supposed Events of Default relate to the failure of each depositor to deliver certain mortgage file documents to the Trustee. Plaintiffs' tortured theory is as follows: (1) the loan seller failed to deliver complete files at or around the time of closing and did not voluntarily repurchase loans that had undelivered documents; (2) under Section 3.01 of the PSAs, the master servicer must "represent and protect

---

[3] Plaintiffs argue that (i) cumulative losses led to a Servicer Event of Default in FNLC 2005-1 and an Event of Default in NHEL 2006-1 and that (ii) an Event of Default occurred in NHEL 2006-1 when the initial servicer allegedly failed to remit funds to the trust in 2007 at the time the successor servicer took over as servicer.

the interests of the Trust Fund," so – according to Plaintiffs – the master servicer should have forced the seller to buy back those loans; (3) the master servicer did not do so, but instead foreclosed or otherwise liquidated some set of those loans, allegedly at a loss to the trusts; (4) unlike other master servicer breaches, this triggered an "automatic" Event of Default, because – according to Plaintiffs – under Section 7.01(ii) of the PSAs "the sixty day cure period [does] not apply to the initial delivery of the Mortgage File for Delay Delivery Mortgage Loans nor the failure to substitute or repurchase in lieu of delivery"; (5) by late 2008, despite having no relevant contractual duty, BNYM employees somehow became aware that loans with document exceptions were being foreclosed; and, finally, (6) BNYM did not undertake a review of all defaulted mortgage loans, pursue claims against the seller, or provide notice to certificateholders. (Br. 16-23.)

Plaintiffs' theory suffers from several independently dispositive flaws.[4] One of the most glaring, and the reason that similar claims have been dismissed on the pleadings in state court, is that Plaintiffs fail to show that BNYM was given "written notice" of any Event of Default in any of the 11 trusts that require such notice. (ECF No. 132 at 11-13.) Each of the PSAs for the Written Notice Trusts provide that "the Trustee shall not be deemed to have knowledge of an Event of Default until a Responsible Officer of the Trustee shall have received written notice thereof …." (ECF No. 171 ¶ 10); *see also Commerce Bank v. The Bank of New York Mellon*, 141 A.D.3d 413, 414-15 (1st Dep't 2016) (addressing *identical* PSA language and holding that a trustee cannot have knowledge of an Event of Default in the absence of formal written notice). The evidence shows that BNYM did not receive any written notice of any Event of Default in

---

[4] Tellingly, in the 7 pages of Plaintiffs' brief dedicated to recounting this theory, they do not cite a single case. (Br. 16-23 (Sections III(A), (B) and (C).)

any of these trusts, much less written notice of the breaches that Plaintiffs allege here.[5] (ECF No. 171 ¶ 13.)

Plaintiffs' contention that certain BNYM employees became "aware that the Master Servicer had liquidated loans with missing documents" (Br. 20-21) is insufficient to establish BNYM's knowledge of an Event of Default. Courts have declined to infer "written notice" from employee statements or emails. As the court explained in *Process America Inc. v. Cynergy Holdings LLC*,

> [t]he recollections of Cynergy employees cannot suffice, as Section 6.3.D explicitly requires "written notice." Even assuming notice via email could qualify as "written notice"—which is far from clear—the record here is devoid of any written statements informing Process America that Cynergy considered the CRIP a material breach of the Agreement or that Cynergy was triggering the provisions under the [ISO] Agreement that would allow [Process America] an opportunity to cure any alleged defects.

2014 WL 3844626, at *12 (E.D.N.Y. Apr. 30, 2014), *aff'd and adopted* 654 F. App'x 507 (2d Cir. 2016) (internal quotation marks and citation omitted); *see also UBS Capital Ams. II, LLC v. Highpoint Telecomm's Inc.*, 2002 WL 377537, at *4 (S.D.N.Y. Mar. 8, 2002) ("Even if Plaintiffs received and read the emailed press releases, the information supplied by Global Light does not satisfy the written notice requirement in either letter or in spirit. Neither the press releases nor the financial statements [emailed by plaintiff] specifically informed Plaintiff that a Purchase Event occurred or stated the amount of Excess Cash received, as required by the Debenture Purchase Agreement. Thus, the information provided by Global Light did not substantially comply with the written notice requirement.").

---

[5] BNYM addresses the written notice issue at length in both in opening and reply briefs in support of its motion for summary judgment. (ECF No. 132 at Section II.B.2; ECF No. 169 at Section I.)

Second, Plaintiffs ignore the definition of Event of Default. Under Section 7.01(ii) of the PSAs, an Event of Default includes the failure of "the Master Servicer to observe or perform in any material respect [which] continues unremedied for a period of 60 days after the date on which *written notice of such failure shall have been given to the Master Servicer*." (ECF No. 171 ¶¶ 3-4 (emphasis added).) Plaintiffs do not, because they cannot, argue that written notice of a breach was provided to the master servicer – it was not.[6] They attempt to sidestep this requirement, pointing to a caveat at the end of Section 7.01(ii): "the sixty day cure period shall not apply to the *initial delivery* of the Mortgage File for Delay Delivery Mortgage Loans nor the *failure to substitute or repurchase* in lieu of delivery." (Br. 19 (emphasis added).) This language has no application here. It refers explicitly and exclusively to breaches by the depositor and seller – as Plaintiffs admit (Br. 17), the master servicer has no duty either to deliver the Mortgage Files or to substitute or repurchase loans. *See, e.g.*, Fread Decl., Ex. A § 2.01(c). This proviso does not impose a new duty on the master servicer, let alone create an automatic Event of Default; it simply clarifies that the 60-day cure period before a noticed master servicer breach can ripen into an Event of Default does not apply to file-related breaches by other parties.

Plaintiffs may argue that reading the proviso to protect only against an *incorrect* reading of the cure provisions renders it superfluous. "Even assuming that their surplusage argument is correct, the canon against surplusage is not absolute." *Marx v. Gen. Revenue Corp.*, __ U.S.__, 133 S. Ct. 1166, 1177 (2013). But Plaintiffs' competing interpretation would require rewriting Section 2.01(c) and imposing duties on the master servicer, via a proviso, that the contract expressly imposes on other parties. Because Plaintiffs' proposed reading of the proviso conflicts directly with the unambiguous language of Section 2.01(c), it should be rejected. *Mastrobuono v.*

---

[6] BNYM addresses this issue in detail in its summary judgment briefing. (ECF No. 132 at Section I.A.; ECF No. 169 at Section II.)

*Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 64 (1995) ("[R]espondents' reading sets up the two clauses in conflict with one another: one foreclosing punitive damages, the other allowing them. This interpretation is untenable."); *see also Chesapeake Energy Corp. v. The Bank of New York Mellon Trust Co., N.A.*, 773 F.3d 110 (2d Cir. 2014) ("A further flaw in Chesapeake's interpretation is that it introduces conflict and contradiction into the contractual text.").

Third, and more fundamentally, Plaintiffs fail to establish that the master servicer materially breached the PSAs in the first place. Indeed, Plaintiffs cherry-pick language from Section 3.01 of the PSAs, stating that the master servicer will "represent and protect the interests of the Trust Fund in the same manner as it protects its own interests in mortgage loans in its own portfolio in any claim, proceeding or litigation regarding a Mortgage Loan …." (Br. 19; *see also* CSUF ¶ 103.)[7] From this phrase, Plaintiffs conjure a duty on behalf of the master servicer to enforce the *seller's* obligation to cure document defects or the *seller's* failure to repurchase.[8] (*Id.*) And in Plaintiffs' view, the breach of this "straw man" duty results in an automatic Event of Default.

Yet neither Section 3.01 nor any other provision in the PSAs obligates the master servicer to police document delivery by the seller or to enforce the seller's repurchase obligation. Placing the language on which Plaintiffs rely into context emphasizes this point. Section 3.01 provides that the master servicer, "[i]n connection with such servicing and administration [of the Mortgage Loans]," shall have full power and authority to:

---

[7] Citations to "CSUF ¶ __" are to BNYM's Rule 56.1 Counter-Statement of Undisputed Facts, dated January 27, 2017.

[8] It is not clear how such a duty could even exist as a practical matter. For instance, as Plaintiffs note, BNYM was obligated to deliver final certifications and document exception reports within 90-180 days after closing. (Br. 18.) By this time, in Plaintiffs' view, the seller had been in breach of its document delivery duties under Section 2.01(c) with respect to any reported document exceptions for months, without the master servicer being able to discover or address the breaches.

(i) execute and deliver…customary consents or waivers and other instruments and documents…(ii) consent to transfers of any Mortgaged Property and assumptions of the Mortgage Notes and related Mortgages...(iii) collect any Insurance Proceeds and other Liquidation Proceeds…, and (iv) … effectuate foreclosure or other conversion of the ownership of the Mortgaged Property securing any Mortgage Loan; provided that the Master Servicer shall not take any action that is inconsistent with or prejudices the interests of the Trust Fund or the Certificateholders in any Mortgage Loan or the rights and interests of the Depositor, the Trustee and the Certificateholders under this Agreement. ***The Master Servicer shall represent and protect the interests of the Trust Fund in the same manner as it protects its own interests in mortgage loans in its own portfolio in any claim, proceeding or litigation regarding a Mortgage Loan***, and shall not make or permit any modification, waiver or amendment of any Mortgage Loan which would cause any REMIC created under this Agreement to fail to qualify as a REMIC or result in the imposition of any tax under section 860F(a) or section 860G(d) of the Code.

Fread Decl., Ex. A (CWALT 2006-OA10) (emphasis added).[9]

In short, Plaintiffs fail to show that the master servicer materially breached the PSAs, much less that notice of this non-existent breach was given to the master servicer, which is a necessary element to establish an Event of Default, and even less that BNYM had the requisite knowledge of this non-existent Event of Default.

---

[9] At a minimum, if the Court were to disagree that the notice provisions dispose of Plaintiffs' claims, Plaintiffs' reliance on Section 3.01 to establish a material breach raises issues that cannot be resolved without expert evidence regarding what a prudent servicer would do in similar circumstances.

II.     **PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT
        ON THE 6 NON-COUNTRYWIDE TRUSTS.**

    A.     **There Is No Evidence That BNYM Breached
            Any Prudent Person Duty In Five Non-Countrywide Trusts.**

        1.     *As a threshold matter, Plaintiffs have not shown that BNYM had
            reasonable grounds to believe it was assured of an adequate indemnity.*

Plaintiffs argue that BNYM breached its prudent person duty by failing to act with

respect to the OWNIT 2006-1, NHEL 2006-1, and the C-BASS Trusts. (Br. 7-16.) To prevail,

Plaintiffs must show as an initial matter that there is no genuine issue of material fact regarding

whether BNYM had reasonable grounds to believe that it would receive an adequate indemnity

to cover the costs of exercising its duties. Plaintiffs fail to do so.

The PSAs for each of those trusts provide that the trustee need not expend any funds

without assurance of repayment:

> *No provision of this Indenture* shall require the Indenture Trustee
> to expend or risk its own funds or otherwise incur any financial
> liability in the performance of *any of its duties hereunder*, or in
> the exercise of any of its rights or powers, *if it shall have
> reasonable grounds for believing* that repayment of such funds or
> adequate indemnity against such risk or liability is not reasonably
> assured to it under this Indenture or the other Basic Documents.

(ECF No. 171 ¶¶ 16-17 (emphasis added).) The unambiguous language of this provision shows

that the Trustee need not "expend or risk its own funds" even if it is subject to a prudent person

standard (*i.e.*, one of the "duties hereunder") if it has "reasonable grounds for believing" that it is

not reasonably assured of repayment. Here, there is no evidence that any investor even offered

BNYM an indemnity. (ECF No. 171 ¶¶ 22, 35.) Thus, Plaintiffs cannot show that BNYM

breached its duties.

Plaintiffs argue that BNYM was reasonably assured of indemnity not from investors but

from other sources and, thus, it should have acted. (Br. 14-15.) Plaintiffs point to an indemnity

from the servicer in NHEL 2006-1. (ECF No. 171 ¶¶ 461-462.) But the servicer is the very party that Plaintiffs claim BNYM should have been spending money to investigate, terminate, and sue. If there is ever an indemnity that is *not* reasonably assured of being honored, that is it. In fact, courts have disagreed whether PSA indemnities cover the costs incurred by a trustee in asserting claims against the party providing the indemnity. *Compare U.S. Bank N.A. v. DLJ Mortgage Capital, Inc.*, 140 A.D.3d 518, 519 (1st Dep't 2016), *with SACO I Trust 2006–5 v. EMC Mort. LLC*, 2014 WL 2451356, at *10 (N.Y. Sup. Ct., N.Y. Cnty. May 29, 2014).

Plaintiffs next say that BNYM had the right to seek indemnity from Credit-Based Asset Servicing and Securitization LLC ("C-BASS"), which was the "Sponsor" in OWNIT 2006-1 and the "Seller" or "Sponsor" in the C-BASS Trusts. (ECF No. 171 ¶¶ 463, 465.) Yet, in 2009, C-BASS was on the brink of bankruptcy. (ECF No. 170, Ex. H.) Finally, in order to access the back-up trust indemnities in OWNIT 2006-1 and the C-BASS trusts, BNYM would have required investor approval before using trust assets. But, as explained, no investor – including Plaintiffs – contacted BNYM about these Events after receiving notice of them. Therefore, there was no reasonable assurance of an indemnity in these trusts.

The cases on which Plaintiffs rely offer them no help. (Br. 15-16.) In *Upwood Investments Ltd. v. U.S. Bank Nat. Assoc.*, the court merely concluded that whether the trustee was reasonably assured of an investor indemnity could not be resolved on a motion to dismiss. 2012 WL 10007037, at *8-9 (N.Y. Sup. Ct., N.Y. Cnty. July 17, 2012). Moreover, the plaintiff investor in that case had *offered* the trustee an indemnity, but the trustee argued that this indemnity was not adequate. *Id*. at *4, *6. Here, it is undisputed that no investor offered BNYM indemnity. In *Harch Int'l Ltd. v. Harch Capital Mgmt.*, the court simply did not hold that the

trustee was reasonably assured of repayment based on an issuer indemnity. 2011 WL 11047191, at *3 (N.Y. Sup. Ct., N.Y. Cnty. Mar. 16, 2011).

The unambiguous language of the PSAs and undisputed record show that not only should Plaintiffs' motion be rejected but that summary judgment should be entered in BNYM's favor.

### 2.     *In any event, there is no evidence BNYM breached any duty.*

Even if, counterfactually, Plaintiffs had shown that BNYM had reasonable grounds for believing that it was assured of an indemnity, Plaintiffs' motion still would fail because they fail to show that BNYM acted imprudently as a matter of law after Servicer Events of Termination occurred in OWNIT 2006-1 and the C-BASS Trusts and an Event of Default relating to a tax issue occurred in NHEL 2006-1. Plaintiffs acknowledge that "[w]hether a trustee acted prudently is normally an issue of fact that cannot be resolved on a motion for summary judgment." (Br. 9.) Plaintiffs claim that "[t]his is the rare case" where prudence can be determined on such a motion. (*Id*.) They are correct:  the undisputed evidence demonstrates that BNYM *satisfied* any prudent person duty that arose with respect to these five trusts. (ECF No. 132 at 18-19.) Plaintiffs take the opposite view. They contend that BNYM acted imprudently as a matter of law because it allegedly "did nothing." (Br. 9.) But the evidence simply does not support Plaintiffs' conclusory assertion.

Starting in December 2008, BNYM provided notice of the Servicer Events of Termination in the C-BASS and OWNIT trusts through publicly available remittance reports. (ECF No. 171 ¶¶ 31-34.) These reports detailed the cumulative realized losses and specified that the contractual thresholds had been exceeded. (*Id*.) These reports were available to all investors, including Plaintiffs. (*Id*.) Plaintiffs do not dispute this. (*Id*.) In addition, starting in January 2009, BNYM provided separate notices to all investors – including Plaintiffs – in all four trusts of the

Servicer Events of Termination. (ECF No. 171 ¶¶ 27-30.) The notices state that the applicable Cumulative Realized Loss percentages were in excess of the contractual thresholds. (*Id*.) Moreover, the notices explained that, "if the Trustee receives appropriate written direction by the Holders of each Class of Regular Certificates evidencing Percentage Interests aggregating not less than 51%, it shall terminate all of the rights and obligations of Litton as Servicer under the PSA."[10] (*Id*.) Plaintiffs admit that they held certificates in these four trusts when BNYM reported these Servicer Events of Termination in the publicly available reports and in the separate notices sent to all investors. (CSUF ¶¶ 208-212.) In fact, the record shows that Plaintiff's collateral manager, C-BASS Investment Management LLC, received the notice relating to C-BASS 2005-CB4 and circulated it internally by email. (CSUF ¶¶ 213-214.) Similarly, with respect to NHEL 2006-1, it is undisputed that, on June 15, 2010, BNYM notified investors that an Event of Default had occurred in this trust because it had become subject to federal income tax. (ECF No. 171 ¶ 21.) The notice specifically invited the noteholders to direct BNYM to take specific action. (*Id*.)

---

[10] Plaintiffs do not dispute that they received the notice of these Servicer Events of Termination. Instead, they claim that there is no evidence that notices were actually sent to investors. (Br. 10.) Plaintiffs are wrong. (ECF No. 171 ¶ 24.) In 2009, BNYM specifically requested that these notices be sent to all investors by certified mail and fax. (*Id*.) Therefore, under the PSAs these notices are "conclusively presumed to have been duly given." *See* Fread Decl., Ex. E-G § 11.05 (C-BASS PSAs) ("Notice of any Servicer Event of Termination shall be given by telecopy and by certified mail. Any notice so mailed within the time prescribed by this Agreement shall be conclusively presumed to have been duly given when mailed, whether or not the Certificateholder receives such notice."); Ex. U § 11.05 (OWNIT 2006-1 PSA) (same). Moreover, there is undisputed evidence that Plaintiffs' collateral manager received at least one of the notices. (ECF No. 171 ¶ 24.) Plaintiffs have presented no evidence to the contrary. In any event, Plaintiffs admit that the BNYM notified investors of these Events in monthly remittance reports starting in 2009. (ECF No. 171 ¶¶ 31-34.)

Plaintiffs are also wrong when they assert that Loretta Lundberg's statement in her declaration that these notices were sent to investors somehow contradicts her Rule 30(b)(6) testimony. She testified that she could not *recall* whether BNYM had issued notices to investors regarding the Servicer Events of Termination. (ECF No. 171 ¶ 24.) Considering the declaration for summary judgment purposes is more than appropriate. *See Torrico v. Int'l Business Machines Corp.*, 319 F. Supp. 2d 390, 394 n.2 (S.D.N.Y. 2004) (considering declaration for summary judgment purposes because it did not contradict prior deposition testimony).

Despite these numerous notices, no investor – including Plaintiffs – provided a direction to BNYM to terminate the servicer, let alone offered the Trustee an indemnity to cover the costs of terminating the servicer in the OWNIT 2006-1 or the C-BASS Trusts. (ECF No. 171 ¶ 35.) Again, Plaintiffs do not dispute this. (*Id*.) The C-BASS PSAs provide the specific remedy for such Servicer Events of Termination:  "the Trustee shall, at the direction of the Holders of each Class of Regular Certificates evidencing Percentage Interests aggregating not less than 51%, by notice then given in writing to the Servicer and the Trustee, terminate all of the rights and obligations of the Servicer as servicer under this Agreement." (ECF No. 171 ¶ 25.) The remedy in OWNIT 2006-1 is nearly identical:  "the Trustee shall, at the direction of the Holders of each Class of Regular Certificates evidencing Percentage Interests aggregating not less than 51%, by notice then given in writing to the Servicer (and to the Trustee if given by Holders of Certificates), terminate all of the rights and obligations of the Servicer as servicer under this Agreement." (*Id* ¶ 26.) Therefore, absent direction by a requisite number of certificateholders and indemnity, BNYM was not obligated to terminate the servicers in these trusts. Separately, in NHEL 2006-1, the Indenture obligated BNYM to declare the notes immediately due and payable only if noteholders representing more than 50% of the balance of the outstanding notes provided BNYM a direction to that effect, but noteholders, including Plaintiffs, declined to provide any direction. (ECF No. 171 ¶ 22.) Plaintiffs do not dispute this either. (*Id*.)

Plaintiffs claim that BNYM was required to do more than terminate the servicers pursuant to Section 7.01(b). (Br. 10-11.) But a Trustee's prudent person duty is circumscribed by the limitations of the governing PSA or Indenture. *Beck v. Mfrs. Hanover Tr. Co.*, 218 A.D.2d 1, 13 (1st Dep't 1995) ("The Trustee must in the post-default context act prudently, but only in the exercise of those rights and powers granted in the indenture."). Plaintiffs argue that BNYM

should have also (i) demanded that the servicers improve their servicing practices and compensate the trusts for their past failures; (ii) filed lawsuits seeking injunctions and damages for past breaches; and/or (iii) enforced repurchase claims. (Br. 10-11.) Yet Plaintiffs do not cite a single provision from the C-BASS or OWNIT PSAs to support their contention.[11]

To the extent Plaintiffs rely on the broad language in Section 8.01, they are wrong. (Br. 8.) According to that provision, after the occurrence of a Servicer Event of Termination, "the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs." (CSUF ¶¶ 19, 47.) That general language regarding the Trustee's prudent person duty is limited by Section 7.01, entitled "Servicer Events of Termination," which sets forth the specific remedies for various Servicer Events of Termination. (ECF No. 171 ¶¶ 25-26) As the Second Circuit has explained, "[e]ven where there is no 'true conflict' between two provisions, 'specific words will limit the meaning of general words if it appears from the whole agreement that the parties' purpose was directed solely toward the matter to which the specific words or clause relate.'" *Aramony v. United Way of Am.*, 254 F.3d 403, 413-14 (2d Cir. 2001) (quoting 11 Richard A. Lord, *Williston on Contracts* § 32:10, at 449 (4th ed.1999)); *see also John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co.*, 717 F.2d 664, 669 n.8 (2d Cir. 1983) ("definitive, particularized contract language takes precedence over expressions of intent that are general, summary, or preliminary.").

Applying this rule, the Second Circuit has held that specific provisions in an indenture limit the meaning and scope of general provisions. In *In re AMR Corp.*, 730 F.3d 88 (2d Cir. 2013), an Event of Default occurred under the indenture when the debtor petitioned for

---

[11] Plaintiffs are silent as to what BNYM should have done in the NHEL 2006-1 trust after it issued notice to noteholders and received no response, let alone an indemnity. For this reason alone, Plaintiffs' motion should be denied as to this trust and this particular Event of Default.

bankruptcy. *Id.* at 99. The Second Circuit held that, although the indenture contained a general provision stating that the trustee had the option of accelerating the debt after the occurrence of non-bankruptcy Events of Default, an automatic acceleration provision directed toward bankruptcy Events of Default applied. *Id.* (applying the New York rule that "a specific provision … governs the circumstance to which it is directed, even in the face of a more general provision."); *see Aramony*, 254 F.3d at 414 (the "general language of Article I" of the contract was "limited by the specific operative language of Article V," which controlled the issue in dispute).

At a minimum, the PSAs and evidence relating to BNYM's conduct after it notified investors of these Servicer Events of Termination raise issues that cannot be resolved without expert discovery.[12] *See FMS Bonds, Inc. v. The Bank of New York Mellon*, 2016 WL 4059155, at *12 (S.D.N.Y. July 28, 2016) ("Without a more developed record as to what indenture trustees typically do under the circumstances and the consequences of different courses of action, the Court cannot grant summary judgment to Plaintiffs on their first claim at this time.") (denying investors' summary judgment motion without prejudice until after fact and expert discovery); *cf. Becker v. The Bank of N.Y. Mellon Trust Co., N.A.*, 172 F. Supp. 3d 777, 791 (E.D. Pa. 2016) ("[T]riable disputes are presented as to the scope and particulars of the duties Defendants owed to the bondholders. The parties proffer extensive expert opinion evidence of custom and practice in the corporate trust industry to establish the contractual intent and meaning of the transaction agreements.").

---

[12] Plaintiffs all but conceded the necessity of expert discovery by submitting in the first instance no fewer than four expert affidavits in support of their cross-motion for summary judgment. Plaintiffs later withdrew those affidavits because they violated the Court's order staying all expert discovery pending a ruling on BNYM's summary judgment motion, but they did not otherwise materially amend their cross-motion.

**B.      There Is No Evidence That Events Of Default Due To
         <u>Cumulative Losses Occurred In Two Non-Countrywide Trusts</u>.**

**1.      *FNLC 2005-2.***

Plaintiffs argue that BNYM was under a prudent person duty in FNLC 2005-2 because a Servicer Event of Default occurred. (Br. 8-9.) Plaintiffs claim that such an Event began in 2008 because losses on the collateral allegedly exceeded certain thresholds in the PSA. (Br. 8.) But the very documents on which Plaintiffs rely – three monthly statements that the Trustee provided to investors – show otherwise. None of them say that a "Servicer Event of Default" has occurred or that "Cumulative Realized Losses" have exceeded certain levels. (CSUF ¶ 25.) Instead, they each state that a "Trigger Event" has occurred. (CSUF ¶ 25.) Under the PSA, a "Trigger Event" does not give rise to a Servicer Event of Default or any prudent person duty. (CSUF ¶¶ 27, 172-173.) Instead, it impacts the priority of payments to investors on each distribution date. (CSUF ¶¶ 171, 177.)

The fact that the monthly reports do not refer to Cumulative Realized Losses makes sense. Pursuant to Section 11.1(a) of the PSA, "[t]he Trustee, except during the continuance of an Event of Default, undertake[s] to perform such duties and only such duties as are specifically set forth in this Agreement." (CSUF ¶ 28.) But there is no PSA provision that obligated BNYM to calculate, let alone report, Cumulative Realized Losses or that such Losses exceeded the thresholds in the PSA.[13] In fact, the PSA indicates just the opposite. Section 7.14 sets forth an exhaustive list of items that the Trustee is required to include on the monthly statements. (CSUF ¶ 174.) Cumulative Realized Losses are not on that list. (CSUF ¶ 175.) Courts have repeatedly rejected efforts to impose a duty on trustees to make calculations that are not specifically set

---

[13] There is no evidence that BNYM possessed the information required to calculate whether Cumulative Realized Losses exceeded the PSA thresholds and Plaintiffs do not argue otherwise.

forth in the governing agreements. *See, e.g.*, *House of Europe Funding I, Ltd. v. Wells Fargo Bank, N.A.*, 2014 WL 1383703, at *9-10 (S.D.N.Y. Mar. 31, 2014) ("There is, however, no contractual provision requiring [the trustee] to report whether the CDO Limit had been exceeded…. Because Plaintiffs have not cited any contractual provisions requiring [the trustee] to report the total amount of CDO securities and whether this amount complies with the CDO Limit, the Court will dismiss claims arising out of [the trustee's] preparation of the Monthly Reports."); Opinion, *Peak Partners, LP v. Republic Bank*, No. 02-cv-01831, (D.N.J. Mar. 24, 2005), ECF No. 60 (no duty to reconcile the collection account balance because it "require[d] the Indenture Trustee to look beyond the numbers, and make numerous calculations") (applying New York law; granting summary judgment to indenture trustee) (Hanchet Decl., Ex. B).

Moreover, the PSA expressly provides that "[t]he Trustee shall not be deemed to have notice of any Servicer Event of Default unless a Responsible Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such a default is received by the Trustee…." Fread Decl., Ex. R § 11.1(c)(ii). There is no evidence that BNYM had any such actual knowledge or written notice of this alleged Servicer Event of Default. (ECF No. 133 ¶¶ 2, 3, 5.) Again, the only evidence that Plaintiffs offer – the three monthly statements – do not satisfy either the actual knowledge or written notice requirements. *See Arrowgrass Master Fund Ltd. v. The Bank of New York Mellon*, 2012 WL 8700416, at *9-10 (N.Y. Sup. Ct., N.Y. Cnty. Feb. 24, 2012) (trustee had no actual knowledge or written notice of Event of Default based on "documents relevant to the transaction" at issue).

### 2.   *NHEL 2006-1.*

Plaintiffs contend that BNYM was under a prudent person duty in NHEL 2006-1 because losses on the collateral exceeded contractual thresholds in the Sale and Servicing Agreement ("SSA"). (Br. 7-8.) That theory fails for numerous reasons. As an initial matter, the Indenture

16

Trustee is subject to a prudent person duty only if a Responsible Officer has actual knowledge of an Event of Default under the NHEL 2006-1 Indenture. (CSUF ¶ 188; Fread Decl., Ex. T at § 6.01.) An Event of Default is defined with respect to acts involving or breaches by the Issuing Entity. (CSUF ¶ 189; Fread Decl., Ex. T at § 5.01.) Plaintiffs fail to show how an Event of Default under the Indenture could have been triggered by cumulative losses exceeding the thresholds in the SSA. (CSUF ¶ 32.) As Plaintiffs acknowledge, exceeding those thresholds gives rise only to a "Servicing Default" under Section 8.01 the SSA. (CSUF ¶ 32.) That provision has nothing to do with the Issuing Entity or Events of Default under the Indenture.

In a footnote, Plaintiffs attempt to address this missing link in their faulty chain of logic. (Br. 8 n.7.) They point to Section 5.01(c) of the Indenture, which defines an Event of Default as a breach by the Issuing Entity of any Indenture covenant that remains unremedied for 30 days. (CSUF ¶ 56.) Plaintiffs assert that the Issuing Entity breached two covenants. Both contentions fail. Plaintiffs first claim that the Issuing Entity breached Section 3.05(a)(iv), which requires it to "take such other action as may be necessary or advisable to … enforce … the Sale and Servicing Agreement." (CSUF ¶ 57.) But that provision says nothing about enforcing rights related to Servicing Defaults. Plaintiffs also claim that the Issuing Entity breached Section 3.07(c), which provides that, "[i]f the Servicer or the Owner Trustee, on behalf of the Issuing Entity, shall have actual knowledge of the occurrence of a Servicing Default, the Servicer or the Owner Trustee … shall promptly notify" certain parties. (CSUF ¶ 58.) But, as is apparent from that provision's plain language, the duty to notify is placed on the Servicer or Owner Trustee – not the Issuing Entity. Moreover, there is no evidence that either the Servicer or Owner Trustee had "actual knowledge" of a Servicing Default. Plaintiffs do not argue otherwise.

17

Plaintiffs' Event of Default theory also fails because a Servicing Default based on cumulative losses did not occur. The only evidence Plaintiffs offer are three monthly reports that BNYM prepared pursuant to Section 2.09 of the Indenture. (CSUF ¶¶ 33-34.) These reports provide the "Aggregate Losses as a % of Initial Collateral Balance" and state that those numbers exceeded the "Current Loss Threshold." (CSUF ¶¶ 194, 197, 200.) But those Current Loss Thresholds (2.1% for January 25, 2009, *see* Fitzgerald Decl., Ex. 126 at BNYM_PL_00086018; 2.85% for February 25, 2010, *id*. Ex. 127 at BNYM_PL_00086030; and 3.38% for February 25, 2011, *id*. Ex. 128 at BNYM_PL_02649502) match the thresholds in the definition of "Trigger Event." (CSUF ¶ 191.) Under the Indenture, the occurrence of a Trigger Event affects how payments are made to investors (CSUF ¶ 193); it does not give rise to a prudent person duty (CSUF ¶¶ 188, 207).

None of these three reports state that the Cumulative Loss Percentage exceeded the thresholds that trigger a Servicing Default in the SSA. (CSUF ¶¶ 33, 34.) That makes sense because the Indenture does not obligate the Indenture Trustee to calculate or report whether those thresholds have been met. *See House of Europe*, 2014 WL 1383703, at *9 (no duty on trustees to make calculations that are not specifically set forth in the governing agreements); Opinion, *Peak Partners, LP*, at 6 (same). Section 2.09 of the Indenture sets forth a comprehensive list of items that the Indenture Trustee is required to include on the monthly statements. (CSUF ¶ 203.) Reporting whether these triggers have been satisfied are not on that list. (CSUF ¶ 204.) Moreover, the Indenture Trustee

> shall not be charged with knowledge of any failure by the Servicer to comply with any of its obligations under the [SSA] … or any Event of Default under the [SSA] unless a Responsible Officer of the Indenture Trustee obtains actual knowledge of such failure or breach or the Indenture Trustee receives written notice of such failure or breach from the Servicer.

(CSUF ¶ 205.) Plaintiffs fail to show that a Responsible Officer of BNYM had actual knowledge of any such default based on cumulative losses.

Plaintiffs also incorrectly argue that an Event of Default occurred when the initial servicer (*i.e.*, NovaStar Mortgage, Inc. ("Novastar")) allegedly failed to remit funds to the trust in 2007 at the time the successor servicer (*i.e.*, Saxon Mortgage Services, Inc. ("Saxon")) took over as servicer. (Br. 11-12.) Plaintiffs primarily rely on a letter, dated August 7, 2009, from Saxon to BNYM. But the letter alleges that NovaStar breached the SSA, not the "Servicer" which at that time was Saxon. (CSUF ¶ 73.) Therefore, the alleged breach cannot serve as the basis for a "Servicing Default" under the SSA. In addition, the remedy for a Servicing Default – termination of the servicer – was unavailable and inappropriate in 2009 when BNYM received the Saxon letter because the servicer that had allegedly failed to remit funds to the trust (NovaStar) had already been replaced two years earlier by Saxon. (CSUF ¶ 76.) Plaintiffs also point to a notation in BNYM's Default Administration Group database that indicates that a notice was sent to noteholders regarding an Event of Default. (CSUF ¶ 80.) But as BNYM's corporate representative testified, BNYM never determined that an Event of Default had, in fact, occurred and the notation was merely an error. (CSUF ¶ 79.) In fact, there is no evidence that such a notice was actually sent. Lastly, and most significantly, Plaintiffs fail to show how this alleged Servicing Default under the SSA triggered a prudent person duty under the Indenture. As explained above, a Servicing Default does not give rise to any heightened duties on the part of the Indenture Trustee.

III.    **PLAINTIFFS' REQUEST FOR DISCOVERY SANCTIONS IS MERITLESS.**

Plaintiffs ask the Court to preclude BNYM from relying on the four Servicer Events of Termination notices that it sent to all investors in OWNIT 2006-1 and the C-BASS Trusts

because they were produced after the August 31, 2016 deadline for fact discovery. (Br. 24-25.) Plaintiffs' request should be denied.

To begin with, BNYM mailed these notices to all investors – including Plaintiffs – in 2009. Plaintiffs and their third-party service providers should therefore have had them in their files years ago. In fact, Plaintiffs' collateral manager, C-BASS Investment Management LLC, produced one of the notices in this case. (ECF No. 171 ¶¶ 24, 27-30.) Moreover, the notices did not become relevant until *after* the close of fact discovery. Plaintiffs never alleged that Servicer Events of Termination had occurred because of collateral losses in any of the three complaints they filed during fact discovery.[14] This theory first became apparent in Plaintiffs' response to BNYM's contention interrogatories, which were served on September 28, 2016 – nearly a month after the close of fact discovery. (CSUF ¶ 168.) BNYM then produced the notices on October 21, 2016 as potentially relevant to the new theories contained in those responses.

The exclusion of evidence pursuant to Rule 37 is "an extreme sanction." *Capitol Records, Inc. v. MP3Tunes, LLC*, 2014 WL 503959, at *7 (S.D.N.Y. Jan. 29, 2014) (quoting *Outley v. City of N.Y.*, 837 F.2d 587, 590 (2d Cir. 1988)). Because "refusing to admit evidence that was not disclosed in discovery is a drastic remedy," courts will resort to preclusion only "in those rare cases where a party's conduct represents flagrant bad faith and callous disregard of the Federal Rules of Civil Procedure." *Ward v. Nat'l Geographic Soc'y*, 2002 WL 27777, at *2 (S.D.N.Y. Jan. 11, 2002). In *Ward*, the court denied plaintiff's request to preclude the defendant from relying on a highly relevant letter for purposes of summary judgment or later proceedings merely

---

[14] Further proof that these theories were not part of the case is that, on November 4, 2016, Plaintiffs requested leave to file a Fourth Amended Complaint to, *inter alia*, include these Servicer Event of Termination theories. (ECF No. 118 at 3.)

because the letter had been produced six weeks after the close of discovery. *Id*. at *1.[15] Like the

plaintiff in *Ward*, Plaintiffs here do not satisfy Rule 37(c)'s stringent standard.[16]

## **CONCLUSION**

For all the foregoing reasons, Plaintiffs' cross-motion for summary judgment and their

motion for discovery sanctions should be denied in their entirety.

Dated:  New York, New York
          January 27, 2017

                                        */s/ Mark G. Hanchet*

                                        Matthew D. Ingber
                                        Mark G. Hanchet
                                        Christopher J. Houpt
                                        James Ancone
                                        MAYER BROWN LLP
                                        1221 Avenue of the Americas
                                        New York, New York 10020
                                        (212) 506-2500

                                        *Attorneys for Defendant*
                                        *The Bank of New York Mellon*

---

[15] Plaintiffs seek preclusion under Rule 37(b)(2), but like the plaintiff in *Ward*, Plaintiffs here "never made a motion under Rule 37(a)(2)(B) to obtain an order to compel discovery and thus cannot now obtain sanctions under Rule 37(b)(2)." *Ward*, 2002 WL 27777, at *2.  Nor can they point to any prejudice they have supposedly suffered.

[16] BNYM does not rely on any of the documents contained in its December 12, 2016 production, which BNYM collected and produced out of an abundance of caution as also potentially relevant to the Servicer Event of Termination theories.