**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- x

PHOENIX LIGHT SF LIMITED, in its own right and
the right of BLUE HERON FUNDING V LTD., BLUE
HERON FUNDING VI LTD., BLUE HERON
FUNDING VII LTD., KLEROS PREFERRED
FUNDING V PLC, SILVER ELMS CDO PLC,
SILVER ELMS CDO II LIMITED, C-BASS CBO XVII
LTD. and C-BASS CBO XIV LTD., and each of BLUE
HERON FUNDING V LTD., BLUE HERON
FUNDING VI LTD., BLUE HERON FUNDING VII
LTD., KLEROS PREFERRED FUNDING V PLC,
SILVER ELMS CDO PLC, SILVER ELMS CDO II
LIMITED, C-BASS CBO XVII LTD and C-BASS CBO
XIV LTD. in their own right,

                                                    Plaintiffs,

                   -against-

THE BANK OF NEW YORK MELLON, as Trustee,

                                                    Defendant.

-------------------------------------------------------------- x

Index No. 14-cv-10104 (VEC)


**MODIFIED MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND MOTION**
**FOR SANCTIONS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 37**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

FACTUAL BACKGROUND ......................................................................................................3

I.     THE CUMULATIVE LOSS TRIGGER TRUSTS ...............................................................3

II.    THE COUNTRYWIDE PSA TRUSTS ..............................................................................5

ARGUMENT ..............................................................................................................................7

I.     LEGAL STANDARD .........................................................................................................7

II.    THE UNDISPUTED FACTS ESTABLISH THAT EODs OCCURRED IN THE
CUMULATIVE LOSS TRIGGER TRUSTS .....................................................................7

        A.    The Relevant Cumulative Loss Triggers Were Exceeded .........................................8

        B.    BNYM Failed to Act Prudently .................................................................................8

        C.    BNYM Has Prudent Person Duties Even
If No Certificateholder Direction Is Provided ..........................................................12

        D.    BNYM Received Adequate Indemnity.....................................................................14

III.   THE UNDISPUTED FACTS ESTABLISH THAT BNYM FAILED TO ACT
PRUDENTLY AFTER THE OCCURRENCE OF EODs IN THE COUNTRYWIDE
PSA TRUSTS ...................................................................................................................16

        A.    Countrywide Failed to Remove Delay Delivery Mortgage Loans ...........................16

        B.    The Master Servicer Liquidated Delay Delivery
Mortgage Loans at a Loss, Triggering EODs ..........................................................19

        C.    BNYM Was Aware of the EODs But Failed to Act Prudently..................................20

        D.    BNYM's Arguments Concerning Notice Are Without Merit....................................23

IV.  BNYM SHOULD BE SANCTIONED FOR ITS BELATED PRODUCTION OF
DOCUMENTS...................................................................................................................24

CONCLUSION..........................................................................................................................25

i

## <u>TABLE OF AUTHORITIES</u>

**<u>Page(s)</u>**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...........................................................................................................7

*Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Capital, Inc.*,
821 F.3d 297 (2d Cir. 2016)............................................................................................24

*BanxCorp. v. Costco Wholesale Corp.*,
978 F. Supp. 2d 280 (S.D.N.Y. 2013).............................................................................10

*Beck v. Mfrs. Hanover Tr. Co.*,
632 N.Y.S.2d 520 (1st Dep't 1995) .................................................................................9

*BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*,
778 F. Supp. 2d 375 (S.D.N.Y. 2011).............................................................................23

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)...........................................................................................................7

*D'Attore v. New York City*,
2015 WL 556778 (S.D.N.Y. Feb. 10, 2015)...................................................................25

*Dresner Co. Profit Sharing Plan v. First Fid. Bank, N.A., N.J.*,
1996 WL 694345 (S.D.N.Y. Dec. 4, 1996) ......................................................................9

*Fixed Income Shares: Series M v. Citibank N.A.*,
130 F. Supp. 3d 842 (S.D.N.Y. 2015).............................................................................23

*Harch International Limited v. Harch Capital Management*,
2011 WL 11047191 (N.Y. Sup. Ct. Mar. 16, 2011) ......................................................15

*Howe v. Bank of N.Y. Mellon*,
783 F. Supp. 2d 483 (S.D.N.Y. 2011)..........................................................................8-9

*Kulak v. City of N.Y.*,
88 F.3d 63 (2d Cir. 1996)..................................................................................................7

*LNC Invs., Inc. v. First Fid. Bank*,
1997 WL 528283 (S.D.N.Y. Aug. 27, 1997)....................................................................9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)...........................................................................................................7

*Morales v. Quintel Entm't, Inc.*,
249 F.3d 115 (2d Cir. 2001)................................................................................7

*Nat. Res. Def. Council v. Evans*,
254 F. Supp. 2d 434 (S.D.N.Y. 2003)................................................................ 7

*Okla. Police Pension & Ret. Sys. v. U.S. Bank Nat'l Ass'n*,
291 F.R.D. 47 (S.D.N.Y. 2013) .........................................................................8

*Phoenix Light v. Deutsche Bank*,
172 F. Supp. 3d 700 (S.D.N.Y. 2016)..............................................................23

*Ret. Bd. of the Policemen's Annuity & Benefit Fund of Chi. v. Bank of N.Y. Mellon*,
914 F. Supp. 2d 422 (S.D.N.Y. 2012).................................................................8

*Ricci v. DeStefano*,
557 U .S. 557 (2009)............................................................................................7

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*,
2016 WL 439020 (S.D.N.Y. Feb. 3, 2016)........................................................23

*Upwood Investments Limited v. U.S. Bank National Association*,
2012 WL 10007037 (N.Y. Sup. Ct. July 17, 2012) ..........................................15

*Vt. Pub. Interest Research Grp. v. U.S. Fish & Wildlife Serv.*,
247 F. Supp. 2d 495 (D. Vt. 2002)......................................................................7

*Watson-Tobah v. Royal Moving & Storage, Inc.*,
2014 WL 6865713 (S.D.N.Y. Dec. 5, 2014) ....................................................10

## OTHER AUTHORITIES

**Page(s)**

Fed. R. Civ. P. 56(a) .............................................................................................7

Fed. R. Civ. P. 37.............................................................................1, 3, 24, 25

15 U.S.C. § 77ooo(c) ...........................................................................................8

15 U.S.C. § 77ooo(b) ...........................................................................................8

Reg. AB 1122(d) ...................................................................................................22

17 C.F.R. § 229.1122(d)(2)(v).............................................................................22

17 C.F.R. § 229.1122(d)(4)(i) ................................................................................................ 22-23

Plaintiffs Phoenix Light SF Limited, Blue Heron Funding V Ltd., Blue Heron Funding VI Ltd., Blue Heron Funding VII Ltd., Kleros Preferred Funding V PLC, Silver Elms CDO PLC, and Silver Elms CDO II Limited (collectively, "Plaintiffs") respectfully submit this Memorandum of Law, Local Rule 56.1 statement of undisputed facts ("SUF"), declaration of Steven S. Fitzgerald dated January 4, 2017, and exhibits thereto, in support of Plaintiffs' Cross-Motion for Partial Summary Judgment and Motion for Sanctions Pursuant to Federal Rule of Civil Procedure 37.

## PRELIMINARY STATEMENT

The uncontested evidence shows that it would be imprudent for a trustee to do nothing to protect the interests of certificateholders after the occurrence of an Event of Default ("EOD") and during the period that the EOD remains uncured. The evidence further shows that The Bank of New York Mellon ("BNYM") did just that—i.e., *nothing*—with respect to 17 Trusts at issue in this action where there is no genuine issue of material fact that an EOD occurred. Plaintiffs do not move on the issue of the extent of the damages resulting from BNYM's failure to act upon EODs, but there is no question that BNYM is liable for breaching the Governing Agreements ("GAs") for these 17 Trusts and, as to the NHEL 2006-1 Trust, violating the Trust Indenture Act.[1]

In six of the 17 Trusts (CBASS 2005-CB4, CBASS 2005-CB8, CBASS 2006-CB3, FNLC 2005-2, NHEL 2006-1, and OWNIT 2006-1, collectively, "the Cumulative Loss Trigger Trusts"), an EOD occurred because cumulative losses exceeded thresholds specified in the GAs. The only action BNYM claims to have taken in response was to provide a notice of an EOD in four of the Trusts and that is based on a belated production of materials after the close of fact

---

[1] As set forth in Plaintiffs' opposition to BNYM's motion for summary judgment, Plaintiffs have marshalled evidence sufficient to establish other, independent breaches by BNYM with respect to the at-issue trusts but believe genuine issues of material fact exist with respect to these breaches.

discovery that contradicts the testimony of BNYM's corporate representative. As a matter of law, BNYM was required to do more in its role as a fiduciary for the Trusts. A prudent person, at a minimum, would have engaged with the servicers of the loans underlying the Trusts to ensure that they were implementing effective loss mitigation practices. Under the GAs, BNYM had a full indemnity that was more than sufficient to cover any incidental legal fees and expenses, or other financial liability, arising out of BNYM competently supervising the servicers as required during the period of an uncured EOD.

As to 11 Trusts sponsored by Countrywide Home Loans, Inc. (the "Countrywide PSA Trusts"),[2] the undisputed facts show that Countrywide (as loan seller) failed to timely remove from the Trusts 18,572 loans that were missing documents required under § 2.01(c) of the Countrywide Pooling and Servicing Agreements ("PSAs"). SUF ¶ 100. The Master Servicer (a subsidiary of Countrywide that was later merged into Bank of America, N.A.) then failed to ensure that Countrywide repurchased those loans, and, instead, liquidated them at a loss to investors. These actions plainly triggered an EOD under each of the Countrywide PSAs. Indeed, an officer in BNYM's trust department acknowledged these EODs in an email noting that Countrywide "appears to be out of compliance per certain sections of the CHL Pooling Agreements." *Id*. ¶ 130.

As a result of the EODs, § 8.01 of the Countrywide PSAs imposed on BNYM a duty to exercise its "rights and powers" using "the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs." *Id*. ¶ 125.  BNYM, however, did nothing to identify defaulted loans that should

---

[2] References to the "Countrywide PSA Trusts" are to CWALT 2006-OA3, CWALT 2006-OA6, CWALT 2006-OA10, CWALT 2006-OA11 (collectively, the "CWALT Trusts"); CWL 2005-6, CWL 2005-BC1, CWL 2005-IM3 (collectively, the "CWL 2005 Trusts"); and CWL 2006-1, CWL 2006-14, CWL 2006-4, and CWL 2006-9 (collectively, the "CWL 2006 Trusts").

have been put back to Countrywide or to ensure that such loans were in fact repurchased. In fact, BNYM itself admits that it did not ask Countrywide to repurchase even a single loan with a document defect. *Id*. ¶ 140. While BNYM notified the Master Servicer of its failure to take action to address uncured document exceptions, BNYM then stood by idly while the Master Servicer and Countrywide cured only a handful of document defects long after the deadline for doing so, and did literally nothing for the remaining defective 65% of the loans. *Id*. ¶¶ 110, 115, 120.

Finally, Plaintiffs reluctantly move for sanctions pursuant to Federal Rule of Civil Procedure 37. In July 2016, BNYM assured Plaintiffs and the Court that it had completed its production of documents in response to Plaintiffs' document requests. And then BNYM insisted on an accelerated summary judgment schedule and stay of further discovery on the basis that none of the outstanding discovery pertained to its summary judgment motion. That statement was not true. Fifty days after the close of fact discovery BNYM produced documents from its files that are featured prominently in its motion. To make matters worse, on December 16, 2016, BNYM produced thousands of pages of additional documents. Under these circumstances, BNYM's motion for summary judgment should be denied, and BNYM should not be allowed to rely on any of the late-produced documents in opposing Plaintiffs' cross-motion.

## **FACTUAL BACKGROUND**

### I.   **THE CUMULATIVE LOSS TRIGGER TRUSTS**

The GAs for the six Cumulative Loss Trigger Trusts provide that an EOD[3] occurs if losses or defaults exceed a specified level. SUF ¶¶ 3, 8, 13, 24, 32, 43. By April 2009, the specified levels were exceeded for all of these Trusts, and those levels continue to be exceeded to

---

[3] The PSAs for the CBASS Trusts and OWNIT 2006-1 use the term "Servicer Event of Termination."  SUF ¶¶ 3, 8, 13, 43. The PSA for FNLC 2005-2 refers to a "Servicer Event of Default." *Id*. ¶ 24. As used herein, the term EOD includes a Servicer Event of Termination and a Servicer Event of Default, as applicable.

date. *Id.* ¶¶ 5, 10, 15, 25.[4] The table below identifies the specified levels and the date when losses

first exceeded those levels.

| TRUST | CUMULATIVE LOSS TRIGGER DATE | LEVEL |
|---|---|---|
| CBASS 2005-CB4 | December 2008 | 3.40 % |
| CBASS 2005-CB8 | December 2008 | 4.24 % |
| CBASS 2006-CB3 | April 2009 | 7.78 % |
| FNLC 2005-2 | October 2008 | 5.48 % |
| NHEL 2006-1 | January 2009 | 4.34 % |
| OWNIT 2006-1 | February 2009 | 10.62 % |

The GAs for all six Trusts provide that BNYM must exercise all rights and remedies

available to it upon the occurrence of an EOD and during the period that such EOD is

continuing, using the same degree of care that a "prudent person" would in the exercise of her

own affairs. For example, the PSA for CBASS 2005-CB4 provides:

> If a Servicer Event of Termination has occurred (which has not been cured) of
> which a Responsible Officer has actual knowledge, the Trustee shall exercise such
> of the rights and powers vested in it by this Agreement, and use the same degree of
> care and skill in their exercise, as a prudent person would exercise or use under the
> circumstances in the conduct of such person's own affairs.

*Id.* ¶ 19. The GAs further provide that BNYM is entitled to be reimbursed for any costs incurred

in connection with carrying out its trustee duties and is indemnified for any liabilities arising out

of carrying out those duties.  *Id.* ¶¶ 21, 29, 41, 48.

BNYM testified that it could not locate any evidence that it provided notice to investors

of EODs for these six Trusts, as it was required to do under the GAs. *Id.* ¶ 79. After discovery

closed, BNYM produced what appear to be notices for the three CBASS Trusts and OWNIT

---

[4] Pursuant to an amendment to the NHEL 2006-1 SSA, an EOD based on exceeding cumulative loss and default
triggers would not occur unless the servicer was subject to "any withdrawal or downgrade by two or more levels . . .
of such successor Servicer's rating." SUF ¶ 35. The successor servicer experienced a downgrade by two or more
levels by January 5, 2012. *Id.* ¶ 36.

2006-1, but there is no evidence that the notices were ever sent to or received by Plaintiffs or other investors. *Id*. ¶¶ 52, 53. These notices state that the relevant loss trigger had been met and that "if the Trustee receives appropriate written direction" by a holder or holders of more than 50% of voting rights, "it shall terminate" the Master Servicer. *Id.* ¶ 54. Even if the notices were sent and received, they do *not* divulge that BNYM intended to do nothing unless specifically directed to do so—in direct contravention of its duties under the GAs. *Id.* BNYM similarly did not advise the investors that it believed that there was inadequate indemnity to support further action. *Id.* Finally, BNYM appears to admit that it failed to provide any notice of loss trigger EODs for NHEL 2006-1 and FNLC 2005-2.

A prudent person would not have ended its inquiry and ceased action after doing no more than possibly issuing inadequate EOD notices as to only four of the six Cumulative Loss Trigger Trusts. To the contrary, a prudent person would have reached out to the Master Servicer to discuss methods for improving loss mitigation practices, including the possibility of enforcing loan sellers' obligations to repurchase defaulted loans where appropriate. These discussions also would have addressed pursuing loan modifications where appropriate and meeting applicable foreclosure benchmarks.

## II.    **THE COUNTRYWIDE PSA TRUSTS**

RMBS are supposed to be "backed" by mortgage loans. To this end, the Countrywide PSAs provide that the 11 Countrywide PSA Trusts must receive complete mortgage files for at least 50% of the loans at the time each trust closed. *Id*. ¶¶ 93-95. The Countrywide PSAs define the term "Mortgage File" as all of the documents required to be delivered under § 2.01(c) of the PSAs, which are the note, the mortgage, all mortgage assignments, and the applicable title policy. *Id.* ¶¶ 91, 92.

If all or part of a Mortgage File was not delivered at closing, the loan was deemed to be a

"Delay Delivery Mortgage Loan." *Id.* ¶¶ 93-95.  Countrywide was required to deliver complete

Mortgage Files for Delay Delivery Mortgage Loans within 30 days after the closing of the

relevant Countrywide Trust. If Countrywide failed to do so, the loan was to be removed from the

Trust within 35 days after the closing of the Trust. *Id.* ¶ 96.

The evidence demonstrates that BNYM issued exception reports 90 days after the closing

for each Countrywide PSA Trust showing that, in total, 18,572 loans that had incomplete

Mortgage Files were not removed from the Trusts. These exception reports were provided to the

Master Servicer. Under § 3.01 of the Countrywide PSAs, the Master Servicer must "represent

and protect the interests of the Trust Fund . . . in the same manner as it protects its own interests

in mortgage loans . . ." *Id.* ¶ 103.  One of the interests of certificateholders and the "Trust Fund"

was to have Countrywide repurchase Delay Delivery Mortgage Loans under § 2.01(c). Rather

than take action to enforce repurchase obligations triggered by the collateral failures, the Master

Servicer liquidated the defective loans at a loss to investors. *Id.* § II.B. Pursuant to § 7.01(ii) of

the Countrywide PSAs, this triggered an "Event of Default," which is defined as

> any failure by the Master Servicer to observe or perform in any material respect
> [which] continues unremedied for a period of 60 days after the date on which
> written notice of such failure shall have been given to the Master Servicer by the
> Trustee . . . provided, however, that *the sixty day cure period shall not apply to the
> initial delivery of the Mortgage File for Delay Delivery Mortgage Loans nor the
> failure to substitute or repurchase in lieu of delivery.*

*Id.* ¶ 89 (emphasis added).

A prudent person would not have stood by idly while the Master Servicer liquidated

defective loans at a loss to investors. Instead, a prudent person would have identified the

defaulted loans that Countrywide was required to repurchase, and insisted that Countrywide

repurchase them and that the Master Servicer pay money damages for its failure to comply with

the Countrywide PSAs. BNYM made no attempt to get Countrywide to repurchase the relevant

loans or to recoup money damages from the Master Servicer to compensate for its breaches of

the Countrywide PSAs. *Id.* ¶ 140.

**ARGUMENT**

## I.      LEGAL STANDARD

"When cross-motions for summary judgment are made, the standard is the same as that

for individual motions for summary judgment." *Nat. Res. Def. Council v. Evans*, 254 F. Supp. 2d

434, 438 (S.D.N.Y. 2003) (citing *Morales v. Quintel Entm't, Inc.,* 249 F.3d 115, 121 (2d Cir.

2001); *Vt. Pub. Interest Research Grp. v. U.S. Fish & Wildlife Serv.*, 247 F. Supp. 2d 495, 504-

05 (D. Vt. 2002)). "Summary judgment is mandated when 'there is no genuine issue as to any

material fact . . . and the moving party is entitled to a judgment as a matter of law.'" *Kulak v.*

*City of N.Y.*, 88 F.3d 63, 70 (2d Cir. 1996) (quoting Fed. R. Civ. P. 56(a)); *see also Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it "might affect the outcome of the suit

under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and there

is a genuine issue for trial where, considering the record as a whole, a rational trier of fact could

find in favor of the non-moving party. *Ricci v. DeStefano*, 557 U .S. 557, 586 (2009) (quoting

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II.      THE UNDISPUTED FACTS ESTABLISH THAT EODs OCCURRED IN THE CUMULATIVE LOSS TRIGGER TRUSTS

For the Cumulative Loss Trigger Trusts, an EOD occurs if losses exceed levels specified

in the GAs. For example, § 7.01(a)(v) of the CBASS 2005-CB4 PSA states that an EOD occurs

when

> [t]he aggregate amount of cumulative Realized Losses incurred
> since the Cut-off Date through the last day of the related Collection
> Period divided by the initial Pool Balance exceeds the applicable
> percentages set forth below with respect to such Distribution Date:

| DISTRIBUTION DATE OCCURRING IN | PERCENTAGE |
| --- | --- |
| August 2005 through July 2009 | 3.25% |
| August 2009 through July 2010 | 4.75% |
| August 2010 through July 2011 | 6.00% |
| August 2011 through July 2012 | 7.00% |

7

| August 2012 and thereafter | 7.75% |
|---|---|

SUF ¶ 3.[5]

## A.     The Relevant Cumulative Loss Triggers Were Exceeded

Plaintiffs have established conclusively that losses exceeded the specified levels in each of these six trusts by April 2009.  *Id.* ¶¶ 5, 10, 15, 25. BNYM admits that, as a result, EODs occurred in four of these Trusts (CBASS 2005-CB4, CBASS 2005-CB8, CBASS 2006-CB3, and OWNIT 2006-1). *See* ECF No. 129 ("BNYM 56.1") ¶¶ 23-24. As for FNLC 2005-2 and NHEL 2006-1,[6] for obscure reasons, BNYM does not concede that EODs occurred. If BNYM argues that no EOD occurred in these two Trusts because BNYM could not locate a formal EOD notice, BNYM would be wrong. No provision of the GAs for FNLC 2005-2 or NHEL 2006-1 provides that written notice of an EOD is required.[7]

## B.     BNYM Failed to Act Prudently

Upon the occurrence of an EOD, and during the period it has not been cured, BNYM is duty bound to "exercise such of the rights and powers vested in it by [the GAs], and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs." SUF ¶ 19, 27, 39, 47; *see also Howe v. Bank of N.Y. Mellon*, 783 F. Supp. 2d 483-84 (S.D.N.Y. 2011) ("It is recognized that post-

---

[5] Additionally, for NHEL 2006-1, an Event of Default occurs if the Cumulative Loss Percentage exceeds the specified level or the "Rolling 90 Day Delinquency Percentage exceeds 20.00%." SUF ¶ 63.

[6] Unremedied breaches of the NHEL 2006-1 Sale and Servicing Agreement triggered breaches by the Issuer for its failures to "enforce . . . the Sale and Servicing Agreement" and to provide notice of Servicing Defaults, which in turn triggered EODs under the Indenture. SUF ¶¶ 57-58; *see also* MTD Order at 9 (citing *Okla. Police Pension & Ret. Sys. v. U.S. Bank Nat'l Ass'n*, 291 F.R.D. 47, 66-67 (S.D.N.Y. 2013); *Ret. Bd. of the Policemen's Annuity & Benefit Fund of Chi. v. Bank of N.Y. Mellon*, 914 F. Supp. 2d 422, 431-32 (S.D.N.Y. 2012) (finding that trustee's breaches of an SSA also constitute breaches of issuer's duties under the Indenture).

[7] The PSA for FNLC 2005-2 expressly states that the trustee is "deemed" to have knowledge of an Event of Default if it "has actual knowledge thereof." SUF ¶ 59. Section 6.02 of the NHEL 2006-1 Indenture requires the trustee to provide notice of a "Default," which is defined as "[a]ny occurrence that is, or with notice or the lapse of time or both would become, an Event of Default." *Id.* ¶¶ 61-62. Section 315(b) of the TIA has a similar requirement. 15 U.S.C. § 77ooo(b).

default, an indenture trustee's obligations 'more closely . . . resemble those of an ordinary

fiduciary . . . .'") (quoting *Beck v. Mfrs. Hanover Tr. Co.*, 632 N.Y.S.2d 520, 528 (1st Dep't

1995)); *accord Phoenix Light SF Ltd. v. The Bank of N.Y. Mellon*, 2015 WL 5710645, at *4

(S.D.N.Y. Sept. 29, 2015) ("MTD Order").

   Whether a trustee acted prudently is normally an issue of fact that cannot be resolved on a

motion for summary judgment. *See LNC Invs., Inc. v. First Fid. Bank*, 1997 WL 528283, at *16

(S.D.N.Y. Aug. 27, 1997) ("determinations of reasonableness and prudence are fact-intensive");

*Dresner Co. Profit Sharing Plan v. First Fid. Bank, N.A., N.J.*, 1996 WL 694345, at *7

(S.D.N.Y. Dec. 4, 1996) ("The issue of prudence, here, presents a question of fact."). However,

there are times when "prudence will dictate one and only one course." *LNC Invs.*, 1997 WL

528283, at *17. This is the rare case where the issue of prudence can be resolved on summary

judgment because BNYM did nothing despite the occurrence of an EOD. BNYM's corporate

representative testified that *doing nothing* is not prudent.

> Q. Okay. So if an allegation comes in following an event of default,
> the trustee has to look into it, right?
>
> A. Following an event of default, yes.
>
> Q. Yes, they can't just, you know, do nothing; you would agree with
> that?
>
> A. Correct.

SUF ¶ 144. As Robert Griffin, head of BNYM's corporate trust department testified, "when there

is an event of default, we move from ministerial duties to a fiduciary." *Id*. ¶ 65; *see also* MTD

Order at 4 ("If BNYM knows that there has been an Event of Default, then it 'assumes the same

duties as a common law trustee[.]'"). BNYM's corporate representative stated that this duty of

prudence requires it to act as if "acting on its own behalf for its own – for its own interests." *Id*. ¶

66. To this end, BNYM's *Corporate Trust Division Employee Reference Guide* emphasizes that,

post-default, a trustee has a duty to "maximize the recovery for bondholders." *Id*. ¶ 67.

For the CBASS Trusts and OWNIT 2006-1, BNYM claims it acted prudently because it provided a notice to certificateholders.[8] The notices BNYM now points to were produced more than 50 days after the close of fact discovery and as discussed in Section IV this Court should not consider them. There is also no evidence that any of these notices was actually delivered to investors. While one BNYM employee alleges in a declaration filed after the close of discovery that "BNYM provided notice to certificateholders," *see, e.g.*, BNYM 56.1 (ECF No. 129) ¶ 18, this self-serving claim cannot be permitted to contradict BNYM's admission during discovery that no evidence of actual delivery could be located. SUF ¶ 53.[9]

But even if the Court credited the belatedly-produced "notices," BNYM admits that it did nothing but sit on its hands after it supposedly provided notice. *Id*. ¶¶ 53, 76. The four notices BNYM belatedly produced merely state that an EOD occurred and that if more than 50% of the certificateholders directed it to terminate the servicer, BNYM was obligated to do so. *Id*. ¶ 54. The notices do not reveal that, unless BNYM received direction, it intend not to act prudently during the pendency of the EOD, or that it intended to take no further action. *Id.* Even if sent and received, these notices fell far short of what prudence dictates.

A prudent person would have done something to address the skyrocketing loss severities. BNYM should have demanded that the servicer improve its servicing practices and compensate the Trusts for its past failures. If the servicer refused, BNYM should have filed an action seeking an injunction and damages for past breaches, or terminated the servicer. BNYM also should have

---

[8] BNYM's belated production of default notices did not include notices applicable to FNLC 2005-2 or NHEL 2006-1. Thus, BNYM appears to concede it failed to act prudently in these two Trusts assuming there was an EOD.

[9] *See BanxCorp. v. Costco Wholesale Corp.*, 978 F. Supp. 2d 280, 299 (S.D.N.Y. 2013) ("[A] self-serving, contradictory affidavit fails to raise a triable issue of fact when it conflicts with documentary evidence."); *see also Watson-Tobah v. Royal Moving & Storage, Inc.*, 2014 WL 6865713, at *9 (S.D.N.Y. Dec. 5, 2014) (finding self-serving testimony introduced for the first time in summary judgment briefing was insufficient to raise a triable issue of fact).

assumed obligations to enforce repurchase claims, including claims arising from breaches of representations and warranties and the numerous documents that were not delivered to the Trusts. *Id.* If BNYM was concerned that some certificateholders for some reason might object to such actions, BNYM could have asked them if they objected or sought judicial approval. *Id.* BNYM did not do any of these things.

Although BNYM had an affirmative fiduciary obligation to root out problems after an EOD triggered by cumulative losses, BNYM did not need to perform such a review because it received express notice that the loan servicers for the Cumulative Loss Trigger Trusts had breached prudent servicing obligations. First, in February 2009, BNYM was notified that Litton, the servicer for five of the six Trusts, was not completing loss mitigation within timeframes required by Fannie Mae and Freddie Mac, which were industry standard. *Id.* ¶¶ 69-71. As discussed above, this was still a problem in 2011, when Litton disclosed that it had "temporarily suspended evictions and foreclosure actions and real estate owned sales in a number of states, including those with judicial foreclosure procedures. As a consequence, certain foreclosures were serviced outside prescribed timeframes established by FNMA and FHLMC."  *Id.* ¶ 72.

Second, with respect to the sixth Cumulative Loss Trigger Trust, NHEL 2006-1, on August 7, 2009, Saxon (the replacement servicer) notified BNYM that the initial servicer, Novastar, had improperly paid itself millions of dollars from Trust assets. *Id.* ¶ 73 ("Novastar failed to remit $2,024,699 to the Trust at the time of the servicing transfer. We want to apprise you, as Trustee for the Trust, of this situation as the Trust may wish to pursue remedies against Novastar with respect to any of its failures to remit Trust funds to the Trust."). As a result, Saxon claimed that it was entitled to withdraw funds from the Trust because it had mistakenly paid Novastar's liability to the Trust. *Id.* ¶¶ 73-74. On September 25, 2009, BNYM stated in a formal notice to the noteholders that "[i]f the default is not remedied within 3 Business Days it will

become a Servicing Default under Section 8.01 (a)(i) of the Sale and Servicing Agreement." *Id.* ¶ 75. BNYM's corporate representative admitted that the default was not remedied in three business days and that no servicer ever compensated the Trust. *Id.* ¶ 76. A notation in BNYM's Default Administration Group ("DAG") database indicates that BNYM declared an EOD on October 7, 2009. *Id.* ¶ 80. In addition, BNYM admits that another EOD occurred under § 5.01(c) of the NHEL 2006-1 Indenture. BNYM 56.1 ¶ 18. In sum, BNYM failed to take action after no fewer than three separate, indisputable NHEL 2006-1 EODs.[10]

### C.   BNYM Has Prudent Person Duties Even If No Certificateholder Direction Is Provided

BNYM has argued in the past that it had no obligation to act unless directed to do so by a controlling certificateholder or group of certificateholders. The GAs contain no such limitation on BNYM's prudent person duties. For example, § 8.01 of the CBASS 2005-CB4 PSA states:

> If a Servicer Event of Termination has occurred (which has not been cured) of which a Responsible Officer has actual knowledge, the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

Fread Decl., Ex. E § 8.01. This language does not condition BNYM's duties upon a direction from anyone. On the contrary, the trigger is the trustee's "actual knowledge," however obtained. And the exculpatory provisions granted to the trustee that limit implied duties and its duty to investigate apply only "prior to the occurrence" of an EOD. SUF ¶¶ 20, 28, 49, 62.

That Plaintiffs, passive "buy and hold" investment vehicles, did not issue a direction is irrelevant because, unlike BNYM, they have no obligation to act upon the occurrence of an EOD. And, in any event, the irrefutable evidence demonstrates that any notice would have been

---

[10] BNYM's failure to act prudently also constitutes a violation of TIA § 315(c), which states that "[t]he indenture trustee shall exercise in case of default (as such term is defined in such indenture) such of the rights and powers vested in it by such indenture, and to use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs." 15 U.S.C. § 77ooo(c). The NHEL 2006-1 Indenture defines "Default" as "[a]ny occurrence that is, or with notice or the lapse of time or both would become, an Event of Default." SUF ¶ 61. Furthermore, BNYM's failure to give notice of defaults constitutes a violation of TIA § 315(b). 15 U.S.C. § 77ooo(b).

futile. *Id*. ¶¶ 82-88. BNYM employees testified that BNYM would not take action unless directed to do so by a controlling certificateholder or group of certificateholders. *Id*. ¶ 82. Peter Collins, one of Plaintiffs' collateral managers, testified that "the trustees would not talk to us unless you could point that you had, you know, 25% voting right[s]," and that the Plaintiffs' holdings were not "close" to the requisite percentage. *Id*. ¶ 83.

BNYM's contention that it need not act unless a controlling certificateholder or group of certificateholders directs it cannot be reconciled with the role of the trustee to represent *all* certificateholders, not just holders who contact the trustee or who possess a controlling interest. Indeed, Ms. Lundberg testified, "We are the trustee for *all* of the bondholders." *Id*. ¶ 84. She further confirmed that when BNYM took action as trustee and "all the bondholders were not represented, yes, the trustee would have been the representative of the bondholders who were not there." *Id*. ¶ 84. This sentiment aligns with the typical composition of an RMBS transaction, in which it is rare that any single certificateholder, or even a definable group, possesses a controlling, voting percentage.

Furthermore, the evidence demonstrates that forming a control group is exceedingly difficult for relatively small institutional plaintiffs. First, the Trusts' certificates were sold to numerous investors, thus, as a practical matter, eliminating the possibility that any one investor could control the trust. Second, investors had no means to form a group with sufficient voting rights because there was no effective way to identify other holders in a particular Trust. Janet Russo, a BNYM Assistant Treasurer, testified that BNYM itself did not know and could not determine the identity of investors because the certificates were registered with the Depository Trust Company. *Id*. ¶ 86. Ms. Russo further confirmed that, to her knowledge, holders are generally not able to access the identities of other holders in RMBS deals. *Id*. ¶ 87. Ms. Lundberg similarly testified that "we don't know" the identity of RMBS investors "[b]ecause the

holder on our books and records is [Cede] and Co." *Id*. ¶ 86. Peter Collins testified that Plaintiffs

tried to form a control group but could not amass the required voting rights because they could

not identify other bondholders with sufficiently large holdings. *Id*. ¶¶ 83, 88.

### D.    BNYM Received Adequate Indemnity

BNYM also has argued that it was not indemnified against potential liabilities arising out

of its taking action. Once again, BNYM's position disregards the GAs, which <u>expressly</u> provide

that BNYM was indemnified by both the loan sellers and the Trust funds.[11] *Id*. ¶¶ 21, 29, 41, 48.

For example, the CBASS 2005-CB8 PSA provides:

> **Section 8.05          <u>Seller to Pay Trustee Fees and Expenses</u>**
>
> [T]he Seller covenants and agrees to indemnify the Trustee . . . against, any and all
> losses, liabilities, damages, claim or expenses incurred in connection with any legal
> action relating to this Agreement . . .the Certificates or incurred in connection with
> the administration of the Trust. . . . The Trustee . . . shall be indemnified, to the
> extent not paid by the Seller pursuant to this Section, by the Trust Fund and held
> harmless against any loss, liability or expense . . . incurred by the Trustee . . . arising
> out of or in connection with the acceptance or administration of its duties under this
> Agreement . . . .

*Id*. ¶ 21. While BNYM points to language providing that it is not "required to expend or risk its

own funds or otherwise incur financial liability . . . if there is reasonable ground for believing

that the repayment of such funds or adequate indemnity against such risk or liability is not

reasonably assured to it," *id*. ¶¶ 22, 30, 42, 50, at all times, there were ample funds in the Trust

Fund to cover any hypothetical indemnification demand. *Id*. ¶ 23, 31, 51.

New York courts interpreting similar provisions have rejected trustees' arguments that

they are not reasonably assured of indemnification when a governing agreement has an express

indemnification provision. For example, in *Harch International Limited v. Harch Capital

Management*, 2011 WL 11047191 (N.Y. Sup. Ct. Mar. 16, 2011), the trustee defendant

transferred interest proceeds out of the trust account into a separate account after it received a

---

[11] The source of the trustee's indemnification in NHEL 2006-1 is the Servicer, not the Trust Fund. SUF ¶ 40, 41.

demand for indemnification from the issuer. 2011 WL 11047191, at *1. When the trustee refused

to disburse any of the funds to noteholders, they sued for breach of contract. *Id*.

The trustee argued that it was authorized to transfer the interest proceeds because of two

provisions in the operative indenture:

> 6.1 (c) (iv) :[N]o provision of this Indenture shall require the Trustee to expend or
> risk its own funds or otherwise incur any financial liability in the performance of
> any of its duties hereunder, or in the exercise of any of its rights or powers, if it has
> reasonable     grounds     for     believing     that     repayment     of     such     funds
> or adequate indemnity against such risk or liability is not reasonably assured to it
> unless such risk or liability relates to its ordinary services, including under Article
> V, under this Indenture.
>
> 6.3 (e): The Trustee shall be under no obligation to exercise or to honor any of the
> rights or powers vested in it by this Indenture at the request or direction of any of
> the Noteholders pursuant to this Indenture, unless such Noteholders shall have
> offered to the Trustee reasonable security or indemnity against the costs, expenses
> and liabilities which might reasonably be incurred by it in compliance with such
> request or direction.

2011 WL 11047191, at *2-3. The court rejected this argument, concluding that "[d]efendant has

not shown reasonable grounds for believing that repayment of such funds is not reasonably

assured to it." *Id*. at *3 (internal quotation and citation omitted). In so holding, the court focused

on a substantively similar indemnification by the issuer. *Id*.

Similarly, in *Upwood Investments Limited v. U.S. Bank National Association*, the court

rejected a trustee's argument that it should be excused for its failure to act because of an

inadequate indemnity. 2012 WL 10007037, at *3,9 (N.Y. Sup. Ct. July 17, 2012). In that case,

the trustee refused to comply with a cease and desist letter issued by the plaintiff noteholder,

arguing that the noteholder had failed to offer an adequate indemnity. *Id*. at *6. The court

rejected that argument as a basis for dismissing the plaintiff's complaint. *Id*. at *9.

In light of these cases, and the plain language of the GAs, it is clear that BNYM cannot

rely upon § 8.01(iv) of the GAs, or similar language in the other Trusts, to absolve itself of

failing to act prudently upon the occurrence of EODs. Because the GAs expressly provide that

the trustee is indemnified by the Trust Fund and loan sellers, BNYM has no excuse for neglecting to act prudently. Accordingly, Plaintiffs are entitled to summary judgment on their breach of contract claims with respect to CBASS 2005-CB4, CBASS 2005-CB8, CBASS 2006-CB3, FNLC 2005-2, NHEL 2006-1, and OWNIT 2006-1.

## III.    THE UNDISPUTED FACTS ESTABLISH THAT BNYM FAILED TO ACT PRUDENTLY AFTER THE OCCURRENCE OF EODs IN THE COUNTRYWIDE PSA TRUSTS

EODs occurred in the Countrywide PSA Trusts because Countrywide failed to deliver complete loan files for 18,572 of the underlying loans, and the Master Servicer (initially Countrywide Home Loans Servicing LP and ultimately Bank of America, N.A.) allowed many of those loans to be liquidated at a loss to investors when it should have enforced Countrywide's repurchase obligation. A prudent person would have taken action against Countrywide and the Master Servicer to ensure that defective loans were repurchased rather than liquidated at a loss to investors.

### A.    Countrywide Failed to Remove Delay Delivery Mortgage Loans

Because they are "mortgage-backed," all RMBS provide a mechanism for delivery to the trustee or its designated custodian of key documents concerning the mortgage loans. Section 2.01(c) of the Countrywide PSA provides: "the Depositor has delivered or caused to be delivered to the trustee (or, in the case of the Delay Delivery Mortgage Loans, will deliver or cause to be delivered to the trustee within thirty (30) days following the Closing Date) for the benefit of the Certificateholders the following Documents." SUF ¶ 91. The "following Documents" include, among other things, the note, mortgage, assignments of the mortgage, and the title policy relating to each loans. *Id*. These documents are defined collectively as the "Mortgage File." *Id.* ¶ 92.

The term "Delay Delivery Mortgage Loans" is defined as "[t]he Mortgage Loans for which all or a portion of a related Mortgage File is not delivered to Trustee on the Closing

Date."[12] The Countrywide PSA provides that at closing no more than 50% of the loans can be Delay Delivery Mortgage Loans. *Id.* ¶¶ 93-95. Thus, Countrywide was required to deliver complete Mortgage Files for at least half the loans by the close of the RMBS transaction, with the remainder to be treated as Delay Delivery Mortgage Loans.

Section 2.01(c) further provides that if a loan is a Delay Delivery Mortgage Loan, Countrywide must deliver the complete Mortgage File with respect to that loan within 30 days of the closing or repurchase or substitute the loan:

> (c) . . . [W]ithin thirty (30) days after the Closing Date with respect to the Mortgage Loans, Countrywide . . . shall either (i) deliver to the Depositor, or at the Depositor's direction, to the Trustee or other designee of the Depositor the Mortgage File . . . for each Delay Delivery Mortgage Loan or (ii) either (A) substitute a Substitute Mortgage Loan for the Delay Delivery Mortgage Loan or (B) repurchase the Delay Delivery Mortgage Loan which substitution or repurchase shall be accomplished in the manner and subject to the conditions set forth in Section 2.03 (treating each Delay Delivery Mortgage Loan as a Deleted Mortgage Loan for purposes of such Section 2.03); . . . provided further that the cure period provided for in Section 2.02 or in Section 2.03 shall not apply to the initial delivery of the Mortgage File for such Delay Delivery Mortgage Loan, but rather Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) shall have five (5) Business Days to cure such failure to deliver.[13]

As this language indicates, for Delay Delivery Mortgage Loans, Countrywide had 30 days from closing to (a) deliver the complete Mortgage File or (b) repurchase or substitute. If it failed to do either, it had five days to cure. Thus, the Countrywide PSAs contemplated that all Mortgage Files would be complete or removed from the trust within 35 days from the closing. The loans with incomplete files were to become "Deleted Mortgage Loans," which BNYM was required to assign back to the seller pursuant to § 2.03(c) ("the Trustee shall release the Mortgage File held for the benefit of the Certificateholders relating to such Deleted Mortgage Loan to the related

---

[12] SUF ¶ 93. The PSAs for the CWL 2005 and the CWL 2006 Trusts define Delay Delivery Mortgage Loans as "[t]he Initial Mortgage Loans identified on the schedule of Mortgage Loans . . . for which all or a portion of a related Mortgage File is not delivered to the trustee on or prior to the Closing Date . . . ." *Id.* ¶¶ 94-95.

[13] SUF ¶ 96.

Seller"). *Id.* ¶ 106.

The indisputable evidence shows that BNYM prepared final certification and exception reports for each of the Countrywide Trusts identifying 18,572 loans for which Countrywide failed to deliver documents required under § 2.01(c). *Id.* ¶ 100. The table below sets forth the missing documents by Trust:

| TRUST | NUMBER OF LOANS WITH MISSING DOCUMENT EXCEPTIONS |
|---|---|
| CWALT 2006-OA10 | 4,117 |
| CWALT 2006-OA11 | 1,304 |
| CWALT 2006-OA3 | 1,438 |
| CWALT 2006-OA6 | 1,171 |
| CWL 2005-6 | 3,403 |
| CWL 2005-BC1 | 215 |
| CWL 2005-IM3 | 37 |
| CWL 2006-1 | 976 |
| CWL 2006-14 | 4,261 |
| CWL 2006-4 | 715 |
| CWL 2006-9 | 935 |

Under the Countrywide PSAs, the loans on the final certifications and exception reports were required to be delivered within 90-180 days after closing, depending upon the particular Trust. The fact that these reports still reflect missing documents is, therefore, conclusive evidence that Countrywide failed to remove Delay Delivery Mortgage Loans from the trusts within 35 days of closing, in violation of § 2.01(c). *Id.* ¶¶ 100-06.

**B.**     **The Master Servicer Liquidated Delay Delivery**
**Mortgage Loans at a Loss, Triggering EODs**

To the extent Countrywide did not voluntarily repurchase Delay Delivery Mortgage

Loans, the Master Servicer—a Countrywide subsidiary—was obligated to pursue repurchase

claims pursuant to § 3.01, which requires that the Master Servicer "represent and protect the

interests of the Trust Fund." *Id*. ¶ 103. For the CWALT Trusts, the Master Servicer also had a

duty to "promptly deliver to the Trustee, upon the execution or receipt thereof, the originals of

such other documents or instruments constituting the Mortgage File as come into the possession

of the Master Servicer from time to time." *Id*. ¶ 104.

Instead of pursuing repurchases after the Master Servicer had concluded that it could not

cure the document defects, the Master Servicer liquidated, at a loss to investors, the vast majority

of the Delay Delivery Mortgage Loans that defaulted. *Id*. § II.B. A prudent servicer would have

ensured that the defaulted loans with missing documents were put back to the Seller. Under §

7.01(ii) of the PSAs for the CWALT Trusts and § 7.01(2) for the CWL Trusts, an EOD includes

any failure of

> the Master Servicer to observe or perform in any material respect [which] continues
> unremedied for a period of 60 days after the date on which written notice of such
> failure shall have been given to the Master Servicer by the Trustee . . . provided,
> however, that ***the sixty day cure period shall not apply to the initial delivery of the***
> ***Mortgage File for Delay Delivery Mortgage Loans nor the failure to substitute or***
> ***repurchase in lieu of delivery***.[14]

Because the cure period "shall not apply to the initial delivery of the Mortgage File for Delay

Delivery Mortgage Loans nor the failure to substitute or repurchase in lieu of delivery," the EOD

is triggered automatically—no additional notice or opportunity to cure is required.

---

[14] Section 7.01(ii) of CWALT 2006-OA6 PSA (emphasis added); *see also* § 7.02 of CWL PSAs ("…the sixty-day
cure period shall not apply to the initial delivery of the Mortgage File for the Delay Delivery Mortgage Loans nor
the failure to repurchase or substitute in lieu thereof . . . ."). SUF ¶ 89.

### C.    BNYM Was Aware of the EODs But Failed to Act Prudently

Section 8.01 of the Countrywide PSA provides:

> In case an Event of Default has occurred and remains uncured, the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

*Id*. ¶ 125. This duty is a continuing duty for the entire period the EOD "remains uncured."

The evidence marshalled in discovery shows that by late 2008 BNYM was indisputably aware that the Master Servicer had liquidated loans with missing documents rather than tendering them to its Countrywide parent for repurchase. In October 2007, Courtney Bartholomew, former head of the Countrywide MBS team, emailed Countrywide personnel regarding the delivery of Mortgage Files, noting that "several deals [] are very past due and require repurchase under the relevant deal documents." *Id*. ¶ 129. The spreadsheet attached to Ms. Bartholomew's email shows that she was referring to at least one of the deals at issue in this action, CWABS 2005-6 (or CWL 2005-6). *Id.*

In a November 7, 2008 email to Davina Zeidel, a BNYM Structured Finance Control Coordinator, William Herrmann, a member of the Countrywide MBS team, stated that because the document exceptions had not been cured within the cure period, certain Countrywide trusts "appear[] to be out of compliance per certain sections of the CHL Pooling Agreements." *Id*. ¶ 130. Mr. Herrmann testified that this triggered a joint effort between the Master Servicer and BNYM coined the "cure project." *Id*. ¶ 131. At the beginning of this project, BNYM identified "hundreds of thousands" of loans in Countrywide securitizations, including the eleven Countrywide PSA Trusts, that had uncured document exceptions. *Id*. ¶ 132.

From late 2008 through 2009, Mr. Herrmann had "bi-weekly" calls with individuals employed by the Master Servicer to discuss the outstanding document exceptions. *Id*. ¶ 135. Mr. Herrmann testified that as part of this project, he asked Countrywide to cure its breaches. *Id*. ¶

133 ("Q. So you asked Countrywide to cure, right? A. Yeah, provide the document."). He

testified, and the documentary evidence confirms, that BNYM transmitted numerous notices to

the Master Servicer concerning its failures to rectify collateral exceptions, including in the trusts

at issue. *Id*. ¶ 110.

Mr. Herrmann admitted that the Master Servicer was able to cure only a very small

percentage of the total outstanding document exceptions. *Id*. ¶ 136.[15] But Bank of America

repurchased only a small handful of loans with missing notes in connection with the process. *Id*.

¶ 138 ("BOA has agreed to repurchase certain Mortgage Notes as well as provide Lost Note

Affidavits (Repurchases and LNAs will clear around 15."). Mr. Herrmann admitted that all

exceptions should have been cured, regardless of whether BNYM or the Master Servicer

believed they were material. *Id*. ¶ 139. ("Q. So it was not your opinion or belief that only

material exceptions should be cured? A. Again, when I start this project, all exceptions should be

cured."). Nevertheless, BNYM did not ask Bank of America or Countrywide to repurchase any

of the loans subject to document exceptions that could admittedly not be cured. Indeed,

according to Mr. Herrmann, "we never asked BofA to repurchase any mortgage loans in

connection to this project." *Id*. ¶ 140.

When it became aware that the Master Servicer was not taking action to cause the

repurchase of defective loans, BNYM, as a prudent person, should have sought to maximize

recoveries for certificateholders, and so would have undertaken a review of all defaulted

mortgage loans to determine whether any should be put back to Countrywide due to missing

documentation (or for a representation and warranty breach). *Id*. ¶ 64. By 2009, BNYM should

have been actively pursuing claims against Countrywide for its failure to repurchase and against

the Master Servicer for its breaches of the Countrywide PSA. Indeed, that is what the PSAs

---

[15] *See also* ¶¶ 136-37 (reporting that only approximately 12% of exceptions could be cleared); 125:22-24 ("Q. Okay.
I think we have established that not all exceptions could be cleared, right? A. Correct.").

explicitly require. BNYM did not even provide notice to certificateholders that Countrywide was attempting to cure document exceptions after the cure period ended because, in the words of Melissa Adelson, head of Structured Finance in Corporate Trust, "[w]e were not their time clock." *Id*. ¶ 145.

Worse than its failure to provide notice to certificateholders, BNYM disseminated an intentionally misleading notice to cover up the whole problem. Section 11.07 of the PSAs requires BNYM to submit annual "Assertions of Compliance with Applicable Servicing Criteria" pursuant to Item 1122(d) of Regulation AB. *Id*. ¶ 159. Among the items that BNYM was required to certify for the Trusts was that the "collateral or security on pool assets is maintained as required by the transaction agreements or related pool asset documents," and that "each custodial account is maintained at a federally insured depository institution as set forth in the transaction agreements." 17 C.F.R. § 229.1122(d)(2)(v) and (d)(4)(i). BNYM's February 27, 2009 "Assertion of Compliance with Applicable Servicing Criteria," which was signed by Patrick Tadie, head of BNYM's Structured Finance Group in the Corporate Trust Division, failed to disclose that the collateral was not maintained pursuant to the PSAs and that not all custodian accounts were held at eligible institutions under the PSAs. SUF ¶ 147. Beginning in August 2009, BNYM disclosed in its certifications that "certain mortgage notes . . . were absent endorsements required by the related transaction agreement." *Id*. ¶ 148.  This was a dramatic understatement because in reality over 58% of the loans underlying the Trusts were missing important documents required under the PSAs or were otherwise defective. *Id*. ¶ 100.

BNYM's lack of action is all the more inexcusable considering that, among others, Kelly Crosson, a former head of the Countrywide MBS team, acknowledged that Countrywide was breaching the PSAs as a result of the missing collateral file documents. *Id*. ¶ 137. In a September 2009 email circulated internally within BNYM with the subject "Risk," Crosson described

"potential risks spanning large populations of deals," including "[e]xisting and proliferating loan document exceptions relating to collateral for the CW/BoA book of business." *Id*.

### D.     BNYM's Arguments Concerning Notice Are Without Merit

Numerous courts interpreting identical contractual language, including this Court, have held that an RMBS trustee's failure to give notice of a known servicer breach does not relieve the trustee of its duty to act prudently. *See* MTD Order at 5; *see also Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*, 172 F. Supp. 3d 700, 715 (S.D.N.Y. 2016) ("*Phoenix Light v. Deutsche Bank*"); *see also Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, 2016 WL 439020, at *5 (S.D.N.Y. Feb. 3, 2016); *Fixed Income Shares: Series M v. Citibank N.A.*, 130 F. Supp. 3d 842, 855 (S.D.N.Y. 2015). As set forth above, the undisputed facts show that BNYM was aware of Master Servicer breaches. *Phoenix Light v. Deutsche Bank*, 172 F. Supp. 3d at 716 ("[F]ormal written notices are not required unless the indenture explicitly sets out the format of the notice."); *accord BNP Paribas Mortg. Corp. v. Bank of Am., N.A.,* 778 F. Supp. 2d 375, 399 (S.D.N.Y. 2011). Under this Court's prior decision, if BNYM failed to provide notice, it cannot rely on lack of notice to the Master Servicer to avoid prudent person duties.

BNYM had a duty to provide notice under multiple provisions. Regulation AB expressly requires BNYM the trustee to disclose on Form 10-K if "[c]ollateral or security on pool assets" are not "maintained as required by the transaction agreements or related pool asset documents." 17 C.F.R. § 229.1122(d)(4)(i).[16] For the Countrywide Trusts issued in 2006 and later, BNYM was also required to file reports on Form 10-D. SUF ¶ 161. "Material breaches of pool asset representations or warranties or transaction covenants" must be reported on that form. 17 C.F.R.

---

[16] While Regulation AB applies to securities issued August 2005 and later, the SEC made clear that it was merely "codify[ing] current staff positions and industry practice." SEC Rel. Nos. 33-8518, 34-50905 (avail at https://www.sec.gov/rules/final/33-8518.htm. Thus, BNYM should have provided this disclosure for all trusts where it served as trustee and custodian.

§ 229.1121(a)(12).[17] When BNYM learned that Countrywide failed to deliver complete Mortgage Files for tens of thousands of loans underlying the Contested Trusts and the Master Servicer failed to take action, BNYM was actually aware of breaches that it should have reported to the Master Servicer.

Finally, the "notice-and-cure" provision BNYM has previously pointed to is not a condition precedent to the occurrence of an EOD because it does not contain "unmistakable language" demonstrating an intent to create a condition precedent. *Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Capital, Inc.*, 821 F.3d 297, 305-06 (2d Cir. 2016). Thus, even if the notice was not provided, an EOD could still be triggered if there was substantial compliance with the provision as a whole. Given that the Master Servicer was aware of its breaches and did not cure, there is no genuine issue as to substantial compliance.

## IV. BNYM SHOULD BE SANCTIONED FOR ITS BELATED PRODUCTION OF DOCUMENTS

On July 20, 2016, BNYM advised the Court that "BNYM has completed its document production." ECF No. 99. BNYM later adamantly argued that all further discovery should be stayed to allow it to move for summary judgment based on its assertion that the outstanding discovery "has no bearing on the[] issues" raised in BNYM's motion for summary judgment. SUF ¶ 166. Yet on October 21, 2016, 50 days after the close of fact discovery, it produced documents that it relies upon in its summary judgment motion. *Id*. ¶ 52. If that were not bad enough, on December 16, 2016 BNYM produced thousands of pages of additional documents

---

[17] Similarly, § 11.03 of the PSAs for the CWALT Trusts and the CWL 2006 Trusts further requires that "the Trustee shall promptly notify the Depositor and the Master Servicer . . . of any Reportable Event of which it has actual knowledge" so that an appropriate Form 8-K could be filed with the SEC. "Reportable Event," is defined as "[a]ny event required to be reported on Form 8-K, and in any event . . . the occurrence of an early amortization, [a] performance trigger or other event, including an Event of Default." SUF ¶¶ 152-55. The seller's failure to timely cure the voluminous mortgage documentation defects constituted a Reportable Event because it (i) triggered the servicers' duty to require repurchase of the relevant mortgage loans; (ii) would have result in a large unscheduled pre-payment of principal to certificateholders following those repurchases; and (iii) required correction of disclosures in the offering documents concerning the characteristics of the collateral and legal and regulatory risks that could impact the performance of the Certificates. *See* SEC Release; Fitzgerald Decl., Exs. 213-14, 217 (17 CFR 229.1108(c)(6); 17 CFR 229.1111(a)(6); Items 2.04 and 6.05 on Form 8-K).

with no explanation as to why they were not produced earlier. These failures to produce are worthy of sanctions under Federal Rule of Civil 37(b)(2) and 37(c). *See D'Attore v. New York City*, 2015 WL 556778, at *8 (S.D.N.Y. Feb. 10, 2015) (party's reliance at summary judgment on documents produced post-discovery warrants preclusion of party's reliance on documents).

BNYM's Motion should be denied with prejudice and BNYM should be precluded from relying in any way on the late-produced documents in opposing Plaintiffs' motion for summary judgment. This is the only equitable way to proceed because BNYM convinced the Court to enter an expedited, and accelerated, summary judgment schedule based on BNYM's assurance that all responsive documents in BNYM's possession had been timely produced before the end of fact discovery and that no outstanding discovery was conceivably relevant to its Motion. Plaintiffs were deprived of any opportunity to take discovery with respect to these documents and have been severely prejudiced. As noted above in Section I, BNYM's corporate representative testified that BNYM could not locate any notices of EODs that were sent to certificateholders. Now BNYM is saying the exact opposite in its Motion. BNYM cannot be permitted to proceed with its Motion *and* rely upon the late-produced documents.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' Cross-Motion for Partial Summary Judgment and Motion for Sanctions pursuant to Federal Rule of Civil Procedure 37.

Dated:  January 12, 2017

By:     */s/ Steven S. Fitzgerald*
_____

David H. Wollmuth
Steven S. Fitzgerald
Samantha C. Glazer
Marissa A. Dioguardi
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110

25

Phone: (212) 382-3300
Fax: (212) 382-0050
dwollmuth@wmd-law.com
sfitzgerald@wmd-law.com
sglazer@wmd-law.com
mdioguardi@wmd-law.com


George A. Zelcs
John A. Libra
KOREIN TILLERY LLC
205 North Michigan Plaza
Suite 1950
Chicago, Illinois 60601
Phone: (312) 641-9750
Fax: (312) 641-9760
gzelcs@koreintillery.com
jlibra@koreintillery.com


Stephen M. Tillery
KOREIN TILLERY LLC
505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Phone: (314) 241-4844
Fax: (314) 241-3525
stillery@koreintillery.com

*Attorneys for Plaintiffs*