UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/7/2017

-------------------------------------------------------------X
PHOENIX LIGHT SF LIMITED, in its own right     :
and on the right of Blue Heron Funding V Ltd.,     :
Blue Heron Funding VI Ltd., Blue Heron Funding     :
VII Ltd., Blue Heron Funding IX Ltd., Kleros     :
Preferred Funding V PLC, Silver Elms CDO PLC,     :          14-CV-10104 (VEC)
Silver Elms CDO II Limited, C-BASS CBO XVII     :
Ltd., and C-BASS CBO XIV Ltd., and each of     :
BLUE HERON FUNDING V LTD., BLUE     :
HERON FUNDING VI LTD., BLUE HERON     :
FUNDING VII LTD., BLUE HERON FUNDING     :
IX LTD., KLEROS PREFERRED FUNDING V     :          OPINION & ORDER
PLC, SILVER ELMS CDO PLC, and SILVER     :
ELMS CDO II LIMITED, in their own right,     :
                                                                          :
                                        Plaintiffs,     :
                                                                          :
                                                                          :
                    -against-                             :
                                                                          :
THE BANK OF NEW YORK MELLON, as     :
Trustee,                                                         :
                                                                          :
                                        Defendant.     :
-------------------------------------------------------------X
VALERIE CAPRONI, United States District Judge:

        This case represents another chapter in the saga of seemingly endless residential

mortgage-back securities ("RMBS") actions that have flooded this District. Although many

RMBS cases appear to settle shortly after the motion-to-dismiss stage, this case has lived on,

with Plaintiffs pressing claims against Defendant Bank of New York Mellon ("BNYM") relative

to twenty-one RMBS trusts ("Trusts"), down from twenty-seven trusts at issue in the initial

complaint.

        At this stage, only the following claims remain: (1) violations of the Trustee Indenture

Act ("TIA"), relative to three indenture Trusts (Count I); (2) breach of contract, relative to all

Trusts (Count II); and (3) negligence, gross negligence, and negligent misrepresentation, relative

1

to all Trusts (Counts IV and V); and breach of the covenant of good faith and fair dealing,

relative to all Trusts.[1]  BNYM moves for summary judgment on all claims as to twenty Trusts.[2]

Dkt. 128.  Plaintiffs cross-move for partial summary judgment as to seventeen Trusts.  Dkts. 159,

180.[3]  For the following reasons, BNYM's motion is GRANTED in part and DENIED in part,

and Plaintiffs' cross-motion is DENIED in its entirety.

## BACKGROUND

The Court assumes familiarity with RMBS in general, the RMBS securitization process,

and the roles of the various entities (such as the sponsor, seller, servicer, and trustee) in the

RMBS trusts.  For those unfamiliar (or who would like a refresher), the Court directs readers to

its earlier opinion in this case for background on those subjects.  *See, e.g.*, *Phoenix Light I*, 2015

WL 5710645.

Of the twenty Trusts that are the subject of BNYM's motion, three are indentures:

CWHEL 2005-H, ECR 2005-1, and NHEL 2006-1 (collectively, "Indenture Trusts").  Pooling

---

[1]      In this Court's ruling on the motion to dismiss, the Court dismissed Plaintiffs' breach of fiduciary duty claim with leave to replead "insofar as Plaintiffs allege a difference in the scope of BNYM's express or implied contractual duties after an Event of Default and their fiduciary duties in the same context."  *Phoenix Light SF Ltd. v. Bank of N.Y. Mellon* (hereafter, "*Phoenix Light I*"), No. 14-CV-10104 (VEC), 2015 WL 5710645, at *7 (S.D.N.Y. Sept. 29, 2015).  Because Plaintiffs have not repleaded this claim, the breach of fiduciary duty claim is dismissed.

[2]      After fact discovery concluded, Plaintiffs moved for leave to amend the Third Amended Complaint based on BNYM's belated discovery that BNYM was the Master Servicer, not the Trustee, of FNLC 2005-1.  *See* Dkt. 136 at 2.  The Court ordered summary judgment briefing to proceed as to all Trusts except FNLC 2005-1, Dkt. 126, and the Court stayed discovery, which neither party opposed, relative to the claim against BNYM as Master Servicer for FNLC 2005-1, pending the Court's disposition of the summary judgment motions as to the balance of the Trusts. Dkts. 136, 138, 139.

[3]      Plaintiffs initially relied on expert affidavits in their cross-motion, despite this Court's Order staying expert discovery pending its disposition of the summary judgment motion.  Dkt. 147.  The Court severed and stayed Plaintiffs' cross-motion, unless Plaintiffs chose to refile without relying on expert discovery.  Dkt. 163.  Plaintiffs then refiled their cross-motion, purportedly without expert affidavits, although Plaintiffs' 56.1 Statement in support of their cross-motion (as well as Plaintiffs' counterstatement of facts in connection with BNYM's motion) includes citations to Plaintiffs' expert affidavits.  *See* Dkts. 159, 171.  The Court accordingly disregards the sections of Plaintiffs' 56.1 Statement that rely on expert affidavits.  Plaintiffs refiled their cross-motion a second time to remove redactions that had been part of their earlier cross-motion.  Dkt. 180.

and Service Agreements ("PSAs") govern the other seventeen trusts (collectively, "PSA Trusts"), of which eleven were serviced by Countrywide (collectively, "Countrywide PSA Trusts").[4]  The balance of the PSA Trusts is comprised of: CBASS 2005-CB4, CBASS 2005-CB8, CBASS 2006-CB3 (collectively, the "CBASS Trusts"); OWNIT 2006-1; HELT 2005-FRE1; and FNLC 2005-2.  BNYM is Indenture Trustee for the Indenture Trusts and Trustee for the PSA Trusts.  *See* Fread Decl., ¶¶ 3-23, Exs. A–U.[5]

The governing agreements ("GAs") for the Trusts impose different obligations on the Trustee depending on whether the Trust experienced an "Event of Default."[6]  The GA describes, in considerable detail, what constitutes an "Event of Default."  *See, e.g.,* Fread Decl., Ex. A ("CWALT 2006-OA10 PSA") § 7.01(ii).  Prior to an Event of Default, the Trustee has only the contractual duties specified in the GA, which include providing notice to all parties to the GA upon certain breaches of a representation or warranty.  *See Phoenix Light I*, 2015 WL 5710645, at *2.  After an Event of Default, however, the Trustee's obligations "come more closely to resemble those of an ordinary fiduciary . . . ."  *Royal Park Invs. SA/NV v. HSBC Bank USA, Nat'l*

---

[4]     The Countrywide PSA Trusts are: CWALT 2006-OA3, CWALT 2006-OA6, CWALT 2006-OA10, CWALT 2006-OA11, CWL 2005-6, CWL 2005-BC1, CWL 2005-IM3, CWL 2006-1, CWL 2006-14, CWL 2006-4, and CWL 2006-9.

[5]     The Court uses the following abbreviations herein: Third Amended Complaint is "TAC" (Dkt. 88); BNYM's opening brief in support of its motion for summary judgment is "Mem." (Dkt. 132); Plaintiffs' opposition brief to BNYM's motion is "Opp." (Dkt. 177); BNYM's reply brief in further support of its summary judgment motion is "Reply" (Dkt. 169); the 56.1 statement for BNYM's summary judgment motion, which incorporates Plaintiffs' counterstatement and BNYM's reply, is "Mot. 56.1" (Dkt. 171); Plaintiffs' cross-motion for summary judgment is "Cross-Mem." (Dkt. 181); BNYM's opposition to Plaintiffs' cross-motion is "Cross-Opp." (Dkt. 174); Plaintiffs' reply brief in further support of its cross-motion is "Cross-Reply" (Dkt. 185); and the 56.1 statement for Plaintiffs' cross-motion, which incorporates BNYM's counterstatement and Plaintiffs' reply, is "Cross-Mot. 56.1" (Dkt. 187); Declaration of Thomas A. Fread is "Fread Decl." (Dkt. 131); Declaration of Mark G. Hanchet is "Hanchet Decl." (Dkt. 135); Declaration of Loretta A. Lundberg is "Lundberg Decl." (Dkt. 133); Declaration of Mark G. Hanchet in further support of BNYM's motion is "Hanchet Reply Decl." (Dkt. 170); Declaration of Steven S. Fitzgerald is "Fitzgerald Decl." (Dkt. 179).

[6]     Most of the Trust GAs define an "Event of Default"; others define a "Servicer Event of Termination."  For the purpose of considering BNYM's post-Event of Default duties, there is no material difference between an "Event of Default" and a "Servicer Event of Termination," and the Court uses "Event of Default" to include a "Servicer Event of Termination."

*Ass'n* ("*Royal Park I*"), 109 F. Supp. 3d 587, 597 (S.D.N.Y. 2015). In particular, if BNYM has

knowledge of an Event of Default, it assumes the duty to act as a prudent person. *Phoenix Light*

*I*, 2015 WL 5710645, at *2; *see also Royal Park Investments SA/NV v. Bank of N.Y. Mellon*

("*Royal Park II*"), No. 1:14-CV-6502-GHW, 2016 WL 899320, at *2 (S.D.N.Y. Mar. 2, 2016).

Plaintiffs allege that BNYM breached its pre-Event of Default and post-Event of Default

obligations under the GAs. Relative to BNYM's pre-Event of Default duties, Plaintiffs allege

that BNYM failed promptly to give notice of breaches of representations or warranties and that

BNYM failed to enforce repurchase obligations triggered by those breaches, among other things.

TAC ¶ 385. Relative to BNYM's post-Event of Default duties, Plaintiffs allege that BNYM

breached its duty to act prudently upon numerous Events of Default in the Trusts. TAC ¶ 385.

## I.     BNYM's Pre-Event of Default Contractual Obligations

The GAs provide that "upon discovery" of a breach of a representation or warranty in a

mortgage loan that materially and adversely affects the interests of certificateholders, BNYM

must give notice to "the other parties" to the contract. *See* Mot. 56.1 ¶ 40 (collecting contractual

provisions); *see also* Hanchet Decl., Ex. O (same). Thus, for a notice obligation to arise, BNYM

must "discover" a breach of a representation or warranty with respect to a loan in the trust, and

that breach must "materially and adversely affect[]" the certificateholder interests in the loan in

breach. Upon that occurrence, BNYM must promptly notify the other parties to the GA (i.e., the

Sellers, Master Servicer, and Depositor).

Plaintiffs also allege that BNYM had a duty to enforce repurchase obligations triggered

by a breach of representation or warranty. For example, relative to the CWALT Trusts, if a

breach is uncured, the Seller must either remove and substitute the mortgage loan that is in

breach from the Trust, or repurchase that loan from the Trustee within 90 days of the Seller's

discovery or written notice of a breach.  *See, e.g.*, CWALT 2006-OA10 PSA § 2.03(c); Mot.

56.1 ¶ 47 (citing contractual provisions).

## II.    Trustee's Post-Event of Default Contractual Obligations

BNYM has more expansive obligations upon the occurrence of a contractually-defined

"Event of Default."  If an Event of Default occurs and is not cured, the Trustee is required to

"exercise such of the rights and powers vested in it by this Agreement, and use the same degree

of care and skill in their exercise, as a prudent person would exercise or use under the

circumstances in the conduct of such person's own affairs."  *See, e.g.*, CWALT 2006-OA10

PSA § 8.01.

Although the GAs do not specifically provide that the Trustee must have knowledge of an

Event of Default before it is subject to a prudent person duty, the parties do not dispute, and the

Court previously held, that the Trustee's prudent-person duty arises after the Trustee has

knowledge of an Event of Default.  *See Phoenix Light I*, 2015 WL 5710645, at *2 ("If BNYM

knows that there has been an Event of Default, then it 'assumes the same duties as a common

law trustee,' including . . . exercising 'the same degree of care and skill in their exercise . . . as a

prudent person would exercise under the circumstances . . . .'").  The GAs define the

circumstances in which the Trustee has "knowledge" of an Event of Default: some require the

Trustee to receive written notice of an Event of Default; others provide that the Trustee has

"knowledge" if the Trustee receives written notice or has actual knowledge of an Event of

Default.  *See* Hanchet Decl., Exs. E–G (collecting "knowledge" provisions under the GAs).

### A.  *It is Undisputed that an Event of Default Occurred in Five Trusts.*

The parties agree that an Event of Default occurred in five of the Trusts: the three

CBASS Trusts, OWNIT 2006-1, and NHEL 2006-1 (collectively, the "Default Trusts").  Mot.

56.1 ¶¶ 18, 37.  The GAs for these Trusts provide specific direction to the Trustee upon an Event

of Default:

> [T]he Trustee shall, at the direction of the Holders of each Class of
> Regular Certificates evidencing Percentage Interests aggregating
> not less than 51%, by notice then given in writing to the Servicer
> and the Trustee, terminate all of the rights and obligations of the
> Servicer as servicer under this Agreement.

Mot. 56.1 ¶¶ 25–26 (citing § 7.01(b) in the CBASS PSAs and the OWNIT 2006-1 PSA).

Similarly, Section 5.02 of the NHEL 2006-1 Indenture provides, "If an Event of Default occurs

and is continuing, . . . the Indenture Trustee may, and at the direction of Holders of Notes

representing more than 50% of the Class Note Balance of the Outstanding Notes, shall, declare

all the Notes to be immediately due and payable by a notice in writing to the Issuing Entity . . . ."

Fread Decl., Ex. T ("NHEL 2006-1 Indenture") § 5.02.

In response to the Events of Default in the CBASS Trusts and OWNIT 2006-1, BNYM

issued notices to the certificateholders pursuant to Section 7.01(b) (the "Notices").  Mot.

56.1 ¶¶ 27-30.[7]  In those Notices, BNYM stated that there had been an Event of Default and that,

pursuant to Section 7.01(b) of the PSA, if the Trustee received "appropriate written direction"

from certificateholders totaling at least 51% of the certificate interests, the Trustee "shall

---

[7]     Plaintiffs dispute that BNYM sent Notices relative to the CBASS and OWNIT Trusts because "BNYM testified that it could not locate any notice of a[] [Default Event] that was sent to investors, and there is no evidence that the notices cited were ever disseminated." Mot. 56.1 ¶¶ 27–30.  Plaintiffs' assertion mischaracterizes the record.  The deposition testimony cited by Plaintiffs reflects that relative to one of the Trusts (NHEL 2006-1), the Rule 30(b)(6) witness testified BNYM was unable to find any notice, Fitzgerald Decl., Ex. 12 at 58:20–59:11, and that relative to another Trust (CBASS-CB3), the witness did not recall if a Notice had been issued, Hanchet Reply Decl., Ex. G, at 169:6-11.

Plaintiffs do not dispute that BNYM sent a Notice relative to NHEL 2006-1.  Mot. 56.1 ¶ 21.  Relative to the CBASS and OWNIT Trusts, the record includes copies of the Notices.  Lundberg Decl., ¶¶ 9–12, 18–21, Exs. A, C–F.  Attached to each of those Notices is an email from a BNYM employee directing a BNYM listserv, "SF Ops Calls FCP's," to send the Notice to all registered holders in that Default Trust.  Hanchet Reply Decl., Exs. B–E.  Plaintiffs fail to raise a genuine dispute of material fact relative to these Notices because the record reflects copies of the Notices, and Plaintiffs fail to adduce any evidence tending to show that these Notices were not sent to certificateholders in the Default Trusts.

terminate all of the rights and obligations" of the Servicer.  Lundberg Decl. ¶¶ 18-21, Exs. C–F

(CBASS and OWNIT Notices).

Similarly, in response to the NHEL 2006-1 Event of Default, BNYM sent a Notice to

NHEL 2006-1 certificateholders notifying them that there had been an Event of Default and that,

pursuant to the Indenture, "the Indenture Trustee may, and at the direction of Holders of Notes

representing more than 50% of the Class Note balance of the Outstanding Notes, shall, declare

all the Notes to be immediately due and payable . . . . Noteholders should contact the Indenture

Trustee . . . should they wish to direct the Indenture Trustee to accelerate the Notes . . . ."  Mot.

56.1 ¶ 21; *see also* Lundberg Decl., ¶¶ 9–12, Ex. A (NHEL Notice).  Plaintiffs do not dispute

that BNYM sent a Notice relative to the NHEL 2006-1 Event of Default.

It is undisputed that BNYM did not receive any certificateholder direction in response to

the Notices in the Default Trusts.  Mot. 56.1 ¶¶ 22, 35.  Plaintiffs assert that BNYM did not take

any action beyond issuing the above Notices and waiting for direction, and BNYM cites no

evidence that controverts that assertion.  *See* Opp. 3–5.  Rather, BNYM argues that it was not

required to act because BNYM "was not reasonably assured of receiving an indemnity and was

not under an obligation to act."  Reply 8.

### B.  *Remaining Fifteen Trusts*

The remaining Trusts are comprised of: eleven Countrywide PSA Trusts; the ECR,

CWHEL, and NHEL Indenture Trusts (collectively, the "Indenture Trusts"); and HELT 2007-

FRE1.  Relative to these fifteen Trusts, the parties dispute the existence *vel non* of an Event of

Default and BNYM's knowledge of an Event of Default, if there was one.  As discussed *supra*,

the parties do not dispute that the Trustee's prudent person duty arises only upon *both* the

occurrence of an Event of Default *and* the Trustee's knowledge of that Event of Default.

Plaintiffs contend that these fifteen Trusts had Events of Default stemming from servicing defaults that were not cured within the contractually-specified cure period.  Plaintiffs assert that Events of Default occurred when, *inter alia*: the servicer failed to deliver complete mortgage files; loans "languish[ed] for exceptionally long periods in foreclosure"; and cumulative losses exceeded thresholds specified in the PSA.  Opp. 7–13.  BNYM contends that to the extent that any of these events were servicer breaches, none ripened into an Event of Default.  Reply 3–4, 7–8.

Knowledge of an Event of Default is defined differently in different Trusts.  The PSAs for the 11 Countrywide PSA Trusts provide, "the Trustee shall not be deemed to have knowledge of an Event of Default until a Responsible Officer of the Trustee shall have received written notice thereof."  *See, e.g.*, CWALT 2006-OA10 PSA § 8.02(viii); *see also* Mot. 56.1 ¶ 10 (collecting contractual provisions); Hanchet Decl., Ex. F (same).  For the other four Trusts (the three Indenture Trusts and HELT 2007-FRE1), the GAs provide that the Trustee shall not be deemed to have knowledge of an Event of Default "unless a Responsible Officer has actual knowledge thereof or unless written notice of such Event of Default is received by a Responsible Officer . . . ."  *See, e.g.*, Fread Decl., Ex. P ("ECR 2005-1 Indenture") § 5.01; *see also* Mot. 56.1 ¶ 11 (collecting contractual provisions); Hanchet Decl., Ex. G (same).

## MOTIONS FOR SUMMARY JUDGMENT

BNYM moves for summary judgment on all counts as to all but one of the Trusts,[8] arguing that BNYM did not breach any pre-Event of Default or post-Event of Default duties, that Plaintiffs' negligence-based claims are barred as a matter of law, and that BNYM did not violate the TIA.  Plaintiffs cross-move for partial summary judgment, arguing that BNYM breached its

---

[8]       *See* note 2, *supra*, for a discussion of the one Trust as to which BNYM is not moving for summary judgment.

post-Event of Default duties relative to the Countrywide PSA Trusts, the Default Trusts, and

FNLC 2005-2. For the following reasons, Defendant's motions are GRANTED in part and

DENIED in part, and Plaintiffs' motion is DENIED.

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). "A genuine

dispute exists when the evidence is such that, if the party against whom summary judgment is

sought is given the benefit of all permissible inferences and all credibility assessments, a rational

factfinder could resolve all material factual issues in favor of that party." *SEC v. Sourlis*, 851

F.3d 139, 144 (2d Cir. 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

For contract-based claims, summary judgment is appropriate "where the language of the contract

is unambiguous, and reasonable persons could not differ as to its meaning." *Fulton*

*Cogeneration Assocs. v. Niagara Mohawk Power Corp.,* 84 F.3d 91, 98 (2d Cir. 1996) (internal

marks and citations omitted).

The non-moving party "must do more than simply show that there is some metaphysical

doubt as to the material facts" and "may not rely on conclusory allegations or unsubstantiated

speculation." *Jeffreys v. City of N.Y.,* 426 F.3d 549, 554 (2d Cir. 2005) (citations and internal

quotation marks omitted). Rather, the nonmoving party must come forward with "specific facts

showing that there is a genuine issue for trial." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41

(2d Cir. 2000) (quoting *Anderson*, 477 U.S. at 256). Where "the burden of proof at trial would

fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of

evidence to go to the trier of fact on an essential element of the non-movant's claim." *In re*

*Lehman Bros. Sec. & ERISA Litig.*, 131 F. Supp. 3d 241, 249 (S.D.N.Y. 2015). "Summary judgment is appropriate when there can be but one reasonable conclusion as to the verdict, *i.e.*, it is quite clear what the truth is, and no rational factfinder could find in favor of the nonmovant." *Sourlis*, 851 F.3d at 144 (citations and internal quotation marks omitted).

<u>BNYM'S MOTION FOR SUMMARY JUDGMENT</u>

BNYM moves for summary judgment as to all of Plaintiffs' claims. For the following reasons, BNYM's motion relative to the breach of contract and breach of implied covenant of good faith and fair dealing claim is granted in part and denied in part, BNYM's motion relative to the negligence-based claims is granted, and BNYM's motion relative to the TIA claims is granted in part and denied in part.

### I. **BNYM's Pre-Event of Default Duties**

Plaintiffs allege that BNYM breached its pre-Event of Default contractual duty to investigate and provide notice of breaches of representations or warranties and to enforce Countrywide's repurchase obligations. TAC ¶ 385. In its opening brief, BNYM includes a section titled, "The Claims Relating to Underwriting-Related Breaches Fail," but makes arguments relative only to BNYM's alleged duties to investigate and to provide notice of a breach of representations or warranties. Mem. 20–21.[9] In response to Plaintiffs' argument that BNYM failed to investigate breaches of representation or warranties *and* that BNYM failed to enforce Countrywide's repurchase obligations, BNYM argues that it had no duty to do so absent certificateholder direction and adequate indemnity. Reply 10.

---

[9] BNYM also moved for summary judgment concerning Plaintiffs "claims relating to mortgage file-related breaches." Mem. 19-20. In response, Plaintiffs stated that they were not asserting any pre-Event of Default claims relating to mortgage file-related breaches. Opp. 20. Accordingly, this motion is moot.

The crux of BNYM's argument for summary judgment is that Plaintiffs have no evidence that BNYM discovered any specific underwriting breach, much less one that materially and adversely affected the interests of certificateholders in a mortgage loan. Because the Court concludes, for the reasons discussed *infra*, that BNYM did not "discover" a breach of any representation or warranty for sixteen Trusts, BNYM's motion is GRANTED as to those sixteen Trusts, but DENIED as to four Trusts: CWALT 2006-OA3, CWALT 2006-OA10, CWL 2005-BC1, and CWL 2006-9.

## A. *BNYM's "Discovery" of Breaches of Representations or Warranties*

The GAs provide that any duty by the Trustee to provide notice of a breach of a representation or warranty is triggered by the Trustee's "discovery" of that breach:

> Upon discovery by any of the parties hereto of a breach of a representation or warranty with respect to a Mortgage Loan made . . . that materially and adversely affects the interests of the Certificateholders in that Mortgage Loan, the party discovering such breach shall give prompt notice thereof to the other parties and the NIM Insurer.

*See, e.g.*, CWALT 2006-OA10 PSA § 2.03(c).[10] Under the plain language of this provision, BNYM's obligation to provide "prompt notice" to "the other parties" arises only if it "discover[s]" a breach of a representation or warranty with respect to a loan and that breach "materially and adversely affects" the certificateholder interests in that loan. *Id*.

The parties failed to brief the standard that governs BNYM's "discovery" of a breach of a representation or warranty: Does "discovery" require only "inquiry notice," which triggers

---

[10]     Although the contract requires BNYM to give notice to the NIM Insurer, Plaintiffs do not base their claim on lack of notice to the NIM Insurer. *See* TAC ¶ 385. Rather, Plaintiffs' breach of contract claim relative to BNYM's pre-Event of Default duties is that BNYM breached its obligation to "investigate and give notice to all parties to the PSAs of the breaches of representations and warranties . . . ." *Id*.

BNYM's duty to investigate? Or does "discovery" require that BNYM had actual knowledge of breaches?[11] There is authority going both ways,[12] but this Court need not resolve which of the "discovery" standards governs. For sixteen of the Trusts, under either standard, Plaintiffs failed to adduce any evidence that BNYM discovered a breach of a representation or warranty. For the other four Trusts, there is a question of fact whether BNYM discovered loan- and Trust- specific breaches.

Relative to the twelve Countrywide Trusts, Plaintiffs offer two types of evidence as proof that BNYM knew of breaches of representations or warranties.[13] For eight of those Trusts (CWALT 2006-OA6, CWALT 2006-OA11, CWL 2005-6, CWL 2005-IM3, CWL 2006-1, CWL 2006-14, CWL 2006-4, and CWHEL 2005-H), Plaintiffs rely on evidence of "pervasive breaches" at Countrywide. For the remaining four Trusts (CWALT 2006-OA3, CWALT 2006-OA10, CWL 2005-BC1, and CWL 2006-9), Plaintiffs cite evidence that BNYM received a letter in connection with each of those Trusts putting it on notice of breaches of representations or warranties relative to specific loans in the Trusts. For the following reasons, the Court GRANTS in part and DENIES in part BNYM's motion relative to Plaintiffs' claim of breaches of representations or warranties.

---

[11]     The parties addressed these different standards in Notices of Supplemental Authority, filed after they had completed their summary judgment briefing. *See, e.g.*, Dkts. 199, 200.

[12]     *Compare Royal Park Invs. SA/NV v. HSBC Bank Nat'l Ass'n* ("*Royal Park III*"), Nos. 14-CV-08175, 14-CV-09366, 14-CV-10101, 15-CV-02144, 15-CV-10032, 15-CV-10096, 2017 WL 945099, at *6 (S.D.N.Y. Mar. 10, 2017) (actual knowledge), *with Policemen's Annuity & Benefit Fund of Chity of Chi. v. Bank of Am., NA* ("*PABF*"), 907 F. Supp. 2d 536, 553 (S.D.N.Y. 2012) (inquiry notice), *with* Opinion and Order at 24, *Blackrock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank, Nat'l Ass'n*, No. 14-cv-9371 (KPF) (S.D.N.Y. filed Aug. 21, 2017) (knowledge standard that is between "constructive knowledge" and "actual knowledge").

[13]     Plaintiffs cite evidence relative to only the twelve Countrywide Trusts: the eleven Countrywide PSA Trusts and CWHEL 2005-H. Because Plaintiffs have not presented any evidence relative to BNYM's knowledge of breaches of representations or warranties relative to any of the other eight Trusts (the three CBASS Trusts and the OWNIT, NHEL, ECR, HELT, and FNLC Trusts), BNYM's motion relative to pre-Event of Default duties is GRANTED as to these eight Trusts.

1. *Eight Countrywide Trusts: CWALT 2006-OA6, CWALT 2006-OA11, CWL 2005-6, CWL 2005-IM3, CWL 2006-1, CWL 2006-14, CWL 2006-4, and CWHEL 2005-H*

Relative to eight Countrywide Trusts, Plaintiffs rely on evidence of "pervasive breaches" at Countrywide to prove that BNYM discovered breaches of representations and warranties related to loans within those Trusts. For example, Plaintiffs cite evidence that BNYM knew of "systemic representation and warranty breaches across an enormous portfolio of Countrywide loans," "systemic fraud" at Countrywide, and that a BNYM employee noted that there was a "growing" number of repurchase requests. Opp. 23–24. Plaintiffs, however, adduce no evidence of BNYM's knowledge of any specific breach of any representation or warranty relative to any particular loan in any of these eight Countrywide Trusts.

In *Retirement Board of the Policemen's Annuity and Benefit Fund of the City of Chicago v. Bank of N.Y. Mellon* (hereafter, "*Retirement Board*"), 775 F.3d 154 (2d Cir. 2014), in the context of deciding whether a putative class representative had class standing relative to RMBS trusts in which the plaintiff had not invested, the Second Circuit concluded that the plaintiffs' claims alleging violations of the TIA, breach of contract, breach of covenant of good faith, and breach of fiduciary duty arising out of RMBS trusts "must be proved loan-by-loan and trust-by-trust." 775 F.3d at 162. In rejecting the plaintiffs' argument that generalized proof regarding widespread breaches by the loan originator could be used to establish Trustee liability, the Second Circuit explained:

> [W]hether Countrywide breached its obligations under the governing agreements (thus triggering BNYM's duty to act) requires examining its conduct with respect to each trust. Whether it was obligated to repurchase a given loan requires examining which loans, in which trusts, were in breach of the representations and warranties. And whether a loan's documentation was deficient requires looking at individual loans and documents.

*Id.* Although *Retirement Board* arose in the context of determining class standing, the Second Circuit nevertheless made clear that to prevail on the merits of their RMBS claims, the plaintiffs cannot rely on generalized proof; rather, the plaintiffs must prove their claims that the Trustee breached its contractual obligations "loan-by-loan and trust-by-trust." *Id.* at 162–63.

Although allegations of the Trustee's generalized knowledge of breaches may be sufficient at the pleadings stage, *see, e.g.*, *Royal Park I*, 109 F. Supp. 3d at 601, by summary judgment or trial the plaintiffs must present evidence that proves a specific breach of a representation or warranty as to any loan or trust for which plaintiffs allege there was a breach. *See Royal Park III*, 2017 WL 945099, at *4 ("Courts in this District have dismissed theories of generalized wrongdoing after the pleading stage."). For example, in *U.S. Bank, Nat'l Ass'n v. UBS Real Estate Sec. Inc.*, the district court concluded that breaches needed to be proven "on an individualized loan-by-loan basis" because the court could not "determine whether the Trusts have proved that UBS received notice or otherwise discovered that a loan was in breach unless the loan is identified." 205 F. Supp. 3d 386, 424–25, 476 (S.D.N.Y. 2016).

This Court joins other courts in this District in holding that Plaintiffs' lack of loan- or Trust-specific proof relative to BNYM's knowledge of any breach is fatal to their claims. *See, e.g.*, *Royal Park III*, 2017 WL 945099, at *4 (rejecting on summary judgment plaintiffs' "pervasive breach" theory (collecting cases)); *see also MASTR Adjustable Rate Mortg. Trust 2006-OA2 v. UBS Real Estate Secs. Inc.* ("*MASTR I*"), No. 12-CV-7322 (PKC), 2015 WL 764665, at *10–12 (S.D.N.Y. Jan. 9, 2015) (plaintiff could not rely on a theory of pervasive breaches or generalized knowledge at summary judgment on claims alleging breach of representation or warranty).

Plaintiffs argue that they need not adduce evidence of loan-specific breaches because Countrywide provided a representation and warranty that the "Mortgage Loans, individually *and in the aggregate*, conform in all material respects to the descriptions thereof in the Prospectus Supplement." Opp. 22. This theory assumes too much. The PSAs make clear that any pre-Event of Default duty that BNYM had arose only when it discovered "a breach of a representation or warranty *with respect to a Mortgage Loan*." Mot. 56.1 ¶ 43 (emphasis added). Along similar lines, the remedy provisions for a breach of a representation or warranty required the Seller to cure the breach, and if it could not or did not cure, to "remove *such Mortgage Loan . . .* from the Trust Fund and substitute in its place a Substitute Mortgage Loan" or "repurchase the affected Mortgage Loan or Mortgage Loans from the Trustee." Mot. 56.1 ¶ 47 (emphasis added). Moreover, this remedy was the "sole remedy" available for this breach. *See, e.g.*, CWALT 2006-OA10 PSA § 2.03(c). Taken together, these breach and remedy provisions make clear that breaches must be discovered (and remedied) relative to the particular mortgage loans in breach; as such, knowledge of "pervasive breaches" does not suffice. *See MASTR I*, 2015 WL 764665, at *11 ("the PSAs expressly provide[] that cure or repurchase are the 'sole remedies,' and, thus, they foreclose the 'pervasive breach' theory").[14]

At summary judgment, Plaintiffs must prove that they have evidence to support their claims "loan-by-loan and trust-by-trust." *Ret. Bd.*, 775 F.3d at 162. Because Plaintiffs have not done so relative to CWALT 2006-OA6, CWALT 2006-OA11, CWL 2005-6, CWL 2005-IM3,

---

[14]     Plaintiffs' reliance on *Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475, 512 (S.D.N.Y. 2013), *Nomura Asset Acceptance Corp. Alt. Loan Trust v. Nomura Credit & Capital, Inc.*, No. 653390/2012, 2014 WL 2890341 (N.Y. Sup. Ct. June 26, 2014), and *Home Equity Mortgage Trust Series 2006-5 v. DLJ Mortgage Capital, Inc.*, No. 653787/12, 2014 WL 317838 (N.Y. Sup. Ct. Jan. 27, 2014), to support its theory of pervasive breach is unavailing because all of these cases were decided before the Second Circuit's decision in *Retirement Board*.

CWL 2006-1, CWL 2006-14, CWL 2006-4, and CWHEL 2005-H, BNYM's motion related to pre-Event of Default duties is GRANTED relative to these eight Trusts.

### 2. *Remaining Four Countrywide Trusts: CWALT 2006-OA3, CWALT 2006-OA10, CWL 2005-BC1, and CWL 2006-9*

For the remaining four Trusts, Plaintiffs' proof, though scant, fares better. Plaintiffs cite evidence that BNYM received a letter relative to CWALT 2006-OA3, Fitzgerald Decl., Ex. 18 ("Baupost OA3 Letter"), and a letter relative to CWALT 2006-OA10, Fitzgerald Decl., Ex. 19 ("Baupost OA10 Letter"), from the Baupost Group, LLC ("Baupost"), a certificateholder in both of those trusts, stating that hundreds of loans in each of those Trusts did not comply with Countrywide's representations and warranties and that those breaches "materially and adversely affect[ed] the value of the interests of Certificateholders in those mortgage loans." Baupost OA3 Letter at 1; Baupost OA10 Letter at 1. The Baupost Letters each attached appendices identifying each loan that was purportedly in breach of Countrywide's representations or warranties concerning loan-to-value ratios, appraisal values, and occupancy status.[15] Baupost OA3 Letter, Apps. A–B; Baupost OA10 Letter, Apps. A–B.

Baupost subsequently assigned its interest in CWALT 2006-OA10 to Walnut Place. Walnut Place sent a follow-up letter to BNYM ("Walnut Place Letter") noting that the Sellers had failed to repurchase the loans in breach and requesting BNYM to file suit against the Sellers to enforce the Sellers' repurchase obligations. Fitzgerald Decl., Ex. 64 at 1–2. Walnut Place offered to indemnify BNYM for any expenses incurred in doing so. Fitzgerald Decl., Ex. 64 at 2.

---

[15]   The Baupost Letters also demanded that BNYM give "prompt written notice of these breaches of representations and warranties to Countrywide and the NIM Insurer," that BNYM require Countrywide to repurchase all loans in breach, and also offered an indemnity to BNYM for any expenses incurred from those actions. Baupost OA3 Letter at 1, 6; Baupost OA10 Letter at 1, 6.

BNYM forwarded the Baupost OA3 Letter to: Countrywide Home Loans, Inc., Park Granada LLC, Park Monaco, Inc., and Park Sienna, LLC (the Sellers to the Trust); CWALT, Inc. (the Depositor to the Trust), and BAC Home Loans Servicing, LP (the Servicer to the Trust). *See* Fitzgerald Decl., Ex. 66 ("Countrywide Letter"). Those entities responded that BNYM had not followed the proper procedure to notify Countrywide of any breach, because "Section 2.03 [of the PSA] . . . provides that a party may provide notice of a breach only upon its 'discovery' of a breach—not upon an allegation of breach by a non-party certificateholder." Countrywide Letter at 2. BNYM asserts that it forwarded the Baupost OA10 Letter to Countrywide, *see* Reply 9 (citing Fitzgerald Decl., Ex. 64), but the evidence that BNYM cites shows only an email chain among BNYM employees and attorneys at Mayer Brown, with the subject line "Call re draft letter?" and attaching the Walnut Place Letter. Fitzgerald Decl., Ex. 64. That document does not prove that BNYM forwarded either the Walnut Place Letter or the Baupost AO10 Letter to Countrywide. Fitzgerald Decl., Ex. 64.[16]

Litton Loan Servicing LP sent a letter ("Litton Letter 1") to BNYM and Countrywide stating that a single loan in CWL 2005-BC1 was in breach of the representation and warranty that each loan was "secured by a valid and enforceable first lien on the related Mortgaged Property"; according to the Litton Letter, the loan had a defective deed of trust. Fitzgerald Decl., Ex. 95 at 1. Litton also sent BNYM and Countrywide a letter relative to CWL 2006-9 ("Litton Letter 2"). Fitzgerald Decl., Ex. 110. Litton Letter 2 stated that a single loan in that trust was in breach of Countrywide's representation and warranty that the loan was "free and clear of any

---

[16]     Portions of the email chain were redacted, and BNYM failed to submit an unredacted copy of the email chain for the Court's review. But even if the redacted portions of the email chain reflected that the Baupost OA10 Letter was sent to Countrywide, BNYM's motion for summary judgment relative to its duty to provide notice would fail for the reasons discussed *infra*.

pledge, lien, encumbrance or security interest" because there was a quitclaim deed conveying

interest rights in the mortgage loan. Fitzgerald Decl, Ex. 110 at 1.[17]

Although BNYM does not dispute that it received the Baupost, Walnut Place, and Litton

Letters, it adopted Countrywide's argument asserting that those letters were merely "*allegations*

of breach" that "cannot support the notion that BNYM, in fact, discovered any breaches in any

specific loan." Mem. 21 n.24. BNYM asserts that the "Trustee never conducted, and was never

directed to conduct, an investigation of possible underwriting breaches or a reunderwriting of

loan files in the trusts at issue." Mem. 21. But regardless of whether BNYM did investigate or

was directed to investigate potential underwriting breaches, the issue (which BNYM ignores) is

whether a reasonable juror could find that BNYM's receipt of the Baupost and Litton Letters

constituted its *discovery* of the breaches.

Although the parties did not brief whether "discovery" means inquiry notice or actual

knowledge, a reasonable juror could find that, relative to the four Trusts about which BNYM

received letters, BNYM discovered the breaches under either standard. Under the inquiry notice

standard, a reasonable juror could find that the Baupost, Walnut Place, and Litton Letters

provided BNYM with notice of potential breaches that BNYM should have investigated; had it

investigated, the investigation would have confirmed that there were breaches triggering

BNYM's obligation to provide prompt notice to the other parties to the GA. Under the actual

knowledge standard, when viewing the letters in the light most favorable to Plaintiffs, a

reasonable juror could find that the letters identified loan-specific breaches of representations

---

[17]     The Litton Letters are silent as to whether Litton is a certificateholder in the affected trust. In addition, unlike the Baupost Letters, the Litton Letters did not assert that the alleged breaches materially and adversely affected the value of the certificateholder interests in the mortgage loans, and the Litton Letters did not demand any particular action or offer to indemnify BNYM for any action it took in response. *See* Fitzgerald Decl., Exs. 95, 110.

and warranties and that, because BNYM received those letters, it had actual knowledge of those breaches.

BNYM's duty to provide notice was triggered only if the breach "materially and adversely" affected the certificateholder interests in the loan purportedly in breach. The contract is silent as to what "materially and adversely" means. In *MASTR Adjustable Rate Mortgages Tr. 2006-OA2 v. UBS Real Estate Sec. Inc* ("*MASTR II*"), which considered an identical provision, Judge Castel concluded that this language meant "a significant increase in the risk of loss" in the particular loan. No. 12-cv-7322 (PKC), 2015 WL 797972, at *3 (S.D.N.Y. Feb. 25, 2015). Judge Castel noted, "Materiality is determined not by the degree of deviation from the internal underwriting standards, but by how the deviation affects the Certificateholders in relation to 'such Mortgage Loan.'" *Id.* Judge Rakoff had adopted a similar interpretation. *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 892 F. Supp. 2d 596, 603 (S.D.N.Y. 2012) (To demonstrate a material and adverse effect, "the plaintiff must only show that the breaches materially increased its risk of loss."). The Court adopts Judge Castel and Rakoff's construction of "materially and adversely" for the reasons discussed in their opinions. Neither party offers, nor has the Court found, any case adopting a different construction.

Viewed in the light most favorable to Plaintiffs, the Baupost, Walnut Place, and Litton Letters provided notice of breaches that materially and adversely affected the certificateholder interests in the loans purportedly in breach. A reasonable juror could find that the breaches of Countrywide's representations or warranties related to loan-to-value ratios, appraisal values, and occupancy status, discussed in the Baupost and Walnut Place Letters, increased the risk of loss in the loans purportedly in breach. When viewing the Litton Letters in the light most favorable to Plaintiffs, a reasonable juror also could find that the existence of a lien or property interest in the

referenced loans encumbered the certificateholders' interests in those loans, thereby increasing the risk of loss.

In sum, Plaintiffs have adduced evidence that these breaches materially and adversely affected certificateholder interests and that BNYM "discovered" these breaches by virtue of its receipt of the Baupost, Walnut Place, and Litton Letters. Under the PSAs, BNYM's discovery of these breaches triggered its duty to provide notice of the breaches to the other parties. *See, e.g.*, CWALT 2006-OA10 PSA § 2.03(c).

### a. Did BNYM discharge its duty to provide notice?

Plaintiffs allege that BNYM breached its duty to provide notice "to all parties to the PSAs." TAC ¶ 385(c). BNYM argues that even if it discovered these breaches, it satisfied its narrow duty to provide notice because "[t]he undisputed record shows BNYM forwarded these letters to Countrywide and that others were already directly addressed there." Reply 9–10.

Pursuant to PSA § 2.03(c), BNYM was required to give notice to "the other parties" upon its discovery of a breach. For each of these four Trusts, the "parties" to the PSA included Countrywide Home Loans, Inc. (Seller), Park Granada (Seller), Park Monaco (Seller), Park Sienna (Seller), Countrywide Home Loans Servicing LP (Master Servicer), and Bank of New York (Trustee). Fread Decl., Exs. A, C, I, N. Relative to CWALT 2006-OA3 and CWALT 2006-OA10, the Depositor was CWALT, Inc. Fread Decl., Exs. A, C. Relative to CWL 2005-BC1 and CWL 2006-9, the Depositor was CWABS, Inc. Fread Decl., Exs. I, N.

Relative to CWALT 2006-OA3, the record reflects that BNYM forwarded the Baupost OA3 Letter ("BNYM Baupost Letter") to "Countrywide Home Loans, Inc., Park Granada LLC, Park Monoaco, Inc., and Park Sienna, LLC (the 'Sellers'), CWALT, Inc. (the 'Depositor'), and BAC Home Loans Servicing, LP (the 'Servicer')." *See* Countrywide Letter at 1. Countrywide

and the other entities, however, rejected the BNYM Baupost Letter as not sufficient to constitute notice of a breach. *See* Countrywide Letter at 2.[18] Therefore, there is a genuine issue of material fact relative to whether simply forwarding the Baupost OA3 Letter was sufficient to discharge BNYM's contractual duty to provide notice; a rational juror could find that BNYM's letter to the CWALT 2006-OA3 Sellers, Depositor, and Servicer, enclosing the Baupost OA3 Letter, discharged BNYM's duty to provide notice, but a rational juror could also find that BNYM had not provided notice, as Countrywide and the other parties to CWALT 2006-OA3 asserted at the time.[19]

Relative to the other three Trusts (CWALT 2006-OA10, CWL 2005-BC1, and CWL 2006-9), there is no evidence in the record that BNYM notified any party of a breach. Relative to CWALT 2006-OA10, BNYM asserts in its brief that it forwarded the Baupost OA10 Letter to Countrywide, *see* Reply 9 (citing Fitzgerald Decl., Ex. 64), but there is no evidence in the record supporting that assertion.[20] BNYM also asserts in its brief that relative to CWL 2005-BC1 and CWL 2006-9, the Litton Letters "were already directly addressed" to Countrywide, but BNYM fails to explain why a letter addressed to Countrywide would discharge BNYM's duty as Trustee

---

[18] The Countrywide Letter identifies "BAC Home Loans Servicing, LP as the "Servicer," but the CWALT 2006-OA3 PSA identifies "Countrywide Home Loans Servicing LP" as the "Master Servicer." *Compare* Countrywide Letter at 1, *with* Fread Decl., Ex. C at 1. In any event, even if BAC Home Loans Servicing, LP was the Master Servicer to the CWALT 2006-OA3, and the Countrywide Letter was sent on behalf of all parties to the CWALT 2006-OA3, BNYM's motion relative to its duty to provide notice still fails for the reasons discussed *infra*.

[19] There is, of course, a certain internal tension in Plaintiffs' argument. If the Baupost Letters were sufficient to have provided "knowledge" to BNYM, it is not at all clear why forwarding those Letters to Countrywide and others was not sufficient to discharge BNYM's obligation to provide notice. On the other hand, if the Letters were not sufficient to discharge BNYM's duty to notify the parties to the Trusts, then it is not clear why the Letters were sufficient to provide notice to BNYM. Ultimately, a factfinder will have to resolve that tension.

[20] Exhibit 64 to the Fitzgerald Declaration, which BNYM cites as "evidence" that it forwarded the Baupost OA10 Letter to Countrywide, is an email chain among BNYM and Mayer Brown employees attaching the Walnut Place Letter. As discussed *supra*, this document does not show that BNYM forwarded the Baupost OA10 Letter to Countrywide.

to provide Countrywide and the other parties to the CWL 2005-BC1 and CWL 2006-9 PSAs (i.e., the other Sellers, Depositor, and Master Servicer) with notice.

Because a reasonable factfinder could find that BNYM discovered a breach of a representation or warranty that materially and adversely affected the certificateholder interests in the loan in breach, and that BNYM did not discharge its contractual duty to give notice to all parties to the PSAs, BNYM's motion relative to this claim as to these four Trusts is DENIED.

### b. Did BNYM breach any duty to enforce repurchase obligations?

Plaintiffs' second pre-Event of Default claim is that BNYM breached its contractual duty to enforce repurchase obligations. In response to BNYM's silence in its opening brief regarding this purported obligation, Plaintiffs pointed out that BNYM had a duty to enforce repurchase obligations. Opp. 21. In reply, BNYM argued, for the first time, that it had no such duty because "Plaintiffs do not—because they cannot—cite any evidence that BNYM received direction and adequate indemnity." Reply 10. Although BNYM made a similar argument relative to the five Default Trusts in its opening brief—that it was not indemnified to take action and did not receive certificateholder direction—BNYM had not previously raised this argument in connection with these Four Trusts.[21]

The parties did not brief whether BNYM, as Trustee, had a contractual duty to enforce the Seller's repurchase obligations. The Court need not decide at this time whether such a duty existed because BNYM bases its motion on its argument that it had no duty to act absent

---

[21] The Court notes that because BNYM did not make this argument in its opening brief, the Court may decline to consider it. *See United States v. Yousef*, 327 F.3d 56, 115 (2d Cir. 2003) ("We will not consider an argument raised for the first time in a reply brief."); *Galin v. Hamada*, No. 15-CV-6992 (JMF), 2016 WL 2733132, at *3 (S.D.N.Y. May 10, 2016) ("Defendant did not make that argument in his opening brief, so the Court will not consider it."). Even if, however, BNYM had made this argument in its opening brief, the Court would reject it for the reasons discussed *infra*.

certificateholder direction and adequate indemnity. BNYM's argument relative to lack of

indemnification is insufficient to support its motion for summary judgment for the reasons

discussed in Section II.A.1 BNYM bears the burden to adduce evidence that it had reasonable

concerns that indemnification was not reasonably assured, and BNYM's failure to adduce any

evidence on that issue is fatal to BNYM's motion on that ground.[22] In addition, BNYM points to

no contractual provision requiring certificateholder direction before it was obligated to enforce

the Seller's repurchase obligations. Therefore, BNYM's motion relative to Plaintiffs' claim that

that BNYM breached its duty to enforce repurchase obligations as to these four Trusts is

DENIED.[23]

## II. BNYM's Post-Event of Default Duties

Plaintiffs allege that BNYM breached its contractual obligation to act prudently upon the

occurrence of an Event of Default and that BNYM breached the implied covenant of good faith

and fair dealing because it did not ensure that Plaintiffs "receive[d] the benefits and protections

provided for under the PSAs." TAC ¶¶ 385, 415.[24] BNYM moves relative to these post-Event

of Default claims, arguing that for the five Default Trusts, it did act prudently, and that for the

remaining fifteen Trusts, BNYM had no knowledge of an Event of Default. For the following

---

[22]     The Court expresses no view on whether a trier of fact would be persuaded by BNYM's arguments that it was not reasonably assured of being indemnified.

[23]     Plaintiffs also allege that BNYM had a pre-Event of Default duty to provide accurate reports under SEC Regulation AB. TAC ¶¶ 65–68; *see also* Mot. 56.1 ¶¶ 48, 65. BNYM makes no arguments relative to Plaintiffs' allegation that BNYM breached this duty. Accordingly, the Court concludes that BNYM did not move for summary judgment relative to this claim and declines to discuss it further.

[24]     At the motion-to-dismiss stage, the Court dismissed Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing "as it pertains to any allegations prior to the time the Trustee became aware of an Event of Default." *Phoenix Light I*, 2015 WL 5710645, at *9. Thus, Plaintiffs' post-Event of Default allegations of breach of the implied covenant of good faith and fair dealing survived BNYM's motion to dismiss.

reasons, BNYM's motion is DENIED as to the five Default Trusts and GRANTED as to the remaining fifteen Trusts.

### A. *BNYM Concedes that There Were Events of Default in the Default Trusts.*

BNYM concedes that Events of Default occurred in the Default Trusts. Mot. 56.1 ¶¶ 18, 37. As discussed *supra*, BNYM's knowledge of an uncured Event of Default subjected BNYM to a prudent person duty, i.e., that BNYM "shall exercise such of the rights and powers vested in it . . . and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of his or her own affairs." *See, e.g.*, Fread Decl., Ex. E ("CBASS 2005-CB4 PSA"), § 8.01.[25]

BNYM moves for summary judgment, arguing that: (1) BNYM was not required to act because it had reasonable grounds to believe that an indemnity was not reasonably assured; and, in any event, (2) BNYM discharged its prudent person duty. The Court disagrees and DENIES BNYM's motion relative to the Default Trusts.

#### 1. *Indemnity*

BNYM argues that it is entitled to summary judgment on the Default Trusts because it was not obliged to take any action absent an offer of indemnity from a certificateholder and that Plaintiffs have no evidence that any investor asked BNYM to take action, let alone that any investor asked BNYM to take action and offered to indemnify it for doing so. Mem. 15.

The GAs for the Default Trusts include the following (or a substantially similar) indemnity provision:

> No provision of this Indenture shall require the Indenture Trustee
> to expend or risk its own funds or otherwise incur any financial
> liability in the performance of any of its duties hereunder, or in the

---

[25] The parties do not dispute that BNYM was subject to a prudent person duty relative to the CBASS and OWNIT Trusts, Mot. 56.1 ¶ 37, although the parties are curiously silent relative to BNYM's prudent person duty in the NHEL Trust.

exercise of any of its rights or powers, if it shall have reasonable
grounds for believing that repayment of such funds or adequate
indemnity against such risk or liability is not reasonably assured to
it under this Indenture or the other Basic Documents.

Mot. 56.1 ¶¶ 16–17 (collecting contractual provisions). Thus, the Trustee is not required to act if

it has "reasonable grounds for believing that repayment of [any expended] funds or adequate

indemnity against such risk or liability is not reasonably assured to it." Mot. 56.1 ¶¶ 16–17.

BNYM does not, however, adduce any evidence tending to show that it had reasonable grounds

to believe that indemnity against risk was not reasonably assured. BNYM cites only two pieces

of evidence: (1) a declaration by Loretta Lundberg, a Managing Director in the BNYM's

Corporate Trust Division, stating that "BNYM did not receive direction or indemnity from

certificateholders in response" to the notices of Event of Defaults in the Default Trusts,[26]

Lundberg Decl. ¶¶ 13, 22–25, 38–41; and (2) a copy of a CBASS bankruptcy petition dated

November 12, 2010, Reply Hanchet Decl. ¶ 9, Ex. H. That evidence fails to show, as is

BNYM's burden on its own motion for summary judgment, that BNYM had reasonable grounds

to believe that it was not reasonably assured of indemnity.

Plaintiffs argue that under the GAs, BNYM was contractually entitled to indemnification

from the Trust fund and from the Sponsor, Seller, or Servicer. Mot. 56.1 ¶¶ 461–63, 465 (citing

contractual provisions). BNYM asserts, *ipse dixit*, that this contractual indemnity was

inadequate: as to the NHEL Trust, BNYM asserts that it was not reasonably assured of being

indemnified because the Servicer (from whom BNYM would be seeking indemnity) was the

breaching party; and as to the CBASS and OWNIT trusts, CBASS was on the brink of

---

[26]     BNYM also cites Plaintiffs' Responses and Objections to BNYM's First Set of Requests for Admission,
Hanchet Decl., Ex. Q, to show that Plaintiffs concede that the certificateholders did not direct BNYM to take any
action in response to the Events of Default. As discussed *supra*, regardless of whether the certificateholders did or
did not direct BNYM to take action, BNYM ignores that it is its burden on its motion for summary judgment to
show that it had reasonable grounds to believe that it was not reasonably assured of indemnity.

bankruptcy, making its promise of indemnity unreliable. Reply 8–9. But BNYM presents no evidence that, at the time, it had reasonable grounds to believe that it was not reasonably assured of receiving an indemnity for these reasons. BNYM cites to the CBASS bankruptcy petition, but BNYM fails to adduce any evidence showing that, at the time, it believed that it would not receive an indemnity for costs it would incur because of that bankruptcy. BNYM's bare assertions that an indemnity was not reasonably assured appear to be little more than post-hoc justifications crafted in the context of litigation.

BNYM further argues that investors would have had to approve use of Trust assets to indemnify itself and that no investor contacted BNYM about any Event of Default. Reply 8–9. The Court understands BNYM's argument to be that the investors were apparently blasé about the breach (because they did not contact BNYM), giving BNYM reasonable grounds to believe that they would not have approved the use of Trust funds to indemnify BNYM. But BNYM fails to adduce evidence sufficient to support this argument: the fact that BNYM did not receive certificateholder direction does not mean that, at the time, it was concerned that the certificateholders would not have approved the use of Trust funds to indemnify itself.

In order to be relieved of any obligation to act, the indemnity provision required BNYM to have "reasonable grounds" for believing indemnity was not "reasonably assured." For BNYM to be awarded summary judgment based on that provision, BNYM must show that there is no genuine dispute that, at the time, it had reasonable grounds for believing indemnity was not reasonably assured; that places the burden on BNYM to present evidence of its concerns. Plaintiffs present evidence that the GAs provided BNYM with an indemnity and note that

BNYM adduces no evidence that the contractual indemnities were inadequate.[27] Opp. 2–3. Because there is a genuine issue of fact whether, at the time, BNYM had reasonable grounds to believe that indemnification was not reasonably assured, BNYM's motion for summary judgment on that ground is denied.

### 2. *Did BNYM Act Prudently?*

Regardless of the indemnification issue, BNYM argues that it acted prudently in not taking further action after issuing the Notices of Events of Default because no certificateholder (including Plaintiffs) directed BNYM to terminate the Servicer. Plaintiffs, on the other hand, argue that the Notices "fell far short of what prudence dictates" and that BNYM did not act prudently when it sat on its hands after providing notice. Opp. 3.

BNYM asserts that it issued Notices of Servicer Events of Termination in the CBASS Trusts and OWNIT 2006-1, Mot. 56.1 ¶¶ 27–30, and attached copies of these Notices to its motion, Lundberg Decl. ¶¶ 9–12, 18-21, Exs. A, C–F; *see also* Hanchet Reply Decl. Exs. B–E. Plaintiffs dispute that those Notices were ever sent, noting: that they were produced to Plaintiffs by BNYM after the close of fact discovery; that there is no evidence that the Notices "were ever disseminated"; and that BNYM testified that it could not locate any Notices of Events of Default (including Servicer Events of Termination) that were sent to investors. Mot. 56.1 ¶¶ 27–30.[28]

---

[27]     In their Rule 56.1 Counterstatement, Plaintiffs also cite expert affidavits stating that the Trust assets were sufficient to indemnify BNYM. The Court disregards this evidence because Plaintiffs' reliance on expert discovery in this motion was improper. *See* note 3, *supra*.

[28]     As discussed in note 7, *supra*, Plaintiffs mischaracterize the record. Plaintiffs' contentions do not raise a *genuine* dispute, particularly in light of the fact that the record includes copies of the Notices, Lundberg Decl., Exs. A, C–F, as well as an email from BNYM instructing the Notices to be sent to all registered holders for these Default Trusts, Hanchet Reply Decl., Exs. B–E. Plaintiffs fail to adduce evidence that the certificateholders in the Default Trusts did not receive the Notices; indeed, CBASS produced BNYM's Notice relative to C-BASS 2005-CB4, implying that CBASS certificateholders received the Notices. *See* Hanchet Reply Decl. ¶ 7, Ex. F.

         In any event, regardless of whether BNYM issued the Notices, BNYM's motion for summary judgment on this issue fails because there is a question of fact whether BNYM acted prudently.

Plaintiffs concede that no certificateholder instructed BNYM to take action in response to the Servicer Events of Termination. Mot. 56.1 ¶ 35. Plaintiffs also concede that BNYM issued a Notice relative to the Event of Default in NHEL 2006-1 and was not instructed by any certificateholders to declare the Notes immediately due and payable. Mot. 56.1 ¶ 21–22.[29]

Nonetheless, BNYM's motion is denied. BNYM argues that, as a matter of law, it acted prudently because "BNYM undertook its contractually-required obligations to notify certificateholders of these events and invited them to instruct BNYM to take action . . . [and] none responded . . . ." Mem. 19. But BNYM points to no contractual provision or court decision holding that, as a matter of law, a prudent person would simply issue a Notice and passively wait for certificateholder direction. BNYM also argues that, even if it had received the requisite certificateholder direction and indemnity, it was not required to do anything other than terminate the servicers because "a specifically-enumerated remedy provided in the PSAs . . . controls over the general prudent person provision." Reply 9 (citing *John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co.*, 717 F.2d 664, 669 n.8 (2d Cir. 1983) ("definitive, particularized contract language takes precedence over expressions of intent that are general, summary, or preliminary")).

_____

[29]     In connection with their cross-motion, Plaintiffs move for sanctions, seeking to preclude BNYM's reliance on these Notices, arguing that BNYM produced these Notices fifty days after the close of fact discovery. Cross-Mem. 3. In opposing BNYM's motion, Plaintiffs assert that "further discovery would be required to address BNYM's late production" of the Notices more than 50 days after the close of fact discovery. Opp. 3.

       Plaintiffs' motion for sanctions is DENIED. Plaintiffs do not argue that they are prejudiced by this evidence, and these Notices are material to the issue of whether BNYM satisfied its prudent person duty. Although the Court is not persuaded by BNYM's argument that it produced these Notices late because they did not become relevant until after the close of fact discovery, Cross-Opp. 20, the Court denies Plaintiffs' motion to preclude BNYM's use of the Notices in furtherance of BNYM's motion. To the extent Plaintiffs need additional discovery related to these Notices in order to prepare for trial, they should request fact discovery to be reopened for that limited purpose.

The Court is not persuaded by BNYM's interpretation of *John Hancock*. *John Hancock* concluded that a specific, particularized contractual provision controls over an inconsistent "general statement" in the contract. *John Hancock*, 717 F.2d at 669 n.8 ("Thus, where the parties have particularized the terms of a contract an apparently inconsistent general statement to a different effect must yield." (quoting *Preminger v. Columbia Pictures Corp.*, 267 N.Y.S.2d 594, 599 (N.Y. Sup. Ct. 1966), *aff'd*, 25 App. Div. 2d 830 (1st Dep't 1966))). Here, the provision that BNYM terminate a servicer upon a Servicer Event of Termination is not inconsistent with a general prudent person provision. Moreover, to conclude that the former supplanted the latter would run counter to the Court's obligation to "interpret a contract in a way that ascribes meaning, if possible, to all of its terms." *Goodheart Clothing Co. v. Laura Goodman Enters., Inc.*, 962 F.2d 268, 272-73 (2d Cir. 1992) (internal quotation marks and citations omitted).

Plaintiffs argue that a prudent person would have taken actions beyond merely issuing the Notices and waiting for certificateholder direction. According to Plaintiffs, a "prudent person would have demanded that the servicer improve its practices and compensate the Trusts for its past failures" and filed suit against the servicer or terminated it if the servicer refused. Opp. 4; *see also* Opp. 5 ("A prudent person would not have stood by idly while the servicers pocketed trust funds, losses skyrocketed, and the Issuer failed to protect the holders' interests.").

Given the complexities of these Trusts, a prudent person may have simply issued a Notice and waited for direction (as BNYM did); but, a prudent person may also have been less passive and pursued remedies against the servicer. *See LNC Invs., Inc. v. First Fid. Bank*, No. 92 CIV. 7584 MBM, 1997 WL 528283, at *17 (S.D.N.Y. Aug. 27, 1997) ("[A]lthough in some cases prudence will dictate one and only one course, and failure to follow that course will impose

liability, prudence may point also toward more than one course, and in such event the mere availability of other courses of action . . . does not support a finding that the fiduciary acted imprudently in choosing one such course." (citation and internal quotation marks omitted)). Whether BNYM acted prudently must be determined in light of what was known at the time of the Trustee's challenged decision and not with the benefit of twenty-twenty hindsight. *LNC Invs., Inc. v. Nat'l Westminster Bank, N.J.*, 308 F.3d 169, 176 (2d Cir. 2002).

Whether BNYM's issuance of a Notice and failure to act (because it had not received certificateholder direction) was sufficient to discharge its prudent person duty is a question of fact that is inappropriate for resolution at this stage. *See First Fid. Bank*, 1997 WL 528283, at *16 ("[D]eterminations of reasonableness and prudence are fact-intensive, and in this case there are issues of fact as to whether the trustees acted or failed to act as reasonably prudent people"). As noted in another case brought against BNYM as Trustee, "Without a more developed record as to what indenture trustees typically do under the circumstances and the consequences of different courses of action, the Court cannot grant summary judgment to Plaintiffs on their [] claim at this time." *FMS Bonds, Inc. v. Bank of N.Y. Mellon*, No. 15 CIV. 9375 (ER), 2016 WL 4059155, at *12 (S.D.N.Y. July 28, 2016).

A reasonable juror could conclude that BNYM did not act prudently by doing nothing other than issuing the Notice. A reasonable juror also could conclude that BNYM acted entirely prudently by issuing the Notice and waiting for direction from certificateholders (who were, after all, the ones with a financial interest in the viability of the Trust). Because a genuine issue of material fact exists relative to the Default Trusts, BNYM's motion for summary judgment on Plaintiffs' claims that BNYM breached its contractual obligation to act prudently relative to the Default Trusts is DENIED.

## B. *Other Fifteen Trusts*

BNYM also moves for summary judgment relative to the eleven Countrywide PSA Trusts and ECR 2005-1, HELT 2007-FRE1, CWHEL 2005-H, and FNLC 2005-2, arguing that Plaintiffs have not adduced evidence of Events of Default for these Trusts and that, even if there were Events of Default, Plaintiffs have not adduced evidence that BNYM had knowledge of any Event of Default. The Court need not resolve the existence *vel non* of an Event of Default for these fifteen Trusts. Even if there were an Event of Default, Plaintiffs have failed to adduce evidence that BNYM had knowledge of that Event of Default as "knowledge" is defined in the GAs. Therefore, BNYM's motion relative to these fifteen Trusts is GRANTED.

### 1. *Eleven Countrywide PSA Trusts*

The PSAs for the eleven Countrywide PSA Trusts provide: "the Trustee shall not be deemed to have knowledge of an Event of Default until a Responsible Officer of the Trustee shall have received written notice thereof." *See, e.g.*, CWALT 2006-OA10 PSA § 8.02(viii); *see also* Hanchet Decl., Ex. E (collecting contractual provisions).

BNYM argues that Plaintiffs have not adduced evidence that BNYM received written notice of any Event of Default. Plaintiffs argue that the "deemed to have knowledge" language in Section 8.02(viii) refers to the Trustee's *constructive* knowledge, not its actual knowledge. Plaintiffs contend that this provision does not address circumstances in which BNYM has actual knowledge of an Event of Default; in such circumstances, according to Plaintiffs, BNYM must act prudently.

The Court agrees with BNYM that, relative to these Trusts, in the absence of written notice of an Event of Default, the Trustee lacks "knowledge" and is not subject to a prudent person duty. In *Commerce Bank v. Bank of N.Y. Mellon*, which considered an identical

knowledge provision, the First Department affirmed the trial court's dismissal of contract claims based on the lack of written notice to the Trustee. 141 A.D.3d 413 (1st Dep't 2016). The First Department concluded that BNYM's receipt of a letter from a nonparty "was not a notice of an event of default; rather, it was a notice of events that, with time, might ripen into events of default." *Id*. at 414–15. Here, Plaintiffs have presented *no* evidence of written notice—not even a letter—relative to the eleven Countrywide PSA Trusts. The absence of such evidence is fatal to their post-Event of Default claims.[30]

Plaintiffs argue that Section 8.02(viii) should be interpreted to refer only to constructive knowledge, and that provision does not apply where the Trustee has actual knowledge of an Event of Default. The Court is not persuaded. In interpreting a contract, the Court must give "full meaning and effect to all of its provisions," and "an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible." *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 124 (2d Cir. 2003) (internal quotations marks and citations omitted). In another sub-section of the PSA discussing the duties of the Trustee, the PSA requires the Trustee to act if it has notice *or* actual knowledge. *See, e.g.*, CWALT 2006-OA10 PSA § 8.01(iv) (Trustee "shall have no obligation to make any

---

[30]    After the close of summary judgment briefing, Plaintiffs submitted a Memorandum Decision and Order from Judge Daniels in *Commerzbank AG v. Bank of N.Y. Mellon*, No. 15 Civ. 10029 (GBD) (S.D.N.Y. filed Mar. 21, 2017), as supplemental authority. Dkt. 190. Judge Daniels concluded, on a motion to dismiss, that *Commerce Bank* did not require dismissal of Plaintiff's breach of contract claims because Plaintiff's allegations that BNYM had "received at least three written notices of servicing violations, which viewed in the light most favorable to Plaintiff, plausibly alleges knowledge of events of defaults" were "more robust than in *Commerce Bank*. 2017 WL 1157278, at *5 (S.D.N.Y. Mar. 21, 2017).

        *Commerzbank* is inapposite. Here, at summary judgment, Plaintiffs must adduce *proof* of their claims. Plaintiffs have failed to adduce *any* evidence of written notice of an Event of Default. In the absence of such evidence, no reasonable juror could find that BNYM had knowledge of an Event of Default necessary to trigger a prudent person duty.

Advance . . . in the absence of a Trustee Advance Notice *or actual knowledge* of a Responsible

Officer of the Trustee" (emphasis added)). If the Trustee's prudent person duty were to arise

upon the Trustee's actual knowledge, or if Section 8.02(viii) intended to include "actual

knowledge," then the PSA could have used the phrase "actual knowledge" in Section 8.02(viii),

as it did elsewhere. Because it did not do so, the Court concludes that Section 8.02(viii) means

what it says: the Trustee does not have knowledge of an Event of Default unless it receives

written notice of an Event of Default.

Plaintiffs argue that BNYM itself was required to provide written notice of an Event of

Default and that, under the prevention doctrine, BNYM "cannot rely on its own failure to give

notice to escape its own liability." *See Okla. Police Pension & Ret. Sys. v. U.S. Bank Nat'l

Ass'n*, 291 F.R.D. 47, 70 (S.D.N.Y. 2013); *see also Fixed Income Shares: Series M v. Citibank

N.A.*, 130 F. Supp. 3d 842, 855 (S.D.N.Y. 2015) ("Citibank may not excuse its failure to perform

the additional duties required of it after an Event of Default by pointing to its own failure to give

notice; that is, Citibank is not permitted to take advantage of its own wrong." (internal citation

and quotation marks omitted)). The prevention doctrine provides that "a party may not insist

upon performance of a condition precedent when its nonperformance has been caused by the

party [it]self." *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.* ("*Royal Park IV*"), No.

14-CV-4394 (AJN), 2016 WL 439020, at \*5 (S.D.N.Y. Feb. 3, 2016) (citation omitted).

Plaintiffs fail to explain why (or even how) the prevention doctrine applies to BNYM's

*knowledge* of an Event of Default. The prevention doctrine makes little sense in considering

whether BNYM had knowledge because the PSA's knowledge provision does not require

BNYM to give any written notice: rather, it imposes obligations if the "Responsible Officer of

the Trustee shall have *received* written notice" of the Event of Default, *see, e.g.*, CWALT 2006-

OA10 PSA § 8.02(viii) (emphasis added).  It would be a farcical contract to require BNYM to give written notice to itself.  Indeed, courts applying the prevention doctrine have done so in the context of considering whether an Event of Default exists—and not, as Plaintiffs seek to do here, in determining whether the Trustee has *knowledge* of an Event of Default.  *See, e.g.*, *Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.* ("*Phoenix Light II*"), 172 F. Supp. 3d 700, 715 (S.D.N.Y. 2016) ("Deutsche Bank cannot take advantage of its own failure to give notice to the sponsor of the possible breaches of representations and warranties to argue that no Event of Default occurred" where sponsor's receipt of written notice from the Trustee was a prerequisite to the occurrence of an "Event of Default" under the PSA); *see also Fixed Income*, 130 F. Supp. 3d at 855 (same).[31]

Plaintiffs contend that they have marshalled "overwhelming evidence" that BNYM and the Master Servicer had actual knowledge of servicing-related defaults.  Opp. 19.  As discussed *supra*, however, BNYM and the Master Servicer's actual knowledge is irrelevant.  Because Plaintiffs have failed to adduce evidence that BNYM received written notice of Events of Default relative to the Countrywide PSA Trusts, no reasonable juror could find that BNYM had knowledge of any Event of Default relative to those Trusts.  Accordingly, BNYM's motion relative to the Countrywide PSA Trusts is GRANTED.

2. *ECR 2005-1, HELT 2007-FRE1, CWHEL 2005-H, and FNLC 2005-2*

Unlike the Countrywide PSA Trusts, the knowledge provisions applicable to the HELT 2007-FRE1, ECR 2005-1, CWHEL 2005-H, and FNLC 2005-2 Trusts state that the Trustee is not required to "take notice or be deemed to have notice or knowledge of any default" unless an "Authorized Officer of the Trustee . . . shall have received written notice thereof or an

---

[31]     Indeed, the parties themselves argued the prevention doctrine in connection with their discussion of the existence *vel non* of an Event of Default in the Trusts.  *See* Opp. 15–16; Reply 6–7.

Authorized Officer shall have actual knowledge thereof." Mot. 56.1 ¶ 11 (citing contractual

provisions); *see also* Hanchet Decl., Ex. G (same).

As with the Countrywide PSA Trusts, Plaintiffs have not adduced any evidence that

BNYM received written notices of Events of Default relative to HELT 2007-FRE1, ECR 2005-1,

CWHEL 2005-H, and FNLC 2005-2. Nor have Plaintiffs adduced any evidence of BNYM's

actual knowledge of any Event of Default for any of these trusts. Plaintiffs assert that there is

"ample evidence . . . demonstrating that both BNYM and the servicers received notice of

servicing breaches," Opp. 20, but the only loan-specific documents to which Plaintiffs point are

the Baupost, Walnut Place, and Litton Letters, which did not concern loans contained in any of

these four Trusts. *See* Opp. 22.[32] Therefore, Plaintiffs have adduced no evidence that BNYM

had actual knowledge or received written notice relative to any breaches or defaults in ECR

2005-1, HELT 2007-FRE1, CWHEL 2005-H, and FNLC 2005-2.

Because there is no evidence that BNYM received written notice or had actual

knowledge of any Event of Default relative to these four Trusts, BNYM was not subject to a

prudent person duty. Accordingly, BNYM's motion relative to these Trusts is GRANTED.

In sum, BNYM's motion is GRANTED relative to Plaintiffs' breach of contract claims

alleging that BNYM did not act prudently upon the occurrence of an Event of Default for the

Countrywide PSA Trusts,[33] ECR 2005-1, HELT 2007-FRE1, CWHEL 2005-H, and FNLC 2005-

---

[32]     Plaintiffs also cite to the "pervasive breaches" in the Countrywide Trusts, but Plaintiffs cannot rely at
summary judgment on evidence of pervasive breaches for the reasons discussed *supra*.

[33]     Plaintiffs cross-moved for summary judgment as to the Countrywide PSA Trusts. For all of the reasons
BNYM's motion for summary judgment is granted, the Plaintiffs' cross-motion is DENIED.

2, and BNYM's motion is DENIED relative to Plaintiffs' breach of contract claims relative to the Default Trusts.[34]

### III.    Plaintiffs' Negligence-Based Claims

Plaintiffs allege claims of negligence, gross negligence, and negligent misrepresentation. Plaintiffs allege that BNYM "failed to perform its responsibilities" under the GAs or performed them in a "grossly inadequate and negligent manner," TAC ¶ 395, and that BNYM negligently breached its duty to provide "complete, accurate and timely information regarding the mortgage loans and mortgage files" for the Trusts to Plaintiffs, TAC ¶ 402.  BNYM moves for summary judgment on these negligence-based claims, arguing that they are duplicative of Plaintiffs' breach-of-contract claims and are barred by New York's economic loss rule.  Mem. 21–22.  The Court agrees.

The economic loss doctrine bars a plaintiff from recovering damages by bringing a tort claim for an injury that "is primarily the result of economic injury for which a breach of contract claim is available."  *Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*, 172 F. Supp. 3d 700, 718–19 (S.D.N.Y. 2016).  Put differently, "a contracting party seeking only a benefit of the bargain recovery, viz., economic loss under the contract, may not sue in tort notwithstanding the use of familiar tort language in its pleadings."  *17 Vista Fee Assocs. v. Teachers Ins. & Annuity Ass'n of Am.*, 693 N.Y.S.2d 554, 559 (1st Dep't 1999).  Courts in this District have routinely

---

[34]    At the pleading stage, this Court dismissed Plaintiffs' cause of action for breach of implied duty of good faith "only as it pertains to any allegations prior to the time the Trustee became aware of an Event of Default." *Phoenix Light I*, 2015 WL 5710645, at *9.  In its motion for summary judgment, BNYM asserted in a footnote that summary judgment on "the breach of the implied covenant of good faith and fair dealing claims" was warranted "because they . . . are limited to the post-Event of Default period."  Mem. 4 n.3.

        In neither its opposition to BNYM's motion nor its own cross-motion do Plaintiffs argue their claims for breach of the covenant of good faith and fair dealing.  Because Plaintiffs have abandoned these claims, *see Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014), Plaintiffs' claims for breach of the implied covenant of good faith and fair dealing are DISMISSED.

dismissed tort claims that sound in breach of contract—that is, where "the injury and the manner in which the injury occurred and the damages sought persuade us that plaintiff's remedy lies in the enforcement of contract obligations." *Nat'l Credit Union Admin v. U.S. Bank Nat'l Ass'n*, No. 14-CV-9928 (KBF), 2016 WL 796850, at *11 (S.D.N.Y. Feb. 25, 2016) (internal quotation marks and citation omitted).

Plaintiffs seek only monetary damages for their negligence, gross negligence, and negligent misrepresentation claims. Mot. 56.1 ¶ 42.[35] But these negligence-based claims sound in breach of contract: the claims seek a remedy for Plaintiffs' economic injury arising from BNYM's purported breaches of its contractual obligations under the GAs. Because the GAs provide contractual remedies for those breaches, Plaintiffs' negligence-based claims are barred by the economic loss doctrine. *Royal Park I*, 109 F. Supp. 3d at 609 ("Because plaintiffs allege only monetary losses, without property damage or physical injury, the negligent misrepresentation claim is barred by New York's economic loss doctrine."); *see also Blackrock Core Bond Portfolio v. U.S. Bank Nat'l Assoc.*, 165 F. Supp. 3d 80, 106 (S.D.N.Y. 2016) (fiduciary duty claims barred by economic loss doctrine because plaintiffs alleged only damages and their "remedy lies in the enforcement of contract obligations" (citation omitted)).

Plaintiffs argue that the economic loss doctrine does not apply because BNYM "owed duties . . . separate from the duties set forth in the PSAs and the Indenture Agreements." Opp.

---

[35] In their counterstatement to BNYM's 56.1 statement, Plaintiffs "[d]isputed" BNYM's statement that "Plaintiffs have admitted that they allege solely economic, monetary losses." Mot. 56.1 ¶ 42. Plaintiffs asserted that they "also suffered injury because the certificates are a much riskier investment as a result of BNYM's breaches and because they have been deprived of fiduciary protections to which they are entitled." *Id.* Plaintiffs, however, cited no evidence from the record in support of that assertion, and Plaintiffs nowhere state (in either their counterstatement or briefs) that they are seeking non-monetary damages. *See* Opp. 24–25. On the other hand, BNYM adduces evidence that in Plaintiffs' initial disclosures, Plaintiffs disclosed only monetary damages claims in connection with Federal Rule of Civil Procedure 26's requirement that a party disclose "a computation of each category of damages . . . ." *See* Hanchet Decl., Ex. R at 4–5. Therefore, Plaintiffs fail to raise a genuine dispute of material fact relative to their damages claims.

25.    But other than *ipse dixit*, Plaintiffs cite no cases, make no arguments, and adduce no

evidence supporting their position that BNYM had extra-contractual duties.  *Phoenix Light II,*

cited by Plaintiffs, is distinguishable because the court held only that the tort claims could not be

dismissed on a motion to dismiss because the plaintiffs had made arguments supporting the tort

claims that were not duplicative of their breach of contract claim.  *Phoenix Light II*, 172 F. Supp.

3d at 719.  *Royal Park I,* also cited by Plaintiffs, does not support Plaintiffs' argument either.

*Royal Park I* held that the plaintiffs' negligence and negligence misrepresentation claims were

barred by the economic loss doctrine because the defendant-trustee did not have any extra-

contractual duties.  109 F. Supp. 3d at 609.

        Here, Plaintiffs have not made any tort-based arguments that are not duplicative of their

breach-of-contract arguments: prior to any Event of Default, BNYM had only contractual

obligations, *Phoenix Light I*, 2015 WL 5710645, at *9, and after any Event of Default, Plaintiffs'

arguments are only that BNYM did not act prudently, which is the contractual obligation

imposed by the GAs.  At summary judgment, Plaintiffs must adduce evidence showing that a

reasonable juror could find in their favor.  Because Plaintiffs have failed to adduce evidence

tending to prove that BNYM had extra-contractual duties that it breached, the Court GRANTS

BNYM's motion relative to Plaintiffs' negligence, gross negligence, and negligent

misrepresentation claims.

## IV.    TIA Claims

        Plaintiffs' only remaining TIA claims relate to the three Indenture Trusts (ECR 2005-1,

CWHEL 2005-H, and NHEL 2006-1).  *Phoenix Light I*, 2015 WL 5710645, at *9-10.  Plaintiffs

allege that BNYM violated TIA § 315(b) by failing to provide "notice of all defaults known to

the [T]rustee," 15 U.S.C. § 77ooo(b), and that BNYM violated TIA § 315(c) by failing to act

prudently upon the occurrence of a default, 15 U.S.C. § 77ooo(c). *See Phoenix Light I*, 2015 WL 5710645, at *10.

Although the Court would be warranted in not considering Defendant's motion for summary judgment as to the TIA § 315(c) claims,[36] BNYM's prudent-person duty under TIA § 315(c) rises and falls with BNYM's prudent-person duty under the GAs. TIA § 315(c) provides that the Indenture Trustee "shall exercise in case of default (as such term is defined in such indenture) such of the rights and powers vested in it by such indenture, and to use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs." 15 U.S.C. § 77ooo(c).

For the same reasons that BNYM was not subject to a prudent-person duty because it lacked knowledge, Plaintiffs' TIA § 315(c) claims cannot survive. *See PABF*, 907 F. Supp. 2d at 558 (dismissing TIA § 315(c) claim because the court's reasoning that the plaintiff had failed to adequately plead that the Trustee breached its contractual duty to act prudently "applies with equal force" to plaintiff's TIA § 315(c) claim); *see also Royal Park II*, 2016 WL 899320, at *9 (denying BNYM's motion to dismiss relative to plaintiff's TIA § 315(c) claim on the same

---

[36] BNYM did not adequately raise or advance TIA arguments in its motion for summary judgment. In its opening brief, BNYM included a conclusory assertion in a footnote that dismissal of the TIA claims relative to ECR 2005-1 and CWHEL 2005-H "is warranted . . . because any duties imposed by the TIA are limited to the post-Event of Default period." Mem. 4 n.3. Relative to NHEL 2006-1, BNYM again dropped only a footnote stating that its argument that BNYM had no obligation to act in the absence of indemnity "compels the dismissal" of Plaintiffs' TIA claims relative to NHEL 2006-1. Mem. 15 n.16. In response to Plaintiffs' argument that BNYM had "ignore[d] the TIA breaches in its Motion," Opp. 25, in its reply BNYM—again in a conclusory footnote—asserted that "the TIA claims relating to ECR 2005-1 or CWHEL 2005-2 should be dismissed because Plaintiffs cannot prove that BNYM was subject to a prudent person duty in either of these two trusts." Reply 3 n.4.

Courts have routinely declined to consider arguments mentioned only in a footnote on the grounds that those arguments are inadequately raised. *See, e.g.*, *United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993) ("We do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review."). "Merely mentioning or simply stating an issue" is "insufficient" because a litigant "must advance an argument," and courts "generally will decline to consider issues that are not sufficiently argued." *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 107 (2d Cir. 2012) (internal quotation marks and citation omitted).

grounds it denied BNYM's motion relative to plaintiff's breach of contract claim). Accordingly, for the reasons discussed *supra*, Defendant's motion for summary judgment on Plaintiffs' TIA § 315(c) claims is GRANTED as to ECR 2005-1 and CWHEL 2005-H and DENIED as to NHEL 2006-1.

As for Plaintiffs' TIA § 315(b) claims, BNYM did not make any TIA § 315(b) arguments in its reply brief as to any of the Trusts. Therefore, the Court deems BNYM to have abandoned its arguments relative to these claims, *see Galin v. Hamada*, No. 15-CV-6992 (JMF), 2016 WL 2733132, at *3 (S.D.N.Y. May 10, 2016), and DENIES BNYM's motion on Plaintiffs' TIA § 315(b) claims.[37]

### PLAINTIFFS' CROSS-MOTION

Plaintiffs cross-move for partial summary judgment relative to the Default Trusts and FNLC 2005-2 (collectively, "Cumulative Loss Trusts"), arguing that there is no genuine issue of material fact that: (i) there was an Event of Default because cumulative losses exceeded thresholds specified in the GAs and (ii) BNYM failed to act prudently in connection with the Cumulative Loss Trusts. Cross-Mem. 1–2.[38] Plaintiffs' cross-motion is largely repetitive of the arguments Plaintiffs made in opposition to BNYM's motion and is DENIED in its entirety for many of the reasons previously discussed.

In their cross-motion, Plaintiffs argue, as they did in opposing BNYM's motion, that BNYM failed to act prudently after the occurrence of Events of Default. Because there is a

---

[37] BNYM also did not make *any* TIA arguments in its reply brief as to NHEL 2006-1. Thus, the Court also may deem BNYM to have abandoned its arguments relative to Plaintiffs' TIA § 315(c) claim as to that Trust. Nevertheless, even if BNYM had not abandoned its TIA § 315(c) argument as to NHEL 2006-1, BNYM's motion for summary judgment on that claim would fail for the reasons discussed *supra*.

[38] Plaintiffs also cross-moved relative to the eleven Countrywide PSA Trusts, arguing that there was an Event of Default arising from Countrywide's failure to timely remove or repurchase loans with missing documentation and that BNYM failed to act prudently in connection with those Events of Default. Cross-Mem. 2–3. That cross-motion is denied. *See* note 33, *supra*.

genuine issue of material fact relative to whether BNYM acted prudently in connection with the Default Trusts, Plaintiffs' cross-motion relative to those Trusts is DENIED for the reasons discussed *supra* in connection with BNYM's motion.

Plaintiffs, however, also argue that they are entitled to summary judgment relative to FNLC 2005-2, which was not one of the Default Trusts, and have additional arguments relative to NHEL 2006-1, which was a Default Trust. The Court is not persuaded.

## I.  FNLC 2005-2

Plaintiffs argue that collateral losses exceeding certain thresholds in the FNLC 2005-2 PSA gave rise to a Servicer Event of Default in that Trust, triggering BNYM's prudent person duty. Cross-Mem. 8–9; Cross-Mot. 56.1 ¶ 25. But, as discussed *supra*, the PSA provides that the Trustee does not have knowledge of a Servicer Event of Default absent the Trustee's actual knowledge or receipt of written notice. Fread Decl., Ex. R § 11.1(c)(ii). BNYM offers a declaration from Loretta Lundberg, a Managing Director in the BNYM's Corporate Trust Division, that BNYM "has not received written notice of any material master servicer or servicer breach, nor has any Responsible Officer of BNYM reported actual knowledge of any material master servicer or servicer breach" for FNLC 2005-2, Lundberg Decl. ¶ 5.

Notwithstanding the Lundberg declaration, Plaintiffs argue that BNYM did have actual knowledge of a Servicer Event of Default and point in support to BNYM's Trustee report for FNLC 2005-2, dated October 27, 2008, indicated there had been a "Trigger Event." Cross-Mot. 56.1 ¶ 25 (citing Fitzgerald Decl., Ex. 155 at BNYM_PL_00076089). Although the same event might qualify as both a "Trigger Event" and a "Servicer Event of Default," the two are not the

same.[39]  When viewing the record in the light most favorable to BNYM, as the Court must on Plaintiffs' cross-motion, there is a genuine issue of material fact whether BNYM had actual knowledge of a Servicer Event of Default—especially in light of Ms. Lundberg's sworn declaration attesting that BNYM did not have actual knowledge and did not receive written notice of any material servicer breach.  Accordingly, Plaintiffs' cross-motion relative to FNLC 2005-2 is denied.

## II.  NHEL 2006-1

BNYM conceded that there was an Event of Default relative to NHEL 2006-1 (one of the Default Trusts) because NHEL 2006-1 became subject to federal income tax.  *See* Mot. 56.1 ¶ 18.  Plaintiffs cross-move relative to this Trust, alleging that there were also Servicing Defaults under the Sale and Servicing Agreement ("SSA") that triggered other Events of Default under the NHEL 2006-1 Indenture.  Cross-Mem. 8 n.6.  In particular, Plaintiffs argue that there were three other occurrences that gave rise to an Event of Default: (1) cumulative losses exceeded thresholds specified in the SSA, Cross-Mot. 56.1 ¶ 33; (2) the rolling 90-day delinquency percentage exceeded a specified threshold in the SSA, Cross-Mot. 56.1 ¶ 63; and (3)

---

[39]  The PSA provides that a Servicer Event of Default arises if "[t]he aggregate amount of cumulative Realized Losses incurred . . . exceeds the applicable percentages" set forth in FNLC 2005-2 PSA § 6.1(h).  Cross-Mot. 56.1 ¶ 24 (citing Fread Decl., Ex. R § 6.1(h) (FNLC 2005-2 PSA)).  A "Trigger Event," on the other hand, is: "[a]n event that is in effect on any Distribution Date on or after the Stepdown Date, if either (a) the Average Sixty-Day Delinquency Ratio equals or exceeds 30.50% of the Senior Enhancement Percentage on such Distribution Date or (b) Cumulative Realized Losses as a percentage of the sum of (i) the aggregate Scheduled Principal Balance of the Closing Date Mortgage Loans as of the Cut-off Date and (ii) the Pre-Funded Amount as of the Closing Date, exceeds the applicable percentages set forth" in the table included in the definition of "Trigger Event."  Fread Decl., Ex. R at 55.

Plaintiffs argue that the distinction between a "Trigger Event" and a "Servicer Event of Default" is "a red herring because the definition of 'Trigger Event' includes cumulative realized loss triggers similar to those provided for in § 6.1(h) and the record demonstrates they vastly exceeded the specified thresholds."  Reply Br. 5 & n.6.  But BNYM disputes that the Trigger Event resulted in a Servicer Event of Default and that BNYM had actual knowledge or written notice of a Servicer Event of Default.  Because the Court is required to view the evidence in the light most favorable to BNYM on Plaintiffs' cross-motion, BNYM's denial of knowledge forecloses Plaintiffs' motion relative to FNLC 2005-2.

the Trust's former servicer (NovaStar Mortgage Inc.) misappropriated trust funds, which gave rise to a Servicing Default under the SSA, Cross-Mot. 56.1 ¶¶ 73-75. BNYM disputes that these events resulted in Events of Default under the Indenture.

As Indenture Trustee, BNYM's prudent person obligation relative to NHEL 2006-1 was triggered only by BNYM's "actual knowledge" of an Event of Default arising under the Indenture. NHEL 2006-1 Indenture § 6.01. Plaintiffs fail to show that that there is no genuine issue of material fact whether BNYM had actual knowledge of any of the purported "Events of Default." In addition, the Indenture defines an "Event of Default" relative to certain breaches by the Issuing Entity (NovaStar Mortgage Funding Trust). *Id*. § 5.01. The events that Plaintiffs claim to be "Events of Default" under the Indenture refer to breaches of the SSA. Plaintiffs adduce no evidence showing—and BNYM disputes—that these breaches of the SSA resulted in Events of Default under the Indenture.[40] Therefore, Plaintiffs' cross-motion relative to NHEL 2006-1 is DENIED.[41]

---

[40] Plaintiffs asserts that this Court, in deciding the motion to dismiss, was "unpersuaded" by the argument that defaults under the SSA do not result in Events of Default "because the servicing breach resulted in a breach by the issuer under the indenture." Cross-Reply 6 (citing *Phoenix Light I*, 2015 WL 5710645, at *8-9). But the Court did not go so far; rather, the Court concluded that Plaintiffs stated a plausible claim because Plaintiffs alleged that a Servicer breach "triggered Events of Default under the Indenture." *Phoenix Light I*, 2015 WL 5710645, at *5 (citing First Amended Complaint ¶ 327 n.7). At summary judgment, Plaintiffs must adduce evidence showing that there is no genuine issue of material fact that defaults under the SSA gave rise to an Event of Default under the Indenture. Their failure to do so forecloses their motion for summary judgment on that ground.

[41] Plaintiffs also argue, in a conclusory footnote in their opening brief and in a single sentence in their reply brief, that BNYM violated TIA § 315(b) by failing to give notice of defaults and violated TIA § 315(c) by failing to act prudently upon the occurrence of Events of Default in NHEL 2006-1. Cross-Mot. 12 n.10; Cross-Reply 5. As discussed *supra*, note 36, the Court declines to consider an argument raised only in a footnote because that argument has not been adequately raised for the Court. The fact that Plaintiffs addressed their TIA claims in a single sentence (and not in a footnote) in their reply brief does not adequately raise the argument for the Court's consideration. *See Shah v. Wilco Sys., Inc.*, 76 F. App'x 383, 384 (2d Cir. 2003) ("An argument mentioned only in a footnote is not adequately raised" and cannot be resurrected in a reply brief.).

## CONCLUSION

For the foregoing reasons, Defendant's motion is GRANTED in part and DENIED in part, and Plaintiffs' cross-motion is DENIED in its entirety. The parties must appear for a status conference on **October 20, 2017, at 10:00 a.m.**, to reinstate the expert discovery schedule and to discuss whether fact discovery should be reopened relative to FNLC 2005-1. On or before **October 12, 2017**, the parties must submit a joint letter setting forth: (1) a description of all remaining claims in this case; (2) a proposed discovery schedule; (3) the prospect of settlement; and (4) any other matter that either party wishes to discuss.

The Clerk of the Court is respectfully directed to terminate Docket Entry Nos. 128, 159, and 180.

**SO ORDERED.**

Date: **September 7, 2017**
**New York, New York**

**VALERIE CAPRONI**
**United States District Judge**