# Exhibit A

HAKJPHOC                     Conference

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    PHOENIX LIGHT SF LIMITED,
     in its own right, et al.,
4
                  Plaintiffs,
5
              v.                        14 Civ. 10104 VEC
6
     THE BANK OF NEW YORK MELLON
7    CORPORATION, et al.,

8                 Defendants.

9    ------------------------------x

10

11                                      October 20, 2017
                                        10:08 a.m.
12

13

14

15   Before:

16                    HON. VALERIE E. CAPRONI,

17                                      District Judge

18

19

20

21

22

23

24

25

1           (In open court)

2           (Case called)

3           THE COURT:  It is so good to see you all again.  So I

4    have a pending motion for reconsideration, right?

5           MR. FITZGERALD:  Yes.

6           THE COURT:  Your motion for reconsideration is denied.

7           You have not identified any controlling authority or

8    data that I overlooked.  I understand you disagree with me.

9    The 17th floor may agree with you and disagree with me, but

10   you're going to have to wait on that.

11          MR. SCHATZ:  Thank you, your Honor.

12          THE COURT:  In your joint letter the parties raised

13   questions.  My incredibly detailed opinion was apparently not

14   clear to you guys, so in response to your Question 1 B 4 which

15   would be pre-event default based on a failure -- breach of

16   contract, pre-event of default, based on failure to provide

17   notice of representation and warranty breaches as to those four

18   trusts, the defendant's position is correct.  The claim is

19   limited to the loans that were identified.

20          That is also the question to Question 1 B 5, relative

21   to breach of contract based on failure to enforce repurchase

22   obligations as to four trusts, the same four trusts.  Again the

23   defendant is correct, the claim is limited to the identified

24   loans.

25          MR. SCHATZ:  Would you entertain a question about

1   that?

2                   THE COURT:  Sure.

3          MR. SCHATZ:  For two of those -- I understand it for

4   the ones, where only one loan was identified -- for two of

5   those letters, which is irrespective of hedge funds that look

6   at a huge sample of loans from larger ones and identified a

7   breach trade of 50 percent in one of the trusts and 66 percent

8   in the other, and said there are problems that are trust-wide,

9   systematic problems.  For those two trusts, it would seem to me

10  that if they were on notice, they were on notice of a duty to

11  inquire, further based upon that representation to them.

12              So to limit the claims as to just the identified loans

13  seems an artificial limitation, I would submit, particularly

14  based upon rulings by your fellow judges, and I understand

15  you're all independent and you all --

16          THE COURT:  Thank Goodness.

17          MR. SCHATZ:  Yeah, right.  Last night I saw the

18  president of the BNY M commission as well as yours.  It was

19  explained to me once.  For those two pools of loans, it seems

20  to me they were on notice and had a duty to inquire under

21  Pauley's, Judge Pauley's ruling and also under Judge Failla's

22  ruling and I think under the actual language of the trusts.

23          THE COURT:  The language of the trusts requires an

24  identification of breaches, right?

25          MR. SCHATZ:  Yes.

1    THE COURT:  They identified specific loans that were

2    in breach.

3    MR. SCHATZ:  Yes, but the identification carried with

4    it a suggestion and actually a statement if they look forward,

5    they would find more.

6    THE COURT:  It said that specifically?

7    MR. SCHATZ:  That I would have to look at the

8    exhibits.  I do have them here.

9    THE COURT:  That is okay.

10    MR. HOUPT:  Just briefly, the contract says that the

11    trustee shall have no duty to conduct any investigation.  That

12    is somewhere in Section 802.  The notice obligation under 203

13    is tied to the repurchase obligation which is loan-specific.

14    The court found we might have discovered loan specific

15    breaches.  If you look, you might find others.  That is on

16    specific discovery.

17    MR. SCHATZ:  The other point I would make is that

18    since your Honor ruled, Judge Wesley in the Second Circuit

19    ruled that, noted that the RMBS industry in the run-up to

20    crisis was a race to the bottom with inside parties trying to

21    downwardly define their obligations and duties.

22    THE COURT:  That was despicable, but the fact remains

23    that the contract is the contract.

24    MR. SCHATZ:  Yes, but the contract actually -- yes,

25    yes, and no.  The court's ruling which I understand the court

1    is adhering to was based on an expressly onerous argument in

2    one provision, it says actual knowledge and notice and the

3    other provides it says notice only; and, therefore, the court

4    and I think correctly used the canon, said therefore, the

5    parties meant to exclude actual knowledge.

6           But the race to the bottom thing, I think the way

7    these contracts were drafted, they're boilerplate contracts

8    that --

9           THE COURT:  Sort of.  They're all different in their

10   own little ways.

11          MR. SHATZ:  They are different and the reason they're

12   different it is like a game of telephone.  The contracts are

13   being dumbed-down in the closing and you'll see differences

14   between numerical tranches, 0A 11 and 10, you'll see

15   differences between them.

16          They don't make any sense.  They have been carried

17   across all the other contracts, and so there is ambiguities

18   inherent in all these contracts as a result of self-interested

19   parties downwardly defining their duties.

20          THE COURT:  And people buying the loans didn't do due

21   diligence and accepted all that.

22          MR. SCHATZ:  What did they do?  They made

23   recomendations under --

24          THE COURT:  This is a jury argument.

25          MR. SCHATZ:  I understand.

1          THE COURT:  I get your point.  I am dealing with the

2     contracts at this point, and the contract is the contract.

3          MR. SCHATZ:  Yes, I understand.

4          There are other rules of contract construction I think

5     that bear here.  One is contra-proffer -- the certificate

6     holders are the parties for whom these contracts are written.

7     Throughout these contracts it says for the benefit of the

8     certificate shoulders, but the certificate holders had no say

9     in how these contracts were written.  These parties had every

10    say in how these contracts were written.  For that reason, they

11    ought to be interpreted against them.  If there is any

12    ambiguity at all, it should create a jury argument.

13         I want to go back to this particular point.  The court

14    is saying that for these two loans, that -- two trusts, that

15    despite being on notice of a substantial systematic problem, a

16    written notice from a respected financial player, that there

17    was systematic problem throughout the trust, that only the ones

18    that were specifically identified are actionable, where we have

19    this recent ruling, again I will not play judge politics, but

20    just say the issue is can a party fail to get knowledge by

21    closing its eyes and going nah, nah, nah, nah, I don't see.

22    That is the issue that is being raised by these two notices.

23         They got a notice that showed a systematic problem,

24    and they did nothing.  I think that --

25         THE COURT:  I think they sent it on to the --

1         MR. HOUPT:  All the other parties to the contract.

2         THE COURT:  And no one did anything.

3         MR. HOUPT:  The seller apparently didn't agree with

4    those allegations and they didn't repurchase the loans.

5         MR. SCHATZ:  Again there is no enforcement mechanism

6    built into these contracts.  They were created in a way that

7    creates illusion of protection for certificate holders, but

8    provides none.

9         THE COURT:  I heard you.  No.  It is loan-by-loan.

10        I don't quite understand the problem you've run into

11   in the issue of re-underwriting and I have problems with both

12   of your positions.  Let's start with the plaintiff.  Why can't

13   the plaintiff identify now or the proposal is by November 15

14   the reasons that you want to re-underwrite?

15        MR. SCHATZ:  We have, in fact, identified --

16        THE COURT:  Why can't you be bound by a list that will

17   be produced by November 15th?

18        MR. SCHATZ:  For one reason.  Mr. Fitzgerald can help

19   me with this issue because he is more intimately involved.  I

20   believe it requires the input of our expert.

21        THE COURT:  This case was filed when I was a brand new

22   Judge.  I am now old and cranky.  Why haven't your experts

23   looked at these already?

24        MR. SCHATZ:  They have been looking at them.

25        THE COURT:  Mr. Fitzgerald, why can't you be bound by

1    the list by November 15th?

2              MR. FITZGERALD:  The main concern, we would like an

3    opportunity to address the court's ruling with respect to these

4    particular notices.  We would like to collect a few more of

5    these loan finals that were the subject of the notice and look

6    at them.

7              THE COURT:  How long is that going to take?

8              MR. FITZGERALD:  Probably take a few months.

9              THE COURT:  Why?

10             MR. FITZGERALD:  It takes -- we can --

11             THE COURT:  You have got all this stuff.

12             MR. FITZGERALD:  We are relying on a third party to

13   turn them over.  First we need to seek your permission to go

14   and ask the seller for the loan file.  Then they need to go and

15   get them.  I am estimating that will be a 30-day process.

16             THE COURT:  I am sorry.  The identified loans that are

17   in the letter you have had for two years if not more.  I don't

18   understand.  Are you serious that you don't have all these loan

19   files yet?

20             MR. FITZGERALD:  Well, the seller would not produce

21   all of them.  Understandably, there would have been hundreds of

22   thousands, so we had --

23             THE COURT:  There wasn't hundreds of thousands on the

24   list, was there?

25             MR. HOUPT:  Not in the letters.

1          MR. FITZGERALD:  We have everything on the list.

2          We would like the opportunity to request a few more

3    loan files to address this aspect of the court's ruling.

4    Discovery has been closed for a while so we haven't been able

5    to do this.  It wouldn't take that long to get them, but

6    particularly if the seller agreed to do so quickly, but we are

7    at their mercy to some extent, and they will have to identify

8    the loans in their possession.

9          We tried to mitigate the burden on them by

10   requesting -- it was a few thousand.  I don't have the number

11   right in front of me, but there are a few more that we would

12   like to request and to get it to address this aspect of the

13   court's ruling.

14         THE COURT:  Are you going to re-underwrite those?

15         MR. FITZGERALD:  Yes, if we can get them.

16         THE COURT:  You still haven't answered my question why

17   you can't be bound by a list that you can create by November

18   15th?

19         MR. FITZGERALD:  By November 15th?

20         THE COURT:  Correct.

21         MR. FITZGERALD:  By early December would be more

22   realistic.

23         THE COURT:  Why is it going to take a month and a

24   half?

25         MR. FITZGERALD:  Because we will have a bit of

1    back-and-forth as to what we can get.

2              THE COURT:  You can do it by December 1?

3              MR. FITZGERALD:  I think we can commit to that.

4              THE COURT:  Okay.  Assuming the plaintiff identifies

5    the loans that are going to be re-underwritten by December the

6    1st, why is an extended deadline for expert rebuttal

7    re-underwriting and damage reports necessary?

8              MR. HOUPT:  So we have done this a few times already

9    including with plaintiff's firm.  In the case we just finished

10   in Ohio, their expert testified he took 22 months to

11   re-underwrite 3100 loans.  We did not have a very reasonable

12   rebuttal schedule, and we are -- our expert had to hire extra

13   staff and work 18 hours a day, and he managed to get it done in

14   five months.

15             This case is a little more complicated because whereas

16   that one had one originator, this one has 15 originators, and

17   they told us they think it will take 9 months to go through the

18   volume of loans that plaintiffs proposed.  As you just were

19   discussing, we can start that process if we at least get the

20   identities of the loans, we can start arranging those files and

21   matching them up with applicable underwriting guidelines, can

22   do that before we get the report and that will cut some time

23   off the schedule.

24             The other reason we proposed --

25             THE COURT:  Hang on a second.  Being generous, that

1    would take you to September the 1st of next year.

2              MR. HOUPT:  Well --

3              THE COURT:  Because you're going to -- they'll

4    identify the loans by December 1.  You say it will take 9

5    months to underwrite, and I am assuming there is a month for

6    frumping around.

7              MR. HOUPT:  We can start if we have the sample, but we

8    don't have the report, and our experts tell us they can spent

9    four to eight weeks productively in that span, but we need to

10   get their report to see what breaches they're alleging, and

11   that is when the actual re-underwriting will take place.

12             THE COURT:  Okay.  Does that sound reasonable?

13             MR. FITZGERALD:  It seems a little bit protracted.

14   There is going to be much fewer loans than in the case that

15   counsel referenced.

16             THE COURT:  How many loans are there going to be?

17             MR. FITZGERALD:  We estimate right now about 1500 at

18   the most.

19             THE COURT:  How many were there in how?

20             MR. HOUPT:  Exactly the number.  In that case they

21   reviewed 3100.  They alleged breaches on half of them and that

22   is what we had to do.  We just did response on ones they

23   alleged breaches.

24             THE COURT:  It is the same amount.

25             MR. FITZGERALD:  We reviewed 3,000 in that case.  He

1    is saying they just reviewed the breaching ones.  I don't know

2    what the defect rates are.

3         THE COURT:  Your theory is you will review 1500.

4    Assuming there is 50 percent default rate, they will only have

5    to look at 750.

6         MR. HOUPT:  If we knew in advance what the breach rate

7    would be, we could propose a shorter schedule.  In some of

8    these cases plaintiffs allege 99 percent breach rates.

9         MR. SCHATZ:  It IS quite --

10         MR. FITZGERALD:  I do think the number of loans will

11    be much lower that they need to review, but we can't tell you

12    exactly what they will be.

13         THE COURT:  Let's come back to that and talk about the

14    trust that BNYM did not know what they were doing on; that is,

15    they didn't know they were the master servicer or at least

16    their lawyers didn't know.  That is FNLC 2005-1.  Why does it

17    not make sense for you all to agree to sever that trust and put

18    it on its own schedule?

19         MR. SCHATZ:  Well, we think that it requires -- that

20    would result in two cases.  It would be an increase --

21         THE COURT:  That is true.

22         MR. SCHATZ:  -- in work on the court.  We think it can

23    be fit into the current schedule without any real harm to

24    anybody.  The discovery will be quite limited and focused.  The

25    issues, the same parties --

1          THE COURT:  But it is a different obligation.

2          MR. SCHATZ:  It is.  One issue that they raised was

3     prejudice, but that can be dealt with jury instructions.  The

4     court certainly can deal with that.

5          THE COURT:  I am not sure I would try them together

6     because they're so different.

7          MR. SCHATZ:  Are they?

8          The issue, the fundamental issue is the failure to

9     abide by the standards in the contracts.  That is an

10    understandable issue.  The thing is there will be extra

11    discovery in this case anyway related to the collateral

12    managers, and so we were thinking we would just fold in our

13    discovery which is going to be -- we just need the servicing

14    files which they have not given us and then we would target,

15    have targeted search terms to run and a couple of depositions.

16    Their proposition is to have bifurcated -- not just bifurcated

17    discovery, but bifurcated motion practice.

18         THE COURT:  I am not inclined to do that.  Given I am

19    not inclined to do that, does it make sense, does it

20    nevertheless make sense to sever that trust out?

21         MR. ANCONE:  We think it does make sense.  As you

22    pointed out, it is a separate case, separate witnesses and

23    discovery.

24         THE COURT:  Is it a separate group in the bank?

25         MR. ANCONE:  It is there.  There is a firewall between

1   corporate trust, which was the group that dealt with all the

2   trusts at issue and summary judgment breaching, and the master

3   servicing group deals with this particular trust.

4            THE COURT:  You're not going to agree to severance?

5            MR. SCHATZ:  I don't think it is a necessary expense

6   for you and us.

7            THE COURT:  Thank you so much for looking after my

8   schedule.

9            MR. SCHATZ:  I do care.

10            THE COURT:  I appreciate that.  Your motion to sever

11   is due on November 15.  Your response is due November 29th.  Do

12   you want more time than that because that is over Thanksgiving?

13            MR. SCHATZ:  I think that would be prudent.

14            THE COURT:  Your response is due December the 4th.

15   Any reply is due December 11th.  It looks like you need

16   additional discovery for third parties?

17            MR. SCHATZ:  Limited.  Again Ms. Glazer can handle

18   that.

19            THE COURT:  Is this fact discovery on -- not on this

20   trust, not on 2005-1.  On the other trusts, the ones for whom

21   fact discovery is closed or for which?

22            MS. GLAZER:  If your Honor is referencing Point 1 in

23   the additional matters?

24            THE COURT:  Yes.

25            MS. GLAZER:  So that is what Mr. Fitzgerald is

1    speaking about previously.  We would just request your

2    permission to seek a small number of additional loan files to

3    the extent we don't already have them from third parties during

4    this time period.

5            MR. SCHATZ:  That was based on the court's ruling, the

6    need for them?

7            MS. GLAZER:  Yes.

8            MR. FITZGERALD:  One other thing, we wanted to confirm

9    with Bank of New York Mellon there is not any additional

10   evidence suggesting the document exceptions were cured that

11   relates to the Regae B related contract claim.  We were just

12   concerned documents were produced during the summary judgment

13   briefing.  We wanted to avoid any big surprises going forward.

14           If they can confirm if there was any evidence of cures

15   of document exceptions, they produced that already.  We

16   wouldn't need discovery discovery on that point, but we would

17   like additional discovery if they can't confirm that.

18           THE COURT:  Can you confirm that?

19           MR. HOUPT:  I need to check what we produced, but

20   there were additional exception reports that were created.

21   Either we have them or we will produce them.  If what

22   Mr. Fitzgerald means by that is to know whether the delivery

23   exception has been cured as of today, we have to look in the

24   warehouse today and see what is there.  They never asked for

25   that.

HAKJPHOC                    Conference

1          MR. FITZGERALD:  Your Honor, what I am referring to is

2     what I think Mr. Houpt referred to.  There are these things

3     called trailing exception reports, and they produced a number

4     of them.

5          THE COURT:  Trailing exception reports?

6          MR. FITZGERALD:  Yes.  That is what we refer to them

7     as.  Sometimes they're saved as that.  We have not seen those

8     for all trusts, so if they exist, we would like them.

9          THE COURT:  Did you request them before?

10          MR. FITZGERALD:  Sure.

11          MR. SCHATZ:  It is just a matter we don't want to get

12     sandbagged.

13          THE COURT:  I am sympathetic.  What about the loan

14     files, is there any objection to them serving third-party

15     discovery to get these additional loan files?

16          MR. HOUPT:  No.  We don't have those documents.

17          THE COURT:  I understand that.

18          MR. HOUPT:  They're welcome to serve.

19          THE COURT:  You can do that, but you've got to get it

20     done because your deadline is December 1st to have a list of

21     the loans you're going to re-underwrite.

22          Then you refer to something -- what is the issue with

23     the depositions of the collateral managers?

24          MR. SCHATZ:  No issue.  It is a non-issue.

25          THE COURT:  Perfect.  Non-issue, it is a non-issue.

1            Do I care?

2            MR. SCHATZ:  No.  You can help us maybe.

3            THE COURT:  Oh.

4            MR. SCHATZ:  The court issued an order.  We agreed to

5    produce the depositions, but we didn't represent the deponents,

6    and they had third-party counsel, and we thought as a matter of

7    prudence we should obtain their consent because they're marked,

8    "Confidential."  I think we produced 5 of the 11 that exist.

9    So there are six more.  If the court orders us to produce them

10   notwithstanding any confidentiality designations, we can do it

11   tomorrow.

12           THE COURT:  I ordered you to produce them a whole long

13   time ago.  What happened?

14           MS. GLAZER:  Your Honor, when you had ordered us to

15   produce them last July, there were no deposition transcripts of

16   collateral managers.  There were a few depositions taken in our

17   actions of collateral managers this year.  Discovery was

18   stayed, and at the time that you had ordered us to produce

19   them, we didn't know whether we would represent the collateral

20   managers or not.

21           We didn't end up representing any of them, so what we

22   had told Bank of New York Mellon's counsel is that we would

23   like, we think we are required to seek the permission of the

24   third-party counsel before producing the transcripts and we

25   have been working to do so.

1        THE COURT:  Do that quickly, please.

2        MR. ANCONE:  If I may, your Honor.

3        You're right, the order came down last year and I

4   understand at that point there were no transcripts available.

5   We have been meeting and conferring.  If I could, I think maybe

6   having a date certain --

7        THE COURT:  I am about to set one.  They should be

8   produced by November 15th.  If any lawyer won't consent, let me

9   know.

10       MR. SCHATZ:  Okay.

11       MS. GLAZER:  Thank you.

12       THE COURT:  That brings us to the schedule.

13       So your schedules were actually for the most part one

14  day apart.  That led me to believe why you bothered fighting

15  over a single day.

16       MR. ANCONE:  We didn't fight over that.  It is just a

17  convenience issue, not having deadlines on Friday or Monday.

18       THE COURT:  Okay.  So you're moving Monday deadlines

19  to Tuesday?

20       MR. ANCONE:  Things like that, right.

21       THE COURT:  Or Friday to Thursday?  Exactly, moving

22  them back?

23       MR. ANCONE:  Exactly.

24       THE COURT:  That seems like a nice thing for

25  associates.  So the real dispute, I am going to go with the

1    associate-friendly schedule of no Fridays or Mondays.  So that

2    takes us to this issue of the rebuttal underwriting reports,

3    correct?

4              MR. HOUPT:  I think that is right.

5              THE COURT:  You've pushed it all the way out to

6    January 2019.

7              MR. HOUPT:  We have proposed that their report would

8    be due at the end of April, and then we would have I think that

9    is nine months after that to serve.

10             THE COURT:  That just seems excessive.

11             MR. HOUPT:  It is certainly longer than expert

12   discovery in most cases I have been involved in, but what the

13   expert has to do here is go through thousands of files, each of

14   which contains dozens of documents, and come up with a

15   single -- it is time consuming.  We will crack the whip, but

16   that is what our experts told us we needed.

17             THE COURT:  Maybe they need an extra expert.  I will

18   give you until the end of September.  So September 28th for

19   your rebuttal expert report.

20             MR. SCHATZ:  Your Honor, our proposal didn't have this

21   bifurcated expert discovery, and they've got two kinds of

22   expert discovery.  One is the -- why is that?

23             THE COURT:  This is limited entirely to the loan

24   re-underwriting.

25             MR. FITZGERALD:  Yes.

HAKJPHOC                    Conference

1          THE COURT:  That is all it is.  Your April 26 deadline

2     is the deadline for all expert reports other than

3     re-underwriting reports, okay, which they can't do until they

4     get your report.  Does that solve your problem, your objection?

5          MR. SCHATZ:  They still have a summary judgment motion

6     before they do any of their underwriting.  Our schedule --

7          THE COURT:  No.  If their deadline is September 28th,

8     the deadline for summary judgment is November 1.

9          MR. SCHATZ:  I see you've moved the date up, okay.

10          THE COURT:  Does that solve your problem?  Your

11     schedule -- (multiple voices) --

12          MR. SCHATZ:  You're the judge.  I thought our schedule

13     was more concrete.

14          THE COURT:  It is more compact, but it doesn't deal

15     with their problem, which is they can't really do their

16     underwriting report until they see what you're beefing about.

17     So your deadline is September 28th.  Then there will be a

18     rebuttal to that, right?  How long do you need for that?  You

19     asked for a month.

20          MR. SCHATZ:  Is that adequate?

21          MR. FITZGERALD:  45 days.

22          THE COURT:  You asked for less than a month.

23          MR. FITZGERALD:  Fine.

24          MR. SCHATZ:  But they got longer.  I want to make sure

25     we don't end up getting the short end of the schedule.

HAKJPHOC                    Conference

1            THE COURT:  I am confident that you will not.  So

2    their report is due September 28th.  Then yours will be due

3    October 26th.  That is going to squeeze you on summary

4    judgment.

5            MR. HOUPT:  Maybe everyone else understands but me.  I

6    thought what we agreed on was there would be one set of reports

7    by whichever party has the burden of proof on that issue and

8    that will be served in April.

9            MR. FITZGERALD:  Yes.

10            MR. HOUPT:  Then there will be one rebuttal report by

11    whichever party --

12            THE COURT:  Is rebutting.

13            MR. HOUPT:  This seems to contemplate they do

14    re-underwriting, we do a response, and they do another

15    re-underwriting report.

16            THE COURT:  What is the February 21 deadline in your

17    schedule?

18            MR. HOUPT:  That was our effort because we knew the

19    re-underwriting was taking a long time.  We would serve the

20    re-underwriting report as soon as possible, but then the

21    damages report -- and this will be true on both sides -- the

22    damages expert needs to know what, at least what the breach

23    rate is and possibly what specific loans the re-underwriting

24    expert found in breach.

25            Rather than setting a deadline all the way up when the

HAKJPHOC                    Conference

1   damages expert would be done, we serve the re-underwriting

2   report as soon as it is ready and start with depositions, and

3   then the damages expert would have another three or four weeks

4   to finish that work.  If they wanted to do that on their end as

5   well, that would be fine.  They would serve everything, their

6   damages report would come later because that would depend on

7   other reports.

8           THE COURT:  Is that agreeable?  Work together.  Send

9   me a schedule to be so ordered, okay?

10          That is everything I've got, I think.  Are the parties

11  interested in talking settlement?

12          MR. SCHATZ:  My view is it is never a problem to talk

13  settlement, but we did broach the subject together, and I

14  believe it is not something --

15          THE COURT:  Not close enough yet?

16          MR. HOUPT:  No.

17          MR. SCHATZ:  We are not, no, we're not.

18          THE COURT:  Okay.  So be it.

19          MR. HOUPT:  One other question.  We didn't put this in

20  the letter, but you may know some of the other judges have

21  wanted preliminary briefing and rulings on whether sampling is

22  appropriate.  We don't really care what the order is, but if

23  you want to do that sooner, we could set a schedule for that.

24          THE COURT:  Are you going to be doing sampling?

25          MR. FITZGERALD:  We may in a few trusts.  We haven't

HAKJPHOC                          Conference

1  decided finally yet.

2              THE COURT:  I will tell you what.  If that is where

3  you land, that you're going to do sampling, how about sending

4  me a letter to that effect, and that will tee up the issue for

5  discussion at that point.

6              MR. FITZGERALD:  Just notifying you that we will --

7              THE COURT:  Just notifying that is what you would like

8  to do.

9              MR. FITZGERALD:  Not briefing it?

10              THE COURT:  Not briefing it and I'll set up a briefing

11  schedule.  What I want to do, if you are going to do sampling,

12  talk to your opponent, explain what your sampling methodology

13  is so they can make an intelligent decision to object.

14              MR. FITZGERALD:  Sampling in the context of loan file

15  re-underwriting?

16              THE COURT:  Right.  Is there any other sampling you're

17  planning to do?

18              MR. FITZGERALD:  Not sitting here today, but we may.

19              THE COURT:  If it changes, stay in touch.

20              MR. FITZGERALD:  We may.

21              THE COURT:  Anything further?

22              MR. HOUPT:  No.

23              MR. SCHATZ:  No.

24              THE COURT:  Have a nice weekend.

25              (Court adjourned)