

VIA ECF

The Honorable Valerie E. Caproni
United States District Court
Southern District of New York
40 Foley Square, Room 240
New York, New York  10007

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:   4/13/2020
```

Re:   *Phoenix Light SF Ltd., et al. v. The Bank of New York Mellon Corp.*,
      Case No. 14-cv-10104 (S.D.N.Y.)

Dear Judge Caproni:

Pursuant to the Court's March 20, 2020, Opinion and Order (ECF No. 337), Plaintiffs Phoenix Light SF Limited, et al. ("Plaintiffs") and Defendant The Bank of New York Mellon ("BNYM") (together, the "Parties") respectfully submit this joint letter to address (1) issues to be raised in the Parties' contemplated motions for summary judgment, (2) a proposed schedule for the Parties' contemplated motions for summary judgment, and (3) a proposed schedule for trial in the event the Court denies the Parties leave to move for summary judgment.

**I.   ISSUES TO BE RAISED IN THE PARTIES' CONTEMPLATED MOTIONS FOR SUMMARY JUDGMENT**

**BNYM's Position:**

BNYM requests the opportunity to file a summary judgment motion addressing the discrete issues set forth below. The contemplated motion has the potential to eliminate or substantially narrow the issues remaining in this case.

**A.   Standing**

1.   Issue

Plaintiffs lack standing because, as Judge Broderick held on March 18, 2020, they received these claims through a champertous assignment. *See Phoenix Light SF Limited v. U.S. Bank National Association*, 2020 WL 1285783 (S.D.N.Y. Mar. 18, 2020). Judiciary Law § 489 "restricts individuals and companies from purchasing or taking an assignment of notes or other securities with the intent and for the purpose of bringing an action or proceeding thereon." *Justinian Capital SPC v. WestLB AG*, 28 N.Y.3d 160, 166 (2016) (internal quotation marks omitted).

Judge Broderick's decision—issued just weeks ago—was decided on facts materially identical to those presented here. The *U.S. Bank* case involved many of the same plaintiff-entities as in this case,[1] the same original owners of the securities, and the same assignments. Judge Broderick ruled that plaintiffs lacked Article III standing because these assignments were entered for the express purpose of defending standing in cases that already had been brought against the

---

[1] The only exceptions are Blue Heron Funding V Ltd and Silver Elms CDO PL, which are not plaintiffs in the U.S. Bank case.  They are, however, similarly situated on this issue.

April 3, 2020
Page 2

RMBS trustees. Plaintiffs had previously assigned title to the underlying RMBS certificates, and in the subsequent "reassignment" back to Plaintiffs, Plaintiffs did not receive an assignment of any rights other than litigation claims. Thus, there is no argument that the assignment served any purpose other than pursuing litigation.

Finally, even though challenges to standing cannot be waived throughout the pendency of a litigation, in its Third Affirmative Defense, BNYM asserted that Plaintiffs lacked standing and did not waive this affirmative defense. ECF No. 157 at 73.

      2.    Effect on Case

A ruling that Plaintiffs lack standing would end the case.

**B.**    **Effect of Countrywide Settlement**

      1.    Issue

In 2011, BNYM, as RMBS trustee, entered into a settlement agreement on behalf of certificate holders in 530 Countrywide trusts, including the Countrywide trusts in this case. The settlement agreement required Countrywide and/or Bank of America to pay a total of $8.5 billion, to be distributed to certificate holders like Plaintiffs. In exchange, BNYM agreed to release certain claims against Countrywide and Bank of America, including (as relevant here) claims arising from, (i) Countrywide's breaches of representations and warranties relating to the origination, sale, and delivery of mortgage loans held by the trusts, including obligations arising in any way from or under Section 2.03 of the PSAs; (ii) the alleged flaws in the documentation of the mortgage loans held by the trusts—including defective, incomplete, or non-existent documentation; and (iii) Countrywide's servicing of the loans. The settlement released <u>all</u> of the claims that Plaintiffs now contend BNYM should have prosecuted on the Countrywide Trusts.

The settlement was conditioned on court approval. In June 2011, BNYM filed a proceeding in New York Supreme Court and notified holders in the trusts through a court-approved, worldwide notice program. After months of discovery, the court held a 36-day trial and issued a 54-page decision. Following an appeal, the settlement was approved "in all respects." The Appellate Division wrote that "it would have been unreasonable to decline to enter into the settlement with the expectation of obtaining a much greater judgment after years of litigation, while knowing that attempts to enforce such a judgment would likely result in the actual collection of a lesser sum than that offered in the proposed settlement." *In re BNYM*, 4 N.Y.S.3d 204, 208 (N.Y. App. Div. 2015).

Res judicata and preclusion bar Plaintiffs' claims (i) that BNYM was obligated to pursue additional or alternative remedies from Countrywide, and (ii) that BNYM could have generated *more* money for Plaintiff and other holders by not entering the settlement, which the New York Appellate Division found that "it would have been unreasonable not to enter into."

April 3, 2020
Page 3

        2.      Effect on Case

A ruling in BNYM's favor would dispose of all of Plaintiffs' remaining claims relating to the six Countrywide trusts.

    **C.**    **Existence of Duty to Enforce Repurchase**

        1.      Issue

The Court expressly declined to address in its summary judgment decision whether BNYM has a duty to enforce repurchase of allegedly breaching loans. ECF 201 at 22. The trustee's pre-Event of Default duties are limited to those "specifically set forth" in the contracts (§ 8.01), and the contracts specify no such a duty. In fact, the Governing Agreements affirmatively disclaim any such duty, even after an Event of Default and even if the trustee becomes the Master Servicer. *See* Section 3.04 ("Trustee shall not be . . . obligated to effectuate repurchases or substitutions of Mortgage Loans under this Agreement . . ."). Surely the trustee has no such duty in the *absence* of an Event of Default, as alleged here.

Plaintiffs urge the Court to infer the duty from section 2.06 ("Execution and Delivery of Certificates"), which requires the trustee "to hold the Trust Fund and exercise the rights referred to above for the benefit of all present and future Holders of the Certificates and to perform the duties set forth in this Agreement, . . . to the end that the interests of the Holders of the Certificates may be adequately and effectively protected." *See* Pl. Opp. to BNYM MSJ (ECF 177) at 21. As courts have found, however, this contractual language does not impose any specific duty to enforce repurchase obligations. It "delineates that the trustee holds the trust fund for the benefit of the investors rather than for the trustee's own benefit or the benefit of any other party to the PSA." *W. & S. Life Ins. Co. v. BNYM*, 2019 WL 495581, at *5 (Ohio Ct. App. Feb. 8, 2019) (concluding that §2.06 "does not clearly set out the detail required to impose a duty on BNYM"); *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 189 (S.D.N.Y. 2011) (Sullivan, J.) ("provision [that] states that the Trustee (1) 'will hold the Trust Estate in trust for the benefit of the Owners' and (2) '. . . shall enforce the obligations and rights of the other parties to this Agreement'" was "subject to a right of indemnification"; dismissing enforcement claim on the pleadings); *ASR Levensverzekering v. Breithorn ABS*, 958 N.Y.S.2d 380, 381 (N.Y. App. Div. 2013) ("the 'for the benefit of' language . . . refers solely to the issuer's assignment of its rights in the CDS to defendant . . . as indenture trustee"); *CFIP Master Fund, Ltd. v. Citibank N.A.*, 738 F. Supp. 2d 450, 472-73 (S.D.N.Y. 2010) (same "for the benefit of" language; "while certain provisions of the trust agreement do require the Trustee to 'administer' or 'enforce' the Term Asset and the rights of the Trustee under the swap for the Fund's benefit, it does not follow that the Trustee should be charged with a generalized duty to advance the Fund's economic interests in any manner other than with respect to the narrowly circumscribed responsibilities identified in the trust agreement.").

If BNYM's duties included the obligation to require Countrywide to substitute or repurchase mortgage loans, those duties would have had to have been specifically set forth in the

April 3, 2020
Page 4

PSA. And they are not. The Governing Agreements do not—either explicitly or implicitly—require BNYM to enforce repurchase claims.

    2.    Effect on Case

If the Court were to agree with BNYM's interpretation that there is no duty to enforce, Plaintiffs' pre-Event of Default claims arising from the alleged failure to enforce the repurchase of any loan, either due to an alleged breach of a representation and warranty or document defect, would be dismissed.

### D.    Regulation AB and Trust Indenture Act Claims

    1.    Issue

Plaintiffs claim that BNYM's annual Regulation AB ("Reg AB") certifications stated that all documents relating to all loans backing the Countrywide Trusts had been delivered and were in proper form, and that those disclosures violated the Governing Agreements, which Plaintiffs argue required BNYM to disclose alleged defects in the mortgage file documentation. However, that is not what the Government Agreements or Reg AB require.

No provision of the Governing Documents requires the trustee to disclose mortgage file exceptions—in its Reg AB attestations or otherwise. Therefore, there is no basis for a contract claim based on BNYM's alleged failure to do so in its Reg AB attestations. Nor can such a claim be derived from Reg AB itself, which does not provide for a private right of action. Even if it did, Reg AB does not obligate the trustee to attest that mortgage documents have been delivered by other parties. Plaintiffs speculate that this duty arises from the following Reg AB disclosure item: "[c]ollateral or security on pool assets is maintained as required by the transaction agreements or related pool asset documents" and that "[p]ool assets and related documents are safeguarded as required by the transaction agreements" 17 C.F.R. § 229.1122(d)(4)(i) and (ii)). But nothing in that language (or in the Governing Agreements) requires BNYM to review, scrutinize, or correct the Reg AB disclosures of <u>other</u> parties who were responsible for delivering the mortgage files. BNYM accurately certified its own compliance, which is all that Reg AB required.

Moreover, even if BNYM had a duty to disclose the sellers' failure to deliver documents, there is no admissible evidence that such disclosure would have had any effect. The Court has excluded Mark Adelson's "surmise and conjecture" that the market would have applied pressure on the sellers to repurchase offending loans." ECF 337 at 17.

As to the claim under Section 315(b) of the Trust Indenture Act on ECR 2005-1, the Court ruled that BNYM had not addressed that claim on its prior motion, but it found, in addressing the contract claim, that "…Plaintiffs have adduced no evidence that BNYM had actual knowledge or received written notice relative to any breaches or defaults in ECR 2005-1." ECF 201 at 35. Because the Section 315(b) claim depends on knowledge of a "default," that claim should be dismissed as well.

April 3, 2020
Page 5

If the Court were to grant this part of the motion, all document defect claims (including all claims on CWALT 2006-OA6, CWALT 2006-OA11, CWL 2006-4, CWL 2006-9, and CWL 2006-14) would be dismissed. If the Court were to dismiss the TIA claim, all claims on ECR 2005-1 would be dismissed.

### E. Breaches Not Identified in the Baupost Letter

#### 1. Issue

The Court limited the pre-Event of Default claims to breaches of representations and warranties that there is evidence that BNYM "discovered." Here, the universe of potentially actionable breaches are those detailed in an August 3, 2010 letter from Baupost, which identified 1,765 breaches in 536 loans in the CWALT 2006-OA3 trust. Bitner alleges that 154 of the loans he re-underwrote had material breaches (within the subset of 196 loans that he examined). But only 22 of the material breaches identified by Bitner were also identified in the Baupost letter.

The Court already ruled on summary judgment that there is no evidence that BNYM discovered breaches that were not mentioned in the Baupost letter. Section 2.03(c) of the PSAs refers to the "discover[y] of a breach *of any representation and warranty* made with respect to a Mortgage Loan." (Emphasis added.) One of the Seller's remedies is to "cure such breach." *Id.* Thus, evidence that BNYM was notified that a loan violated, for example, the "representation and warranty" about owner-occupancy does not support a claim that BNYM "discover[ed] a breach of [the separate] representation and warranty" about, say, the borrower's FICO score.

Plaintiffs' inability to substantiate over 99% of Baupost's allegations also means that the Baupost letter cannot support any coherent theory of "discovery." The jury cannot find that, upon receipt of the letter, BNYM discovered all 1,765 breaches alleged in the letter, because there is no evidence that 99% of those allegations were true. Neither could the jury find that BNYM "discovered" the 22 breaches upon which Baupost and Bitner agree, because BNYM had no way, upon receiving the Baupost letter, to distinguish those allegations from the other 1,743 that Bitner could not substantiate.[2] In short, Bitner's work confirms that the Baupost letter was totally unreliable and did not cause discovery of anything—Baupost alleged breaches in more than one third of the loans in the trust, and even a highly-motivated plaintiff's expert could confirm only a tiny handful.

#### 2. Effect on Case

A ruling in BNYM's favor on this issue would eliminate Plaintiffs' pre-Event of Default representation and warranty claims with respect to CWALT 2006-OA3 and the need for testimony and evidence on loan re-underwriting.

---

[2] It is equally incoherent to argue that BNYM had a duty, which attached upon "discovery" of a breach, to investigate whether the breach (that it supposedly already discovered) had even occurred.

**Plaintiffs' Position:**

Plaintiffs did not interpret the Court's request for a proposed schedule as an invitation to set forth a detailed recitation of the Parties' summary judgment positions. With the exception of the new champerty argument, the bases for BNYM's contemplated motion have already been explained at length in correspondence with the court (ECF No. 287) and at oral argument on March 9, 2020. Below Plaintiffs address BNYM's previously undisclosed champerty argument and request permission to file their own summary judgment motion on this issue. To the extent the Court is inclined to consider BNYM's pre-argument of the other four issues for its proposed motion, we address that pre-argument briefly below.

*Champerty/lack of standing.*

More than five years have passed since the filing of this action and BNYM has not previously asserted that the ancient legal doctrine of champerty operates to divest Plaintiffs of standing to bring claims. BNYM did not mention the doctrine of champerty in its prior summary judgment motion or in the many submissions seeking permission to file another summary judgment motion. As BNYM admits, it seeks to assert the defense now because the court dismissed claims in *Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n* based on the court's conclusion that certain assignments to Plaintiffs violated champerty. 2020 WL 1285783, at *1 (S.D.N.Y. Mar. 18, 2020) ("*US Bank*"). But unlike BNYM, the Defendants in that action actually asserted the affirmative defense of champerty. *Id.* at 11 ("Champerty is an affirmative defense for which the defendant bears the burden of proof."). BNYM's operative answer does not assert the affirmative defense of champerty, which precludes a motion based on that affirmative defense now. ECF No. 196.

BNYM is a sophisticated financial institution represented by counsel that is very familiar with the creation and administration of investment vehicles such as Plaintiffs. Its failure to previously assert the defense of champerty or argue lack of standing was not accidental. The Plaintiffs exist to own securities and issue notes to their investors backed by the payments received by the securities they own. When BNYM (as RMBS trustee) failed to address defaults that occurred in connection with the underlying RMBS, the Plaintiffs suffered harm because they held the beneficial interest in such securities and had less funds to pay expenses and distribute to investors as a result. BNYM's affiliate, Bank of New York Trust Company, is also the indenture trustee for Plaintiffs Blue Heron Funding V Ltd., Blue Heron Funding VI Ltd., C-BASS CBO XVII Ltd., and C-BASS CBO XIV Ltd. It drafted the assignments that the court found champertous in *US Bank*. Because the assignments were drafted by BNYM's affiliate to allow it to steer clear of litigation against itself and other RMBS trustees, it is clear that BNYM does not seriously believe that the transactions at issue were champertous.

Although BNYM asserts that the issues litigated in *US Bank* were "materially identical" it concedes that they were not identical. To the extent that there is overlap, Plaintiffs submit that the court in *US Bank* made numerous errors that will either lead the court to reconsider its decision or to a reversal on appeal. For example, the court misread binding authority from the New York Court

of Appeals holding that an investment vehicle (there a trust acting through its master servicer) can take an assignment to pursue a claim because of the proprietary interest the trust had in the securities backing its own notes or certificates issued to investors. *Trust For the Certificate Holders of Merrill Lynch Mortg. Inv'rs, Inc. v. Love Funding Corp.*, 13 N.Y.3d 190, 196, 202 (2009). The *Phoenix Light v. US Bank* court further misread decisions in this District that unambiguously hold that investment vehicles, such as the CDOs here, have Article III standing to pursue claims.[3] The *US Bank* court also mistakenly concluded that the relevant indentures did not include language that was in the indenture at issue in *Hildene Capital Mgmt., LLC v. Bank of N.Y. Mellon*, 963 N.Y.S.2d 38, 40 (App. Div. 2013) where the First Department found that a similarly structured investment vehicle retained an ownership interest in the assets backing its notes. *US Bank,* 2020 WL 1285783, at *14. This mistake was significant; in fact, the same language was present in the relevant agreements that were part of the record and the court simply overlooked that language. The court in *US Bank* similarly overlooked numerous other relevant contractual provisions and the fundamental nature of securitization transactions.

To the extent that BNYM intends to assert a defense based on lack of Article III standing in this action, Plaintiffs agree that it should be litigated now through a summary judgment motion. Plaintiffs request permission to file their own affirmative motion because there is no genuine issue of material fact that Plaintiffs have standing to sue, BNYM waived any champerty defense, and, in any event, the assignments at issue were not champertous.

*The four bases disclosed during oral argument*.

Plaintiffs will not rehash all the many reasons why BNYM's remaining summary judgment arguments are not compelling. In sum,

- *Res judicata* -- Judge Failla rejected the very argument BNYM wishes to present to this Court in *PacLife v. BNYM* noting that the plaintiffs' claims "were not extinguished by the Countrywide Settlement, and the damages sought are distinct from those for which Plaintiffs have recovered" in connection with the settlement. *Pacific Life Ins. Co., et al. v. The Bank of New York Mellon*, 2018 WL 1382105, at * 12 (S.D.N.Y. Mar 16, 2018). Other courts have reached the same conclusion. *See In re Bank of New York Mellon*, 2014 WL 1057187 at *6 n.5, at *20 (N.Y. Sup. Ct. Jan. 31, 2014) (adopting only a subset of findings proposed by BNYM and excluding the proposed finding that certificateholder claims against BNYM were barred). And the trial court in an Ohio action frequently cited by BNYM also rejected BNYM's arguments concerning the preclusive effect of the settlement. *Western and Southern Life Ins. Co. v. The Bank of New York Mellon*, 2017 WL 3392856, at *6 (Ohio Com.Pl. Aug. 04, 2017) ("I can find nothing where the defendant has

---

[3] *Compare US Bank,* 2020 WL 1285783, at *14 n. 24 *to House of Europe Funding I Ltd. v. Wells Fargo Bank*, 2015 WL 5190432, at *7 (S.D.N.Y. Sept. 4, 2015) (holding that investment vehicle had Article III standing because "the issuer of a collateralized debt obligation, can be 'injured by actions that adversely affect the underlying assets'"); *House of Europe Funding I, Ltd. v. Wells Fargo Bank, N.A.*, 2014 WL 1383703, at *11 (S.D.N.Y. Mar. 31, 2014) ("CDO issuer . . . owns the underlying assets and is therefore injured by actions that adversely affect the underlying assets."); *accord FDIC v. Bank of New York Mellon,* 15-cv-06560-ALC, ECF No. 68 at 6 (S.D.N.Y. July 10, 2017).

April 3, 2020
Page 8

> paid for bad acts alleged to have been committed by it. I have never seen a document releasing the defendant from any liability from its actions as trustee in these trusts. The money in the settlement was paid by Bank of America not the defendant.").

- *Duty to enforce* -- The court in *Royal Park Inv. SA/NV v. Deutsche Bank Nat'l Trust Co.* interpreted language substantively identical to Section 2.06 of the CWALT 2006-OA3 pooling and servicing agreement and held that it was created to enforce the responsible party's obligation to repurchase loans. 2016 WL 439020, at *4 (S.D.N.Y. Feb. 3, 2016).

- *Regulation AB disclosures* -- Section 11.07 of the Countrywide pooling and servicing agreements requires BNYM to submit annual certifications and assessments of compliance with servicing criteria. BNYM was responsible for certifying that "[c]ollateral or security on pool assets is maintained as required by the transaction agreements or related pool asset documents." 17 C.F.R. § 229.1122(d)(4)(i). "The servicing criterion in Item 1122(d)(4)(i) requires an assessment of whether the mortgage and related documents, rather than the physical properties underlying the mortgages, are maintained as required by the transaction agreements or related pool asset documents." Regulation AB and Related Rules, 2005 WL 4156732, at *4. This means the attesting party must "verify that the mechanics of performing the loan perfection or loan defeasance prescribed in the transaction agreements or related pool asset documents have been performed." *Id.* Although BNYM argues it need not disclose document defects, Plaintiffs have shown that BNYM did disclose some categories of document exceptions in these annual statements. And Plaintiffs are not required to introduce expert evidence relating to the impact that an accurate disclosure would have had.

- *The Baupost letter breaches*. The Baupost letter states: "Our investigation confirms that at least 536 of those loans did not comply with the representations and warranties that Countrywide made about them in the PSA and that those breaches materially and adversely affect the value of the interests of Certificateholders." ECF No. 146-18, at 2. Plaintiffs' loan underwriting expert, Richard Bitner, was able to confirm that statement for 80% of the 196 loans he reviewed.[4] BNYM appears to argue that summary judgment is appropriate because Mr. Bitner found additional types of breaches that were not expressly described in the Baupost letter. But that is not surprising because Mr. Bitner had access to the loan file – Baupost did not. Baupost provided examples of breaches in its letter that it was able to identify from publicly available materials and suggested that it could describe others if given access to the file. The Court previously held that this letter was sufficient to create a genuine issue of material fact as to discovery of breaches. ECF No. 201 at 18.

---

[4] Mr. Bitner limited his review to 196 loans in Loan Group 2 that were identified in the Baupost OA3 Letter because the remaining loans identified in the letter were in Loan Group 1, a group that does not back Plaintiffs' certificates.

April 3, 2020
Page 9

## II.    PROPOSED SCHEDULE FOR THE PARTIES' CONTEMPLATED MOTIONS FOR SUMMARY JUDGMENT

BNYM is prepared to submit its contemplated motion for summary judgment within five weeks, and has proposed this schedule to Plaintiffs. Plaintiffs have raised logistical concerns regarding their ability to respond to the contemplated motion in five weeks, given that counsel is unlikely to have access to their offices due to COVID-19 restrictions. BNYM is sensitive to this concern, and willing to accommodate a slightly more relaxed briefing schedule, to the extent that this schedule is acceptable to the Court. The Parties thus propose the following briefing schedule for both BNYM's motion and Plaintiffs' motion:

- Opening Brief: June 4, 2020

- Opposition: July 31, 2020

- Reply: August 27, 2020

BNYM also requests additional pages for its motion beyond what is permitted in this Court's Individual Rules of Practice. Specifically BNYM requests five additional pages for its opening brief and two additional pages on reply. Plaintiffs consent to this if they are permitted five additional pages for their opposition brief. This would result in opening and opposition briefs of 30 pages and a 12 page reply.

## III.    PROPOSED TRIAL SCHEDULE IN THE EVENT THE COURT DENIES BNYM LEAVE TO MOVE FOR SUMMARY JUDGMENT

If the Court declines to allow a second motion for summary judgment, the Parties agree that, given the current uncertainties related to the COVID-19 pandemic, the earliest realistic date for trial in this action is early next year. Accordingly, the Parties propose February 16, 2021 as the first day of trial. The Parties believe that the trial will last approximately two-and-a-half weeks.

The Parties hope that extending the schedule to allow for trial to begin in early 2021 will allow the Parties to ensure that the current restrictions have been lifted and witnesses will be able to travel to appear in person for the trial. Additionally, this will allow the Parties sufficient time to comply with the pretrial requirements in Your Honor's individual practices and provide the court with sufficient time to consider motions *in Limine*. To that end, the Parties propose the following schedule, which provides interim deadlines in accordance with Your Honor's practices:

- Motions *in Limine*:
  - Moving Papers Due:       October 7, 2020
  - Opposition Papers Due:    November 4, 2020
  - Reply Papers Due:         December 2, 2020

April 3, 2020
Page 10

- Joint Pretrial Order Due:         January 21, 2021
- Trial Exhibits Due:               January 21, 2021
- Final Pretrial Conference:        January 27, 2021
- First Day of Trial:               February 16, 2021


*/s/ Steven S. Fitzgerald*                    */s/ Matthew D. Ingber*
WOLLMUTH MAHER & DEUTSCH LLP                  MAYER BROWN LLP
*Attorneys for Plaintiffs*                    *Attorneys for BNYM*

cc: Counsel of Record (via ECF)


Application GRANTED to file a motion for summary judgment as to (i) the duty to enforce, (ii) the Regulation AB, and (iii) the Baupost letters issues.  The parties' proposed briefing schedule is adopted.  The parties must comply with the page limit requirements of the undersigned's Individual Rules.

As to the issue of champerty, Defendant must show cause in a single-spaced letter no more than three pages why it has not waived that issue by failing to explicitly assert it as an affirmative defense.  Defendant's letter is due no later than **April 17, 2020**.  Plaintiffs may respond with a letter abiding by the same restrictions no later than **April 22, 2020**.

The Court also notes for Plaintiffs that they must respond to Defendant's motion for reconsideration (*see* Dkt. 339) according to Local Rule 6.3.

SO ORDERED.

*[signature]*  4/13/2020

HON. VALERIE CAPRONI
UNITED STATES DISTRICT JUDGE