UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PHOENIX LIGHT SF LIMITED, in its own right and the right of BLUE HERON FUNDING V LTD., BLUE HERON FUNDING VI LTD., BLUE HERON FUNDING VII LTD., KLEROS PREFERRED FUNDING V PLC, SILVER ELMS CDO PLC, SILVER ELMS CDO II LIMITED, C-BASS CBO XVII LTD. and C-BASS CBO XIV LTD., and each of BLUE HERON FUNDING V LTD., BLUE HERON FUNDING VI LTD., BLUE HERON FUNDING VII LTD., KLEROS PREFERRED FUNDING V PLC, SILVER ELMS CDO PLC and SILVER ELMS CDO II LIMITED, C-BASS CBO XVII LTD and C-BASS CBO XIV LTD. in their own right,<br><br>                    Plaintiffs,<br><br>          v.<br><br>THE BANK OF NEW YORK MELLON, as Trustee,<br><br>                    Defendant. | Case No. 14-cv-10104-VEC |

## MEMORANDUM OF LAW IN SUPPORT OF THE BANK OF NEW YORK MELLON'S MOTION FOR SUMMARY JUDGMENT

MAYER BROWN LLP
Matthew D. Ingber
Christopher J. Houpt
Silvia A. Babikian Pacia
Robert W. Hamburg
1221 Avenue of the Americas
New York, New York 10020
(212) 506-2500

*Attorneys for Defendant*
*The Bank of New York Mellon*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ..................................................................................................................... 2

ARGUMENT .......................................................................................................................... 3

     Legal Standard .................................................................................................................. 3

I.     PLAINTIFFS' LOAN REUNDERWRITING COMPELS SUMMARY
     JUDGMENT ON PLAINTIFFS' CWALT 2006-OA3 CONTRACT CLAIM. ................ 3

     A.    The Court Already Ruled That There Is No Evidence That BNYM
          Discovered Breaches That Are Not in the Baupost Letter. ................................... 5

     B.    There Is No Evidence That BNYM Discovered Any Breaches Alleged in
          the Baupost Letter, Including the 23 That Bitner Defends. ................................ 8

II.    BNYM HAD NO DUTY TO ENFORCE REPURCHASES. ......................................... 11

III.   THE REGULATION AB CLAIMS SHOULD BE DISMISSED. .................................. 15

     A.    Plaintiffs Abandoned Any Pre-Event of Default Mortgage File Claims. ........... 16

     B.    Claims Relating to Mortgage File Delivery Are Time-Barred. .......................... 16

     C.    Claims Based on Regulation AB Assertions Are Unsupported. ......................... 17

     D.    There Is No Admissible Evidence of Causation. ................................................ 19

IV.   THE TIA CLAIM SHOULD BE DISMISSED. ............................................................. 21

CONCLUSION .................................................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Argonaut P'ship v. Bankers Trustee Co.*,
   2001 WL 585519 (S.D.N.Y. May 30, 2001) ..........................................................12

*ASR Levensverzekering v. Breithorn ABS*,
   958 N.Y.S.2d 380 (N.Y. App. Div. 2013) ..............................................................13

*Blackrock Allocation Target Shares v. Wells Fargo Bank Nat'l Assoc.*,
   2017 WL 953550 (S.D.N.Y. Mar. 10, 2017) ............................................................7

*CFIP Master Fund, Ltd. v. Citibank N.A.*,
   738 F. Supp. 2d 450 (S.D.N.Y. 2010) ....................................................................13

*Craig v. Bank of New York*,
   2002 WL 154389 (S.D.N.Y. July 12, 2002) ...........................................................14

*Cruden v. Bank of New York*,
   957 F.2d 961 (2d Cir. 1992).....................................................................................21

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*,
   837 F. Supp. 2d 162 (S.D.N.Y. 2011).....................................................................13

*Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.*,
   838 F.2d 66 (2d Cir. 1988)................................................................................11, 12

*LaSalle Bank N.A. v. Capco Am. Sec'n Corp.*,
   2005 WL 3046292 (S.D.N.Y. Nov. 14, 2005) ........................................................18

*In re Lehman Bros. Sec. & ERISA Litig.*,
   131 F. Supp. 3d 241 (S.D.N.Y. 2015)........................................................................3

*Magten Asset Mgmt. Corp. v. Bank of New York*,
   15 Misc. 3d 1332(A) (N.Y. Sup. Ct. 2007).............................................................14

*Policemen's Annuity and Benefit Fund of City of Chicago v. Bank of Am., N.A.*,
   907 F. Supp. 2d 536 (S.D.N.Y. 2012).....................................................................14

*Royal Park Invs. SA/NV v. BNYM*,
   2019 WL 652841 (S.D.N.Y. Feb. 15, 2019) ...........................................................10

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*,
   2018 WL 4682220 (S.D.N.Y. Sept. 28, 2018).........................................................10

## TABLE OF AUTHORITIES

### (continued)

Page

*Royal Park Invs. SA/NV v. HSBC Bank N.A. (Royal Park II)*,
    2017 WL 945099 (S.D.N.Y. Mar. 10, 2017) ...........................................................................10

*Royal Park Invs. SA/NV v. HSBC Bank USA, N.A.*,
    109 F. Supp. 3d 587 (S.D.N.Y. 2015)......................................................................................17

*Royal Park Invs. SA/NV v. HSBC Bank USA N.A.*,
    2018 U.S. Dist. LEXIS 31157 (S.D.N.Y. Feb. 23, 2018)..........................................................7

*VNB Realty, Inc. v. U.S. Bank, N.A.*,
    2014 WL 1628441 (D.N.J. Apr. 23, 2014) ..............................................................................13

*W & S Life Ins. Co. v. BNYM*,
    129 N.E.3d 1085 (Ohio App. 1st Dist. 2019) ...............................................................12, 13, 14

*Williams v. Cont'l Stock Transfer & Tr. Co.*,
    1 F. Supp. 2d 836 (N.D. Ill. 1998) ....................................................................................18, 19

**Statutes**

15 U.S.C. § 77ooo(b) ......................................................................................................................21

**Other Authorities**

17 C.F.R. § 229.1122 .......................................................................................................................17

Fed. R. Civ. P. 56 ..............................................................................................................................3

https://www.merriam-webster.com/dictionary/discover....................................................................9

N.Y. CPLR 213 ................................................................................................................................17

Regulation AB and Related Rules,
    2005 WL 4156732 ....................................................................................................................18

## PRELIMINARY STATEMENT

In its prior summary judgment decision, the Court substantially streamlined the case and, in particular, expert discovery. This motion, based in part on the expert discovery that followed that ruling, explains why Plaintiffs' residual claims predicated on loan reunderwriting, as well as Regulation AB and the Trust Indenture Act, should be dismissed. First, for almost 95% of the underwriting breaches Plaintiffs allege in CWALT 2006-OA3, expert discovery has uncovered no evidence of any breach. In its prior summary judgment Order, the Court dismissed claims insofar as they were tied to breaches not alleged in the Baupost Letter. Only 23 of the 454 breaches that Plaintiffs' expert identifies fit that standard. Further, the lack of any significant overlap between the letter and the admissible evidence of breach by Countrywide also illustrates why, at this stage of the case, the unsubstantiated allegations in the Baupost letter cannot stand in for "discovery" by the Trustee. At this stage, "discovery" can mean only one thing—there is evidence that a breach actually occurred and the "discovering party" actually knew about it—and the record shows that the Baupost letter cannot be relied on to establish that.

Even if BNYM discovered breaches, both express contract terms and case law confirm that, where the contracts say nothing about enforcing repurchase obligations, the trustee has no such duty. In fact, the Countrywide contracts here say that the trustee is not obliged to enforce repurchase even if the trustee becomes the master servicer after an Event of Default. There is no basis for implying such a duty into the PSAs.

The Regulation AB ("Reg AB") claim is a variant of the contract claim that Plaintiffs abandoned in order to avoid dismissal based on the statute of limitations. The Reg AB claim is also untimely, and it misstates the disclosures that BNYM was required to make. But most plainly, there is no evidence that different Reg AB disclosures would have avoided any of

Plaintiffs' losses, as the Court already ruled that there is no factual basis for inferring that such disclosures would have had any effect on the sponsors.

The Trust Indenture Act (§ 315(b)) claim is that BNYM failed to provide notice of a "default *known to the trustee*." But the Court has already held that "Plaintiffs have adduced no evidence that BNYM had actual knowledge or received written notice relative to any breaches or defaults in ECR 2005-1." ECF No. 201 at 35. Because the predicate default in this trust does not exist, Plaintiffs' Trust Indenture Act claim must also be dismissed.

## <u>BACKGROUND</u>

The relevant background is set forth in this Court's first summary judgment order and supplemented by BNYM's statement of undisputed facts.

The remaining claims are as follows:

- Breach of contract claims (Count II) based upon an alleged failure to furnish accurate Regulation AB ("Reg AB") certifications with respect to six Countrywide trusts (CWALT 2006-OA11, CWALT 2006-OA3, CWALT 2006-OA6, CWL 2006-4, CWL 2006-9, and CWL 2006-14);

- Post-Event of Default ("EoD") breach of contract claims (Count II) for three CBASS trusts (CBASS 2005-CB4, CBASS 2005-CB8, and CBASS 2006-CB3);

- A Trust Indenture Act ("TIA") § 315(b) claim (Count I) for ECR 2005-1;

- A pre-EoD breach of contract claim (Count II) based upon an alleged failure by BNYM to provide notice of representation and warranty breaches for 536 loans in CWALT 2006-OA3; and

- A pre-EoD breach of contract claim (Count II) based upon an alleged failure to enforce repurchase obligations with respect to 536 loans in CWALT 2006-OA3.

From December 2017 until February 2019, the parties engaged in and completed expert discovery. In June 2019, both parties moved to exclude the others' expert opinions. Following oral argument, the Court granted in part and denied in part each parties' *Daubert* motions. *See* Houpt Decl., Ex. 5; ECF Nos. 336 & 337. Additionally, the Court allowed BNYM to file a

second summary judgment on the following grounds: (i) BNYM never discovered the 454 alleged breaches of representations and warranties listed in their expert report; (ii) BNYM had no obligation to enforce repurchase obligations; and (iii) BNYM did not violate Regulation AB or the Trust Indenture Act. *See* ECF No. 341.

## ARGUMENT

### *Legal Standard*

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "The moving party must demonstrate the absence of any genuine issue of material fact." *In re Lehman Bros. Sec. & ERISA Litig.*, 131 F. Supp. 3d 241, 249 (S.D.N.Y. 2015). If it does, then "the non-moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Id.*

## I.   PLAINTIFFS' LOAN REUNDERWRITING COMPELS SUMMARY JUDGMENT ON PLAINTIFFS' CWALT 2006-OA3 CONTRACT CLAIM.

In an August 3, 2010 letter (the "Baupost Letter"), Baupost asserted that 536 loans in CWALT 2006-OA3 were subject to breaches of 1,765 representations and warranties pertaining to loan-to-value ratios and owner-occupancy status. Fread Decl., Ex. L. Plaintiffs' expert, Richard Bitner, performed a complete reunderwriting of 196 of the 536 loans, which the letter alleged were subject to 654 breaches. (He did no analysis of the remaining 340 loans and 1,111 alleged breaches.) Of those 196 loans, all of them from Loan Group 1, Bitner claims to have found 454 breaches on 156 of them, and no breaches on the remaining loans. ECF No. 337 at 10. But only 23[1] of the breaches identified in Bitner's report had been alleged in the Baupost Letter. Bitner did not confirm Baupost's other 631 (out of 654) breach allegations for the 196 loans, and

---

[1]  These 23 individual breaches were identified in 22 total loans. Houpt Decl., Ex 3 at ¶ 71, Ex. 3.

the additional 431 breaches that he did identify were mentioned nowhere in the Baupost letter. Figure 1 below breaks out the number of loans and breaches considered by both the Baupost letter and Bitner.[2]

**Figure 1:**

|  | Loans reviewed | Loans with breaches | Number of breaches |
|---|---|---|---|
| Baupost (whole trust) | 937 | 536 | 1,765 |
| Baupost (loan group I) | N/A | 196 | 654 |
| Bitner (loan group I) | 196 | 156 | 454 |
| Overlap between Baupost and Bitner on loan group I | 196 | 156 | 23 |
|  |  |  | 5.07% |

Figure 2 demonstrates the minimal overlap between the breaches Bitner identified and the breaches alleged in the Baupost letter.

**Figure 2:**



Thus, while both Baupost and Bitner allege high breach rates, they agree on hardly any specific breaches. These are not "slightly different breach[es]," as Plaintiffs have suggested. Houpt Decl., Ex. 5, at 218:10. Baupost alleged breaches of only two types of representations out

---

[2]  Bitner chose to reunderwrite loans only from Loan Group 1.

of 56 in the PSA—those relating to appraised values and owner-occupancy. Fread Decl., Ex. L. Bitner found breaches relating to, for example, missing hazard insurance or employment status, topics that were never mentioned in the Baupost letter. Houpt Decl., Ex. 2, at 33-35, 46-47.

That has two implications for the case. First, 431 of Bitner's breaches are no different from any other breach that was not in the Baupost Letter—the Court already ruled that there is no evidence that BNYM discovered them. ECF No. 201 at 14 ("Although allegations of the Trustee's generalized knowledge of breaches may be sufficient at the pleadings stage, by summary judgment or trial the plaintiffs must present evidence that proves a specific breach of a representation or warranty as to any loan or trust for which plaintiffs allege there was a breach.") (internal citations omitted). For those 431, there is no evidence of discovery.

Second, the mismatch between the breaches alleged in the Baupost Letter and those identified in Bitner's reunderwriting exercise makes it impossible to consider BNYM's receipt of the Baupost letter a "discovery" of breaches. Plaintiffs offer no evidence to substantiate 1,742 of the 1,765 (over 98%) of the breaches alleged by Baupost. If anything, Bitner's partial review confirms that the vast majority of Baupost's allegations (over 96% in the loans Bitner reviewed) were wrong. On this record, no reasonable jury could find that the Baupost letter is evidence that BNYM "discovered" the breaches identified in the letter: the jury would have to find either that BNYM "discovered" breaches that never existed, or that BNYM somehow should have been able to identify the 1% of "actual" breaches before it was under any duty to investigate.

A.    **The Court Already Ruled That There Is No Evidence That BNYM Discovered Breaches That Are Not in the Baupost Letter.**

In 2017, the Court dismissed Plaintiffs' claims to the extent that they could "adduce no evidence of BNYM's knowledge of any specific breach of any representation or warranty relative to any particular loan." ECF No. 201 at 13. The Court reasoned that "[t]he [contracts]

provide that any duty by the Trustee to provide notice of a breach of a representation or warranty is triggered by the Trustee's 'discovery' of that breach." *Id.* at 11. That conclusion was based on the language of Section 2.03(c), which states that "[u]pon discovery . . . of a breach of a representation or warranty with respect to a Mortgage Loan . . . that materially and adversely affects the interests of the Certificateholders in that Mortgage Loan, the party discovering such breach shall give prompt notice thereof to the other parties." Quoted at *id.*

Applying that standard, the Court found that "BNYM did not 'discover' a breach of any representation or warranty for sixteen Trusts" and dismissed all loan-underwriting claims on those trusts. ECF No. 201 at 11. As to four other trusts, the Court cited "scant" evidence in the form of letters that had alleged breaches of particular representations made as to particular loans. *Id.* at 16 (Baupost Letter referred to "representations and warranties related to loan-to-value ratios, appraisal values, and occupancy status"); *id.* at 17 (Litton letter alleging that one loan "was in breach of the representation and warranty that each loan was 'secured by a valid and enforceable first lien'"); *id.* at 17-18 (another Litton letter alleging that one loan "was in breach of Countrywide's representation and warranty that the loan was 'free and clear of any pledge, lien, encumbrance or security interest'"). It concluded that "a reasonable juror could find that the letters identified loan-specific breaches of representations and warranties." *Id.* at 18-19. The Court also found that "[a] reasonable juror could find that the breaches of Countrywide's representations or warranties related to loan-to-value ratios, appraisal values, and occupancy status, discussed in the Baupost and Walnut Place Letters," were material. *Id.* at 19; *see also id.* at 19-20 (same as to Litton letters, citing the specific representations identified by Litton).

In that discussion, the Court consistently referred to the relevant "discovery" as being that of "a breach of a representation or warranty," which, not coincidentally, is exactly what Section

2.03(c) says. The Court recognized that the corresponding duty is to provide notice "thereof" (*i.e.*, of the breach of representation that was discovered by BNYM), so that Countrywide may cure "such breach." Fread Decl., Ex. D at § 2.03(c). Never did the Court suggest that the discovery that a loan is subject to *one* false representation means that the Trustee is obligated to notify Countrywide of every *other* false representation that could have been made as to that loan. And the Court certainly did not say that an *incorrect* allegation that one representation was false causes the Trustee to discover that different representations actually were false.

That conclusion is consistent with those of other courts. *See, e.g.*, *Blackrock Allocation Target Shares v. Wells Fargo Bank Nat'l Assoc.*, 2017 WL 953550 at *5 (S.D.N.Y. Mar. 10, 2017) (Netburn, M.J.) ("The elements of [repurchase claims based on section 2.03 of the PSA] require establishing loan-specific proof related to a *particular defect*, *that defect* was material to the value of the loan, that [the trustee] failed to act with respect to the loan-specific remedies available *for a particular defect*, and that such failure caused the plaintiffs harm.") (emphases added), adopted in relevant part, No. 14-cv-9371(KPF), 2017 WL 3610511, at *9 (S.D.N.Y. Aug. 21, 2017) (trustee cannot undertake the contractually required measures under section 2.03 of a similar PSA "without *knowing of a specific defect*, in a specific loan, in a specific trust") (emphasis added); *Royal Park Invs. SA/NV v. HSBC Bank USA N.A.*, 2018 U.S. Dist. LEXIS 31157, at *36 (S.D.N.Y. Feb. 23, 2018) ("The trustee cannot provide [section 2.03] notice to the seller without knowing the specific defective document or the *specific R&W breach*.") (emphasis added).

Accordingly, claims that BNYM breached Section 2.03(c) of the PSAs by failing to provide notice (or take whatever other action Plaintiffs contend was required) upon "discovery" of breaches by Countrywide should be dismissed as to breaches of representations that were not

mentioned in the Baupost Letter, and evidence of such breaches should be excluded at any trial of this matter.[3]

**B.      There Is No Evidence That BNYM Discovered *Any* Breaches Alleged in the Baupost Letter, Including the 23 That Bitner Defends.**

Even Plaintiffs seem to agree that Baupost's blunderbuss allegations were unreliable—while Baupost claimed 1,765 breaches, covering more than half of the loans that it reviewed (Fread Decl., Ex. L), the jury would hear evidence substantiating only 23 of them. Bitner's inability to substantiate the vast majority of those allegations also means that the Baupost Letter cannot prove "discovery" of anything, including the 23 overlapping breach allegations; Plaintiffs' own evidence underscores the incoherence of any interpretation of discovery short of actual knowledge.

The Court already found the letter to be "scant" evidence, even when it was bound to assume that Plaintiffs would adduce evidence to substantiate all of Baupost's allegations. Instead, the evidence will show that even a highly-paid plaintiffs'-side reunderwriting expert could confirm only 3.5% of the allegations that he reviewed.

No jury could find that BNYM discovered all 1,765 breaches, *including* the 23 that overlap with Bitner's findings, because there will be no evidence that more than 1,700 were even breaches. This record is a good illustration of why "discovery" in this context must require both (a) an actual breach of representation and (b) actual knowledge of that breach by the discovering party.

1. Regardless of what *state of mind* is necessary for "discovery," one cannot discover a breach that is not there. That is clear from dictionary definitions and ordinary usage—we do not speak of Columbus "discovering" a new route to India, even if he believed that he did. *See, e.g.,*

---

[3] Plaintiffs have already dropped these claims as to the two loans in the Litton letters. *See* ECF No. 236.

Merriam-Webster's online dictionary, defining "discover" as "(1) to make known or visible" and "(2) to obtain sight or knowledge of for the first time." *See* https://www.merriam-webster.com/dictionary/discover, last accessed June 3, 2020.

It is also clear from Section 2.03(c), which leads straight from "discovery," to a mandatory notice by the discovering party, to a mandatory remedy by the Seller. "*Upon* discovery," the discovering party "*shall* give prompt notice." Fread Decl., Ex. D at § 2.03(c) (emphasis added). The Seller then "shall cure . . . [or] repurchase the affected Mortgage Loan." *Id.* Neither the duty to notify nor the duty to remedy requires confirmation or verification of the breach.[4] This means that if the PSAs contemplate "discovery" of breaches that are merely suspected and may not be valid, then they also require the Trustee (if it is the discovering party) to send notice of those non-existent breaches, and they require the Seller to cure them or repurchase the loan, an absurd result.

That conclusion that "discovery" applies only to actual breaches also follows from the PSAs' description of the breach itself. What is discovered is "a breach," not "[the possibility of] a breach" or "a [suspected] breach." Likewise, the notice must identify "such breach." That which must be cured is also referred to as "such breach," and repurchase is required if "such breach is not so cured." Nowhere does Section 2.03(c) distinguish between the event that is discovered and the event that requires a remedy; therefore, both must refer to an actual breach.

2. "Discovery" must also require a state of mind that allows the "discovering party" to know whether it has discovered a breach. As just shown, "discovery," at least as used in Section 2.03(c), requires an *actual* breach. Thus, if discovery required a state of mind short of actual knowledge of a breach, then a party could "discover" a breach without knowing that it had

---

[4]   And if the Seller itself discovers a breach, that leads directly to a mandatory remedy, even without an intervening notice.

discovered a breach. That would mean that the Trustee could have a duty to notify without knowing whether it had that duty, another absurd result. The facts here illustrate that absurdity. The jury could not find that BNYM discovered all 1,765 breaches alleged by Baupost, because it will not have evidence that 99% of them were breaches at all. But neither could BNYM have discovered, upon receipt of the letter, *only* the 23 breaches that Bitner defends. BNYM would have had no basis for distinguishing one group from the other until reunderwriting every loan. But even Plaintiffs do not argue that BNYM had a duty to investigate—at least not until *after* it had discovered breaches. *See also* Fread Decl., Ex. D at § 8.02(iv) (trustee "shall not be bound to make *any* investigation," regardless of "discovery").

The way to avoid these contradictions is simply to follow the majority of courts that have held that "discovery" requires knowledge. *See Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, 2018 WL 4682220, at *9 (S.D.N.Y. Sept. 28, 2018) (holding that no case in the District interpreted the term "discovery" under the PSAs to mean either "constructive knowledge" or "inquiry notice", and thus, the question for trial was "whether the Trustee had 'actual knowledge' of the alleged R&W breaches."); *Royal Park Invs. SA/NV v. HSBC Bank N.A. (Royal Park II)*, 2017 WL 945099, at *6 (S.D.N.Y. Mar. 10, 2017) ("The Court, however, reads 'discovery' as used in Section 2.03 to mean actual knowledge."); *Royal Park Invs. SA/NV v. BNYM*, 2019 WL 652841, at *5 (S.D.N.Y. Feb. 15, 2019) ("Royal Park must demonstrate, first, that there was in fact a breach of an R&W for that specific loan and, second, that BNYM had knowledge of the breach."). Of course, there is no evidence that BNYM ever obtained actual knowledge, nor is there any argument that BNYM had a duty to seek out knowledge at least until after it discovered a breach.

Applying that standard, Bitner's testimony proves nothing. Only 23 breaches in Baupost's letter will be supported at trial by admissible evidence of breach. And as to those 23, the record now shows that the Baupost Letter did not even convince Bitner—he had to conduct his own loan-file review before he could opine on any of Baupost's allegations (and reject most of them). It could not have given BNYM the requisite knowledge as to any single breach.

Finally, if the Court found that BNYM "discovered" breaches by suspecting them, or receiving allegations about them, then it would have to find that it satisfied its duty to notify. If BNYM "discovered" a suspected, unsubstantiated breach, then it also notified Countrywide of "*such* [suspected, unsubstantiated] breach." Indeed, Plaintiffs' only evidence that BNYM failed to provide notice was Countrywide's response that BNYM was prohibited from giving notice *because it had not discovered any breach*. Fread Decl., Ex. S at BNYM_PL_01336950 ("The [Baupost] Letter does not indicate that this process has been followed or that there has been any breach under Section 2.03(c). Rather, the letter merely refers to the allegations of a certificateholder. Thus, the PSA does not require that the Sellers (or the Depositor or Servicer) take any action in response to the August 31 Letter."). Thus, there is no evidence that could support a consistent verdict that (a) BNYM discovered "a breach," and also (b) it failed to notify Countrywide of "such breach."

## II.     BNYM HAD NO DUTY TO ENFORCE REPURCHASES.

Plaintiffs assert pre-Event of Default claims against BNYM on all of the Countrywide trusts for breaching an alleged duty to enforce the obligation of the Sellers to repurchase loans based on document defects or breaches of representations. *See* ECF No. 144 at 21.

Prior to an Event of Default, BNYM is required "to perform such duties and only such duties as are *specifically set forth*" in the PSAs. *See, e.g.*, Fread Decl., Ex. D at § 8.01 (emphasis added); *see also Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.*, 838 F.2d 66, 71 (2d Cir.

1988) ("the duties of an indenture trustee are strictly defined and limited to the terms of the indenture."); *Argonaut P'ship v. Bankers Trustee Co.*, 2001 WL 585519, at *1 (S.D.N.Y. May 30, 2001) (one claim "dismissed because the applicable sections of the Indenture impose no duty upon BT either to perform those activities or to monitor those parties"; another claim dismissed "because no provision of the Indenture imposes such a duty upon BT").

The contracts do not "specifically set forth" any duty to enforce repurchase obligations. Upon discovery of a breach, the only duty that Section 2.03(c) "specifically set[s] forth" is to notify the Seller. It says nothing about enforcement. Rather, Plaintiffs argue that a duty to enforce is implied in Section 2.06, which states, in full:

> Execution and Delivery of Certificates
>
> The Trustee acknowledges the transfer and assignment to it of the Trust Fund and, concurrently with such transfer and assignment, has executed and delivered to or upon the order of the Depositor, the Certificates in authorized denominations evidencing directly or indirectly the entire ownership of the Trust Fund. The Trustee agrees to hold the Trust Fund and exercise the rights referred to above for the benefit of all present and future Holders of the Certificates and to perform the duties set forth in this Agreement, to the end that the interests of the Holders of the Certificates may be adequately and effectively protected.

Fread Decl., Ex. D at § 2.06.  Plaintiffs posit that Section 2.03 gives BNYM the power to put back breaching loans, and that Section 2.06 transforms that power into a duty. ECF No. 145 at ¶ 47.

In fact, Section 2.06 merely "delineates that the trustee holds the trust fund for the benefit of the investors rather than for the trustee's own benefit or the benefit of any other party to the PSA." *W & S Life Ins. Co. v. BNYM*, 129 N.E.3d 1085, 1094 (Ohio App. 1st Dist. 2019). And relatedly, when it exercises contractual rights, it must do so "for the benefit of all present and future Holders," rather than for its own benefit or the benefit of a subset of Holders; nothing in the section suggests that it obligates the Trustee always to exercise every right that it has. *Id.*

Courts have consistently rejected that reading, which would collapse the distinction between the pre- and post-Event of Default worlds, obligating the Trustee to exercise rights as a prudent person at all times. Considering far more explicit "enforcement" language, Judge Rakoff found that, even though "certain provisions of the trust agreement do require the Trustee to 'administer' or 'enforce' the Term Asset and the rights of the Trustee under the swap for the Fund's benefit, it does not follow that the Trustee should be charged with a generalized duty to advance the Fund's economic interests in any manner other than with respect to the narrowly circumscribed responsibilities identified in the trust agreement." *CFIP Master Fund, Ltd. v. Citibank N.A.*, 738 F. Supp. 2d 450, 472-73 (S.D.N.Y. 2010); *see also ASR Levensverzekering v. Breithorn ABS*, 958 N.Y.S.2d 380, 381 (N.Y. App. Div. 2013) ("the 'for the benefit of' language . . . refers solely to the issuer's assignment of its rights in the CDS to defendant . . . as indenture trustee"); *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 189 (S.D.N.Y. 2011) (PSA that included similar "exercise powers for the benefit of holders" language "does not require the Trustee to undertake any generalized monitoring or safeguarding duties beyond those explicitly provided in the PSA"); *VNB Realty, Inc. v. U.S. Bank, N.A.*, 2014 WL 1628441, at *7 (D.N.J. Apr. 23, 2014) ("The language in Section 2.01 is highly general. Other provisions of the PSAs set forth specific duties that explain how U.S. Bank is to perform its role as a Trustee, and VNB has not identified any specific duty that was breached.").

Thus, responding to the same argument by Plaintiffs' same counsel, under the same section of Countrywide PSAs, the Ohio Court of Appeals held that Section 2.06 of the "PSA did not obligate BNYM to effectuate the substitution or repurchase of loans." *W & S Life Ins. Co.*, 129 N.E.3d at 1095. Interpreting "the *right* to enforce the repurchase or substitution of mortgage loans in the event of a breach of the warranties or representations" to "create[] an *obligation* that

BNYM *require* Countrywide to substitute or repurchase loans . . . contradicts the language of section 8.01(i) of the PSA, which explicitly provides that" the Trustee has only the duties "specifically set forth in this Agreement." *Id.* at 1093; *see also Policemen's Annuity and Benefit Fund of City of Chicago v. Bank of Am., N.A.*, 907 F. Supp. 2d 536, 555 (S.D.N.Y. 2012) (rejecting the plaintiff's interpretation of Section 8.01 requiring repurchase as "too distant a leap . . . without plausible allegations that other MBS trusts' trustees have taken similar action in similar circumstances (bolstering the actions that a 'prudent person' would have taken."); *Craig v. Bank of New York*, 2002 WL 154389 at *3, (S.D.N.Y. July 12, 2002) ("None of the cases cited by plaintiffs stand for the proposition that a trustee must sue the settlor if the settlor produces non-conforming assets."); *Magten Asset Mgmt. Corp. v. Bank of New York*, 15 Misc. 3d 1332(A), at *7 (N.Y. Sup. Ct. 2007) ("Before default, the indenture trustee is liable only for the obligation set out in the Indenture" and that "[t]he trustee is not obligated to affirmatively advance the debenture holders' interest[.]").

Plaintiffs' reading of Section 2.06 also directly contradicts at least one other section. Section 3.04 states that, even when an Event of Default has occurred *and* the Trustee has taken over as the replacement servicer, still "the Trustee *shall not be . . . obligated to effectuate repurchases* or substitutions of Mortgage Loans . . . including . . . pursuant to Section 2.02 or 2.03." *See, e.g.*, Fread Decl., Ex. D at § 3.04 (emphasis added). Plaintiffs also put Section 2.06 at least in tension with Section 8.02(ix), which states that "the Trustee shall be under no obligation to exercise any of the trusts, rights or powers vested in it by this Agreement or to institute, conduct or defend any litigation hereunder or in relation hereto at the request, order or direction of [ ] any of the Certificateholders . . . unless [ ] such Certificateholders have offered to the Trustee reasonable security or indemnity." If Plaintiffs were right about Section 2.06, then there

would never be any need for Certificateholders to direct, let alone indemnify, the Trustee to file litigation, because it would be obligated to do so even without any direction.

The drafters were not stingy with ink: when they meant to impose a duty on the Trustee, they said so explicitly, just as Section 8.01 requires. The Court should decline Plaintiffs' invitation to rewrite the PSAs to conjure a duty to enforce.

## III.   THE REGULATION AB CLAIMS SHOULD BE DISMISSED.

Plaintiffs contend that BNYM breached the PSAs "by failing to provide accurate certifications under Regulation AB and by failing to provide notice of false certifications provided by the Master Servicers and Servicers." ECF No. 137 at ¶¶ 70, 270-273. This theory fails, however, because no provision of the Governing Agreements requires BNYM to disclose mortgage file defects. Nor does Reg AB require the Trustee to attest that mortgage files have been delivered by other parties.

Previously, BNYM moved for summary judgment on the ground that the statute of limitations barred claims relating to the delivery of Mortgage Files at the closing of each trust. Plaintiffs responded that they did not assert any "Pre-EOD Claims Relating to 'Mortgage-File-Related Breaches,'" and the Court found that motion to be moot. *See infra* Part A. If not still abandoned, the claim is still time-barred, as it relates to events and disclosures that occurred more than six years before this case was filed. *See infra* Part B. If addressed on the merits, Plaintiffs' claim fails because it mistakenly assumes, contrary to the text of the disclosures, that BNYM was certifying the Depositor's compliance with its obligations to deliver documents, rather than BNYM's own obligations to take inventory of and maintain the files. *See infra* Part C. Finally, the most obvious problem with the claim is that the Court already found that Plaintiffs' expert opinion— their only evidence of the effect of the reimagined Reg AB

disclosures—was inadmissible as "surmise and conjecture." ECF No. 337 at 17. Plaintiffs therefore have no evidence of causation. *See infra* Part D.

### A.      Plaintiffs Abandoned Any Pre-Event of Default Mortgage File Claims.

If Reg AB Item 1122(d)(4) has anything to do with file delivery, it is a claim that Plaintiffs expressly abandoned. In response to our argument on the first summary judgment motion that claims based on file delivery were time-barred, because they arise out of deliveries that were due shortly after each trust's closing (ECF No. 132 at 19), Plaintiffs stated in opposition that "A. Plaintiffs Do Not Assert any Pre-EOD Claims Relating to 'Mortgage-File-Related Breaches.'" ECF No. 144 at 20 ("Plaintiffs do not assert such claims and, to the extent they were asserted, the Court already dismissed them."). When Plaintiffs later argued that "BNYM disseminated an intentionally misleading notice to cover up the whole problem" of defective files, citing the same section of Reg AB, it was in support of their cross-motion on *post*-Event of Default claims (which the Court denied). ECF No. 181 at 22.

Based on that concession, the Court declined to rule on BNYM's motion. ECF No. 201 at 10 n.9 ("BNYM also moved for summary judgment concerning Plaintiffs' 'claims relating to mortgage file-related breaches.' In response, Plaintiffs stated that they were not asserting any pre-Event of Default claims related to mortgage file-related breaches. Accordingly, this motion is moot.") (internal citations omitted). Now a pre-Event of Default claim relating to Mortgage File breaches has reemerged, but as a violation of a duty supposedly imposed by an SEC regulation, under a claim titled "Breach of Contract." The Court should find this claim abandoned.

### B.      Claims Relating to Mortgage File Delivery Are Time-Barred.

The Reg AB overlay on the mortgage file claim does not solve the problem that led Plaintiffs to abandon the Mortgage File claim. The complaint alleges that incomplete certifications were made in 10-Ks filed "at the end of [each] trust's first year." ECF No. 137 at

16

¶ 270. The pleading identifies nine trusts, all of which closed in 2006. *Id.* Even if the 10-Ks were not filed until December 2007, that was seven years before this case was filed, making these claims untimely. N.Y. CPLR 213(2); *see Royal Park Invs. SA/NV v. HSBC Bank USA, N.A.*, 109 F. Supp. 3d 587, 608 (S.D.N.Y. 2015) ("the six-year statute of limitations bars any action based on the breach of this regulation [AB]"). Plaintiffs also allege that there should have been ongoing certifications, but Reg AB does not require that an annual certification disclose breaches that occurred in prior years.

### C.  Claims Based on Regulation AB Assertions Are Unsupported.

According to its April 3, 2020 letter, Plaintiffs' theory is that, by attesting in Reg AB "Assertions of Compliance with Applicable Servicing Criteria" that "[c]ollateral or security on pool assets is maintained as required by the transaction agreements or related pool asset documents" (17 C.F.R. § 229.1122(d)(4)(i)), BNYM was implicitly stating that every Mortgage File document had been delivered in perfect condition. Plaintiffs are wrong. There is nothing in the language of Reg AB that requires BNYM to assess the disclosures of other parties who were responsible for delivering the mortgage files.

Pursuant to Reg AB Item 1122, each party participating in a servicing function is required to provide an annual assessment of compliance with certain specified servicing criteria set forth in the rule. Although BNYM was not a servicer for any of the Countrywide trusts, it was required to file disclosures under Reg AB because it performed certain activities that were considered "servicing functions" under the regulation. Plaintiffs claim that BNYM should have disclosed failures by other parties, but each assertion was expressly limited to BNYM's own compliance with the "Applicable Servicing Criteria." *See* 17 C.F.R. § 229.1122(a)(1) ("A statement of the party's responsibility for assessing compliance with the servicing criteria *applicable to it*.") (emphasis added); Fread Decl., Ex. M at BNYM_PL_01337124 ("The

Company [BNYM] is responsible for assessing *its compliance* with the Applicable Servicing Criteria.") (emphasis added). In fact, the same SEC interpretations that Plaintiffs relied on in their *Daubert* motion (ECF No. 295 at 12) confirm that the regulation does not require an assessment of other parties' compliance. *See* Regulation AB and Related Rules, 2005 WL 4156732, at *4 ("[I]f Servicer A calculates the waterfall and Servicer B . . . does not calculate the waterfall, Item 1122(d)(3)(i) requires only an assessment by Servicer B with respect to the waterfall" and "does not require that Servicer B assess whether Servicer A correctly calculated the information it gave to Servicer B.").[5]

The Depositor, not the Trustee, agrees to deliver Mortgage Files. *See* Fread Decl., Ex. D at § 2.01(c) ("the Depositor has delivered" the files); *id.* § 10.04(c) ("the obligation to deliver the Mortgage File to the Trustee pursuant to Section 2.01 shall be solely the Depositor's obligation and the Master Servicer shall not be responsible for the safekeeping of the Mortgage Files by the Trustee.").

The Trustee's duties are limited to taking inventory of the files and "maintain[ing]" them (Fread Decl., Ex. D at § 2.02(a)); they do not include obtaining the files or ensuring their delivery. *See LaSalle Bank N.A. v. Capco Am. Sec'n Corp.*, 2005 WL 3046292, at *3 (S.D.N.Y. Nov. 14, 2005) (obligation to perform a "cursory inventory of the mortgage filings" is "not intended to be a means of transferring to the trustee any liability for defective mortgage filings"); *Williams v. Cont'l Stock Transfer & Tr. Co.*, 1 F. Supp. 2d 836, 841 (N.D. Ill. 1998) (trustee's "obligation to perform basic, non-discretionary, ministerial tasks, is inapplicable . . . to impose

---

[5]  *See also* Fread Decl., Ex. D at § 11.07(a)(1) ("Each of the Master Servicer and the Trustee shall deliver to the Depositor and the Master Servicer a report . . . regarding the Master Servicer's or the Trustee's, as applicable, assessment of compliance with the Servicing Criteria . . . . To the extent any of the Servicing Criteria are not applicable to such Person, . . . such report shall include such a statement to that effect.").

liability for failing to obtain documents whose delivery was a precondition to [trustee] having any obligation"). Nor do they include sending to investors any notices concerning file defects. Fread Decl., Ex. D at § 2.02(a) (requiring delivery of mortgage file certifications only to contract parties).

In short, BNYM itself had no mortgage file delivery obligations. It had no obligation to report anything about the Depositor's mortgage file delivery obligations. And nowhere in its Assertions of Compliance did it say that the Depositor delivered complete mortgage files.

### D.     There Is No Admissible Evidence of Causation.

Most importantly, Plaintiffs' claim fails because there is no evidence that any Reg AB disclosure caused any damages. As pleaded, the claim was that "[i]f BNY Mellon had filed an accurate certification, as it was required to do, the Sponsors or Originators would have been forced to repurchase . . . all of the non-compliant loans." ECF No. 137 at ¶ 273. The Court already found that there is no admissible evidence to support that conclusion.

The only evidence that Plaintiffs ever had to connect disclosures to loan repurchases was the opinion of Mark Adelson. But the Court excluded it, precisely because it was speculative and ungrounded in fact. *See* ECF No. 337 at 16 ("[T]he Court cannot countenance Adelson's *ipse dixit* assertions that greater disclosure would have generated significant pressure to comply with the PSAs and that the pressure would have succeed."). Even a supposed expert with decades of experience could not point to a single instance in which a disclosure had led to repurchases. If that leap is "surmise and conjecture" (*id.* at 17) coming from an expert, then it cannot support a jury verdict either.

The historical record is overwhelmingly to the contrary. Adelson pointed to examples in which the revelation of breaches in securitization led to the sponsors' bankruptcy, exactly what *BNYM*'s expert says would have happened if Countrywide had to repurchase virtually all of its

securitized loans. *See* Houpt Decl., Ex. 6 at ¶¶ 13-26. The record also shows that even express statements sent to the Sellers identifying loans with file defects did not lead to repurchase. *See, e.g.*, Fread Decl., Exs. P, Q, R. In the case of Countrywide, it had gone out of the loan origination business altogether and had been sued repeatedly for securities fraud, yet even that publicity did not cause it "to repurchase . . . all of the non-compliant loans." *See* ECF No. 137 at ¶¶ 128-140, 147-150, 273. Nor did widespread media reports or government investigations and consent orders, all detailed in the complaint. *See id.* ¶¶ 141-152.

Reg AB attestations are even less specific than those public allegations. They are required to be made as to an entire "servicing" platform (the term "servicer" in the regulation encompasses administrative parties like trustees). *See, e.g.*, Fread Decl., Ex. N at BNYM_PL_00827765 ("The 'Platform' is comprised of: (i) publicly issued . . . residential mortgage-backed securities . . . issued on or after January 1, 2006 for which the Company provides Applicable Services . . . ."); Fread Decl., Ex. M at BNYM_PL_01337123 ("Platform: Publicly issued . . . residential mortgage-back securities and other mortgage-related asset-backed securities issued on or after January 1, 2006 . . . for which the Company provides trustee, securities administration, paying agent or custodial services."). A reader has no way of knowing which trust or trusts on the platform were the source of the disclosed non-compliance—which may explain why Plaintiffs and their advisors never bothered to read the disclosures. *See* Houpt Decl., Ex. 7 at 99:11-100:10 ("Q. So it's safe to say PIMCO [as Phoenix Light's collateral manager] never looked at any Reg AB certification for any of the trusts in the Phoenix portfolio? A. Yes, that's true.").

20

Plaintiffs claim that BNYM should have made a vague disclosure about facts that were already publicly known, which no one (including Plaintiffs) would have read. They cannot prove that this type of vague disclosure would have avoided any losses.

## IV.   THE TIA CLAIM SHOULD BE DISMISSED.

Plaintiffs assert a TIA claim solely with respect to ECR 2005-1. Section 315(b) of the TIA provides that "[t]he indenture trustee shall give to the indenture security holders . . . notice *of all defaults known to the trustee*, within ninety days after the occurrence thereof."  15 U.S.C. § 77ooo(b) (emphasis added).[6] But this Court has already held that Plaintiffs cannot point to *any* evidence that BNYM knew of *any* breach in ECR 2005-1. Indeed, in its prior summary judgment order, the Court determined that "Plaintiffs have adduced no evidence that BNYM had actual knowledge or received written notice relative to any breaches or defaults in ECR 2005-1." ECF No. 201 at 35.

This holding is fatal to Plaintiffs' TIA claim. Absent evidence that BNYM *knew* of any defaults in ECR 2005-1, Plaintiffs cannot show that BNYM had any duty to notify holders under the TIA.

Moreover, even if Plaintiffs had somehow established a "default" upon which to base their TIA claim, it would be untimely. Violations of the TIA relating to New York-law contracts are subject to New York's six-year statute of limitations. *See Cruden v. Bank of New York*, 957 F.2d 961, 967 (2d Cir. 1992). The undisputed evidence shows that, shortly after the closing of ECR 2005-1, BNYM told Countrywide exactly which documents were undelivered. *See* ECF

---

[6]  The "default" upon which Plaintiffs base their TIA claim is that the Master Servicer liquidated loans when such loans should have been tendered for repurchase. *See* ECF No. 144 at 25. Specifically, Plaintiffs allege the Servicer, under the Master Servicer's supervision, foreclosed or otherwise liquidated 561 loans that were eligible for repurchase because they supposedly had uncured document exceptions.  *See* ECF No. 145 at ¶¶ 296–97.

No. 292 at 32. Specifically, on October 17, 2005, BNYM sent Countrywide an exception report listing the document defects for loans underlying ECR 2005-1. *See* Fread Decl., Ex. O. This notice started a 90-day period for the Seller to cure the defects or substitute or repurchase the loans.  Fread Decl., Ex. J at § 2.03; Fread Decl., Ex. K at § 2.04.

Thus, assuming *arguendo* that BNYM was aware of a default by the Master Servicer, which presumably would have occurred when the Seller failed to cure, substitute, or repurchase loans with material mortgage file defects, Plaintiffs' claim would have accrued in April 2006 (90 days after the October 2005 notice of file defects plus another 90 days for BNYM to provide the required notice to Certificateholders). Even if the Trustee waited another two years to decide that the Master Servicer had failed to take action, it would have had to send notice by April 2008. Because Plaintiffs did not file their complaint until December 2014, their TIA claim, even if credited, is therefore time-barred.

## **CONCLUSION**

For the above reasons, BNYM respectfully requests that this Court dismiss each of these causes of action.

June 4, 2020
New York, New York

                              Respectfully submitted,

                              s/ *Matthew D. Ingber*
                              Matthew D. Ingber
                              Christopher J. Houpt
                              Silvia A. Babikian Pacia
                              Robert W. Hamburg
                              MAYER BROWN LLP
                              1221 Avenue of the Americas
                              New York, New York 10020
                              (212) 506-2500

                              *Attorneys for Defendant*
                              *The Bank of New York Mellon*

22